IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CREEKSTONE FARMS PREMIUM BEEF, L.L.C.,<br>604 Goff Industrial Park Road<br>Arkansas City, KS 67005,<br><br>      Plaintiff,<br><br>      vs.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE,<br>and MIKE JOHANNS, IN HIS CAPACITY AS THE<br>SECRETARY OF AGRICULTURE,<br>14th Street and Independence Avenue, S.W.<br>Washington, DC 20250,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Plaintiff, Creekstone Farms Premium Beef, LLC ("Creekstone"), through its attorneys, brings this action for declaratory and injunctive relief against the United States Department of Agriculture ("USDA") and the Secretary of Agriculture, Mike Johanns, sued in his official capacity ("Secretary Johanns"), and asserts as follows:

### PRELIMINARY STATEMENT

1.     At issue in this case is Creekstone's desire to test cattle that it slaughters for bovine spongiform encephalopathy ("BSE"), to meet the demands and desires of its customers and to allow or facilitate the sale of Creekstone beef products abroad. USDA claims authority to control access to and use of the chemicals and processes ("test kits") needed to perform this BSE testing and has denied Creekstone the opportunity to conduct voluntary BSE testing and

threatened Creekstone with criminal prosecution if Creekstone acquires the test kits and

performs the tests. USDA's actions are outside of its statutory authority, irrational, based on

inappropriate considerations, and contrary to fundamental principles of our American form

of government.

2.    USDA's refusal to allow Creekstone to test its cattle for BSE is founded on a huge

expansion of the authority given to USDA by the statute it claims as the basis for its actions.

USDA has taken its statutory authority under the Virus-Serum-Toxin Act, 7 U.S.C. §§ 151 *et*

*seq.*, to regulate the preparation, sale, or shipment of any worthless, contaminated,

dangerous, or harmful virus, serum, toxin, or analogous product intended for use in the

treatment of domestic animals as grounds for asserting authority to regulate something that is

not a virus, serum or toxin; that is not ineffective or contaminated or dangerous; that is not

intended to be used in the treatment of animals; and at a stage at which it has already been

prepared, sold, and shipped (based on the common meaning of those statutory terms).   It

also has taken the grant in the Virus-Serum-Toxin Act of authority to license establishments

producing products used in the treatment of domestic animals as a grant of authority to issue

licenses for the products themselves.

3.    Even if USDA did have statutory authority to impose restrictions on the distribution

and use of BSE test kits as it has, USDA's decision to prevent Creekstone from voluntarily

testing its cattle for BSE would nevertheless be arbitrary, capricious, and not according to

law. Virtually all developed countries where BSE has been found (save the United States

and Canada) test all or a large portion of the cattle they slaughter for BSE. That testing

frequently has found BSE in cattle that did not show any outward signs of the disease. Even

USDA acknowledges that BSE testing can identify infected cattle months before they might

be identified as diseased from observable symptoms. While the chances of finding a BSE-infected animal among the cattle Creekstone slaughters are very low, the benefits of identifying even one such animal are very high. In any event, USDA has no authority to tell U.S. meat packers that they cannot provide their customers with test data that the customers are demanding, nor is it appropriate for it to try to do so. And to the extent that USDA had any legitimate concerns about BSE testing by Creekstone, it could have addressed those concerns by regulating the manner in which that testing is performed, rather than imposing an absolute prohibition on BSE testing by Creekstone.

## PARTIES

4.    Plaintiff Creekstone Farms Premium Beef, LLC is a limited liability company organized under the laws of the State of Delaware. Creekstone is a leading supplier of premium-quality beef products from Back Angus cattle to many of the nation's top grocers and restaurants and to many customers in Asia, Europe, and Latin America. A significant portion of Creekstone's products historically have been sold in Asia, especially Japan. Creekstone operates an award-winning, state-of-the-art beef processing facility, constructed in 2001, in Arkansas City, Kansas, and is committed to producing top-quality beef in a humane and environmentally friendly manner.

5.    Creekstone has standing to bring this action because it has been adversely affected and aggrieved by actions of USDA and Secretary Johanns that have interpreted federal law to allow them to prohibit the distribution and use of effective, unadulterated biological post-mortem tests for animal diseases and that have prevented Creekstone from obtaining and using such tests for BSE. Not only have Creekstone's requests to conduct BSE tests on the cattle it slaughters been rejected by USDA, but a high-ranking USDA official has threatened

Creekstone with criminal prosecution if Creekstone proceeded to obtain and use such tests. Because of Defendants' actions, Creekstone has been thwarted in its efforts to meet the demands or preferences of some of its customers for meat from BSE-tested cattle. Creekstone's ability to continue to sell to Japan and other foreign markets, which constituted a major portion of Creekstone's customer base prior to the discovery of BSE in the United States in December 2003, has been compromised by its inability to offer to test cattle from which it would supply those foreign markets. Additionally, Creekstone believes that it could expand its sales of premium beef products in the United States if it were not prevented by USDA from BSE-testing the cattle it processes for domestic consumption. This matter is ripe for judicial resolution because USDA already has promulgated rules and regulations that are beyond its statutory authority, has repeatedly rejected Creekstone's requests that it be allowed to test for BSE, and also has repeatedly rejected requests by others that voluntary BSE testing of U.S. cattle be incorporated into rules allowing imports from countries known to have BSE.

6.     The United States Department of Agriculture is an agency of the United States government. It is responsible, *inter alia*, for implementing statutes enacted for the promotion of domestic agriculture and for the protection of humans and animals in the United States from the risk of disease. Those statues include, *inter alia*, the Virus-Serum-Toxin Act, 7 U.S.C. §§ 151 *et seq.*, the Animal Health Protection Act, 7 U.S.C. §§ 8301 *et seq.*, and the Meat Inspection Act, 21 U.S.C. §§ 601 *et seq.*

7.     Mike Johanns is Secretary of the United States Department of Agriculture. He is sued in his official capacity only.

JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question

jurisdiction), 28 U.S.C. § 1346 (United States as Defendant), 28 U.S.C. §§ 2201-2202

(declaratory judgment), and 5 U.S.C. §§ 702-704, 706 (Administrative Procedure Act).

9.    Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because the

Defendants—agencies and employees of the federal government—reside in this judicial

district and because a substantial part of the events giving rise to the claims herein occurred

within this judicial district.


FACTS GIVING RISE TO THIS ACTION

10.    Bovine spongiform encephalopathy ("BSE"), commonly known as "mad cow disease,"

is an invariably fatal, irreversible, neurodegenerative disease that causes progressive

degeneration of the brain and central nervous system of cattle.  BSE is a member of a

notorious family of diseases, known as transmissible spongiform encephalopathies ("TSEs")

that are generally believed to be caused by extremely hardy transmissible agents called

prions.  Prions are abnormal proteins that seem to cause normal cellular protein to convert to

the abnormal form.

11.    Scientists generally agree that the agent that causes BSE in cattle may cause a similar

condition in humans known as variant Creutzfeldt-Jakob Disease ("vCJD"), an invariably

fatal, progressive, incurable, neurodegenerative disease.  Most experts believe that

consumption of bovine tissue contaminated with the BSE agent is the most likely way

humans contract vCJD, though recent studies have shown it also can be transmitted via blood

transfusions between humans.  There is believed to be a substantial "species barrier" that

makes it difficult for humans exposed to BSE-contaminated meat to contract vCJD, since only 154 people have died of confirmed cases of vCJD, mostly in the United Kingdom ("UK"), despite the confirmed presence of BSE in hundreds of thousands of cattle in the UK and the European Union over the last 20 years. Because vCJD has a long incubation period of several to many years and there is no test available to determine whether an individual will develop clinical symptoms of vCJD, the actual number of cases of vCJD infection is unknown.

12.    The BSE epidemic began in the UK, possibly as early as the 1970's. It is theorized that BSE in cattle originated from the disease scrapie in sheep. BSE spread widely in the UK cattle herd, presumably largely through consumption of feed contaminated with BSE-infected animal protein. BSE has spread from the UK to native-born cattle in over 20 other countries, including Canada and Japan. Although the BSE epidemic has subsided in the UK, hundreds of new cases are still discovered there each year, and in many other countries the rate of BSE discoveries is level or increasing. In Canada, for example, three new cases of BSE have been discovered in just a little over a year. Just since 2001, 10 countries (in addition to Canada, Japan, and the United States) have found their first domestic case of BSE infection, with the latest country to find BSE, Sweden, being added to the list only in 2006.

13.    The United States took some of the most aggressive measures to prevent or mitigate the introduction of BSE of any country where BSE had not yet been found. It prohibited importation of ruminants, ruminant meat, and other ruminant products from countries known to have BSE, beginning in 1989. A ban on recycled ruminant protein in ruminant feed was instituted in the United States in 1997 to prevent the recycling of potentially infectious cattle

tissue. In addition, disease surveillance methods were put into place to determine whether BSE infection existed in the United States.

14.     While the BSE prevention and mitigation measures implemented by the United States appear largely to have been successful, nevertheless, on December 23, 2003, a BSE-positive Holstein cow was found in the State of Washington. An investigation revealed that this animal was born in Canada and most likely was exposed to the BSE agent in Canada before it was shipped to the United States. Subsequently, a BSE-infected U.S.-born cow was found in Texas and announced in June 2005, and another BSE-infected cow was found in Alabama in March 2006 that appears to have been born and raised in the United States.

15.     The export markets reacted quickly to the discovery of a BSE-infected cow in the United States in December 2003, with 58 beef export markets closing to U.S. producers. United States beef was shut out of almost all major export markets. Creekstone, as well as many other U.S. beef processors, lost large, profitable markets for their products. Major importers such as Japan and South Korea continue to ban beef from the United States. (Japan reopened to imports of U.S. beef briefly in late 2005, but imports were banned again a month later after the discovery of prohibited material—portions of the vertebral column—in a shipment of veal from the United States. Creekstone then had to divert, and sell at a dramatic discount, thousands of pounds of beef that had been shipped to, but not yet arrived in, Japan.)

16.     Despite repeated assurances to the contrary over the last two years, USDA has not been successful in convincing a number of large beef importing countries that they should accept U.S. beef with less stringent precautions than those countries apply to their domestic beef (including routine BSE testing). It is estimated that U.S. beef producers have lost close to $2

billion because of the inability to sell to foreign markets closed because of the occurrence of BSE in the United States. Creekstone alone has lost approximately $100 million.

17.    Even once foreign governments decide to allow imports of beef from the United States, consumer preference may result in greatly diminished sales in those countries, especially in Asia. For example, published surveys and Creekstone's own inquiries indicate that Japanese consumers are reluctant to eat U.S.-origin beef, although they would be more willing to consume U.S. beef if it came from cattle tested for BSE, as does all Japanese beef. In a December 2005 telephone poll by the Kyodo News Agency, for example, over three-quarters of the Japanese respondents said they are currently unwilling to eat U.S.-origin beef, and over half agreed that the Japanese government should demand blanket BSE testing of all U.S. cattle processed for shipment to Japan.

18.    It appears that the incidence of BSE in the U.S. cattle herd is very low. In the past two years, USDA has used BSE rapid screening tests on over 600,000 head of U.S. cattle most likely to have infectious levels of BSE (those that cannot walk, show signs of neurological disorders, or die from unknown causes) and has found only two confirmed cases of BSE. Nevertheless, publicity surrounding those cases and USDA's decision to begin importing meat or cattle from countries that have had multiple cases of BSE in younger cattle (Japan and Canada) has resulted in U.S. consumer concern about possible BSE contamination in U.S. beef. For example, in an MSNBC online survey conducted in March 2006, out of more than 75,000 respondents 35 percent said they were "very much" concerned about mad cow disease entering the U.S. food supply and 37 percent said they have been eating less beef since mad cow disease was discovered in the United States. USDA also just announced plans to cut back dramatically on the number of cattle it tests for BSE. Its current budget

proposal calls for testing about 110 samples a day in FY 2007, compared to about 1000 samples a day currently.

19.    Virtually every developed country where BSE has been found tests all or a significant portion of the cattle presented for normal slaughter for BSE.  France, Germany, and Italy, for example, require testing of all cattle slaughtered at 24 months of age or over, while Japan has been testing all cattle regardless of age.  Experience in the UK, the EU, and Switzerland demonstrates that routine BSE testing of apparently normal cattle identifies many BSE-infected cattle that were not otherwise suspected to be diseased because they lacked outward, "clinical signs" of BSE, such as trouble walking or nervous or erratic behavior.  This is partly because, as even USDA acknowledges, the available BSE screening tests can detect BSE infection a couple of months before clinical signs would be present.  It is also, no doubt, because some of the clinical signs of BSE are subjective and may be overlooked easily when inspecting large groups of cattle awaiting slaughter.

20.    In response to and anticipation of concerns of foreign governments and domestic consumers about potential BSE contamination of the U.S. beef supply, Creekstone made a business decision that it wanted to test routinely cattle that it slaughters for BSE.  In consultation with vendors of BSE tests and experts in veterinary testing, Creekstone developed a detailed plan for BSE testing at its Arkansas City, Kansas beef processing facility and constructed a state-of-the-art laboratory there for testing and managing samples of the brain stems of cattle processed at the facility.  Creekstone employees were sent to France for training on BSE testing procedures by the producer of the most popular BSE rapid screening test, Bio-Rad, Inc., and Creekstone entered into discussions with Bio-Rad about

purchasing sufficient test kits to test all of the cattle Creekstone processes (about 300,000 head per year).

21.    In letters and e-mails of February 19, February 25, March 10, April 13, and July 27, 2004, and in meetings and conference calls with USDA representatives in March, April, June, and July 2004, Creekstone requested approval to use USDA-approved BSE diagnostic test kits to test the cattle that it processes at its Arkansas City, Kansas facility.  Those requests were supported by more than a dozen other organizations, representing both producers and consumers, as well as members of Congress and the editorial boards of at least 17 major city newspapers.  Creekstone submitted to USDA a detailed BSE sampling, testing, and control procedure manual, describing how the tests would be conducted and used and how the carcasses and offal would be held and tracked until testing was completed, along with a detailed laboratory operations manual.  Creekstone's submission included detailed procedures for limiting access to results of testing and responding to an initial reactive result from the BSE screening test.  Creekstone also offered to share the results of its BSE screening tests with USDA.

22.    USDA's first response to Creekstone's request was a February 26, 2004 statement to a reporter by Dr. Lisa Ferguson, Senior Staff Veterinarian of USDA's Animal and Plant Health Inspection Service ("APHIS"), that Creekstone could be the subject of criminal prosecution under the VSTA if Creekstone were to test its cattle for BSE without prior USDA approval.  (A USDA spokesman subsequently told the New York Times that USDA did not mean to imply that Creekstone would be the subject of criminal penalties if it tested its cattle, but that any company that sold BSE test kits to Creekstone would be breaking the law.)

23.    Creekstone's request to perform BSE testing on cattle that it slaughters was rejected by USDA in an April 8, 2004 meeting between Creekstone and J.B. Penn, Under Secretary for Farm and Foreign Agricultural Services, and Bill Hawks, Under Secretary for Marketing and Regulatory Programs.  That denial was reiterated in a June 1, 2004 letter to Creekstone from Mr. Hawks.  That letter concluded that "allowing a company to use a BSE test in a private marketing program is inconsistent with USDA's mandate to ensure effective, scientifically sound testing for significant animal diseases and maintain domestic and international confidence in U.S. cattle and beef products."  Again on July 6, 2005, in a meeting with Creekstone CEO John Stewart, Secretary Johanns reiterated that USDA would not allow Creekstone to test its cattle for BSE.

24.    Additionally, at the initial suggestion of a USDA official, Creekstone, through Kansas State University ("KSU"), asked that USDA allow KSU to designate Creekstone's laboratory as a satellite laboratory to assist KSU in conducting BSE surveillance testing as part of USDA's network of state and university laboratories that conduct such testing.  Creekstone would then also conduct routine BSE testing of cattle it processes, under the supervision of KSU's College of Veterinary Medicine, if Creekstone was authorized to obtain BSE test kits for that purpose.  That request was rejected in an August 5, 2004 letter to KSU, asserting that "BSE testing is an inherently governmental function that must be conducted by Federal and State laboratories."  Creekstone's renewed appeal for testing under the auspices of KSU was rejected in a September 24, 2004 letter to Creekstone from Under Secretary Hawks, in which he stated that "USDA will continue to limit approval for conducting BSE tests to Federal and State/Federal cooperative laboratories, and will not authorize Creekstone Farms to conduct such testing."

25.    USDA has repeatedly and consistently rejected similar requests that private parties be allowed to test the cattle they slaughter for BSE, in the context of USDA rulemakings concerning importation of meat and cattle from countries where BSE is known to exist.  For example, in the USDA rulemaking to allow imports of cattle and beef from Canada despite the discovery of native cases of BSE in the Canadian herd, commenters (other than Creekstone) asserted that it would mitigate somewhat the adverse impact of allowing such imports on the U.S. cattle market if U.S. meat packers were allowed voluntarily to test the cattle they slaughter for BSE.  The commenters asserted that this would give consumers greater confidence that they will not be exposed to the increased risk (or perceived risk) of BSE in Canadian cattle, and it could mitigate the adverse effect that allowing imports of Canadian cattle could have on U.S. beef export markets.  USDA refused to consider allowing voluntary BSE testing as part of that rule.  USDA's response to the commenters' requests was to assert that domestic and international confidence in U.S. cattle and beef products would somehow be *greater* if individual companies are prevented from testing cattle they process; i.e., confidence will be greater if BSE testing is less.  70 Fed. Reg. 460, 534 (Jan. 4, 2005).  USDA also claimed a need to "maintain clarity with regard to the purpose of USDA's BSE testing" (*id.*), even though the request went to private-party voluntary testing and had nothing to do with USDA's surveillance testing.  Because, it asserted, current BSE tests are useful for disease surveillance but not as food safety indicators, USDA refused to consider voluntary testing as part of the rule on Canadian imports.  *Id.*  USDA offered similar reasons when it recently refused the request of commenters on a proposal to allow imports of beef from Japan, a country with two dozen cases of BSE discovered in the last

- 12 -

couple of years, that USDA require BSE testing of cattle slaughtered in Japan for export to the United States.  70 Fed. Reg. 73,905, 73,914 (Dec. 14, 2005).

26.    Creekstone's critical need to be able to conduct BSE tests to meet the demands or preferences of its customers has grown and continues to grow because of the additional discoveries of BSE in U.S. cattle; the continued, publicized incidence of BSE in cattle in countries that export beef to the United States, especially Canada and Japan; and the continued reluctance of important beef importing countries to accept U.S. beef without further assurances than USDA has been willing or able to provide.

## CLAIMS FOR RELIEF

### Count 1 – *Ultra Vires* Rules – Administrative Procedure Act Section 706(2)(C)

27.    Plaintiff repeats and realleges paragraphs 1-26.

28.    Under the Administrative Procedure Act ("APA"), this Court "shall…hold unlawful and set aside agency actions, findings, and conclusions found to be – …(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;…" 5 U.S.C. § 706(2).

29.    The Virus-Serum-Toxin Act, 7 U.S.C. §§ 151-59 (the "VSTA"), makes it unlawful to "prepare, sell, barter, or exchange…any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product intended for use in the treatment of domestic animals." *Id*. at § 151.  It also authorizes the Secretary of Agriculture to promulgate regulations "as may be necessary to prevent the preparation, sale, barter, exchange, or shipment… of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or

analogous product for use in the treatment of domestic animals, or otherwise to carry out this

chapter, and to issue, suspend, and revoke licenses for the maintenance of establishments for

the preparation of viruses, serums, toxins, and analogous products, for use in the treatment of

domestic animals, intended for sale, barter, exchange, or shipment...." *Id*. at § 154.  The

VSTA makes it unlawful to prepare, sell, barter, exchange, or ship any virus, serum, toxin, or

analogous product intended for use in the treatment of domestic animals, unless such product

has been prepared in compliance with those regulations and at an establishment licensed by

the Secretary of Agriculture. *Id*. at § 151.  Violation of the VSTA is a misdemeanor

punishable by a fine of up to $1000 and/or imprisonment not exceeding one year. *Id*. at §

158.

30.    Under purported authority of the VSTA, USDA has issued a regulation, 9 U.S.C. §

102.5(d), in which it asserts authority to impose requirements with respect to "biological

products," which USDA defines to be "viruses, serums, toxins, or analogous products, which

are intended for use in the treatment of animals and which act primarily through the direct

stimulation, supplementation, enhancement, or modulation of the immune system or immune

response." 9 C.F.R. § 101.2.  USDA further defines "biological products" to include

"diagnostic components" and defines "analogous products" to include substances "which are

intended for use in the treatment of animals through the detection or measurement of

antigens, antibodies, nucleic acids, or immunity." *Id*.  Although a biological product, to be

regulated, must be intended for use in the treatment of animals, USDA regulations define

"treatment" broadly to mean "prevention, diagnosis, management, or cure of diseases of

animals." *Id*.

31.    The BSE rapid test kits that USDA asserts Creekstone may not receive or use to test

the cattle Creekstone slaughters are not viruses, serums, toxins, or analogous products. They

are applied to tissue removed from dead cattle, and so are not used in the treatment of any

animal. They do not act through the stimulation, supplementation, enhancement, or

modulation of the immune system of any animal. Even if USDA were authorized to expand

the definition of "treatment" as used in the VSTA to also include "prevention," they are not

used to prevent any disease. If USDA's regulations implementing the VSTA, at 9 C.F.R.

Chapter I Subchapter E are broad enough to cover the BSE test kits as described above, then

those regulations are beyond the scope of the rulemaking authority granted to USDA in the

VSTA.

32.    Under purported authority of the VSTA, USDA has issued a regulation, 9 C.F.R. §

102.5(d), in which it asserts authority to impose restrictions on the distribution and the use of

effective, unadulterated "biological products." The VSTA authorizes restrictions on the

preparation, sale or shipment of products only if they are "worthless, contaminated,

dangerous, or harmful," and it provides no authorization at all for restrictions on the use of

products, whether effective or worthless.

33.    Under purported authority of the VSTA, USDA has issued a regulation, 9 C.F.R. §§

102.1-102.3, in which it asserts authority to license not only establishments producing

products subject to the VSTA, but also to license the products themselves. The VSTA only

authorizes the licensing of establishments.

34.    Under purported authority of the VSTA, USDA has "licensed" BSE rapid test kits only

for sale to and use by laboratories approved by state and federal animal health officials as

part of USDA's national BSE surveillance plan.  *See* APHIS Center for Veterinary Biologics

Notice No. 04-08, March 17, 2004.

35.    USDA's promulgation of rules and regulations and issuance of "product licenses" that

go beyond and are inconsistent with the authorizations provided in the VSTA constitute

actions in excess of and inconsistent with USDA's statutory authority.  For that reason, the

rules and regulations cited above are unlawful agency actions and should be set aside

pursuant to 5 U.S.C. § 706(2)(C).

36.    Creekstone has no adequate remedy at law.

Count 2 – *Ultra Vires* Actions – Administrative Procedure Act Section 706(2)(C)

37.    Plaintiff repeats and realleges paragraphs 1-36.

38.    Under purported authority of the VSTA, USDA has refused to allow the distribution to

or use by Creekstone of rapid test kits for screening cattle for BSE and has threatened

Creekstone with criminal prosecution should Creekstone use the BSE test kits on the cattle it

processes.

39.    Under purported authority of the VSTA, USDA has refused to allow the laboratory

constructed at Creekstone's beef processing facility to be operated as a satellite laboratory to

KSU's veterinary medicine laboratory, which is part of a USDA-approved network of

government and university laboratories conducting BSE testing on samples supplied under

USDA auspices.

40.    Under purported authority of the VSTA and USDA regulations implementing the

VSTA, USDA has asserted jurisdiction over BSE test kits, even though those test kits are not

used in the treatment of domestic animals and do not "act primarily through the direct

stimulation, supplementation, enhancement or modulation of the immune system or immune response," as required by 9 C.F.R. § 101.2.

41.    USDA's refusal to allow Creekstone to obtain and use USDA-approved rapid test kits for the detection of BSE in cattle that Creekstone has slaughtered constitutes an action in excess of and inconsistent with USDA's statutory authority.  For that reason, USDA's assertion of jurisdiction over the sale or distribution to Creekstone, and Creekstone's use of, BSE rapid test kits, to prevent Creekstone from testing cattle it slaughters for BSE, is an unlawful agency action and should be set aside pursuant to 5 U.S.C. § 706(2)(C).

Count 3 – Arbitrary and Capricious Actions – Administrative Procedure Act Section
706(2)(A)

42.    Plaintiff repeats and realleges paragraphs 1-41.

43.    Under the Administrative Procedure Act, this Court "shall…hold unlawful and set aside agency actions, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…." 5 U.S.C. § 706(2).  An agency acts in a way that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when it fails to apply criteria for its action contained in relevant statutes, applies criteria for its decision not authorized by its statutory authority, fails to consider relevant information, fails adequately to explain the basis for its action or to respond to important public comments, acts inconsistent with the purpose and intent of the statutes granting it authority, takes action that is not supported by the administrative record for that action, or offers an explanation for its decision that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

44.    USDA's stated reasons for rejecting Creekstone's request that it be allowed to obtain

and use BSE test kits for routine testing of the cattle it slaughters include USDA's assertion

that the available, USDA-approved BSE rapid tests are not sufficiently sensitive to detect

BSE infection in most cattle and that, therefore, BSE testing would not be effective in

protecting public health and would give consumers a false sense of security.  But the VSTA,

under which USDA claims authority to prevent Creekstone from obtaining and using BSE

test kits, does not address human health or consumer protection concerns.  USDA also has

asserted that approving voluntary testing by Creekstone would be "inconsistent with USDA's

mandate to… maintain domestic and international confidence in U.S. cattle and beef

products."  But the VSTA is not concerned with maintaining domestic or international

confidence in U.S. livestock or products.  Because it relied on factors that Congress did not

intend it to consider under the statute being implemented, USDA's decisions to use the

VSTA to prevent Creekstone from obtaining and using BSE test kits was arbitrary,

capricious, an abuse of discretion, and contrary to law.

45.    The explanations that USDA has given for its decisions to prevent Creekstone from

obtaining and using BSE test kits are implausible, illogical, inconsistent, and

counterintuitive.  Thus, USDA has failed to provide an adequate explanation for its actions.

For example:

- USDA acknowledges that there is very low risk of BSE in U.S. cattle, but then claims
  that Creekstone's BSE testing would endanger human health because it would often
  result in "false negatives."

- USDA claims that BSE testing by Creekstone would provide no public health benefit, but notes that BSE testing can detect infection months before there are any outward signs of the disease.

- USDA suggests that Creekstone's testing of all the cattle it slaughters for BSE would somehow *reduce* consumer confidence that beef is free of BSE.

- USDA asserts that it would be improper for it to sanction Creekstone's use of BSE test kits for "marketing" purposes, when (it claims) there is no human health or animal health benefit, and yet USDA approves or certifies many actions by beef producers which have no claimed health benefit, such as those under USDA's Beef Export Verification Program, Meat Grading and Certification, National Organic Program, and many others.

These and other illogical and inconsistent arguments do not provide an adequate explanation for USDA's actions, and therefore those actions are arbitrary, capricious, and an abuse of discretion.

46.    Under 9 C.F.R. § 102.5(d) (which Creekstone asserts above is beyond USDA's authority under the VSTA), USDA may restrict the use of a diagnostic product if "necess[ary]" for "protection of domestic animals or the public health, interest, or safety." USDA has failed to show how preventing Creekstone from conducting routine BSE tests is necessary for public health (and it certainly is not necessary for the protection of domestic animals, which are already dead when a sample is taken for testing).  Moreover, if Creekstone's testing identified even a single animal with BSE, it would provide a substantial public health benefit.  USDA also apparently ignored entirely the public interest in reopening export markets for U.S. beef and in increasing domestic demand for beef.  USDA also

ignored the public interest in having data about the incidence of BSE in the United States, especially in light of USDA's announced plans to reduce its own BSE testing by nearly 90 percent. Because USDA failed to give adequate consideration to, or to consider at all, the factors expressed in the regulation that USDA supposedly was implementing, its decision to prohibit Creekstone's use of BSE test kits under that regulation was arbitrary, capricious, an abuse of discretion, and contrary to law.

47.    USDA regulations establish procedures for approval of site-specific plans for the reduction of biological, chemical, and physical hazards that may cause food to be unsafe for human consumption. *See* "Pathogen Reduction; Hazard Analysis and Critical Control Point (HACCP) Systems; Final Rule," 61 Fed. Reg. 38,806 (July 25, 1996) (the "HACCP regulations"). Establishments must identify food safety risks and then determine "critical control points" at which these risks can be monitored and reduced or eliminated. *Id.* at 38,815. USDA's Food Safety and Inspection Service ("FSIS") must verify that initial HACCP plans and all significant substantive revisions meet the criteria of the regulations. *Id.* at 38,818; 9 C.F.R. § 417.8. In 2004, FSIS brought BSE mitigation measures under the umbrella of HACCP plans, mandating that certain "specified risk materials" most likely to have high levels of BSE prions ("SRMs"), such as the brain and spinal cord, of cattle be removed and disposed of, and directing beef processing facilities to develop written procedures to insure that SRM removal and disposal occurs. 69 Fed. Reg. 1892 (Jan. 12, 2004). Establishments were directed to incorporate those written BSE mitigation measures into their HACCP plans or, if appropriate, their Sanitation Standard Operating Procedures required by the HACCP plans or other "prerequisite programs." 9 C.F.R. § 310.22(d)(1).

48.    Consistent with both the letter and the spirit of the HACCP regulations and the FSIS rules incorporating BSE concerns into the HACCP regulations, Creekstone reassessed the risk of BSE-contaminated meat after the December 2003 discovery of BSE in Washington State, determined that the risk was remote but finite, and determined that an appropriate means to control for that risk was routine BSE testing of cattle processed at its facility. Creekstone therefore asked that its documented "BSE Sampling and Testing Program" be approved pursuant to the HACCP regulations, and it offered to make adjustments to its program to meet any USDA concerns.  USDA's refusal to consider post-mortem BSE screening of cattle at the slaughter facility as a pathogen reduction measure under its HACCP regulations, despite the fact that such testing has the potential to reduce the incidence of the BSE infectious agent in beef products and could provide useful data to USDA on the incidence of BSE in apparently healthy cattle at normal slaughter, was arbitrary and capricious and an abuse of discretion.

49.    In rejecting requests that it allow voluntary BSE testing by U.S. meat packers before allowing imports of beef from Japan, a country with a known BSE problem, USDA stated that: "we do not consider the testing of bovines at slaughter to be scientifically justified or meaningful in the context of either human or animal health.  Making this a criterion for the importation of beef from Japan would not contribute to human or animal health protection." 70 Fed. Reg. at 73,914.  If BSE testing is indeed irrelevant to animal health protection, then USDA's claim that BSE post-mortem rapid test kits are a "virus, serum, toxin, or analogous product…intended for use in the treatment of domestic animals," as required for it to assert jurisdiction over those tests under the VSTA, 21 U.S.C. § 151, is arbitrary, capricious, and an abuse of discretion.

- 21 -

50.   USDA had an obligation to consider alternatives to prohibiting any use of BSE rapid test kits on cattle that Creekstone slaughters that would mitigate the adverse impact of its decision on Creekstone.  Although Creekstone stated, in a March 10, 2004 memorandum to Under Secretary J.B. Penn, that Creekstone "is willing to follow any reasonable protocol outlined and approved by" USDA, USDA did not suggest, and made no apparent attempt to consider, any less burdensome alternatives to imposing an absolute prohibition on testing of the cattle Creekstone slaughters for BSE.  This failure renders its actions arbitrary, capricious, an abuse of discretion, and not according to law.

51.   For the reasons stated above, USDA's refusal to approve Creekstone's BSE sampling and testing program, its refusal to authorize Creekstone to obtain and use BSE test kits, its refusal to "license" BSE test kits for purposes other than testing by USDA and its contractors, and its statements that Creekstone is prohibited by law from testing its cattle for BSE are arbitrary, capricious, an abuse of discretion, and contrary to law.  For these reasons, these USDA actions are unlawful and should be vacated and enjoined pursuant to 5 U.S.C. § 706(2)(A).

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

a)   Enter judgment declaring that USDA lacks authority to restrict the use of BSE rapid test kits or to issue licenses for the production of such test kits that limit to whom they may be distributed or how they may be used.

b)   Enter judgment declaring unlawful and vacating 9 C.F.R. §§ 102.1-102.3, to the extent that those rules assert authority to license not only establishments producing products

subject to the VSTA, but also to license the products themselves, and 9 C.F.R. § 102.5(d), to the extent that regulation asserts authority to impose restrictions on the distribution and the use of effective, unadulterated "biological products."

     c)    Enter judgment declaring that USDA's denial of Creekstone's request that it be allowed to acquire and use USDA-approved BSE rapid test kits for routine testing of cattle that Creekstone processes was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and therefore vacating and remanding that decision.

     d)    Enter judgment declaring that USDA's refusal to consider or approve Creekstone's BSE Sampling and Testing Program under USDA's HACCP regulations was arbitrary and capricious, an abuse of discretion, and not in accordance with law, and therefore vacating and remanding that decision.

     e)    Grant an injunction enjoining USDA from implementing or enforcing any prohibition on Creekstone acquiring or using USDA-approved BSE rapid test kits for purposes of routinely screening for BSE cattle that Creekstone processes (including any restriction on the sale of such test kits to Creekstone), or any restriction on Creekstone labeling its products to indicate that they come from cattle subjected to the USDA-approved BSE screening tests.

     f)    Award Plaintiff its costs and reasonable attorneys' fees in this action, pursuant to 28 U.S.C. § 2412; and

     g)    Grant such other and further relief as the Court deems proper and just under the circumstances.

Dated:  March 23, 2006

Respectfully submitted,


Russell S. Frye (D.C. Bar No. 331124)
FryeLaw PLLC
P.O. Box 33195
Washington, DC 20033-0195
(202) 572-8267
rfrye@fryelaw.com


William L. Miller (D.C. Bar No. 443191)
The William Miller Group, PLLC
3050 K Street, NW
Fourth Floor
Washington, DC 20007
(202) 256-2306
wmiller@williammillergroup.com

Attorneys for Plaintiff
CREEKSTONE FARMS PREMIUM BEEF, LLC