IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

CREEKSTONE FARMS PREMIUM BEEF, LLC,       )
                                          )
            Plaintiff,                     )
                                          )
        vs.                                )    Civil Action No. 06-544 (JR)
                                          )
UNITED STATES DEPARTMENT OF AGRICULTURE,   )
and MIKE JOHANNS, IN HIS CAPACITY AS THE   )
SECRETARY OF AGRICULTURE,                  )
                                          )
            Defendants.                    )
_____)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Creekstone Farms Premium Beef, LLC ("Creekstone"), respectfully

moves for summary judgment on Counts 1 and 2 of its Complaint.[1]  A memorandum of

points and authorities supporting summary judgment accompanies this motion.

Acting under purported authority of the VSTA, USDA has issued regulations,

codified at 9 C.F.R. § 102.5(d), under which USDA asserts authority to impose restrictions

on the use of a product licensed under the VSTA, where the Administrator determines such

restrictions are necessary for the protection of domestic animals or the protection of the

public health, interest, or safety.  This Court should declare those regulations invalid,

---

[1] Although this motion addresses only some of the counts of Creekstone's Complaint,
Creekstone has styled this as a motion for summary judgment, rather than a motion for partial
summary judgment, because, if the Court finds that Defendants lacked statutory authority for the
regulations challenged here or lacked statutory authority to prevent Creekstone's access to and
use of certain tests described here, then the question in Count 3 of Creekstone's Complaint
(whether it was arbitrary and capricious for Defendants to prevent Creekstone's access to and use
of those tests, assuming such action was within Defendants' statutory authority) presumably
would become moot.

because the VSTA contains no authority to restrict or dictate the use of products subject to the VSTA. Additionally, to the extent that the reference to "the public health, interest, or safety" authorizes restrictions on the use of products that are not necessary for the protection of the health of animals, that regulation is invalid and should be vacated because the VSTA contains no authority to regulate products other than for the protection of animal health (and, indirectly, their owners' economic interests).

The United States Department of Agriculture ("USDA"), acting under purported authority of the Virus-Serum-Toxin Act, 21 U.S.C. §§ 151 *et seq.*("VSTA"), has issued regulations, codified at 9 C.F.R. § 101.2, in which it asserts authority to regulate and license or require importation permits for diagnostic tests, by defining them to be within the scope of the VSTA. This Court should declare those regulations invalid, because the VSTA only authorizes USDA regulation of viruses, serums, toxins, and analogous products used in the treatment of animals.

USDA furthermore has asserted that the VSTA, which requires a permit for the importation of any virus, serum, toxin, or analogous product, and USDA regulations at 9 C.F.R. § 104.1, which essentially just restate the statutory requirement, authorize USDA to dictate to whom the imported products can be sold and how and for what purpose they can be used. This Court should declare those regulations invalid to the extent they are interpreted to authorize such restrictions on a product's use, because there is no authorization in the VSTA for such limitations on the use of imported products.

USDA has asserted that equipment and solutions used to perform screening tests on the central nervous system tissue of deceased cattle, to determine whether the cattle had been inflicted with bovine spongiform encephalopathy ("BSE test kits"), are subject to regulation

2

under the VSTA, and USDA has determined not to license or permit BSE test kits for use other than by approved laboratories under USDA supervision as part of USDA BSE surveillance programs. This Court should strike down those USDA final actions because BSE test kits do not fall under the VSTA and USDA's implementing regulations, and, even if they did, USDA lacks statutory authority to impose such restrictions on the BSE test kits.

USDA and the Secretary of Agriculture, Mike Johanns ("Secretary Johanns"), have denied Creekstone's requests to be allowed to obtain and use BSE test kits in a private marketing program and have denied Creekstone's requests that USDA approve Creekstone's BSE testing program under USDA regulations governing USDA approval and oversight of facility's plans for pathogen reduction. These denials of Creekstone's requests should be vacated and remanded to USDA, because they were based on an invalid assertion of statutory authority under the VSTA to regulate testing conducted for marketing purposes, rather than limiting regulation to biological products used to treat animal health.

WHEREFORE, for the reasons set forth in the accompanying memorandum of points and authorities, Plaintiff respectfully moves this Court for summary judgment on Counts 1 and 2 of the Complaint, and asks that this Court issued an order ruling, as a matter of law, that:

1. USDA regulations at 9 C.F.R. § 102.5(d), which authorize restrictions on by whom and for what purposes biological products may be used, are outside of USDA's statutory authority and are vacated, and they are remanded to the USDA for further rulemaking consistent with this conclusion of law.

2.  USDA regulations at 9 C.F.R. § 101.2 are outside of USDA's statutory authority and are vacated, to the extent that they contain definitions that have the effect of giving USDA authority to regulate diagnostic test components and diagnostic testing under the VSTA, and they are remanded to the USDA for further rulemaking consistent with this conclusion of law.

3.  USDA regulations at 9 C.F.R. § 104.1, to the extent they can be interpreted to authorize USDA to restrict by whom and for what purposes biological products may be used, through imposition of conditions in the permits required for importation of such products, are outside of USDA's statutory authority and are vacated, and they are remanded to the USDA for further rulemaking consistent with this conclusion of law.

4.  USDA lacks statutory authority under the VSTA to regulate BSE test kits.

5.  USDA lacks statutory authority to restrict the use of BSE test kits or to issue licenses for the production of such test kits or permits for the importation of such test kits that limit to whom they may be sold or how or for what purposes they may be used.

6.  Restrictions USDA has imposed in or upon licenses and permits for BSE test kits that restrict their sale only to and use only by laboratories approved by state and federal animal health officials as part of USDA's national BSE surveillance plan, as described in USDA Animal and Plant Health Inspection Service's Center for Veterinary Biologics Notice No. 04-08, March 17, 2004, are outside of USDA's authority under the VSTA and are vacated and remanded.

7. To the extent that USDA has any authority to regulate the use of BSE test kits, it has no authority under the VSTA to regulate BSE test kits for purposes of promoting international trade, avoiding misconceptions among consumers of beef, avoiding unnecessary testing costs for meat processors, controlling access to information about animal diseases, or for any other reason beyond assuring that the BSE test kits are not worthless, contaminated, dangerous, or harmful if and when used in the treatment of domestic animals.

AND FURTHERMORE, Creekstone respectfully asks the Court to issue an injunction preventing USDA and Secretary Johanns from implementing or enforcing any prohibition on Creekstone acquiring or using USDA-approved BSE rapid test kits for the purposes of routinely screening for BSE cattle that Creekstone processes (including any restriction on the sale of such test kits to Creekstone) or any restriction on Creekstone labeling its products to indicate that they come from cattle subjected to such USDA-approved BSE screening tests.

Plaintiff reserves the right to seek an order of this Court awarding Plaintiff its costs and reasonable attorneys' fees in this action, pursuant to 28 U.S.C. § 2412, after the Court rules on this motion for summary judgment.

Dated: July 15, 2006

Respectfully submitted,


    /s/  Russell S. Frye             
Russell S. Frye (D.C. Bar No. 331124)
FryeLaw PLLC

P.O. Box 33195
Washington, DC 20033-0195
(202) 572-8267
rfrye@fryelaw.com


   /s/   William L. Miller
William L. Miller (D.C. Bar No. 443191)
The William Miller Group, PLLC
2248 Hall Place, NW
Washington, DC 20007
(202) 256-2306
wmiller@williammillergroup.com


Peter C. Choharis
D.C. Bar No. 444787
2771 Woodley Place, NW
(202) 422-8312
Washington, D.C. 20008

Attorneys for Plaintiff CREEKSTONE FARMS
PREMIUM BEEF, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

CREEKSTONE FARMS PREMIUM BEEF, LLC,

               Plaintiff,

               vs.

UNITED STATES DEPARTMENT OF AGRICULTURE,
and MIKE JOHANNS, IN HIS CAPACITY AS THE
SECRETARY OF AGRICULTURE,

               Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-544 (JR)


**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S</u>**

**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................................ 2

STATEMENT OF FACTS .......................................................................................... 4

    The Dangers of BSE for Cattle and Humans                 4

    Incidence of BSE                 5

    Economic Impacts of BSE               6

    BSE Testing and Creekstone's Proposed BSE Testing Program      8

    USDA's Response to Creekstone's Proposed BSE Testing Program    12

SUMMARY OF ARGUMENT ..................................................................................15

ARGUMENT .............................................................................................................16

I.    USDA Lacks Authority Under the VSTA To Regulate How Biological Products Are Used, by Whom, and for What Purpose.    17

    A.  The VSTA's plain language limits USDA's authority to regulating the preparation and exchange of products, not specifying uses and users.    17

        1.    USDA's regulations restricting use and users are unlawful.    17

            a.  Regulation 102.5(d) is not authorized by the VSTA.    18

            b.  Regulation 104.1 is not authorized by the VSTA.    19

        2.    USDA cannot indirectly regulate what it lacks power to regulate directly.  20

        3.    The "otherwise to carry out" clause does not give USDA carte blanche power.    21

    B.  Although Unnecessary, Resort to the VSTA's Legislative History Demonstrates the Narrowness of the Statute.    23

    C.  USDA's Interpretation of the VSTA as Covering Use of Products Is Entitled To No Deference.    26

ii

**II.    USDA Lacks Authority Under the VSTA To Regulate Diagnostic Tests.        27**

    **A.  The VSTA's plain language does not extend to diagnostic tests.        27**

    **B.   There is no statutory history supporting regulation of diagnostic tests.    32**

**III.   BSE Rapid Test Kits, Especially as To Be Used by Creekstone, Do Not
Meet the Criteria for USDA Regulatory Jurisdiction Under the VSTA.        34**

    **A.  A BSE test kit is not a "virus, serum, toxin, or analogous product."        35**

    **B.  A BSE test kit is not "intended for use in the treatment of domestic
animals," and especially not as to be used by Creekstone.        36**

    **C.   BSE test kits are not "worthless, contaminated, dangerous, or harmful."    38**

    **D.  USDA's Interpretation of the VSTA as Extending to BSE Test Kits Is Not
Entitled to Deference.        40**

**IV.   USDA Lacks Authority Under the VSTA To Restrict the Use of BSE
Rapid Test Kits For Purposes Unrelated to Protection of Animal Health
and the Related Economic Interests of Livestock Owners.        40**

**CONCLUSION ..............................................................................................44**

**EXHIBIT 1    Declaration of John D. Stewart**

**EXHIBIT 2    USDA Economic Chronology**

**EXHIBIT 3    Stanley B. Prusiner, "Detecting Mad Cow Disease,"** *Scientific American*
**(July 2004)**

**EXHIBIT 4    Excerpts from European Commission, Report on TSE Testing 2004**

**EXHIBIT 5    Japan-United States BSE Working Group Report**

**EXHIBIT 6    Transcript of June 24, 2005 USDA Press Conference, Release No. 0233.05**

**EXHIBIT 7    Import Permit issued to Bio-Rad Laboratories for BSE Test Kit**

**EXHIBIT 8    USDA May 18, 2004 Letter to Bio-Rad**

**TABLE OF AUTHORITIES**

# TABLE OF AUTHORITIES [2]

## CASES

Abbott Laboratories v. Gardner, 387 U.S. 136 (1967)....................................................................3

Adamo Wrecking Co. v. United States, 434 U.S. 275 (1978)......................................................28

Adams Fruit Co., 494 U.S. 650 (1990) ........................................................................................34

Adams Fruit Co. v. Barrett, 494 U.S. 638 (1990)........................................................................33

America Federal of Government Employees v. Veneman, 284 F.3d 185 (D.C. Cir. 2002) .........41

American Civil Liberties Union v. FCC, 823 F.2d 1554 (D.C. Cir. 1987).................................23

American Finance Services Association v. FTC, 767 F.2d 957 (D.C. Cir. 1985).......................20

American Petroleum Institute v. U.S. EPA, 52 F.3d 113 (D.C. Cir. 1995) ................................23

Animal Health Institute v. USDA, 487 F. Supp. 376 (D. Colo. 1980) ........................................31

Association of America Railroads v. Costle, 562 F.2d 1310 (D.C. Cir. 1977) ......................41, 44

Bankamerica Corp. v. United States, 462 U.S. 122 (1983)..........................................................32

Baur v. Veneman, 352 F.3d 625 (D.C. Cir. 2003) .........................................................................5

Blank v. United States, 400 F.2d 302 (5th Cir. 1968)............................................................30, 31

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)...........33

Christensen v. Harris Cty., 529 U.S. 576 (2000) ........................................................................41

Citizens Coal Council v. Norton, 193 F. Supp. 2d 159 (D.D.C. 2002)..........................................4

City of Chicago v. Environmental Defense Fund, 511 U.S. 328 (1994) ................... 22, 24, 33, 43

Conn. National Bank v. Germain, 503 U.S. 249 (1992) ..............................................................34

Croplife America v. EPA, 329 F.3d 876 (D.C. Cir. 2003)............................................................3

Engine Manufacturers Association v. EPA, 88 F.3d 1075 (D.C. Cir. 1996) ...............................36

---

[2] Denotes authorities principally relied on.

Ethyl Corp. v. EPA, 51 F.3d 1053 (D.C. Cir. 1995)..............................................43, 45

Exxon Mobil Corp. v. Allapattah Services, ___ U.S.___, 125 S. Ct. 2611 (2005) .....................34

Finzer v. Barry, 798 F.2d 1450 (D.C. Cir. 1986)...................................................2, 45

Friends of the Earth, Inc. v. EPA, 446 F.3d 140 (D.C. Cir. 2006) ........................... 29, 34, 36, 43

*Garrelts v. Smithkline Beecham Corp., 943 F. Supp. 1023 (N.D. Ia. 1996).......24, 25, 33, 40, 43

Grand Laboratoriess, Inc. v. Harris, 488 F. Supp. 618 (D.S.D. 1980)............................25, 32, 33

Grand Laboratoriess, Inc. v. Harris, 660 F.2d 1288 (8th Cir. 1981)................................25, 26, 33

Gully v. National Credit Union Admin. Board, 341 F.3d 155 (2d Cir. 2003) ............................34

Gustafson v. Alloyd Co., 513 U.S. 561 (1995)...........................................................23

Hall v. Nebraska, 100 Neb. 84, 158 N.W. 362 (1916)...............................................25

Harvey v. Veneman, 396 F.3d 28 (1st Cir. 2005)................................................21, 45

INS v. Chadha, 462 U.S. 919 (1983) .....................................................................27

Independent Bankers Association v. Farm Credit Admin., 986 F. Supp. 633 (D.D.C. 1997)......................................................................................3

International Brotherhood of Teamsters v. Daniel, 439 U.S. 551 (1979)...................................26

Jarecki v. G.D. Searle & Co., 367 U.S. 303 (1961)......................................................23

John Hancock Mutual Life Insurance Co. v. Harris Trust & Sav. Bank, 510 U.S. 86 (1993)......................................................................................33

Kaempe v. Myers, 367 F.3d 958 (D.C. Cir. 2004) ......................................................4

Kelley v. U.S. EPA, 15 F.3d 1100 (D.C. Cir. 1994)...............................................22, 34

Loge v. United States, 662 F.2d 1268 (8th Cir. 1980) ................................................31

Louisiana Public Serv. Commission v. FCC, 476 U.S. 355 (1986)............................................20

*Lubrizol Corp. v. EPA, 562 F.2d 807 (D.C. Cir. 1977) ......................................... 29, 30, 34

Lyng v. Payne, 476 U.S. 926 (1986).....................................................................34

Military Toxics Project v. EPA, 146 F.3d 948 (D.C. Cir. 1988).....................................................4

Motion Picture Association of America v. FCC, 309 F.3d 796 (D.C. Cir. 2002)............ 18, 26, 28

National Automatic Laundry & Cleaning Council v. Schultz, 443 F.2d 689 (D.C. Cir. 1971).......................................................................................................................................3

Nebraska v. EPA, 331 F.3d 995 (D.C. Cir. 2003) .........................................................................4

*Railway Labor Executives' Association v. National Mediation Board, 29 F.3d 655 (D.C. Cir. 1994)............................................................................................................. 20, 28, 41

*Railway Labor Executives' Association v. National Mediation Board, 998 F.2d 133 (D.C. Cir. 1993)......................................................................................................................22

Smith v. City of Jackson, 544 U.S. 228 (2005) .........................................................................32

United States v. Larionoff, 431 U.S. 864 (1977).........................................................................27

United States v. Mead Corp., 533 U.S. 218 (2001) ...................................................................41

United States v. Ron Pair Enterprises, Inc., 489 U.S. 235 (1989)..............................................24

Wachtel v. Office of Thrift Supervision, 982 F.2d 581 (D.C. Cir. 1993)....................................22

## STATUTES

5 U.S.C. § 702 ..............................................................................................................................2

7 U.S.C. § 8401.......................................................................................................................25, 26

21 U.S.C. § 151...................................................................................................................... passim

21 U.S.C. § 152 ......................................................................................................................36, 37

21 U.S.C. § 153.............................................................................................................................37

21 U.S.C. § 154...................................................................................................................... passim

21 U.S.C. § 156...................................................................................................................20, 36, 37

21 U.S.C. § 157.............................................................................................................................37

21 U.S.C. § 321(g)(1)....................................................................................................................33

42 U.S.C. § 263a...........................................................................................................................33

# REGULATIONS

9 C.F.R. § 101.2 ................................................................................................................ *passim*

9 C.F.R. § 102.2 ................................................................................................................ 33

9 C.F.R. § 102.5(d) ........................................................................................................... *passim*

9 C.F.R. § 104.1 ........................................................................................................ 3, 20, 21

9 C.F.R. § 104.3 ................................................................................................................ 21

9 C.F.R. § 104.5 ................................................................................................................ 21

9 C.F.R. § 105.2 ................................................................................................................ 13

9 C.F.R. § 113.3 (b)(7) ..................................................................................................... 42

21 C.F.R. § 600.3 ........................................................................................................ 29, 47

40 C.F.R. § 102.5(d) .................................................................................................... 22, 27

40 C.F.R. § 121.3 .............................................................................................................. 26

# MISCELLANEOUS

Bovine Spongiform Encephalopathy in Japan: Consumers' Food Safety Perceptions and
    Willingness to Pay for Tested Beef," 49 *The Australian Journal of Agricultural
    and Resource Economics* 196 (2005) ................................................................. 7

Gregory Berlowitz, Note, *Food Safety vs. Promotion of Industry: Can the USDA Protect
    Americans from Bovine Spongiform Encephalopathy?* 2006 U. of Illinois L. Rev.
    No. 3 ................................................................................................................. 9, 10

Thomas O. McGarity, *Federal Regulation of Mad Cow Disease Risks*, 57 Admin. Law
    Rev. 289 ............................................................................................................... 15

---

**INTRODUCTION**

This case involves the efforts of the United States Department of Agriculture ("USDA") to use a 93-year-old statute, intended to protect American farmers from bogus or dangerous animal vaccines, to prevent U.S. beef producers from meeting customer demands by using an effective, USDA-approved test on brain tissue of cattle they have slaughtered. In so doing, USDA has extended its regulatory grasp far beyond what Congress gave it in statute on which USDA relies, the Virus-Serum-Toxin Act, 21 U.S.C. §§ 151-159 ("VSTA").

Creekstone Farms Premium Beef, LLC ("Creekstone") has brought this action for declaratory and injunctive relief against USDA and the Secretary of Agriculture, Mike Johanns, sued in his official capacity ("Secretary Johanns"). USDA and Secretary Johanns (sometimes referred to collectively as "USDA") have denied Creekstone's request to obtain and use USDA-regulated "test kits" to determine, post-mortem, whether each of the approximately 300,000 head of cattle Creekstone slaughters each year was infected with bovine spongiform encephalopathy ("BSE"), commonly known as "mad cow disease."

USDA has prevented Creekstone from obtaining and using these BSE test kits by applying USDA regulations and determinations that are not authorized by and are inconsistent with the VSTA. Moreover, even accepting USDA's regulations, the restrictions USDA is imposing on Creekstone are not authorized by the VSTA. Because this Court can and should invalidate USDA's actions because USDA lacks any statutory authority for those actions, without even considering whether USDA's denial of Creekstone's requests would be arbitrary and capricious if Congress had granted USDA the type of regulatory authority it

asserts, Creekstone seeks summary judgment on Counts 1 and 2 of its Complaint. The questions of USDA's statutory authority raised in Counts 1 and 2 can be resolved now pursuant to Fed. R. Civ. P. 56(c).

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. §§ 2201-2202 (declaratory judgment), and 5 U.S.C. §§ 702-704, 706 (the Administrative Procedure Act ("APA")). The APA gives this Court jurisdiction to "hold unlawful and set aside agency actions, findings, and conclusions found to be – …(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;…" 5 U.S.C. § 706(2). Thus, this Court has jurisdiction to hold unlawful and set aside both (1) the regulations USDA has issued that are beyond its authority under the VSTA and (2) the Defendants' actions restricting access to BSE rapid test kits and denying Creekstone's requests that it be authorized to use BSE rapid test kits in a process-verified voluntary testing program.

This Court also has jurisdiction to enjoin USDA from acting inconsistent with the limits of its statutory authority. If a statute "has been interpreted [by the government] to prohibit conduct that is in fact clearly beyond its scope, a declaratory judgment prohibiting official interference with activities outside its proper reach would be appropriate." *Finzer v. Barry*, 798 F.2d 1450, 1477 (D.C. Cir. 1986), *rev'd on other grounds*, 485 U.S. 312 (1988).

Creekstone has standing to assert these claims and these claims are ripe because Creekstone has suffered and continues to suffer severe economic losses as a result of USDA's refusal to allow Creekstone to implement its proposed voluntary testing program,

2

and Creekstone could mitigate those losses if it could implement that program. *See* pp. 7-8, 15, *infra*. As explained below, Creekstone's business decision to respond to the desires of its customers by implementing a blanket, voluntary BSE testing program for the cattle Creekstone slaughters has been and is being blocked by USDA's *ultra vires* regulations and by permit conditions that USDA has applied to BSE test kits. Creekstone's claims are ripe because the regulations Creekstone challenges are in effect now and are being applied to Creekstone and to manufacturers and importers of the BSE rapid test kits Creekstone wants to use,[3] and because Creekstone's requests for USDA approval of its proposed voluntary testing program have been considered and denied repeatedly at the highest levels of the agency.[4] Additionally, questions of whether agency regulations comply with the statute under which they were promulgated present a "purely legal" issue that is ripe for decision. *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967); *National Automatic Laundry & Cleaning Council v. Schultz*, 443 F.2d 689, 695 (D.C. Cir. 1971).

Summary judgment is an appropriate mechanism to resolve such claims. *See, e.g., Independent Bankers Ass'n v. Farm Credit Admin.*, 986 F. Supp. 633 (D.D.C. 1997), *aff'd* 164 F.3d 661 (D.C. Cir. 1999); *Citizens Coal Council v. Norton*, 193 F. Supp. 2d 159, 165

---

[3] EPA has referenced both 9 C.F.R. § 102.5(d), which applies to licenses for domestically produced products, and 9 C.F.R. § 104.1, which requires permits for imported products, in its denials of Creekstone's requests. *See* pp. 12-13, *infra*. Although Creekstone proposed a BSE testing program using the Bio-Rad BSE test kit, for which USDA issued an import permit, a BSE test kit is also licensed for domestic production, and Creekstone has considered using domestically produced BSE test kits as well. See Declaration of John Stewart, Exh. 1 to this memorandum, at ¶ 8. Creekstone is prevented from doing so, however, by USDA's restrictive licensing of domestic BSE test kits, as discussed below.

[4] Stewart Declaration (Exh. 1) ¶¶ 11-14 and Attachs. 5, 7, and 9. *Cf. Croplife America v. EPA*, 329 F.3d 876 (D.C. Cir. 2003) (EPA press release stating it would not rely on human studies in its regulatory decisionmaking was a final agency action that petitioner had standing to challenge).

(D.D.C. 2002), *aff'd* 330 F.3d 478 (D. C. Cir. 2003), *rehearing, en banc, denied* 2003 U.S.

App. LEXIS 19019 (2004), *cert. denied* 540 U.S. 1180 (2004).

## STATEMENT OF FACTS

**The Dangers of BSE for Cattle and Humans**

BSE is an invariably fatal, irreversible, neurodegenerative disease that causes

progressive degeneration of the brain and central nervous system of cattle.[5]  BSE is a

member of a notorious family of diseases, known as transmissible spongiform

encephalopathies ("TSEs"), that are generally believed to be caused by extremely hardy

transmissible agents called prions.  Prions are abnormal proteins that seem to cause normal

cellular protein to convert to the abnormal form.  "The BSE agent does not evoke any

demonstrated immune response or inflammatory reaction in host animals.  BSE is confirmed

by postmortem microscopic examination of an animal's brain tissue or by detection of the

abnormal form of the prion protein in an animal's brain tissues."  70 Fed. Reg. at 461.  *See*

*also* Stewart Declaration (Exh. 1) Attach. 3; Stanley B. Prusiner, "Detecting Mad Cow

Disease," *Scientific American* (July 2004) 86, 89 (attached as Exhibit 3).

---

[5] Unless otherwise indicated, the following description of BSE and its incidence is derived
primarily from USDA, "Bovine Spongiform Encephalopathy; Minimal-Risk Regions and
Importation of Commodities--Final Rule"; 70 Fed. Reg. 460, 460-62 (Jan. 4, 2005) and USDA,
"An Economic Chronology of Bovine Spongiform Encephalopathy in the United States," June
2006 (hereafter, "Economic Chronology"), attached as Exhibit 2 and available at
http://www.ers.usda.gov/Publications/LDP/2006/06Jun/LDPM14301/.  The Court can take
judicial notice of such public documents. *Military Toxics Project v. EPA*, 146 F.3d 948, 954
(D.C. Cir. 1988) (taking notice of a "policy document from the EPA and two reports from the
General Accounting Office" appended to brief, even though they were "not part of the
administrative record."); *Nebraska v. EPA*, 331 F.3d 995 (D.C. Cir. 2003) (judicial notice of
information contained in agency's online database); *Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir.
2004) (judicial notice of public records of the Patent and Trademark Office).

Scientists generally agree that the agent that causes BSE in cattle may cause a similar condition in humans known as variant Creutzfeldt-Jakob Disease ("vCJD"), an invariably fatal, progressive, incurable, neurodegenerative disease. Most experts believe that consumption of bovine tissue contaminated with the BSE agent is the most likely way humans contract vCJD. About 155 people have died of confirmed cases of vCJD, mostly in the United Kingdom ("UK"), despite the presence of BSE in hundreds of thousands of cattle in the UK and the European Union over the last 20 years. Economic Chronology (Exh. 2) at 3. Much is still unknown about BSE. *See Baur v. Veneman*, 352 F.3d 625, 629, 638-39 (D.C. Cir. 2003).

**Incidence of BSE**

The BSE epidemic began in the UK and spread widely in the UK cattle herd, presumably largely through consumption of feed contaminated with BSE-infected animal protein. In the past 20 years BSE has spread from the UK to native-born cattle in over 20 other countries, including Canada and Japan, and many new cases of BSE continue to be discovered. *See* European Commission, Health and Consumer Protection Directorate-General, "Report on the Monitoring and Testing of Ruminants for the Presence of Transmissible Spongiform Encephalopathy (TSE) in the EU in 2004" (2005) at 15 (hereafter, "EU Report") (excerpts attached as Exhibit 4).[6] In Canada, for example, three new cases of BSE were announced in just a little over a year. *See* Economic Chronology (Exh. 2) at 13.

Beginning in the 1980s, the United States took some of the most aggressive measures to prevent or mitigate the introduction of BSE of any country where BSE had not yet been found. While the BSE prevention and mitigation measures implemented by the

---

[6] The Court can take judicial notice of this governmental publication, *see* n. 3, *supra*.

United States appear largely to have been successful, nevertheless, on December 23, 2003, a

BSE-positive Holstein cow was found in the State of Washington. An investigation revealed

that this animal was born in Canada and most likely was exposed to the BSE agent in

Canada. Subsequently, a BSE-infected U.S.-born cow was found in Texas and announced

in June 2005, and another BSE-infected cow was found in Alabama in March 2006. *See*

Economic Chronology (Exh. 2) at 4-5.

**Economic Impacts of BSE**

The export markets reacted quickly to the discovery of a BSE-infected cow in the

United States in December 2003, with 58 beef export markets closing to U.S. producers.

United States beef was shut out of almost all major export markets. Creekstone, as well as

many other U.S. beef processors, lost large, profitable markets for their products. Major

importers such as Japan and South Korea continue to ban beef from the United States.

(Japan reopened to imports of U.S. beef briefly in late 2005, but imports were banned again a

month later after the discovery of prohibited material—portions of the vertebral column—in

a shipment of veal from the United States.) Economic Chronology (Exh. 2) at 14-15;

Stewart Declaration (Exh. 1) ¶ 3.

Despite repeated assurances to the contrary over the last two years, USDA has

not been successful in convincing several large beef importing countries that they should

accept U.S. beef with less stringent precautions than those countries apply to their domestic

beef (including routine BSE testing). Since U.S. beef producers lost the ability to sell to

many foreign markets at the end of 2003, beef exports have been down by 75% or more. *See*

Economic Chronology (Exh. 2) at 4 Fig. 2. Creekstone alone has lost approximately

$200,000 a day in revenue as a result of not being able to sell to Asian markets. Stewart

Declaration (Exh. 1) ¶ 17.  The economic impact of these lost export opportunities due to BSE fears is discussed in detail in USDA's "Economic Chronology" report (Exh. 2).

Even once foreign governments decide to allow imports of beef from the United States, consumer preference may result in greatly diminished sales in those countries, especially in Asia.  For example, published surveys and Creekstone's own inquiries indicate that Japanese consumers are reluctant to eat U.S.-origin beef, although they would be more willing to consume U.S. beef if it came from cattle tested for BSE, as does all Japanese beef. In a December 2005 telephone poll by the Kyodo News Agency, for example, over three-quarters of the Japanese respondents said they are currently unwilling to eat U.S.-origin beef, and over half agreed that the Japanese government should demand blanket BSE testing of all U.S. cattle processed for shipment to Japan.  See Stewart Declaration (Exh. 1) at ¶ 4; *see also* Economic Chronology (Exh. 2) at 15.  In a December 2001 study of Japanese consumers, they on average were willing to pay 50% more for beef from cattle tested for BSE.  Jill J. McCluskey, *et al*., "Bovine Spongiform Encephalopathy in Japan: Consumers' Food Safety Perceptions and Willingness to Pay for Tested Beef," 49 *The Australian Journal of Agricultural and Resource Economics* 196 (2005). USDA agrees that Japanese consumers lack confidence in U.S.-origin beef.  Economic Chronology (Exh. 2) at 14-15.

It appears that the incidence of BSE in the U.S. cattle herd is very low.  In the past two years, USDA has used BSE rapid screening tests on approximately 750,000 head of U.S. cattle most likely to have infectious levels of BSE (those that cannot walk, show signs of neurological disorders, or die from unknown causes) and has found only two confirmed cases of BSE.  *See* Economic Chronology (Exh. 2) at 5;  Final Report—Japan-United States BSE Working Group (July 22, 2004) at 2-3 (hereafter, "Japan-United States Working

Group") (attached as Exhibit 5), available at

http://www.aphis.usda.gov/lpa/issues/bse/BSEWGiFinal072204.pdf.  Nevertheless, publicity

surrounding those cases and USDA's decision to begin importing meat or cattle from

countries that have had multiple cases of BSE in younger cattle (Japan and Canada) has

resulted in U.S. consumer concern about possible BSE contamination in U.S. beef.  For

example, in an MSNBC online survey conducted in March 2006, out of more than 75,000

respondents 35 percent said they were "very much" concerned about BSE entering the U.S.

food supply and 37 percent said they have been eating less beef since BSE was discovered in

the United States.  Stewart Declaration (Exh. 1) at ¶ 5.

**BSE Testing and Creekstone's Proposed BSE Testing Program**

Beginning in the mid-1980s, researchers began to synthesize new kinds of

antibodies that could help identify more efficiently the abnormal, mis-folded prions thought

to cause BSE.  In the "rapid" tests that have been developed, antibodies created in the

laboratory that attach to any prions—normal or not—are used, so the tissue sample first has

to be treated to eliminate the normal prions.  One of the characteristics of the abnormal, mis-

folded prions is that they are very resistant to degradation, so a special enzyme must be used.

*See* Prusiner (Exhibit 3); Stewart Declaration (Exh. 1) Attachment 3.  The synthesized

antibodies are added to the processed tissue sample and bind to the remaining prions, giving

a measure of abnormal prions in the tissue sample in a matter of hours.  *Id.*

USDA has approved several BSE rapid "test kits," consisting of equipment and

reagents or solutions needed to perform a series of procedures to identify the presence of

"prions" believed to cause BSE.  *See* Stewart Declaration (Exh. 1) Attach. 3; Prusiner (Exh.t

3); Secty Johanns Statement (Exh. 6).  In the Bio-Rad test that Creekstone proposed to use,

nervous system tissue samples from the obex area of the brainstem are obtained postmortem and then prepared by grinding, treatment with an enzyme (Proteinase K), precipitation, concentration by centrifugation, and clarification. After the sample is purified and concentrated in that way, it is subjected to a multi-step immunoenzymatic detection procedure in which monoclonal antibodies bind to the remaining, abnormal prion protein, which is resistant to Proteinase K digestion, and an enzyme attached to those antibodies makes them visible. Stewart Decl. (Exh. 1) Attach. 3; Prusiner (Exh. 3); *see also* Gregory Berlowitz, Note, *Food Safety vs. Promotion of Industry: Can the USDA Protect Americans from Bovine Spongiform Encephalopathy?*, 2006 U. of Illinois L. Rev. No. 3, p. 634.

Virtually every developed country where BSE has been found now tests all or a significant portion of the cattle presented for normal slaughter for BSE. In the European Union, BSE testing is required for several types of "at risk" or "suspect" cattle, and for all apparently healthy cattle presented for slaughter for human consumption that are over 30 months of age. EU Report (Exh. 5) at 1-5. (France, Italy, and Spain require testing of all cattle slaughtered at 24 months of age or over, while in Germany testing is voluntary for cattle between 24 months and 30 months of age. *Id*. at 9. In the view of the EU Health and Consumer Protection Director General, this testing "ensures that no BSE cases are slaughtered for human consumption, thus further increasing the safety of beef." *Id.* at iii. Bio-Rad supplies most of the BSE test kits for the EU-required testing, as well as some voluntary testing. Johanns Statement (Exh. 6). Japan has been using the Bio-Rad test and another rapid test kit to BSE test all cattle at slaughter regardless of age. *See* Japan-United States Working Group (Exh. 5) at 1-2, 9. Japan believes this blanket BSE testing is for the

purpose of keeping infected cattle out of the food chain, thus "ensuring the safety of meat." Exh. 5 at 3.

The United States adopted an enhanced BSE testing program in 2004, but still only tests a small fraction of the cattle that are presented for slaughter, focusing on cattle that exhibit some risk factors for BSE. Japan-United States Working Group (Exh. 5) at 3, 10; *see also* Berlowitz, 2006 U. of Ill. L. Rev. at 635-37 (describing USDA testing policy). USDA uses the Bio-Rad BSE test kits for this testing, and "USDA scientists…believe biorad [*sic*] ELISA is a very effective screening test" and Secretary Johanns believes that "the reliability of the screening test is very sound." Transcript of Statement by Secretary Johanns et al. at June 24, 2005 media press briefing, USDA Press Release No. 0233.05, at 3 (attached as Exhibit 6), available at

http://www.usda.gov/wps/portal/!ut/p/_s.7_0_A/7_0_1OB?contentidonly=true&contentid=2 005/06/0233.xml.[7] USDA has applied the Bio-Rad BSE test kits to brain stem tissue taken from approximately hundreds of thousands of U.S. cattle. Press Release 0233.05 (Exh. 6) USDA has used the results of that testing to assure U.S. and international consumers and trading partners that the incidence of BSE in the U.S. cattle herd is extremely low (*see, e.g.*, Press Release 0233.05 (Exh. 6) at 3-4, 10) and that U.S. beef is "safe" (*id*. at 5).

In response to and anticipation of concerns of foreign governments and domestic consumers about potential BSE contamination of the U.S. beef supply, Creekstone made a business decision that it wanted to test routinely cattle that it slaughters for BSE. In

_____

[7] *See also id*. at 10 (Dr. John Clifford, USDA Chief Veterinary Officer, says the Bio-Rad BSE test "is widely used internationally and has a high degree of sensitivity"); 11 (internationally respected UK scientist describes Bio-Rad BSE test as "thoroughly road-tested around the world" and "robust," commenting that "if the biorad ELISA is actually coming up with a positive that can be repeated, then it's actually telling you something significant.").

consultation with vendors of BSE tests and experts in veterinary testing, Creekstone developed a detailed plan for BSE testing at its Arkansas City, Kansas beef processing facility and constructed a state-of-the-art laboratory there for testing and managing samples of the brain stems of cattle processed at the facility.  Creekstone employees were sent to France for training on BSE testing procedures by the producer of the most popular BSE rapid screening test, Bio-Rad, Inc., and Creekstone entered into discussions with Bio-Rad about purchasing sufficient test kits to test all of the cattle Creekstone processes (about 300,000 head per year).  Stewart Declaration (Exh. 1) ¶ 6.

Creekstone also learned from Bio-Rad that USDA was taking the position that BSE testing could only be conducted as part of USDA's official BSE surveillance program. *Id.* at ¶ 7.Consequently, in letters and e-mails of February 19, February 25, March 10, April 13, and July 27, 2004, and in meetings and conference calls with USDA representatives in March, April, June, and July 2004, Creekstone requested approval to use USDA-approved BSE diagnostic test kits to test the cattle that it processes at its Arkansas City, Kansas facility.  *Id.*  Creekstone explained that its primary purpose for testing was "to meet our export customer requirements and needs," suggesting that the free market system should determine whether the costs of blanket BSE testing are justified.  *Id*. at Attach. 1 at 1; Attach. 6 at 1-2.  Creekstone submitted to USDA a detailed BSE sampling, testing, and control procedure manual, describing how the tests would be conducted and used and how the carcasses and offal would be held and tracked until testing was completed, along with a detailed laboratory operations manual.  (Excerpts of these documents are in Stewart Declaration (Exh. 1) Attach. 3.)  Creekstone's submission included detailed procedures for limiting access to results of testing and responding to an initial reactive result from the BSE

screening test.  *Id.*  Creekstone specifically requested that its testing program be approved

pursuant to USDA regulations tiled "Pathogen Reduction; Hazard Analysis Critical Control

Point Systems," commonly known as the HACCP regulations.  Stewart Declaration (Exh. 1)

Attach. 3.  Creekstone noted that its voluntary testing program would be similar to other

USDA-approved marketing claims that have no food-safety basis, such as "Organic" and

"All Natural."  *Id.* at Attach. 8.  Creekstone also offered to share the results of its BSE

screening tests with USDA, *id.* at ¶ 8, and to include various other limitations or

accommodations to USDA in its testing plans.  *Id.* Attach. 3 at 1; Attach. 8.

**USDA's Response to Creekstone's Proposed BSE Testing Program**

USDA's first response to Creekstone's request was a February 26, 2004

statement to a reporter by Dr. Lisa Ferguson, Senior Staff Veterinarian of USDA's Animal

and Plant Health Inspection Service ("APHIS"), that Creekstone could be the subject of

criminal prosecution under the VSTA if Creekstone were to test its cattle for BSE without

prior USDA approval.  (A USDA spokesman subsequently told the New York *Times* that

USDA did not mean to imply that Creekstone would be the subject of criminal penalties if it

tested its cattle, but that any company that sold BSE test kits to Creekstone would be

breaking the law.)  *Id.* at ¶ 9.

On March 17, 2004, USDA APHIS' Center for Veterinary Biologics issued its

Notice No. 04-08 (Exh. 1 Attach. 3), mandating, under asserted authority of 9 C.F.R. §§

102.5(d) and 104.1, that "sale and use" of BSE test kits be restricted to laboratories approved

by state and USDA animal health officials and that "distribution and use" of BSE test kits

shall be under the supervision of, and subject to conditions imposed by, USDA.  Consistent

with this policy, on March 4, 2004 USDA issued Bio-Rad a permit to import its BSE test

kits, but mandated that "distribution and use" would be "under such conditions as" USDA may require and "sale and use" of the BSE test kits would be "restricted to laboratories approved by State and Federal (USDA) animal health officials."  (Attached as Exhibit 7.)

Creekstone's request to perform BSE testing on cattle that it slaughters was rejected by USDA in an April 8, 2004 meeting between Creekstone and J.B. Penn, Under Secretary for Farm and Foreign Agricultural Services, and Bill Hawks, Under Secretary for Marketing and Regulatory Programs.  Stewart Declaration (Exh. 1) ¶ 8.  Under Secretary Hawks announced that decision in a Press Release the next day.[8]  *Id*. Attach. 5.  That denial was reiterated in a June 1, 2004 letter to Creekstone from Mr. Hawks (Attach. 7 to Exh. 1).  That letter concluded that "allowing a company to use a BSE test in a private marketing program is inconsistent with USDA's mandate to ensure effective, scientifically sound testing for significant animal diseases and maintain domestic and international confidence in U.S. cattle and beef products."  Again on July 6, 2005, in a meeting with Creekstone CEO John Stewart, Secretary Johanns reiterated that USDA would not allow Creekstone to test its cattle for BSE.  Stewart Declaration (Exh. 1) ¶ 14.

Additionally, at the initial suggestion of a USDA official, Creekstone, through Kansas State University ("KSU"), asked that USDA allow KSU to designate Creekstone's laboratory as a satellite laboratory to assist KSU in conducting BSE surveillance testing as part of USDA's network of state and university laboratories that conduct such testing.  That request was rejected in an August 5, 2004 letter to KSU, asserting that "BSE testing is an

---

[8] USDA then sent a May 18, 2004 certified letter to Bio-Rad, reminding Bio-Rad that "sale and use" of Bio-Rad BSE test kits is "restricted to" USDA's  approved "BSE Network laboratories," threatening Bio-Rad with suspension or revocation of its import permit, pursuant to 9 C.F.R. § 105.2, if Bio-Rad distributed  BSE test kits to anyone other than those approved laboratories.  *See* USDA May 14, 2004 letter to Bio-Rad (Exh.) 8.

inherently governmental function that must be conducted by Federal and State laboratories."
(Attach. 10 to Exh. 1.)  Creekstone's renewed appeal for testing under the auspices of KSU
was rejected in a September 24, 2004 letter to Creekstone from Under Secretary Hawks,
stating that "USDA will continue to limit approval for conducting BSE tests to Federal and
State/Federal cooperative laboratories, and will not authorize Creekstone Farms to conduct
such testing."  Exh. 1 Attach. 9.

In addition to statements, in the documents cited above, that voluntary testing by Creekstone
Creekstone "would have implied a consumer safety aspect" and would be "inconsistent with
USDA's mandate to ensure effective, scientifically sound testing for significant animal diseases
and maintain domestic and international confidence in U.S. cattle and beef products," in
meetings and telephone conversations with Creekstone USDA also offered, as reasons for
denying Creekstone's requests, concerns that, voluntary testing by Creekstone would
effectively force Creekstone's larger competitors to engage in testing as well, at substantial
cost, and that it would be misleading to let the public think that they should pay more for beef
from BSE-tested cattle.  Stewart Declaration (Exh. 1) ¶ 12.

Creekstone's request for approval of a voluntary BSE testing program received
broad support from members of Congress, consumer groups, newspaper editorials, and law
journals.  *Id.* at  ¶ 8;  "A Strange Ban on Testing Beef," New York *Times*, April 18, 2004;
Thomas O. McGarity, *Federal Regulation of Mad Cow Disease Risks*, 57 Admin. Law Rev.
289, 338-40, 354-356 (discussing "USDA's Inexplicable Prohibition on Privately Conducted
Testing"), 393 (Spring 2005); Berlowitz, 2006 U. of Illinois L. Rev. No. 3, p. 625 (describing
inconsistency of USDA's actions with language and purpose of VSTA).

14

In response to repeated assurances from USDA that trade with our major foreign markets would be restored quickly, Creekstone delayed pushing its voluntary testing plan until U.S. negotiations with our trading partners were completed.  Stewart Declaration (Exh. 1) ¶ 15.  Unfortunately, trade with Japan and South Korea, Creekstone's largest former foreign markets, remains blocked.  *Id.* at ¶¶ 3, 15-16; Econ. Chronology (Exh. 2) at 14-15.

Creekstone's critical need to be able to conduct BSE tests to meet the demands or preferences of its customers has grown and continues to grow because of the additional discoveries of BSE in U.S. cattle; the continued, publicized incidence of BSE in cattle in countries that export beef to the United States, especially Canada and Japan; and the continued reluctance of important beef importing countries to accept U.S. beef without further assurances than USDA has been willing or able to provide.  Stewart Declaration (Exhbit 1) ¶ 17.  Creekstone will benefit from the ability to use the USDA-approved rapid test kits to screen the cattle it slaughters for BSE even after foreign governments reopen their borders to U.S.-origin beef products, in order to meet consumer preferences, especially in certain foreign markets such as Japan, for BSE-tested beef.  *Id.* at ¶¶ 4-5, 17.

## SUMMARY OF ARGUMENT

USDA is preventing private, voluntary testing of cattle for BSE, to meet customer demands, under purported authority of the Virus-Serum-Toxin Act, 21 U.S.C. §§ 151-159 ("VSTA").  Under that statute, USDA can act to prevent:

> the **[1]** preparation, sale, barter, exchange, or shipment…of **[2]** any worthless, contaminated, dangerous, or harmful **[3]** virus, serum, toxin, or analogous product **[4]** intended for use in the treatment of domestic animals.

21 U.S.C. § 154 (bracketed numbers supplied).

In addition to the VSTA itself, USDA has relied on a regulation it has issued that allows USDA to place restrictions on who may obtain and use a regulated product, and for what purpose. Because that regulation does not involve the "preparation, sale, barter, exchange, or shipment" of a product, but rather constrains subsequent steps in the use of a product, it goes beyond USDA's delegated authority.

USDA also relies on regulations that allow it to regulate certain diagnostic products used in the treatment of animals. Because those regulations do not control a "virus, serum, toxin, or analogous product," they exceed USDA's statutory jurisdiction.

But even if the VSTA had been written broadly enough to authorize regulation of the use of diagnostic tests, it would still not be broad enough to authorize regulation of the BSE test kits that Creekstone wishes to use on its cattle. The BSE test kit is not a "virus, serum, or analogous product." It is not intended to be "used in the treatment of animals." And it is not "worthless, contaminated, dangerous, or harmful."

Finally, even assuming that USDA's regulations were authorized by the VSTA, and assuming also that USDA could, consistent with the VSTA, assert jurisdiction over the use of BSE test kits, USDA still acted beyond its statutory authority VSTA when it denied Creekstone access to BSE test kits for reasons other than the protection of animal health.

## ARGUMENT

USDA has issued regulations that go far beyond the plain language of its purported authority for such regulations, the VSTA. On the basis of those regulations and its expansive interpretation of the VSTA, USDA is preventing Creekstone from implementing a program to meet its customers' desire that Creekstone supply beef from cattle that were tested for BSE.

16

Creekstone believes that, even if the VSTA gave USDA the regulatory authority it asserts, USDA's reasons for denying Creekstone the right voluntarily to test its cattle to meet marketplace demands are inaccurate and illogical. In the instant motion for summary judgment, however, Creekstone addresses only the question of whether, regardless of the reasonableness of USDA's rationale for preventing Creekstone from voluntarily testing, USDA had any statutory authority to do so.  "An agency may not promulgate even reasonable regulations that claim a force of law without delegated authority from Congress."  *Motion Picture Association of America v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002), *rehearing (en banc) denied* 2003 U.S. App. LEXIS 477 (2003).

The relevant provisions of the VSTA give USDA authority over "the preparation, sale, barter, exchange, or shipment" of "any worthless, contaminated, dangerous or harmful" "virus, serum, toxin, or analogous product." 21 U.S.C. §§ 151, 154.   USDA's regulations, and its actions concerning BSE testing and Creekstone in particular, do not fall within those statutory parameters, in several ways (any one of which warrants summary judgment for Creekstone).

**I.   USDA Lacks Authority Under the VSTA To Regulate How Biological Products Are Used, by Whom, and for What Purpose.**

    **A.    The VSTA's plain language limits USDA's authority to regulating the preparation and exchange of products, not specifying uses and users.**

        1.    USDA's regulations restricting use and users are unlawful.

By the statute's plain terms, the Secretary's authority under the VSTA extends only to the "preparation, sale, barter, exchange or shipment" of certain products.  21 U.S.C. § 154.  In other words, USDA can only regulate the manufacture and distribution of products of a type

subject to the VSTA ("biological products").[9]  Despite this very narrow statutory grant however,

USDA has issued regulations governing the use of biological products generally, not just their

preparation and distribution.

          a.    Regulation 102.5(d) is not authorized by the VSTA.

USDA has issued regulations authorizing the Administrator of USDA's Animal and

Plant Health Inspection Service ("APHIS") to impose "restrictions on the use of a product."

9 C.F.R. § 102.5(d).  Specifically, under the regulations, the APHIS Administrator can subject a

product "to such additional restrictions as are prescribed on the license.  Such restrictions may

include, but are not limited to, limits on distribution of the product or provisions that the

biological product is restricted to use by veterinarians, or both."  *Id.*

It is under this regulation that USDA has imposed, in biological product licenses and

permits for BSE test kits, conditions that (1) restrict the sale and the use of BSE test kits to a few

approved laboratories conducting BSE testing for USDA and (2) require that the distribution and

use of BSE test kits be under the supervision or control of USDA.  *See, e.g.*, USDA APHIS

Center for Veterinary Biologics Notice No. 04-08, Stewart Declaration  (Exh. 1) Attach. 3, at 1;

Exhibits 7 and 8.  USDA also cites 9 C.F.R. § 102.5(d) when it asserts that BSE test kits may be

used for "surveillance purposes" but not for "marketing" purposes.  *See* Exh. 1 Attachs. 5 and 7.

Under authority of this regulation, USDA has effectively forbidden Creekstone and other meat

packers from obtaining and using the BSE test kits.

---

[9] USDA regulations create the term "biological product" to mean the type of product regulated
under the VSTA: "virus, serum, toxin or analogous product."  9 C.F.R. § 101.2.  As explained
below, however, USDA regulations define "biological product" to include substances that
Creekstone asserts are not covered by the VSTA, as well.  To simplify the following discussion,
however, "biological product" will be used in the text of this memorandum to mean a virus,
serum, toxin, or analogous product within the meaning of the VSTA.

Congress did not give USDA authority to restrict a product's use under the VSTA. The VSTA speaks only of regulating the "preparation, sale, barter, exchange, or shipment" of biological products. 21 U.S.C. §§ 151, 154, 156. It says nothing of regulating their use, which takes place *after* preparation, sale, barter, exchange, and shipment. In the absence of any express statutory authority to regulate how a biological product may be used, by whom it may be used, and for what purposes it may be used, USDA's regulations asserting such authority, at 9 C.F.R. § 102.5(d), are unlawful and should be struck down. *See*, *e.g.*, *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act ... unless and until Congress confers power upon it"); *Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 667 (D.C. Cir. 1994) (*en banc*), *cert. denied*, 514 U.S. 1032 (1995) (no presumption of power to regulate outside of specific bounds set forth in statute). *See also American Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 965 (D.C. Cir. 1985) ("The extent of [an agency's] powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background."), *cert. denied*, 475 U.S. 1011 (1986).

b.      Regulation 104.1 is not authorized by the VSTA.

In addition to citing 9 C.F.R. § 102.5(d), USDA has also asserted that it can regulate the use of imported BSE test kits under 9 C.F.R. § 104.1. *See* Stewart Declaration (Exh. 1) Attach. 4 at 2. But unlike 9 C.F.R. § 102.5(d), section 104.1 does not even purport to cover the use of imported products. Instead, this regulation merely requires a permit to import a biological product and states that "Each permit to import a biological product into the Untied States shall be issued in accordance with the regulations in this part." 9 C.F.R. § 104.1.

The primary concern of Part 104 is that "the conditions under which the biological product is to be prepared or the methods to be used are such as to reasonably insure that the

product is pure, safe, potent, and efficacious." 9 C.F.R. § 104.5(a).  In other words, imported

biological products are to meet the same standards as must domestic products.  Part 104 does not

even require the importer to provide information about how the product is to be used, by whom,

and for what purpose—let alone restrict such matters.  *See* 9 C.F.R. §§ 104.3, 104.5.

      Thus, 9 C.F.R. § 104.1 does not support USDA's claim that it authorizes conditions for

permits for importing BSE test kits that restricting how and by whom these kits can be used.  But

if it could be interpreted to authorize such conditions, it should be struck down for exceeding

USDA's statutory authority, for the same reasons that 9 C.F.R. § 102.5(d) exceeds such

authority, as explained above.  Under these circumstances, Creekstone is entitled to a declaratory

judgment that 9 C.F.R. § 104.1 does not authorize conditions in import permits on how and by

whom imported biological products may be used.  *See Harvey v. Veneman*, 396 F.3d 28, 36 (1st

Cir. 2005) (where some plausible interpretations of regulation would be beyond statutory

authority, plaintiff entitled to declaratory judgment interpreting language of regulation to be

consistent with statute).

      2.      USDA cannot indirectly regulate what it lacks power to regulate directly.

      Nor can USDA regulate the use and user of a biological product, for which it has no

statutory authority, by limiting who can obtain the product under the "sale, barter, exchange, or

shipment" language of the VSTA.  It is axiomatic that by restricting USDA's authority to

"prevent" only a handful of very specific actions—"the preparation, sale, barter, exchange, or

shipment" of certain products—Congress limited USDA's authority to regulating those functions

alone.  Under the doctrine of *expressio unius est exclusio alterius*, the mention of a group of

items in a statute implies the exclusion of other items.  *See, e.g.*, *Kelley v. U.S. EPA*, 15 F.3d

1100, 1108 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1110 (1995); *Wachtel v. Office of Thrift Supervision, 982 F.2d 581, 586 (D.C. Cir. 1993)*.

In this case, Congress' express grant to USDA of authority to prevent only five enumerated acts, without any mention about the use of such products after their preparation and shipment, "cannot be deemed unintentional or immaterial," and "leads to the inescapable conclusion" that Congress did not provide USDA with authority to restrict how, by whom, and for what purpose biological products are used.  *See Railway Labor Executives' Ass'n v. National Mediation Bd.*, 998 F.2d 133, 139 (D.C. Cir. 1993), *aff'd on rehearing en banc*, 29 F.3d 655 (1994), *cert. denied,* 514 U.S. 1032 (1995); *City of Chicago v. Environmental Defense Fund,* 511 U.S. 328 (1994).

3.  The "otherwise to carry out" clause does not give USDA carte blanche power.

The VSTA's grant, in 21 U.S.C. § 154, of power to the Secretary to promulgate "regulations as may be necessary to prevent the preparation, sale, barter, exchange, or shipment" of ineffective or dangerous biological products "or otherwise to carry out this chapter" does not provide USDA with authority to regulate how and by whom biological products may be used.  In other words, the "otherwise to carry out this chapter" does not provide an independent statutory basis for 40 C.F.R. § 102.5(d).

First, the "or otherwise to carry out this chapter" language was only added to the VSTA in 1985.  *See* P.L. 99-198, title XVII, § 1768(b), 99 Stat. 1654.  USDA regulations authorizing restrictions on distribution and use of biological products could hardly be based on that language, since they were promulgated at least a decade earlier.  *See* p 26, *infra.*

21

Second, applying "traditional tools of statutory construction," the "or otherwise to carry out this chapter" language must be considered in context of the remainder of the statute, for a word or phrase "gathers meaning from the words around it." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). In virtually every provision of VSTA, USDA's authority is limited to preventing the preparation, sale, barter, exchange or shipment of worthless, contaminated, dangerous or harmful biological products used in the treatment of animals. Accordingly, it would be unreasonable and improper to interpret the clause "or otherwise to carry out this chapter" to expand these specifically and repeatedly enumerated limitations, rather than simply to effectuate them.

A grant of regulatory authority must be clear, and not simply inferred from general language. *See American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1567 (D.C. Cir. 1987). The plain meaning of the "or otherwise to carry out this chapter" language does not include any new authority to regulate something other than the preparation, sale or shipment of ineffective or dangerous biological products. *See also American Petroleum Institute v. U.S. EPA*, 52 F.3d 113, 1119-20 (D.C. Cir. 1995) (holding that agency "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area.")

Third, the legislative history of the 1985 amendments gives no hint of a congressional intent to effect a wholesale expansion of USDA authority under VSTA. The primary purpose of the 1985 amendments was to address an anomalous situation, in which USDA could not regulate biological products or their components that were manufactured and used within a single state. *See* S. Rep. No. 99-145, Sept. 30, 1985, at 338-39, *reprinted in* 1985 U.S.C.C.A.N. 2004-2005. The "or otherwise to carry out this chapter" language was not even mentioned in summaries of

the 1985 VSTA amendments contained in the Senate Report for the bill that ultimately became the 1985 statute.  *See id.* and S. Rep. No. 99-145 at 48, *reprinted in* 1985 U.S.C.C.A.N. 1723. The provision is mentioned, but without any explanation at all, in the Conference Report.  *See* House Conf. Rep. No. 99-447 at 602, *reprinted in* 1985 U.S.C.C.A.N. 2528.

This hardly is a basis for inferring that a whole new type of regulatory authority was added by the "or otherwise to carry out this chapter" language.  In fact, what is apparent from the legislative history of the 1985 VSTA amendments is that VSTA is described only in terms consistent with its stated regulatory ambit: regulating the preparation and sale of worthless or dangerous biological products.  *See* S. Rep. No. 99-145 at 48, 338-39, *reprinted in* 1985 U.S.C.C.A.N. 1723, 2004-2005; House Conf. Rep. No. 99-447 at 602-604, *reprinted in* 1985 U.S.C.C.A.N. 2528-30; *see also Garrelts v. Smithkline Beecham Corp.*, 943 F. Supp. 1023, 1066 (N. D. Ia. 1996) (legislative history of 1985 amendments gives no indication that Congress intended to expand VSTA beyond risks to animal health of intrastate biological products).

### B.    Although Unnecessary, Resort to the VSTA's Legislative History Demonstrates the Narrowness of the Statute.

Given the clear absence from the language of VSTA of the authority USDA asserts, resort to legislative history is unnecessary for determining that USDA lacks the authority it claims.  *See, e.g., City of Chicago*, 511 U.S. at 337; *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240-41 (1989).  However, lest there be any doubt, the legislative history confirms the conclusion compelled by the statutory language itself: that Congress intended VSTA to prevent the preparation and sale of worthless or dangerous products, not to regulate for what purpose and by whom safe products are used.

23

Specifically, Congress enacted VSTA out of concern about adulterated or ineffective anti-hog-cholera serum. *Hall v. Nebraska*, 100 Neb. 84, 86-87, 158 N.W. 362, 363 (1916). The authority granted to USDA under VSTA was for the purpose of assuring that vaccines and similar products are not ineffective in treating, or dangerous to, animals. *Grand Labs., Inc. v. Harris*, 488 F. Supp. 618, 620 (D.S.D. 1980), *rev'd on other grounds (en banc)*, 660 F.2d 1288 (8th Cir. 1981), *cert. denied*, 456 U.S. 927 (1982); *Garrelts*, 943 F. Supp. at 1063 (legislative history suggests motivation for statute was "the worthlessness or dangerousness of vaccines to livestock" and "a narrow concern for animal safety" (emphasis omitted)).

VSTA's legislative history further affirms that Congress intended only to regulate the *manufacturers* and *importers* of biological products, *not the users*. "We do not understand that the federal government undertakes to regulate those who sell serum after it has been disposed of by the manufacturer." *Hall v. Nebraska*, 100 Neb. at 88-89, 158 N.W. at 363-64 (holding that anyone could sell a serum that had been manufactured in accordance with VSTA and USDA regulations); *see also* 62 Fed. Reg. 31,326, 31,327 (June 9, 1997) ("The main purpose of VSTA is to protect those who use veterinary biologics from products which are worthless, contaminated, dangerous, or harmful").

It also is instructive to consider the legislative history of the Agricultural Bioterrorism Protection Act of 2002 ("2002 Act"), sections 211-213 of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, P.L. 107-188, 116 Stat. 647, 7 U.S.C. § 8401, which does grant USDA limited authority to regulate the use of listed dangerous products. *See Motion Picture Association of America*, 309 F.3d at 801-802 (provisions of statutes that are *in pari materia* should be construed together and consistently); *Int'l Brotherhood of Teamsters v.*

24

*Daniel*, 439 U.S. 551, 566, 569-70 (1979); *Grand Labs., Inc. v. Harris*, 660 F.2d 1288, 1293 (8th

Cir. 1981) (*en banc*), *cert. denied*, 456 U.S. 927 (1982)..

      The 2002 Act gives USDA authority (now reflected in regulations at 9 C.F.R. pt. 121) to

set standards for the possession, use, and transfer of dangerous biological agents and toxins.  7

U.S.C. § 8401(b)-(c).  The House Conference Report explaining the need for this new authority

reported:

> under provisions of current law, *biologics manufacturers* have had to register,
> maintain associated paperwork, and be subject to inspections and requirements
> from . . . . USDA.  Likewise, the Managers are aware that the inadequacy of the
> penalty provisions of the Virus-Serum-Toxin Act—enacted in 1913 and under
> which USDA currently regulates these dangerous agents—*as well as the lack of*
> *authority for the Secretary of Agriculture to regulate possession of biological*
> *agents and toxins* that pose a severe threat to plant or animal health may expose
> the United States to potential acts of bioterrorism . . . .

House Conf. Rep. No. 107-481 (May 21, 2002) at 124, *reprinted in* 2002 U.S.C.C.A.N. 481

(emphasis added).

      Congress clearly believed that the VSTA did *not* give USDA the authority to regulate

who may obtain and use biological products.  And in fact, when Congress did grant such

authority in 2002, it did so only for a limited number of listed dangerous products.  BSE test kits

do not meet the criteria for such listing under the 2002 Act, and thus have not been so listed.  *See*

40 C.F.R. § 121.3.

      In short, neither the plain meaning of the statutory language of the VSTA itself, nor the

legislative history of the VSTA and related statutes, justifies an interpretation that the VSTA

extends to how, why, and by whom a biological product can be used.  In the absence of statutory

support for regulation of the possession and use of biological products, 9 C.F.R. § 102.5(d)

should be struck down.  *See United States v. Larionoff*, 431 U.S. 864, 873 (1977) (to be valid,

regulations must be "consistent with the statute under which they are promulgated"); *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983) (administrative agency cannot "reach beyond" statute).

### C.    USDA's Interpretation of the VSTA as Covering Use of Products Is Entitled To No Deference.

The fact that USDA apparently interprets the VSTA to authorize it to place restrictions on the use of biological products is not entitled to any deference, or even any weight.  USDA has never offered any explanation for why the VSTA should be interpreted to convey such authority. The prefatory language to the regulations simply references the entire VSTA, 21 U.S.C. § 151-159, as authority for its regulations, 9 C.F.R. pt. 102.  Beyond this general statutory citation, in the preambles to the various Federal Register notices where USDA adopted its VSTA regulations, USDA has provided virtually no explanation for its interpretation that the VSTA authorizes regulation of the use and receipt of biological products.

On October 8, 1976, USDA first claimed authority to restrict the use of a biological product if "the nature of the product necessitates" such restrictions for the protection of domestic animals or the public health, interest, or safety.  USDA gave no real explanation of the basis for this expansion of the regulations.  *See* 41 Fed. Reg. 44,358, 44,359 (first adopting language, codified in 9 C.F.R. § 102.5(e), similar to language now in 9 C.F.R. § 102.5(d).  *Cf.* 41 Fed. Reg. 44,358 *with* 39 Fed. Reg. 37,762, 37,764 (October 24, 1974) (no discussion of use in licensing section).    This Court need not give any weight to USDA's interpretation of the VSTA without a full and adequate explanation of how the regulations derive from and fulfill the statute's precepts.  *See, e.g., Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n.5 (1978) ("the mere promulgation of a regulation, without a concomitant exegesis of the statutory authority for doing so, obviously lacks 'power to persuade' as to the existence of such authority.").

Moreover, a reviewing court owes no deference to an agency's interpretation of a statute when that interpretation asserts agency jurisdiction that exceeds that provided by the statute on its face. *See, e.g., Motion Picture Ass'n of America*, 309 F.3d at 801; *Railway Labor Executives' Ass'n*, 29 F.3d at 671. As established above, the VSTA's jurisdictional grant on its face does not extend to regulating or restricting who may use a biological product and for what purposes.

## II.  USDA Lacks Authority Under the VSTA To Regulate Diagnostic Tests.

### A.  The VSTA's plain language does not extend to diagnostic tests.

USDA's authority under the VSTA is limited to regulating or prohibiting actions concerning a "virus, serum, toxin, or analogous product."  21 U.S.C. §§ 151, 154 (for products manufactured in the United States), 152-53, 155 (for imported products).   USDA claims that this includes authority to regulate certain kinds of diagnostic tests.  The terms "virus, serum, toxin, or analogous product" certainly do not on their face suggest authority to regulate testing methods and procedures and their use, and indeed it does not appear that USDA's asserted authority over testing has ever been "tested" in court.  *Cf.* Berlowitz, 2006 U. of Illinois L. Rev. at 654.  Indeed, as explained *infra*, USDA did not even assert that the VSTA gave it authority over diagnostic tests until after it had been implementing the VSTA for approximately 60 years!

In deciding whether the language of the VSTA authorizes regulation of diagnostic tests, the court must look first to the ordinary, common-sense meaning of the words used in the statute.  *See Lubrizol Corp.*, 562 F.2d at 820 (citing *Addison v. Holly Hill Co.*, 322 U.S. 607, 618 (1944)); *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 144 (D.C. Cir. 2006).  USDA's interpretation of the VSTA fails that test.  A method of determining the presence of a disease is not itself a virus, not a blood serum product, and not a toxin, as those terms are ordinarily

27

understood.[10]  If it is regulated under the VSTA at all, then, it would have to be as an

"analogous product."

      USDA coined a phrase, "biological product"—which is not defined in or even used in

the VSTA—to cover products subject to regulation under the VSTA.  USDA defines

"biological product" as:

> all viruses, serums, toxins (excluding substances that are selectively toxic to
> microorganisms, e.g., antibiotics), or analogous products…which are
> intended for use in the treatment of animals and which act primarily through
> the direct stimulation, supplementation, enhancement, or modulation of the
> immune system or immune response.

9 C.F.R. § 101.2.  Associated with that definition, USDA also defined "analogous product":

> (i)  Substances . . . intended for use in the treatment of animals and which
> are similar in function to  biological products in that they act . . . through the
> stimulation, supplementation, enhancement or modulation of the immune system
> or immune response; *or*
>
> (ii)  Substances . . . intended for use in the treatment of animals through
> the detection or measurement of antigens, antibodies, nucleic acids, or immunity;

9 C.F.R. § 101.2 (2)(i-ii) (emphasis added).  The language of subparagraph (ii) is apparently

what USDA is relying on to regulate BSE test kits.  That definition takes USDA outside of its

statutory authority and should be vacated.

---

[10] The American Heritage Dictionary of the English Language (4th ed. 2000) defines "virus" as
"any of various simple submicroscopic parasites of plants, animals, and bacteria that often cause
disease and that consist essentially of a core of RNA or DNA surrounded by a protein coat."
Obviously a BSE test kit is not a submicroscopic parasite.  "Serum" is defined as "the clear
yellowish fluid obtained upon separating whole blood into its solid and liquid components," or
"blood serum from the tissues of immunized animals, containing antibodies and used to transfer
immunity to another individual."  Certainly that is not what is happening when BSE test kits are
used on post-mortem brain stem samples. "Toxin" is defined to mean a "poisonous substance,
especially a protein, that is produced by living cells or organisms and is capable of causing
disease when introduced into the body tissues but is often also capable of inducing neutralizing
antibodies or antitoxins."  A BSE test kit is neither a poisonous substance nor capable of causing
or neutralizing disease in animals.  *See also* 21 C.F.R. § 600.3 (FDA regulations providing
similar definitions for similar terms used in statute governing human biological products).

By defining the "biological products" subject to the VSTA to include products that are not "similar in function" to other biological products (using the conjunctive, "or"), but rather are simply used in diagnosis of animal diseases "through the detection or measurement of antigens, antibodies, nucleic acids, or immunity," USDA has unlawfully expanded the category of products subject to the VSTA. *See, e.g., Lubrizol Corp. v. EPA*, 562 F.2d 807, 820 (D.C. Cir. 1977) (agency may not expand the list of products that Congress said it could regulate).

An "analogous product" must necessarily be something with similarity to the vaccines and other products eliciting an immune response in animals that Congress intended to regulate under the VSTA. *See Blank v. United States*, 400 F.2d 302, 305 (5th Cir. 1968) (analogous product" means having attributes or effects that are similar). USDA seemingly has recognized this, defining "analogous products" as substances "which are similar in function to biological products in that they act, or are intended to act, through the stimulation, supplementation, enhancement, or modulation of the immune system or immune response;…" 9 C.F.R. § 101.2., and explaining that "analogous products" are involved in "the generation and expression of an immune response," and "work through these immune mechanisms in the treatment of specific disease…." 62 Fed. Reg. 31, 326, 31,327 (June 9, 1997).[11]

Yet the regulation that defines "analogous products" to include diagnostic tests specifically does not require that these tests involve an immune response or even the immune

---

[11] In contrast, products intended for the control of fertility, while they might work in a similar fashion to other biological products, are not intended for the "treatment of specific diseases" and therefore are not "analogous products" subject to regulation under the VSTA. *Id.* And some products, which may involve an immunological response in some uses and in other uses do not act on the immune system, are only considered by USDA to be "analogous to biological products when they are used to stimulate, supplement, enhance, or modulate the immunity of animals in the treatment of disease." 62 Fed. Reg. at 31,327.

system.  *See* 9 C.F.R. § 101.2(2)(ii).  Under USDA's definition, for example, a test that analyzed an animal's DNA to see if it was similar to another animal would be considered "analogous" to a vaccine administered to the animal to treat or prevent its disease, just because the DNA test detected or measured nucleic acids.  *See id.*  By expanding its authority to include things that do not perform a function similar to a vaccine or anti-toxin, and also need not even stimulate of modulate the immune system, USDA has explicitly extended its claimed jurisdiction beyond the "viruses, serums, toxins, and analogous products" that Congress authorized the agency to regulate.[12]

Thus, applying "traditional tools of statutory construction," the VSTA authority to regulate viruses, serums, toxins, and analogous products does not also authorize USDA to regulate diagnostic tests.  Nor has USDA offered any explanation for why it does.  *See, e.g.*, 38 Fed. Reg. 8426 (April 2, 1973) (adding first mention of "diagnostics" to definition of "biological product"; only explanation is that it was substituted for "allergens" and "tuberculins" "as being more inclusive and accurate"); 61 Fed. Reg. 43,483, 43,485 (Aug. 23, 1996) (describing proposed expanded scope of "analogous products" to cover products that detect or measure antigens, antibodies, nucleic acids, or immunity of animals; no explanation of how such products are within the scope of the VSTA); *cf.* 62 Fed. Reg. 31,326 (June 9, 1997) (final rule expanding definition of "analogous products"; no preamble discussion of

---

[12] *See also Loge v. United States*, 662 F.2d 1268 (8th Cir. 1980), *cert. denied* 456 U.S. 944 (under Act of July 1, 1902 covering biological products used in the treatment of human disease (to which VSTA should be interpreted similarly, *see Animal Health Institute v. USDA*, 487 F. Supp. 376, 378-79 (D. Colo. 1980)), "shed virus" is not an "analogous product," since "[t]he 'analogous product' obviously being referred to is a vaccine, which is prepared from a virus."); *Blank v. United States*, 400 F.2d at 304 (holding that "virus, therapeutic serum, toxin, antitoxin, or analogous product applicable to the prevention and cure of diseases of man" under the Act of July 1, 1902 referred to "immunological agents," and rejecting contention that blood cells are "analogous products" because they are derived from the same source as therapeutic serums, since they are not employed for immunological, therapeutic purposes. *Id.* at 304-305.)

30

diagnostics at all).  Without any explanation, USDA's interpretation of the statutory language is entitled to no weight.  *See, e.g., Smith v. City of Jackson*, 544 U.S. 228, ___ (2005) (O,Connor, J concurring).  It also is entitled to no weight because it is a relatively recent "discovery" of regulatory authority that the agency had not claimed previously—USDA took over 60 years to decide that "analogous products" includes diagnostic tests.  *Cf. Bankamerica Corp. v. United States,* 462 U.S. 122 (1983) (noting policy of giving great weight to agency interpretation contemporaneous with enactment of statute, and expressing doubt that agency and Justice Department would have taken no action over 60 years if they thought statute prohibited action); *Grand Labs., Inc. v. Harris*, 488 F. Supp. at 620 (declining to interpret the pre-1985-amendments VSTA as applying to intrastate shipments, noting: "The field has been unoccupied for over sixty years.  If there is to be a change in status quo, Congress is a far more appropriate forum for the resolution of these issues.").

Congress clearly knows how to regulate diagnostic tests if it wishes to do so.  The Food, Drug, and Cosmetic Act, for example, defines ''drugs'' to include, among other things, "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals.  21 U.S.C. § 321(g)(1).  This stands in stark contrast to the VSTA's language, which includes only "treatment."  In fact, as interpreted in the USDA regulations at 9 C.F.R. § 102.2, the VSTA would overlap with the Food, Drug, and Cosmetic Act when it comes to certain diagnostic methods, a result that Congress sought to avoid.  *See Grand Labs., Inc. v. Harris*, 488 F. Supp. at 622.  Compare also the Clinical Laboratory Improvement Amendments of 1988, 42 U.S.C. § 263a, which does contain detailed provisions authorizing comprehensive requirements concerning the use of certain diagnostic tests in laboratories, in contrast to USDA's assertion that vague terms in the VSTA provide similar comprehensive

regulatory authority.  *Cf. Teamsters v. Daniel*, 439 U.S. 569-70 (subsequent passage of statute

with comprehensive provisions on the use and terms of pensions plans "severely undercuts all

arguments" for regulating such plans under the Securities Acts); *Grand Labs., Inc. v. Harris*,

660 F.2d at 1293 (if Congress had intended 1906 Pure Food & Drug Act to encompass animal

biologics as "drugs," then there would have been no need to pass the VSTA seven years later).

        USDA's interpretation of the VSTA as applying to diagnostic tests simply is not

entitled to any deference.  Deference to an agency interpretation, under Step 2 of the analysis

in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)*, does

not come into play when the agency's interpretation extends its authority beyond the plain

language of the statute.  *See, e.g., City of Chicago* 511 U.S. at 339; *John Hancock Mut. Life

Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 109 (1993).  "A precondition to deference

under Chevron is a congressional delegation of administrative authority." *Adams Fruit Co. v.

Barrett*, 494 U.S. 638, 649 (1990).

        This case is quite similar to *Lubrizol*, 562 F.2d 807.  There, EPA had adopted regulations

that interpreted a Clean Air Act requirement to register "any fuel or fuel additive" as extending

to registration of additives for use in motor vehicle engine oil, as well.  EPA claimed that its very

liberal interpretation of "fuel or fuel additive" was justified because it furthered the goals of the

Clean Air Act, since recent information showed lubricants and their additives can contribute

substantially to motor vehicle emissions.  The court concluded, however, that while EPA had

shown that "those effects are potentially harmful enough, as a *policy matter*, to warrant

regulation of such lubricants and additives….Yet that showing by itself is not sufficient to

prompt us to substitute the agency's albeit well meaning interpretation for the clear language that

Congress wrote into the statute."  *Id.* at 819 (emphasis in original).

In the absence of any statutory authority for the licensing or permitting of diagnostic methods, this Court should strike down the unauthorized regulations providing for such licenses and permits, pursuant to the APA, 5 U.S.C. § 706(2).  It is axiomatic that, no matter how beneficial to the public welfare it might be, an agency may not issue regulations covering "'an area in which it has no jurisdiction.'"  *Adams Fruit Co.*, 494 U.S.  650 (citations omitted); *accord, Kelley v. EPA*, 15 F.3d 1100; *Lyng v. Payne*, 476 U.S. 926, 937 (1986).  USDA cannot expand its regulatory authority simply because it thinks such expanded authority would be beneficial and would further the purposes of the statute.  *Friends of the Earth*, 446 F.3d 140.

### B.    There is no statutory history supporting regulation of diagnostic tests.

The clear statutory text makes resort to legislative history unnecessary.  *See Exxon Mobil Corp. v. Allapattah Services*, ___ U.S.___, 125 S. Ct. 2611, 2626 (2005); *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155 (2nd Cir. 2003) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). But in any event there is nothing in the limited legislative history of the 1913 enactment of the VSTA (the relevant provisions of which remain the same today) that provides any basis for inferring authority to regulate diagnostic tests in addition to products that treat a disease in an animal by stimulating or supplementing its immune system.

In testimony explaining the language that was to become the VSTA, Dr. A.M. Farrington, Asst. Chief, Bur. of Animal Industry, USDA, explained that:  "Within the last few years viruses, serums, and toxins have been made for treating animals, and it is found that it is necessary to supervise the manufacture of these products so that only serums of good quality shall be produced for sale to farmers and stock raisers."  Hearing before the Committee on Agriculture on the Estimates of Appropriations for the Fiscal Year Ending June 30, 1914, H.R.

28283, 62d Cong. 3d Sess. 23 (1913). The testimony focused on injecting "serum to prevent hog cholera" into hogs and did not even hint of regulation of diagnostic testing. *Id*. at 24-25.[13]

### III. BSE Rapid Test Kits, Especially as To Be Used by Creekstone, Do Not Meet the Criteria for USDA Regulatory Jurisdiction Under the VSTA.

Even if the VSTA were interpreted to cover diagnostic tests, and to authorize USDA to use import permits and licenses to control who has access to such diagnostic tests and how and for what purpose they may be used, USDA still acted outside of its statutory authority when it used that authority to prevent the possession and use of BSE test kits for purposes of determining whether beef products might contain BSE.

The VSTA authorizes USDA to regulate "a virus, serum, toxin, or analogous product" that is "intended for use in the treatment of domestic animals." *See, e.g.*, 21 U.S.C. §§ 151, 152, 154, 156. In addition, if USDA wants to "prevent" the product's preparation, sale, or shipment, the product must be "worthless, contaminated, dangerous or harmful." Id. §§ 151, 154.

BSE test kits, at least as Creekstone proposed to use them, do not constitute viruses, serums, toxins, or analogous products. They are not used in the treatment of animals. And they are not worthless, contaminated, dangerous, or harmful. Failure to meet any one of those criteria places the BSE test kits outside the ambit of the VSTA. Regardless of the wisdom of the restrictions USDA has imposed on the acquisition and use of BSE test kits (which Creekstone disputes in Count 3 of its Complaint), if those restrictions are outside of USDA's legal authority

---

[13] To the extent it is relevant, the legislative history of the 1985 amendments to the VSTA continues this focus on vaccines and similar products administered to animals, with no mention of regulating diagnostic tests. *See, e.g.*, S. Rep. No. 99-145, Sept. 30, 1985, at 338, *reprinted in* 1985 U.S.C.C.A.N. 2004 (noting "long and successful history of assuring livestock owners, veterinarians, and the American public that there is an ample supply of safe and effective animal vaccines and other biological products"); *id*. at 339, *reprinted in* 1985 U.S.C.C.A.N. 2005 (referring to "USDA's animal vaccine regulatory program" mandated by VSTA).

they must be struck down under 5 U.S.C. § 706(2)(C).  *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d

1075, 1089 (D.C. Cir. 1996); *Friends of the Earth,* 446 F.3d 140.

### A.  A BSE test kit is not a "virus, serum, toxin, or analogous product."

Applying common meanings, BSE test kits do not involve a "virus," nor are any serum

products used, and the test kit and its components are not "toxins."[14]  They could only be

regulated under the VSTA if they were considered "analogous products."  But, as noted above,

"analogous products" must be similar to other biological products in that they must stimulate,

supplement, enhance or modulate the immune systems of animals.  *See* pp. 29-31, *supra*; 62 Fed.

Reg. at 31,327.  The BSE test kit does not do so, and so it cannot be regulated under the VSTA

As described at pp. 8-9, *supra*, the BSE test kits consist of equipment and reagents or

solutions needed to perform a series of procedures to purify a sample of brain tissue, eliminate

normal prions, and measure abnormal prions believed to cause BSE by adding a synthesized

antibody that will bind to the prions and thus allows the prions to be measured.  While the test

involves measurement of antibodies, those antibodies have been synthesized in the laboratory to

detect the prion proteins believed to cause BSE.  They have nothing to do with an immunological

---

[14] The American Heritage Dictionary of the English Language (4th ed. 2000) defines "virus" as "any of various simple submicroscopic parasites of plants, animals, and bacteria that often cause disease and that consist essentially of a core of RNA or DNA surrounded by a protein coat." Obviously a BSE test kit is not a submicroscopic parasite.  "Serum" is defined as "the clear yellowish fluid obtained upon separating whole blood into its solid and liquid components," or "blood serum from the tissues of immunized animals, containing antibodies and used to transfer immunity to another individual."  Certainly that is not what is happening when BSE test kits are used. "Toxin" is defined to mean a "poisonous substance, especially a protein, that is produced by living cells or organisms and is capable of causing disease when introduced into the body tissues but is often also capable of inducing neutralizing antibodies or antitoxins."  A BSE test kit is neither a poisonous substance nor capable of causing or neutralizing disease in animals. See also 21 C.F.R. § 600.3 (FDA regulations defining similar terms under statute governing human biological products).  Moreover, the BSE test kit does not perform the same functions, or utilize the same mechanisms, as any of these three agents regulated by the VSTA.

response in the treatment of an animal, and therefore do not fall under the VSTA, just like certain cytokines in certain uses.  *Cf.* 62 Fed. Reg. at 31,327.  In fact, not even the disease itself involves the immune system or immune responses.  *See* 70 Fed. Reg. at 461; Prusiner (Exh. 3).

**B.   A BSE test kit is not "intended for use in the treatment of domestic animals," and especially not as to be used by Creekstone.**

The VSTA authorizes regulation of biological products "intended for use in the treatment of domestic animals," 21 U.S.C. § 151, or "for use in the treatment of domestic animals," 21 U.S.C. §§ 152, 153, 154, 155, 156, 157.  USDA regulations implementing the VSTA recognize that not all viruses, serums, toxins, and analogous products are used in the treatment of animals—USDA includes in the definition of "biological products" the following guidance:

> A product's intended use shall be determined through an objective standard and not a subjective one, and would be dependent on factors such as representations, claims (either oral or written), packaging, labeling, or appearance.

9 C.F.R. § 1021.2(1).  USDA has said that products that enhance weight gain or feed efficiency or that control fertility, for example, are not regulated under the VSTA because they are not "intended for the treatment of specific diseases."  62 Fed. Reg. 31,326, 31,327 (June 9, 1997).  In this case, USDA implicitly has concluded that all uses of BSE test kits are "use in the treatment of domestic animals," since USDA has asserted authority to ban all uses of BSE test kits other than as part of USDA's BSE surveillance program.

Webster's Revised Unabridged Dictionary, 1913, defined "treatment" as "[t]he act or manner of treating…; as…medical treatment."  To "treat" was defined, *inter alia*, as: "To care for medicinally or surgically; to manage in the use of remedies or appliances; as, to treat a disease, it wound, or a patient."  Creekstone sought USDA approval to acquire and use BSE test kits for purposes of determining whether beef products derived from cattle it slaughters may

36

contain the BSE infectious agent.  This use had nothing to do with "the treatment of animals";

indeed, the cattle to which the BSE test kit is applied are already dead.  Moreover, Creekstone

did not propose to use the data from application of the BSE test kits for the treatment or

prevention of disease in any other animals.  *See* Stewart Declaration (Exh. 1) Attachs. 1-3, 6, 8.

In fact, although USDA has defined "treatment" for purposes of its VSTA regulations

very broadly, that definition still is not broad enough to encompass BSE rapid test kits.  USDA

claims that "treatment" means "the prevention, diagnosis, management, or cure of diseases of

animals."  9 C.F.R. § 101.2(3).  But USDA itself has stated that BSE testing of cattle at slaughter

is not "meaningful in the context of…animal health" and that surveillance testing for BSE "is not

a [disease] mitigation measure."  USDA APHIS, "Importation of Boneless Cuts of Beef from

Japan," 70 Fed. Reg. 73,905, 73,914 (Dec. 14, 2005).  In fact, there is no known treatment or

cure for BSE.  Economic Chronology (Exh. 2) at 3.  Taking USDA at its word, then, BSE rapid

test kits are not used in the treatment of animals at all, and certainly would not be in

Creekstone's case.[15]

Even if some uses of BSE test kits were subject to USDA's authority under the VSTA

because those uses involved "the treatment of domestic animals," that would not provide USDA

with statutory authority to regulate other uses of BSE test kits.  USDA has recognized that

---

[15] That USDA's assertion of regulatory authority over the use of BSE test kits has nothing to do with animal health is also apparent from the way USDA has used that purported authority to prevent testing for the disease:  clearly, testing hundreds of thousands more cattle carcasses for BSE could do nothing to harm live animals and if anything could only help animal health professionals' understanding of and response to BSE.  *Cf*. McGarity, 57 Admin. L. Rev. at 352-354 ("scientific considerations simply cannot explain the Department's obstinate opposition to an effort to gather more information about a little understood phenomenon."); Berlowitz, 2006 U. of Ill. L. Rev. at 635-37 (noting that allowing voluntary testing would provide a chance of finding BSE infection missed by USDA's targeted surveillance testing).

biological products may be subject to its authority under the VSTA for some uses (where they are eliciting an immunological response for the treatment of animals), and not for others.[16]  And in the case of Creekstone's proposed BSE testing program in particular, it would involve use of BSE test kits even further removed from the treatment of domestic animals, since Creekstone's sole purpose for BSE testing is to provide its customers additional peace of mind about the potential for infectious agents in its meat products.  Stewart Declaration (Exh. 1) ¶¶ 6, 8, 17. USDA may not interpret the VSTA to prevent Creekstone's proposed use of BSE rapid test kits when those test kits so clearly do not fall within the VSTA's terms.

### C.  BSE test kits are not "worthless, contaminated, dangerous, or harmful."

The VSTA authorizes USDA to "prevent" the preparation, sale, barter, exchange, or shipment of a biological product, but only one that is "worthless, contaminated, dangerous, or harmful."  21 U.S.C. § 154.  USDA has acted to prevent any sale or distribution of BSE test kits except to government-approved laboratories conducting BSE testing for USDA.  *See* pp.12-14, *supra*.  But BSE test kits do not meet the criteria that must be met before USDA prevents their distribution—they are not "worthless, contaminated, dangerous, or harmful."

BSE test kits are not "worthless."  USDA recognizes their value by licensing them in the United States.  Indeed, Bio-Rad, the manufacturer of the BSE test kit sought by Creekstone, sells millions of BSE test kits each year throughout the world., and they have been determined to be effective by numerous government authorities.  *See* Exhibits 3, 6.  USDA uses the Bio-Rad BSE

---

[16] *See, e.g.*, 62 Fed. Reg. at 31,327 (cytokines and immunomodulators "are analogous to biological products *when they are used to stimulate, supplement, enhance, or modulate the immunity of animals in the treatment of disease*. *Products* consisting of these substances *that work through these immune mechanisms in the treatment of specific disease* appropriately fall within the definition of ''biological products''."  However, "Because of the diverse biological activity of the cytokines, *not all products consisting of these substances would be regulated under the VSTA*." (emphasis added)).

tests itself for purposes of determining the prevalence of BSE in U.S. cattle and considers it an accurate screening tool. *See* p. 10, *supra*. BSE test kits are not "contaminated" either, and there is no allegation from USDA that they are. Nor can BSE test kits possibly be "dangerous or harmful" to animals, since the cow is slaughtered and already dead before the test is administered, which involves removing a sample of the animal's brain. Economic Chronology (Exh. 2) at 3; 70 Fed. Reg. at 461.

Finally, BSE test kits are not dangerous or harmful to humans either. *See* Stewart Declaration (Exh. 1) Attach. 3 (describing standard laboratory procedures for safely administering Bio-Rad tests); *see also* Exhibit 7 (no special restrictions on permit). But even if they were, the VSTA simply does not extend to protecting human health, only to animal health. *Garrelts*, 943 F. Supp. at 1062-64 contains one of the most extensive discussions of the language and purpose of VSTA:

> The logical reading of [21 U.S.C. § 151 *et seq.*] is that Congress was motivated by a concern over the possible worthlessness, contamination, dangerousness, or harmfulness of animal vaccines *to domestic animals*. Indeed, a purpose to protect human health or the public health is not given direct expression anywhere in the 1913 act….[The sparse legislative history] confirm[s] this court's reading of VSTA as motivated by an intent to protect the health of domestic animals, and their economic value, not human health.

*Id*. at 1062-63 (emphasis in original). *See also id*. at 1067 (reference in VSTA to "worthless" or "contaminated" biological products must be read in context to relate to animal health, not human health); 1066 ("the court cannot find that Congress ever expressly committed to the agency policy decisions concerning regulation of human health risks from animal vaccines"); S. Rep. No. 99-145, Sept. 30, 1985, at 338, *reprinted in* 1985 U.S.C.C.A.N. 2004 (describing VSTA as providing the statutory authority for APHIS "assuring livestock owners, veterinarians, and the

American public that there is an ample supply of safe and effective animal vaccines and other biological products.").

### D. USDA's Interpretation of the VSTA as Extending to BSE Test Kits Is Not Entitled to Deference.

The preceding discussion demonstrates that USDA clearly lacks statutory jurisdiction over BSE test kits, for at least three independent reasons, and therefore its actions prohibiting their distribution for private BSE testing and its refusal to approve Creekstone's voluntary testing program are *ultra vires*.

USDA's implicit interpretation of the VSTA as extending to BSE test kits, and to their intended use by Creekstone, is not entitled to any deference, since it is premised on assumed statutory authority that, as demonstrated above, does not exist. *See Railway Labor Executives' Ass'n,* 29 F.3d at 671; *Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310, 1318-19 (D.C. Cir. 1977) (principle of deference to agency's interpretation of statute it implements "has no application where, as here, the agency has misinterpreted its statutory mandate.").  USDA's interpretation of the VSTA as it applies to BSE test kits is not entitled to any deference for another reason, as well:  It is contained in USDA APHIS unpublished notices and in correspondence and press releases concerning Creekstone's requests, not in a rulemaking authorized by the VSTA.  *Cf. Am. Fed. of Govt. Employees v. Veneman*, 284 F.3d 185, 129 (D.C. Cir. 2002) (citing *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000); *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 234 (2001)).

## IV. USDA Lacks Authority Under the VSTA To Restrict the Use of BSE Rapid Test Kits For Purposes Unrelated to Protection of Animal Health and the Related Economic Interests of Livestock Owners.

Even assuming, *arguendo*, that USDA has authority under the VSTA to regulate the use of diagnostic products and that the VSTA covers BSE test kits as intended to be used by Creekstone (*i.e.*, even if all of the preceding arguments failed), USDA still would be acting outside of the VSTA if it used that authority for purposes unrelated to the statutory grant.

USDA regulations allow the agency to obtain, examine, and test "diagnostic test kits," and to restrict those that are unsatisfactory in terms of "purity, safety, potency, or efficacy." 9 C.F.R. §§ 113.3 (b)(7) and 113.6. But USDA did not rely on any of those criteria in denying Creekstone's requests. Although USDA provided little explanation[17] for its assertion that the VSTA and its implementing regulations authorize USDA to prevent Creekstone from obtaining and using BSE test kits, what explanation it did provide shows that USDA was acting for purposes outside of those for which regulation is authorized by the VSTA.

USDA several times asserted that Creekstone's plans were inconsistent with USDA's desire to "maintain domestic and international confidence in U.S. cattle and beef products." Stewart Declaration (Exh. 1) Attach. 7. The VSTA is totally devoid of any indication that the authorities provided therein could be used, not to protect animals against ineffective or harmful biological products, but instead to "preserve domestic and international market confidence in U.S. agricultural commodities." *See* Exh. 1 Attach. 10.

USDA cannot claim authority to regulate biological products for a different purpose than the statute addresses—such as protecting domestic demand for and international trade in agricultural commodities—even if USDA is convinced that would be a good idea. *See, e.g., Friends of the Earth,* 446 F.3d 140; *City of Chicago*, 511 U.S. at 328, 329; *Ethyl Corp. v. EPA*,

---

[17] And deliberately so—*see* Stewart Declaration, Exh. 1, Attach. 7 (declining to provide a substantive reply to issues raised by Creekstone because of Creekstone's "stated intent to pursue legal action in this matter").

51 F.3d 1053 (D.C. Cir. 1995). The same is true of USDA's attempts to use the VSTA ostensibly to protect Creekstone's competitors from increased costs, keep consumers from paying more unnecessarily for tested beef, or even protect consumers from misleading assurances of food safety (even if those objections had been factually accurate). *Cf.* Stewart Declaration (Exh. 1) Paragraphs 12-13 and Attachments 5, 7, 8, 10.

The absence of any language in VSTA authorizing restrictions on products for purposes of international trade, protecting consumers from misleading information about agricultural commodities, and the other justifications USDA has provided is sufficient to make USDA's actions toward Creekstone "in excess of" USDA's "statutory jurisdiction, authority, or limitations." *See* 5 U.S.C. § 706(2)(C).

That conclusion is further reinforced by reference to the language that *is* included in the VSTA, as well as its legislative history. As discussed at pp. 24, 39, *supra*, the logical reading of the VSTA is that it applies to the protection of animal health, not human health, and the legislative history of the 1913 act and its amendment in 1985 buttress that conclusion. *See, e.g., Garrelts*, 943 F. Supp. at 1066 ("the court cannot find that Congress ever expressly committed to the agency policy decisions concerning regulation of human health risks from animal vaccines"). Certainly if the VSTA does not extend to concerns about effects of biological products on human health, then it could not possibly extend to USDA's expressed concerns about promoting domestic and international demand for beef or that testing "would have implied a consumer safety aspect" or would cause Creekstone's competitors or beef consumers to spend more money. *Cf.* Exh. 1 ¶¶ 12-13 and Attachments 5, 7, and 10.

Not even USDA's overbroad regulations implementing the VSTA advance an interpretation of the VSTA as authorizing restrictions on the acquisition and use of biological

products unrelated to the protection of animal health.  Perhaps 9 C.F.R. § 102.5(d), which allows

restrictions on a biological products for "the protection of domestic animals or the public health,

interest, or safety, or both," could be read as broad enough to authorize restrictions totally

unrelated to animal health.  If so, however, that regulation would be beyond the authorizations of

regulatory authority in the VSTA, as discussed above, and it would be *ultra vires* and this court

would be obligated to vacate that language under 5 U.S.C. § 706(2)(C).[18]  The interpretation of

the VSTA contained in those regulations also, of course, would not be entitled to any deference

because it claims authority not apparent in the statute. *See Ass'n of Am. Railroads*, 562 F.2d at

1318-19.

But that overbroad meaning is not what USDA intended when it adopted the "public

health, interest, or safety" language in 9 C.F.R. § 102.5(d).  When USDA proposed that

language, commenters objected that "public interest" was too vague a term.  USDA responded:

> The regulation will not be amended based on these comments because the
> purpose of the Act is to assure that biologics used in the treatment of animals are
> pure, safe, potent, and efficacious.  The public benefits as a result of the
> successful protection of animals from various diseases, including those which are
> of great public concerns such as rabies.  Since safe and effective vaccines and
> other biologics are in the public interest, APHIS has used this term in the
> regulations.

57 Fed. Reg. 38,758, 38,759 (Aug. 27, 1992) (discussing language adopted in 9 C.F.R. § 102.5

(e) (later re-numbered as the current section 102.5(d), see 62 Fed. Reg. 13,293, 13,294 (March

20, 1997))).[19]

---

[18] *See, e.g.*, McGarity, 57 Admin. L. Rev. at 393 "Nothing in the USDA's statutes suggests that
protecting dominant companies from competition is one of the tasks assigned to that
Department."

[19] Under these circumstances, Creekstone is entitled to a declaratory judgment that 9 C.F.R. §
102.5(d) cannot be read to authorize restrictions on use unrelated to animal health, and to an
injunction against USDA interpreting or applying it in that fashion.  *See Harvey v. Veneman*, 396
F.3d at 36; *Finzer v. Barry*, 798 F.2d at 1477.

Thus, not even USDA's prior interpretation of the VSTA, as reflected in its regulations, is broad enough to support a conclusion that the VSTA authorizes restrictions on the possession and use of BSE test kits where those restrictions are designed for purposes other than protecting animals and, indirectly, their owners, from ineffective or dangerous biological products. USDA's actions preventing Creekstone from implementing a voluntary BSE testing program, for reasons unrelated to protecting animal health, are therefore outside of USDA's statutory authority and as a result should be vacated under the APA, 5 U.S.C. § 706(2)(C).   Time and again, courts have struck down regulatory actions that go beyond an agency's specified statutory responsibilities on the basis of vague, general language concerning public safety or welfare.  *See Ethyl Corp.*, 51 F.3d at 1060-61 (agency cannot add, to the statutory factors for a waiver of fuel requirements, other criteria intended to protect "public health" or "in the public interest")   As in *Ethyl Corp.*, in this case "Congress has neither explicitly or implicitly delegated discretionary authority to the Agency to consider other factors 'in the public interest'….")  *Id*. at 1060.

## CONCLUSION

For the reasons set forth above, Creekstone has demonstrated that it is entitled to summary judgment on its claims that USDA regulations regulating test methods and reagents as if they were viruses, serums, toxins, or analogous products and authorizing restrictions on who may obtain and use such test methods and reagents, and for what purpose, are beyond USDA's regulatory authority in the VSTA and therefore invalid.  Additionally, Creekstone has shown that, even if USDA's regulations implementing the VSTA were within its statutory authority, USDA acted outside of its authority in the VSTA when it prohibited access to and use of BSE test kits in all but very limited circumstances, and for reasons unrelated to the purposes and authorities of the VSTA.

Dated:  July 15, 2006

Respectfully submitted,

  /s/ Russell S. Frye
Russell S. Frye (D.C. Bar No. 331124)
FryeLaw PLLC
P.O. Box 33195
Washington, DC 20033-0195
(202) 572-8267
rfrye@fryelaw.com

  /s/ William L. Miller
William L. Miller (D.C. Bar No. 443191)
The William Miller Group, PLLC
2248 Hall Place, NW
Washington, DC 20007
(202) 256-2306
wmiller@williammillergroup.com


Peter C. Choharis
D.C. Bar No. 444787
2771 Woodley Place, NW
(202) 422-8312
Washington, D.C. 20008


Attorneys for Plaintiff
CREEKSTONE FARMS PREMIUM BEEF, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CREEKSTONE FARMS PREMIUM BEEF, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-544 (JR) |
| | ) |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | ) |
| and MIKE JOHANNS, IN HIS CAPACITY AS THE | ) |
| SECRETARY OF AGRICULTURE, | ) |
| | ) |
| Defendants. | ) |

_____

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

The Plaintiff, Creekstone Farms Premium Beef, LLC ("Creekstone"), submits the following statement of material facts as to which there is no genuine dispute:

1. Defendant USDA has denied Creekstone's requests to obtain and use USDA-approved bovine spongiform encephalopathy ("BSE") test kits, to be designated as a USDA-approved laboratory to use such test kits, and/or to have a USDA process verification for BSE-tested beef.

2. USDA has cited, as authority for the actions in Paragraph 1 and for restricting access to BSE test kits, the Virus-Serum-Toxin Act, 21 U.S.C. § 151 et seq., and 9 C.F.R. § 102.5(d) and § 104.1.

3. BSE test kits are intended for the detection of prion proteins, which are not antigens, antibodies, nucleic acids, or immunity.

4. BSE test kits do not act primarily through the direct stimulation, supplementation, enhancement, or modulation of the immune system or immune response.

5. BSE itself is a cellular pathology that does not involve an immunological response or the immune system.

6. BSE test kits are not a virus, serum, or toxin.

7.  BSE test kits do not function similarly to a virus, serum, or toxin.

8.  BSE test kits are not intended for use for purposes of treating animals or for protecting or aiding animal health.

9.  BSE test kits are not worthless, contaminated, dangerous, or harmful.

10. USDA has used BSE test kits supplied by Bio-Rad Laboratories, Inc., to test hundreds of thousands of cattle for BSE at taxpayer expense, including thousands of cattle that had no outward signs of BSE or other risk factors and thousands of cattle that were under 30 months of age.

Dated:  July 15, 2006

Respectfully submitted,


_____/s/  Russell S. Frye_____
Russell S. Frye (D.C. Bar No. 331124)
FryeLaw PLLC
P.O. Box 33195
Washington, DC 20033-0195
(202) 572-8267
rfrye@fryelaw.com


_____/s/   William L. Miller_____
William L. Miller (D.C. Bar No. 443191)
The William Miller Group, PLLC
2248 Hall Place, NW
Washington, DC 20007
(202) 256-2306

Peter C. Choharis
D.C. Bar No. 444787
2771 Woodley Place, NW
(202) 422-8312
Washington, D.C. 20008

Attorneys for Plaintiff CREEKSTONE FARMS
PREMIUM BEEF, LLC

3