Creekstone Farms Premium Beef v. USDA
Civ. Action No. 06-544 (JR)
Plaintiff's Motion for Summary Judgment

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

CREEKSTONE FARMS PREMIUM BEEF, LLC,    )
                                       )
                Plaintiff,             )
                                       )    Civil Action No. 06-544 (JR)
        vs.                            )
                                       )
UNITED STATES DEPARTMENT OF AGRICULTURE, )
and MIKE JOHANNS, IN HIS CAPACITY AS THE )
SECRETARY OF AGRICULTURE,              )
                                       )
                Defendants.            )
_____)

## <u>DECLARATION OF JOHN D. STEWART</u>

John D. Stewart, certifies and states as follows:

1.    I am Chief Executive Officer and Founder of Creekstone Farms Premium Beef, LLC ("Creekstone"). Creekstone is both a cattle producer and processor. We distribute our products through traditional retail channels and in many fine-dining restaurants across the country. We also have supplied export markets in Japan, Mexico, South Korea, China, Taiwan, Hong Kong, and other countries, but our exports have been greatly curtailed since confirmation of the discovery of bovine spongiform encephalopathy ("BSE") infection in a Canadian-raised cow in Washington State on December 23, 2003.

2.    Creekstone's business objective since the brand's introduction has been to build upon our own unique high-quality Black Angus genetics program to become the world's premier producer and marketer of Black Angus beef. Creekstone's program is unique in the beef industry because it combines superior Black Angus genetics, healthy and humane cattle

management, a high quality feeding program, and state-of-the-art processing of Black Angus cattle exclusively. Creekstone Farms' beef is one of a few branded programs certified by the United States Department of Agriculture's ("USDA") Agricultural Marketing Service ("AMS"). This certification requires that USDA graders at the Creekstone plant examine each carcass to assure that it meets the program's quality and certification standards. Creekstone is the first company to earn USDA approval for a USDA Process Verification for Tender Beef which requires that Creekstone apply specified procedures to assure the tenderness of various cuts of beef. Creekstone products also receive USDA approval for labeling Creekstone's products as "Natural," a no added hormone, no antibiotics, vegetarian diet branded program.

3.     Immediately after USDA confirmed that a Canadian-raised cow in Washington State had been afflicted with BSE in late 2003, almost all major foreign countries that imported beef from the United States ("U.S.") closed their borders to U.S. beef and cattle products. Those markets had accounted for approximately 35% of Creekstone's revenue. As of this date, Japan and South Korea, which previously had been the destination of most of Creekstone's exports, remain closed to all U.S. beef products.

4.     Soon after U.S. products were shut out of these foreign markets, Creekstone began discussions with its foreign customers, foreign government representatives, and others about what it would take to obtain approval to export Creekstone products into those countries and to restore confidence in U.S. beef among consumers. I personally have made approximately six trips to Asia in the past 30 months to assess the situation. Discussions with Creekstone's former customers, who distribute beef products in Japan and South Korea, and with others in those countries indicates that even when their governments decide to reopen trade in U.S. beef products, consumers are reluctant to begin buying U.S.-origin beef

products, because of concern about BSE infection in the United States and the impression that the U.S. government is not doing enough to mitigate BSE risks and is not taking as aggressive measures as their own countries. The information I have from personal contacts is consistent with published surveys of consumers in Asia, which have shown a lack of confidence in U.S.-origin beef. My discussions with customers and others in Asia also indicate that providing beef products from cattle that have been tested for BSE with available BSE-screening tests would increase demand, among foreign distributors and foreign consumers, for Creekstone's products. This information is consistent with numerous published surveys, conducted, for example, by Kyodo News Agency and researchers at Washington State University, indicating a marked preference among Japanese consumers that beef products from the U.S. come from cattle that were tested for BSE. For example, in a December 2005 telephone poll conducted and reported by the Kyodo News Service, over three-quarters of the Japanese respondents said they are currently unwilling to eat U.S.-origin beef, and over half agreed that the Japanese government should demand blanket BSE testing of all U.S. cattle processed for shipment to Japan.

5.    Creekstone also has been told by a number of its domestic national retail customers that they would purchase more or pay a premium for Creekstone beef produced from BSE-tested cattle. This reflects U.S. consumers' concerns about BSE, despite the apparently extremely low incidence of BSE in the U.S. cattle herd. MSNBC reported recently that in an MSNBC online survey conducted in March 2006, out of more than 75,000 respondents 35 percent said they were "very much" concerned about BSE entering the U.S. food supply and 37 percent said they have been eating less beef since BSE was discovered in the United States.

6.    Recognizing the critical role that BSE testing would likely play in resuming exports of Creekstone products to Japan, South Korea, and other countries, as well as in convincing consumers in those countries to buy U.S., and specifically Creekstone beef products, Creekstone made a business decision to take additional, voluntary procedures at our processing facility to test every animal slaughtered for BSE as one more part of the business model in which we try to satisfy the needs of our customers and consumers.  Our proposed testing program would test 100 percent of cattle slaughtered at the Creekstone Arkansas City, Kansas processing facility, or about 300,000 head of cattle annually, at an estimated cost of $6,000,000 per year.  In early 2004 Creekstone took steps to be able to apply the same BSE "rapid test" to its cattle that was being used by the Japanese government to test all cattle at slaughter in that country (and which USDA has approved and has used for BSE screening of cattle in the United States).  With technical advice from the test manufacturer, Bio-Rad, of Hercules, California, and other vendors and experts in veterinary testing, Creekstone developed detailed procedures for BSE testing the brain stems of cattle slaughtered at our processing plant; recordkeeping and reporting; tracking the carcasses so that none would be processed until negative BSE test results were obtained; maintaining quality control in the testing process; disposing of waste materials; and so forth.  Creekstone constructed a state-of-the-art laboratory at its processing plant for testing and managing samples of the brain stems of cattle processed at the facility.  Creekstone employees were sent to France for training on BSE testing procedures by Bio-Rad, and Creekstone entered into discussions with Bio-Rad about purchasing sufficient test kits to test all of the cattle Creekstone processes.

7.    Creekstone was informed by Bio-Rad that USDA was taking the position that only USDA-approved post-mortem BSE tests could be used in or imported into the United

4

States, and that USDA was further asserting that only federal or state-affiliated laboratories, performing testing for USDA, could use BSE test kits.  In letters and e-mails of February 19, February 25, March 10, April 13, and July 27, 2004, and in meetings and conference calls with USDA representatives in February, March, April, June, and July 2004, Creekstone requested approval to use USDA-approved BSE diagnostic test kits to test the cattle that it processes at its Arkansas City, Kansas facility.  Those requests were supported by more than a dozen other organizations, representing both producers and consumers, as well as members of Congress and the editorial boards of at least 17 major city newspapers.

8.     Creekstone first made its request for approval to use BSE test kits in a voluntary testing program in a meeting with USDA in February, 2004, followed by a written request in two letters dated February 25, 2004 (attached as Attachments 1 and 2).  On March 10, 2004, Creekstone submitted to USDA a detailed BSE sampling, testing, and control procedure manual, describing how the tests would be conducted and used and how the carcasses and offal would be held and tracked until testing was completed, along with a detailed laboratory operations manual.  Creekstone's submission included detailed procedures for limiting access to results of testing and responding to an initial reactive result from the BSE screening test.  A portion of that manual, describing the BSE screening test procedure, is attached to this declaration as Attachment 3.  Creekstone specifically requested that its testing program be approved pursuant to USDA regulations tiled "Pathogen Reduction; Hazard Analysis Critical Control Point Systems," commonly known as the HACCP regulations.  Creekstone also offered to share the results of its BSE screening tests with USDA.  Although our specific proposal was based on use of the Bio-Rad test kits, we have been in contact with other domestic and foreign BSE test kit manufacturers interested in supplying test kits to Creekstone.

5

9.    USDA's first public response to Creekstone's request appears to be a February 26, 2004 statement to the editor of Meat Marketing and Technology magazine by Dr. Lisa Ferguson, Senior Staff Veterinarian of USDA's Animal and Plant Health Inspection Service ("APHIS"), that Creekstone could be the subject of criminal prosecution under the Virus Serum Toxin Act of 1913 ("VSTA") if Creekstone were to test its cattle for BSE without prior USDA approval.  (A USDA spokesman subsequently is reported to have told the New York Times that USDA did not mean to imply that Creekstone would be the subject of criminal penalties if it tested its cattle, but that any company that sold BSE test kits to Creekstone would be breaking the law.)

10.    On March 17, 2004, USDA APHIS' Center for Veterinary Biologics issued its Notice No. 04-08 (attached as Attachment 4), mandating, under asserted authority of 9 C.F.R. § 102.5(d), that "sale and use" of BSE test kits be restricted to laboratories approved by state and USDA animal health officials and that "distribution and use" of BSE test kits shall be under the supervision of, and subject to conditions imposed by, USDA.

11.    Creekstone's request to perform BSE testing on cattle that it slaughters was rejected by USDA during an April 8, 2004 meeting between Creekstone and J.B. Penn, Under Secretary for Farm and Foreign Agricultural Services, and Bill Hawks, Under Secretary for Marketing and Regulatory Programs.  The following day, USDA issued press release No. Release No. 0141.04 (attached as Attachment 5), which stated in part:  "Yesterday, USDA officials informed Creekstone Farms Premium Beef that its request for a license to use rapid tests for Bovine Spongiform Encephalopathy (BSE) in a private marketing program can not be granted at this time. The test is now licensed for animal health surveillance purposes. The use

6

of the test as proposed by Creekstone would have implied a consumer safety aspect that is not scientifically warranted."

12.    I renewed Creekstone's request that it be allowed to use BSE rapid test kits as part of a voluntary BSE testing program in an April 13, 2004 letter to then-Secretary of Agriculture Ann Veneman, her Chief of Staff Dale Moore, and Under Secretaries Hawks and Penn (Attachment 6).  Creekstone's request to use BSE test kits in a voluntary testing program was again denied in a June 1, 2004 letter to Creekstone from Under Secretary Hawks (attached as Attachment 7).  That letter concluded that "allowing a company to use a BSE test in a private marketing program is inconsistent with USDA's mandate to ensure effective, scientifically sound testing for significant animal diseases and maintain domestic and international confidence in U.S. cattle and beef products."  The letter said it would not provide detailed reasons for the denial, however, on advice of counsel.  USDA's denial of Creekstone's request for authorization to test was reiterated in conference calls between Creekstone representatives and Under Secretary Hawks and others on June 14, 2004 and Under Secretary Penn and others on June 25, 2004. Among the concerns expressed by USDA officials was that, if Creekstone were allowed to test its cattle for BSE, other competitors would be forced to engage in costly testing as well, and that it would be misleading to let the public think that they should pay more for beef from BSE-tested cattle.

13.    Creekstone followed these discussions with yet another written request (Attachment 8), setting out several options that might address USDA's concerns, and noting that BSE testing for marketing purposes would support higher cattle prices and increased demand, similar to how USDA approval for "Organic" and "All Natural" product claims had

stimulated demand. In a further effort to address USDA's concerns, Creekstone asked to be allowed to operate as a satellite laboratory to, and under supervision of, Kansas State University College of Veterinary Medicine's ("KSU's") laboratory, which has been approved to conduct BSE tests for USDA. That requested was rejected in a September 24, 2004 letter from Under Secretary Hawks to Creekstone (attached as Attachment 9), stating that KSU had no authority to designate Creekstone as a satellite laboratory and reiterating that USDA would not authorize Creekstone to test its cattle for BSE. USDA also sent a letter on August 5, 2004 to KSU (attached as Attachment 10), stating that "BSE testing is an inherently governmental function that must be conducted by Federal and State laboratories" in order to "preserve domestic and international market confidence in U.S. agricultural commodities."

14.    Again in a July 6, 2005 meeting with me and Creekstone Vice President Joe Meng, Agriculture Secretary Johanns stated that USDA would not allow Creekstone to test its cattle for BSE.

15.    For the past two years, USDA officials have assured the beef industry in general and Creekstone in particular that the United States would soon be able to secure approval for imports of U.S.-origin beef from the governments of Japan, South Korea, and other Asian countries. Hopeful that the United States government would be able to carry out its promises and negotiate a prompt reopening of those markets to U.S.-origin beef, Creekstone has waited patiently for the promised reopening of foreign markets and improvements in foreign demand for U.S.-origin beef that might reduce or eliminate the need for voluntary BSE testing of the cattle Creekstone processes. Unfortunately, there has been little overall improvement in foreign demand over that time and Creekstone can no longer stand by.

16.    Creekstone's critical need to be able to conduct BSE tests to meet the demands or preferences of its customers has grown and continues to grow because of the additional discoveries of BSE in U.S. cattle; the continued, publicized incidence of BSE in cattle in countries that export beef to the United States, especially Canada and Japan; and the continued reluctance of important beef-importing countries to accept U.S. beef without further assurances than USDA has been willing or able to provide.  Once foreign markets begin to allow imports of U.S. beef, foreign consumers are still unwilling or reluctant to eat U.S.-origin beef unless the cattle have been tested for BSE.

17.    As a direct result of the loss of its export market in Japan based on the perception of the Japanese that U.S. beef products might be contaminated with BSE, Creekstone has suffered losses of revenue amounting to more than $200,000 per day.  Even with the possible reopening of foreign markets in the future, Creekstone will continue to suffer significant lost revenue from its export markets if it is unable to provide foreign distributors, retail establishments, and consumers with assurance that Creekstone beef products come from cattle that have been tested for BSE, as do products produced in their own countries.  This is true even though some or all of those parties understand the apparent low incidence of BSE in the United States' cattle herd and the limitations of available BSE rapid test kits to detect BSE in its early stages and in younger cattle.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 13, 2006.

John D. Stewart

—Civ. No. 06-544 Stewart Declaration
ATTACHMENT 1



PREMIUM BLACK ANGUS BEEF™
and Other Fine Food Products

February 25, 2004

Jim Butler
USDA
1400 Independence Ave., SW
RM 213-A
Washington, DC. 20250

Dear Jim,

I enjoyed our visit and greatly appreciate your listening to our concerns and recognizing our immediate need for help.

We want to officially petition USDA to allow us to meet our export customer requirements and needs. We would like to have the following requirements implemented within 3 weeks.

1. Establish a lab for BSE testing at our plant and equipped by a recognized testing company now being utilized by processors in Japan.

2. Creekstone Farms Premium Beef, LLC(CFPB) would test every animal, and upon a BSE negative result, we would market all product possible for export.

3. If we had a positive test. CFPB would dispose of that carcass and all by-products in an approved manner. We would be able to guarantee that no positive tested material entered the food chain.

It is our understanding today that our export customers and their governments would accept our products immediately if we test every animal with an approved test. We do not understand why USDA is preventing this from happening? We think it would be beneficial to everyone for us to do additional testing. We have one of the newest and best plants in the industry today for food safety and to accommodate trace back systems. We are killing 1,000 head of Black Angus cattle daily, which are highly sought after in the international markets.

Not getting approval to export is costing CFPB at least $80,000 per day. Testing will cost us $15 to $20 per head vs. our lost revenue of over a $100 per head. With approval we will immediately hire 40 people and have the ability to run 5 days per week vs. now of only running 4 days per week, thus enhancing the revenues of hundreds of employees and our surrounding community. Without exports, our plants viability and the jobs of 700 people are at risk.

We would welcome surveillance on all our procedures by USDA. We will invite our customers as well as USDA to monitor each part of the process. We need our government agencies to help us meet our customers request and let the free market system determine if theses costs are justified. It makes no sense that we are being prevented by our government from doing what our customer is requesting while strengthening food safety, trade deficit and our industry's overall economic health with a valued trading partner. We are trying to improve food safety and with additional testing it can only help this process.

Creekstone Farms
Premium Beef, LLC
604 Golf Industrial Park Road
Arkansas City, Kansas 67005
620-741-3100
620-441-3195 fax

001

● Page 2

February 25, 2004

On another issue, current dentitioning of cattle is not the answer. We are finding a large discrepancy between dentition and our USDA Certification (skeletal) for "A" maturity. This should not be ignored an we believe USDA-FSIS and USDA-AMS should work together on this issue.

Thank you for anything you can do to speed up this process. Every day it's delayed is critical.

Sincerely,

Bill Fielding
COO
Creekstone Farms Premium Beef, LLC

Civ. No. 06-544 Stewart Declaration
ATTACHMENT 2



PREMIUM BLACK ANGUS BEEF™
and Other Fine Food Products

February 25, 2004

Jim Butler
USDA
1400 Independence Ave., SW
RM 213-A
Washington, DC. 20250

Dear Jim,

Thank you for your call today updating us on the meetings taking place at USDA with regards to Creekstone Farms Premium Beef, LLC. desire to start testing for BSE immediately.

We can not stress enough how important it is to our company and the surrounding community that we are allowed to test and begin testing **immediately**. Under current industry conditions with losses between $75-$100 per head for packers, Creekstone Farms and companies like ours are in grave jeopardy financially of being able to weather current market conditions. No other area has affected the margin capabilities of this industry more than our inability to export to other countries and our inability comes not because we can't do what our customers and their governments demand, but because we are not allowed to perform a test for the presence of BSE by our own government.

We would like to move ahead with respect to testing and believe we can be operational within 3 weeks. We are beginning the steps necessary to have our own lab on site at our plant and training of those personnel whom will be performing this procedure. We again request that USDA allow us to perform this test and assist in all documentations needed for exporting our product to begin within the 3 week time frame.

Sincerely,

Bill Fielding
COO
Creekstone Farms Premium Beef, LLC.

Creekstone Farms
Premium Beef, LLC
604 Golf Industrial Park Road
Arkansas City, Kansas 67005
620-741-3100
620-741-3195 fax

003

Civ. No. 06-544 Stewart Declaration
ATTACHMENT 3

To:    J.B. Penn, under Secretary, Farm and Foreign Agriculture Services

Date:  March 10, 2004

Re:    Protocol for B.S.E. Testing, Export Capability

Creekstone Farms Premium Beef, LLC respectfully requests that the *BSE Sampling and Testing Program* and its attachments be reviewed and approved. It is the goal of Creekstone Farms Premium Beef, LLC that testing for B.S.E. is started at the Creekstone Farms plant by March 29, 2004. This means U.S.D.A. approval must come within one week of today's meeting.

This establishment believes it should have the right to test for B.S.E. (an agent that causes a food-borne illness) under the *Pathogen Reduction; Hazard Analysis Critical Control Point Systems; Final Rule.* In reviewing the testing procedure and the risks that may be associated with testing a population of animals that are almost all thirty months or younger, the plant feels confident that this is the right thing to do and that the U.S.D.A. should lend its support in everyway possible. Creekstone is willing to follow any reasonable protocol outlined and approved by the U.S.D.A. Creekstone will work with the U.S.D.A. to use the plant as a test to work out issues related to B.S.E. testing procedures.

I look forward to your comments and ideas on the attached program. If you have any questions or comments, please feel free to have your agency contact me.

Sincerely,

Bill Fielding
Chief Operating Officer
Creekstone Farms Premium Beef, LLC
Office ph. (620) 741-3170

**Creekstone Farms Premium Beef, LLC**
**604 Goff Industrial Park Rd.**
**Arkansas City, KS 67005**

# BSE Sampling, Testing and Control Procedure
## Creekstone Farms Premium Beef, LLC
### Est. 27
### Date:   March 9, 2004

I.   Purpose
  A.  Provide a wholesome product.
    1.   Creekstone Farms Premium Beef, in it's drive to provide the most wholesome product available, believes BSE testing will give extra assurance that the products derived at Est. 27 will be the most wholesome available.
    2.   Creekstone Farms Premium Beef understands that the risk for Human Disease caused by consumption of BSE positive products is negligible, but, cannot be assumed to be zero.   The USDA FSIS requested that all plants reassess their HACCP plans after the single incident of a positive BSE tested cow in Washington.  From that reassessment, Creekstone Farms Premium Beef believes that the correct thing to do is to test for BSE until the risk can be moved to improbable with a larger sampling size.
    3.   Creekstone Farms Premium Beef believes that BSE Testing is more cost-benefit effective than current rules of SRM Removal and SRM Monitoring.   The Creekstone Farms Premium Beef may at a later time ask for a revision of the SRM Interim Rules on The Prohibition of the Use of Specified Risk Materials for Human Food.
  B.  Allow for the plant to satisfy customer needs and requirements domestically and internationally.
II.   Justification
  A.  In 1996, The Federal Register published *Pathogen Reduction: Hazard Analysis and Critical Control Point (HACCP) Systems; Final Rule*.
  B.  This rule states, among other statements that:
    1.   "FSIS was establishing requirements applicable to meat and poultry establishments designed to reduce the occurrence and numbers of pathogenic microorganisms on meat and poultry products, reduce the incidence of foodborne illness associated with the consumption of those products...."
    2.   This need to bring into FSIS rules the concept of HACCP was established by outbreaks of foodborne illness and the National Academy of Sciences, U.S. General Accounting Office and FSIS.
    3.   That FSIS recognized that no single technological or procedural solution exists for the problem of foodborne illness and that the Agency's food safety goal would be achieved only through continuous efforts to improve hazard identification and prevention.  The food safety strategy outlined in the Pathogen Reduction/HACCP proposal included, among others, the following major elements: 1)  provisions for the systematic prevention of biological, chemical and physical hazards through adoption by meat and poultry establishments science-based process control systems, and 4) removal of unnecessary regulatory obstacles to innovation.

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 1 of 1

005

C. Under the *Pathogen Reduction: Hazard Analysis and Critical Control Point (HACCP) Systems: Final Rule*, the establishment should be allowed to use validated monitoring and testing for a food safety hazard.

D. The *Pathogen Reduction: Hazard Analysis and Critical Control Point (HACCP) Systems: Final Rule* states that establishment's shall conduct a Hazard Analysis. After the case of BSE was reported by FSIS that through the BSE Surveillance Program that tested 20,500 animals, the plant performed a mandated reassessment of it's HACCP plan and found that the risk rose from improbable to remote. With the catastrophic significance of the foodborne illness that can be created by consuming meat adulterated by the TSE agent, BSE now became a hazard with remote likelihood of occurrence, which then would require an element of control necessary to be applied at a Critical Control Point. Unless the plant has a prerequisite program or a monitoring program to assure it is improbable, a critical control point is needed. The removal of SRM's can be viewed as a step that reduces the likelihood, but, SRM's are only required to be removed on cattle 30 months or older. Therefore, the final rule requires the plant to test for BSE to reduce the likelihood so that this is not a CCP.

E. The plant believes that approval of a BSE Testing Protocol will prompt the U.S. Government and the Japanese Govt. to change the Export Requirements to Japan.

    1.     Creekstone Farms Premium Beef, LLC believes that if 100% of animals that are slaughtered at this plant are tested for BSE and found to be negative by using a validated testing protocol, the export certificate should be able to be signed as being BSE free.

    2.     The Red Meat Export Requirements for Japan should be modified so that the Eligible Products section lists as eligible "All Bovine Products, including meat, viscera, and meat products, and casings that were derived from animals that were tested for BSE using a validated testing method". The Ineligible Meat Products Section needs to be changed so that "All bovine products, including meat, viscera and meat products and casings derived from animals that have not been tested for BSE using a validated testing method."(See **Red Meat Export Requirements for Japan**)

III.    Testing Protocol

A. Insert Japanese Approved Quick Test protocol here.

    1.     The plant will station 2 Obex Extractors on the Head Chain that is adjacent to the laboratory along with a person to label the obex sample containers.

    2.     The label person will remove the head tag from the head chain and affix it to the sample container.

    3.     If at any time there is an issue with supplies, obex removal, or labeling, the head chain will be stopped using the stop button stationed at the obex removal station.

    4.     The labeled sample container will be delivered into the lab through the sample window.

    5.     The obex core samples will be removed from the obex and placed within Brand X core sample preparation dish. The remaining obex that is in the labeled sample container will be placed in the cold storage facility within the laboratory.

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 2 of 2

006

6.    Continue with prion isolation procedure according to Kit Specific Procedure.

7.    After completing prion isolation procedure, the sample will be evaluated for the presence of prion/prion indicative material.

    a.  Their will be two employees trained to read the finished isolated sample.

    b.  Only these two people will have access to the finished sample.

    c.  These employees will be sign statements of confidentiality of the results of these tests.

    d.  By designation on a time basis, only one of these employees will be assigned to evaluating the sample plates.

8.    If an initial reactive is observed, it will be reported to the Director of Technical Services who will notify V.P. of Operations.

9.    If an initial reactive is found, Part VI of this program will be executed.

10.    All records will be kept for a minimum of two years and will be made available to FSIS, or other relevant regulatory entity within the guidelines of our current HACCP Program.

B.  Brand X Quick Test Program, Protocol and Testing Methodology has been validated by the European Commission in 1999.  **(See attachment European Commission)**

C.  Assurance of Traceback to Carcass from Sample/Test

    1.    All carcasses are labeled with a tag.  The tag has identical numbers on each side of a perforation.  This perforation is split when the head is dropped, and one portion of the tag is attached to the head hanger the head is placed on, and the other portion continues with carcass.**(See Atttachment 1)  (See Photo 1)**

    a.  There is currently an employee on the floor that is designated to apply the carcass tag on the carcass and the corresponding head.

    b.  This employee will receive task specific training to assure an understanding of the process and the importance of the adequate performance of this function.

    c.  If at any time there is a lack of clarity as to accuracy of tagging, the Slaughter Department will be stopped and the Director of Technical Services will be notified.

    2.    When the sample for BSE testing is removed from the head, this head tag will be transferred from the head hanger to the side of the sample container.**(See Photo 2)**

    3.    The traceback to actual product is documented in Part IV of this document.

    4.    The plant has this paper tracking program in addition to an electronic tracking program, which is augmented by the bar code tracking protocols.

D.  Laboratory Technician Training considerations

    1.    The establishment is developing a relationship with a nationwide laboratory organization to perform the testing on-site.  This organization is ISO/IEC Accredited and USDA accredited.

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 3 of 3

007

2.  The establishment has arranged for travel to Europe by existing Creekstone Farms Premium Beef employees to train in laboratories in Europe.

    a.  The training will be to perform and understand the sampling and testing of EU Validated Tests.

    b.  The training will be "train the trainer" activities so that the learning can be transferred to the new employees of the laboratory.

    c.  A commitment from the diagnostic test kit supplier has been made to have trained technicians in the plant during the start up phase to assure correct protocols are in place.

E.  Laboratory Facility considerations

1.  The establishment has assessed the risk associated with this testing in determining the needs of the laboratory facility.

    a.  The risks associated with isolating the material necessary to extract the required sample would not create any greater risk than the removal or segregation of other types of SRM's within the facility. Therefore, the handling of the waste and the tissue would follow our Food Safety Program (HACCP, SSOP, GMP's and SOG's)

    b.  The Initial Reactive sample, if found, would be completely isolated, split and sent to an outside laboratory for confirmation. The remaining part of the sample kept at the establishment would be locked in a freezer within the secured and monitored laboratory.

    c.  All equipment associated with the testing for that day would be cleaned and sanitized as allowed by the WHO **(See World Health Organization – Communicable Disease Surveillance and Control – Section 3.3)**

    d.  BSE zoonotical disease is not listed in the USDA Departmental Policy on BioSafety Levels.**(See Departmental Manual-Subject USDA Security Policies and Procedures for Biosafety Level-3 Facilities)**

        i.  TSE illnesses in humans are only known to occur from natural familial occurrences, or, through ingestion of modified fold protein prions.

        ii.  TSE transmission is not airborne.

        iii.  Any Initial Reactive sample tissue will be isolated and sent to an authorized laboratory.

        iv.  Testing for BSE only will take place in this laboratory, no other pathogens, micro-organisms, or any other potentially dangerous agent will be analyzed in this lab facility.

    e.  The plant will incorporate the following procedures/processes into the laboratory:

        i.  Inventory Control Procedures

        ii.  Physical Security Systems

        iii.  Cybersecurity Systems

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 4 of 4

      iv.     Personal Suitiability

      v.     Biosecurity Incident Response Plan

      vi.    Personal and Laboratory Safety Requirements **See World Health Organization – Communicable Disease Surveillance and Control – Table 6)**

2. The establishment conferred with USDA APHIS, and the State of Kansas Veterinary Laboratory in the decision making process.

3. The establishment does understand that over-riding policy may take place in the near future, and is establishing a protocol that will meet those future expectations.

4. Design of the Laboratory **(See Floor Print for the Slaughter Floor)**

    a. The laboratory is situated in the plant to allow for quick and error-free transferal of the identified sample.

    b. The laboratory will have separate filtered ventilation system.

    c. The laboratory will have swipe card technology entrance restriction. **(See Picture 3)**

    d. The laboratory will have video surveillance on all access doors and within the lab. **(See Picture 4)**

    e. The laboratory is suitably sized for the volume of tests as it will be over 372 sq. ft., with over 60 sq. ft. of free bench space. **(See Laboratory Floor Print)**

5. The plant is procuring 2 sets of the testing equipment to provide for back-up in case one set of equipment becomes non-functional.

IV. Control Elements of Product Tracking

  A. Carcass Side Tracking

1. All carcasses are given a tag that has a sequential number. This tag is perforated with identical numbers on each side of perforated tag. When the carcass has the head removed, the perforation is separated and one number goes with the head and one number with the carcass. **(See Atttachment 1)**

2. At the Hot Scale (Attachment B - HACCP Flow Diagram), each side of a carcass is weighed and given a carcass number. This tag is attached to the carcass using a 4" pin through the tag and into the cavity side of the carcass in the rib cage area. **(See Atttachment 1)**

3. All carcasses are held, at minimum, 24 hours in Carcass Coolers.

4. No carcasses will be allowed out of the Carcass Coolers until a negative result is obtained, or, if a presumptive positive occurs, until all suspect carcasses are retained. **(See Atttachment 2)**

5. The plant has a system by which it can track electronically the movement and placement of any carcass through the system.

    a. Each trolley (holds one side of a carcass) has a radio frequency chip imbedded and attached to the trolley **(See Picture 5)**

    b. As the trolley passes key points in the system it is read and data is collected into the tracking program **(See Picture 6)**

    c. An operator is stationed at key points in the system and has a touch screen that allows them to add data into the tracking program. These stations are located at:

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 5 of 5

009

      i.    Between knocking and sticking **(See Picture 7)**
      ii.   Slaughter Hot Scale, where the carcasses exit the slaughter floor **(See Picture 8)**
      iii.  Grading Scale, where the carcasses exit the cooler **(See Picture 9)**
      iv.  Fabrication Scale, where the carcasses enter the fabrication/boning department **(See Picture 10)**

6.    Each carcass is given a barcode tag at the Slaughter Hot Scale that is scanned at subsequent stations in addition to the Radio Frequency Tracking System. **(See Picture 11 and Attachment 1)**

7.    Creekstone Farms Premium Beef has tested this system weekly to assure the capability. 32 carcass numbers are randomly selected and traced back through the system. The system can track carcasses from when the carcass enters the fab, when it was graded, when it was hot scaled and when it was knocked and complete traceback to feedyard supplier is verified.

B. Variety Meats/Offal Products

1.    All variety meat/offal products are packaged in boxes, which are labeled with a weight label that is created at the time of box fill. These weight labels have a time/date stamp. **(See Attachment 1)**

2.    The plant is capable of tracking, within a target box, variety meat products back to the originating carcass. **(See Box Tracking Worksheet)**

3.    All Variety Meat/Offal Products are held at the plant for a 24 hour time period in the Blast Freezer and/or box storage area. Most are held for 96 hours minimum.

4.    No Variety Meat/Offal Product will be allowed out of storage until a negative result is obtained, or, if a presumptive positive occurs, until all suspect boxes are retained.

C. Blood/Blood Products

1.    All blood/blood products are contained in bulk tanks/trailers.

2.    The plant will consider the total daily production as one unit.

3.    The bulk trailers will be sealed using a numbered seal.**(See Security Outbound Log Form)**

4.    No blood will be allowed out of the bulk tanks/trailers until all negatives are obtained, or, if a presumptive positive occurs, the bulk tanks/trailers are labeled as suspect to assure proper disposal.

D. All other carcass parts

1.    All other carcass parts are sent to an off-site rendering facility in truck-trailer transports. These truck-transports are logged in prior to fill and logged out post-fill with a time. **(See Inedible Trailer Transport Log Form and Security Outbound Log Form)**

2.    The plant is capable of tracking, within 3 hours, the carcass parts back to the originating carcass.

3.    The trailer transports will be sealed using a numbered seal.**(See Picture 12)**

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 6 of 6

010

4.    The trailer transports will not be allowed to leave the facility without being checked out by Plant contracted Security assuring it is sealed and documenting the seal and the time of departure. **(See Picture 13)**

5.    All truck-trailer transports will not be allowed to unload at the destination rendering facility until all negative results are obtained, or, if a Initial Reactive occurs, until the truck-trailer transport is properly identified to assure proper disposal.**(See Renderer Procedure)**

E.  Hides

    1.    All hides will be processed in order of reception in the hides room.

    2.    This order follows the order of knocking and hide pulling, therefore the hides are received in sequential order. **(See Hide Vat Log Form)**

    3.    Each vat receives the same number of hides, therefore if a presumptive positive occurs, the traceback will be to the target vat plus the vat filled prior to target vat and the vat filled after the target vat.

    4.    All trailers with hides will be sealed. **(See Picture 12)**

    5.    The trailers that transport the hides to the processor will not be allowed to leave the facility without being checked out by Plant contracted Security assuring the trailer is sealed and documenting the seal and time of departure. **(See Security Outbound Log Form)**

V.    Equipment Considerations involved in Product Disposition

    A.  Product Contact Equipment

        1.    Hand Utensils

            a.    All hand utensils that contact an SRM will be sanitized between carcasses, or all product associated with the utensil will be considered an SRM and disposed of in accordance to disposal guidelines listed in Section VII.

            b.    The instrument will be decontaminated with the strictest form of decontamination procedure which can be tolerated by the instrument and process **(See World Health Organization – Communicable Disease Surveillance & Control–Section 3.3)**

        2.    Fixed Utensils/Product Conveyances

            a.    All fixed utensils/product conveyances that contact an SRM will be sanitized between uses, or, all product associated with the equipment will be considered an SRM and disposed of in accordance to 9CFR310.22 and the plant's SOG (**(See SOG 41)**

        3.    Means of Sanitizing

            a.    The plant will either use $180^0$F wash, or, potable water rinse with a chemical sanitizer with a strength of 150-200 PPM in accordance to Plant SSOP procedures.   These practices are considered General Food Hygeine Requirements which are accepted in the EU, Japan, and U.S.

    B.    Non-Contact/Inedible Product Contact Surfaces

        1.    Blood Collection Equipment

            a.    All blood collection equipment on the production floor is cleaned and sanitized daily by hand cleaning.

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 7 of 7

011

      b.      Blood conveyances and holding tanks are cleaned by hand cleaning and/or CIP cleaning daily.

  2.    Inedible Carcass Parts Equipment

      a.      The contact equipment on the production floor that contacts the inedible carcass parts is cleaned and sanitized daily prior to start up.

      b.      The auger that conveys the products from the floor to the trailer-transports will have removal of carcass parts on a daily basis. In the event of an Initial Reactive, the auger system will be completely cleaned and sanitized using a Nitrogen based sanitizer.

VI.    Event of Initial Reactive test result for BSE

  A.  If an initial reactive result for BSE occurs, Creekstone Farms Premium Beef has a crisis management team that has rehearsed food-borne related crisis (Mock Recalls) that will meet.

      1.    Discussion of isolation of product will occur.

      2.    Discussion of communication with the regulatory entities will occur.

      3.    Regular meetings will be scheduled as the event unfolds to assure proper management activities.

  B.  In the event of a Initial Reactive result for BSE, all products associated with the Initial Reactive carcass, the carcass processed immediately prior to the Initial Reactive and the immediately trailing two carcasses would be retained. This practice is accepted in the EU and Japan.

  C.  Carcass Side Disposition

      1.    The carcasses are labeled with a carcass number tag as stated in Part IV-A-1 and subsequently as stated in IV-A-2.

      2.    If a Initial Reactive result occurs, the carcass sides that correspond to the number of the test will be retained. Additionally, the carcass sides corresponding to the carcass in front of the carcass that was presumptive positive and the two carcasses that correspond to the two carcasses that immediately followed the presumptive positive will be retained.

      3.    These carcass sides will be identified and isolated in the cooler prior to release to the fabrication department.

      4.    These sides will be locked in the Retention Cage found within the Carcass Coolers for further disposition. They will be marked conspicuously with denaturant on all sides, in the areas of all subprimals, including the carcass cavity side.

  D.  Variety Meat/Offal Disposition (Both edible and inedible)

      1.    The containers/boxes are labeled with a weight manifest that has a time/date stamp on the label as stated in IV-B-1.

      2.    If a Initial Reactive occurs, all Variety Meat/Offal products associated with the 4 carcasses will be identified, isolated and retained prior to any Variety Meat/Offal products leaving the freezer/box storage.(See **Box Tracking Worksheet**)

      3.    The containers associated with a presumptive positive will be retained and isolated by placement within a cage or a locked transport to await further product disposition.

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

E. Blood
    1.    All blood will be considered suspect in the event of a presumptive positive as the plant cannot break lots or allow for complete CIP at anytime during operations.
    2.    The transport containing the blood from the day of production that the Initial Reactive occurred will be retained pending further disposition. Notification of the blood processor will occur, and the blood transport will be sent to a contract renderer. **(See Renderer's Program)**
    3.    All blood tanks/conveyances are cleaned daily using a CIP cleaning procedure and/or hand cleaning.

F. Other Carcass Parts/Inedible Products in Truck-Transports
    1.    The truck transports are logged in prior to fill and logged out post-fill. This allows the plant to track back to the originating animal within a 3 hour time period.
    2.    The renderer will be notified in the event of a Initial Reactive. Notification of the trailer-transports that contain the Initial Reactive carcass parts that correspond to the Initial Reactive will be included in the conversation. The Renderer may choose to isolate the complete production from this production date. **(See Renderer's Program)**

G. Hide
    1.    The vat numbers will be logged daily as to order of fill. All hides will be required to be processed in order of slaughter.
    2.    The hide processor will be notified of the Initial Reactive, and they will hold the material under retention until further results are obtained.

VII. Methods of Disposal (in the event of a confirmed positive)
A. After disposition has been given for the Initial Reactive test for the affected carcasses, variety meat/offal products, blood and inedible carcass parts, they will be disposed of. according to the EU (licensed landfill).
B. Manner of Disposal
    1.    All carcasses and carcass parts, whether they be inedible or edible, whether they be subjected to rules of being SRM's or not, will be disposed of in an acceptable manner.
        a.    It is acceptable to bury if the burial is done by licensed landfills.**(See European Commission – Opinion on the Use of Burial for Dealing with Animal Materials that Might Contain BSE/TSE)**
    2.    Documentation of this will occur by letter to the Solid Waste facility. **(See Mock Landfill Memo)**
    3.    Visual Verification of this will occur by an official of Creekstone Farms Premium Beef and any governmental agency representative if needed. Documentation of this will occur by receipt of weight slips that show the material was received by the Landfill.

VIII. Documentation
    1.    Red Meat Export Requirements for Japan
    2.    European Commission – validation of "quick BSE tests"
    3.    Attachment 1 – displays carcass number tags, bar code tags and box manifest labels.
    4.    Picture 1 - carcass with a carcass number attached

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

Property of Creekstone Farms Premium Beef
3/12/2004

Do Not Copy
Page 9 of 9

013

5.     Picture 2  - head with a head number attached
6.     World Health Organization – Section 3.3.
7.     Departmental Manual – Subject USDA Securities Policies and Procedures for Biosafety Level-3 Facilities
8.     World Health Organization – Table 6
9.     Floor Plan of Slaughter Department 2
10.    Picture 3 – card swipe technology to minimize lab access
11.    Picture 4 – video surveillance camaras to monitor lab
12.    Laboratory Floor Print
13.    Attachment 2 – samples of retention tags
14.    Picture 5 – trolley with radio frequency chip installed
15.    Picture 6 – Radio Frequency Reader to read trolleys as they pass
16.    Picture 7, 8, 9, and 10 – touchscreen input terminals so that information can be added to trolleys as they pass by reader.
17.    Picture 11 – carcass with bar code tag
18.    Box Tracking Worksheet – displays logic of box tracking system
19.    Security Outbound Log Form – displays form for departing cargo and the logging of the transport trailers.
20.    Picture 12 – picture of a trailer seal.
21.    Picture 13 – truck gate at the plant
22.    Inedible Trailer Transport Log Form – displays the log utilized when trailers are being filled.
23.    Renderer Procedure – procedure developed by the contract renderer.
24.    Hide Vat Log Form – displays the log utilized to track vats of hides
25.    SOG 41 – SRM removal and disposal plan
26.    European Commission – Opinion on Burial of BSE Carcass/Carcass Parts
27.    Mock Landfill Memo – displays a generic notification to the contracted landfill notifying them of potentially hazardous waste.
28.    Floor Plans of the Slaughter Plant and of the Laboratory.

Confidential Commercial Information
Pursuant to 5 U.S.C. sec. 552(b)(4)

# Bovine Spongiform Encephalopathy Antigen Test Kit ELISA

(Bovine Obex)

TeSeE™   PURIFICATION KIT    Catalog # 360 0011

TeSeE™   DETECTION KIT      Catalog # 360 0012

REAGENT KITS

FOR *IN VITRO* PURIFICATION AND DETECTION OF PrP$^{res}$

*Rev i--*
*Lit # 411-017--*

*USDA Permit Number 624*
*Product Code 5430.20*

**BIO-RAD**

1 - GENERAL INFORMATION

2 - TeSeE™ PURIFICATION KIT

2 – 1   Principle of purification of PrP^res

2 – 2   Samples

2 – 3   Composition of the TeSeE™ Purification Kit

2 – 4   Preparation of reagents

2 – 5   Storage, shelf life

2 – 6   Procedure

2 – 7   Limits of the purification protocol

3 - TeSeE™ DETECTION KIT

3 – 1   Principle of PrP^res detection by ELISA

3 – 2   Samples

3 – 3   Composition of the TeSeE™ Detection Kit

3 – 4   Preparation of reagents

3 – 5   Storage, shelf life

3 – 6   Preparation of samples for PrP^res detection by ELISA

3 – 7   Procedure

3 – 8   Calculation and interpretation of the results

3 – 9   Limits of the test

4 -   MATERIAL REQUIRED BUT NOT SUPPLIED

5 -   PRECAUTIONS

6 -   HYGIENE AND SAFETY INSTRUCTIONS

- GENERAL INFORMATION

Transmissible Spongiform Encephalopathies (TSEs) are slow degenerative diseases of the central nervous system induced by unconventional transmissible agents (UTAs) routinely called prions.

TSEs are generally classified according to their etiology, as iatrogenic, familial and/or sporadic. Sheep Scrapie has been reported in the 18th century and transmission demonstrated (including to goats). However, the modes of contamination within flocks remain obscure. TSEs were also described in deer and elk (Chronic Wasting Disease, CWD) and in cattle (Bovine Spongiform Encephalopathy, BSE).

Humans are also susceptible to certain forms of TSE. There is compelling evidence supporting that BSE has passed from cattle to humans, probably through consumption of contaminated meat.

In addition to this variant form of Creutzfeldt-Jakob disease (vCJD), other forms in humans include Kuru and the iatrogenic Creutzfeldt-Jakob disease.

Pure hereditary forms (such as the Gertsmann-Straussfier-Scheinker syndrome [GSS]) and/or sporadic CJD have been demonstrated in humans, but their incidences are low. We do not know if similar sporadic TSE cases exist in animals.

The main characteristics of these diseases are:

- a slowly progressive but always fatal course,
- absence of conventional infectious agents,
- progressive accumulation in the central nervous system of an abnormal isoform of the natural prion protein (PrP) called PrP$^{res}$. This isoform is characterized by particular biochemical properties and especially by an increased resistance to proteases.

A long path of investigation led the scientific community to accept that $PrP^{res}$ per se constitutes the transmissible agent of TSE.

The strikingly long incubation period that precedes the neurological symptoms suggests that important events of TSE pathogeneses might take place in extra nervous sites and especially in peripheral lymphoid tissues.

The detection of abnormal $PrP^{res}$ is now established as the method to confirm TSE diagnosis.
This detection is mainly achieved from postmortem collected nervous tissues. Researchers have also detected abnormal $PrP^{res}$ in a number of lymphoid tissues and organs: in the germinal centers of spleen, lymph nodes, tonsils, and/or mucosa-associated lymphoid tissue in animal models or in Scrapie sheep, CWD deer and elk, and vCJD patients.

This determination includes the following reaction steps:

• **Purification of $PrP^{res}$**
  Step performed with the following reagents and accessories:
  - ○ TeSeE™ Purification Kit      Catalog # 360 0011
  - ○ Calibration syringe and needle, 100      Catalog # 355 1120 (order 2x for each kit)
  - ○ Sample syringe, 100      Catalog # 355 1121

• **Qualitative Determination of $PrP^{res}$ by ELISA**
  Step performed with the following reagents:
  - ○ TeSeE™ Detection Kit      Catalog # 360 0012

# Bovine Spongiform Encephalopathy Antigen Test Kit ELISA
## (Bovine Obex)
# TeSeE™ PURIFICATION KIT

192 TESTS          Catalog # 360 0011

REAGENT KIT FOR *IN VITRO* PURIFICATION OF PrP$^{res}$

*USDA Permit Number 524*
*Product Code 5430.20*

**BIO-RAD**

## 2-1 PRINCIPLE OF PURIFICATION OF PrP$^{res}$

The reagents of the TeSeE ™ Purification Kit allow purification, concentration and solubilization of PrP$^{res}$ from samples of nervous tissues obtained from infected animals.

Processing of the samples comprises the following steps:

· Grinding of samples

· Treatment of samples with Proteinase K,

· Concentration of PrP$^{res}$ by precipitation

· Solubilization of PrP$^{res}$ for immunoenzymatic assay with the reagents of the TeSeE ™ Detection Kit.

## 2-2 SAMPLES

Purification of PrP$^{res}$ is performed on samples of nervous tissue. The obex area from brainstem must be sampled for optimal detection, since distribution of PrP$^{res}$ is heterogeneous in the central nervous system.

For bovine animals, a sampling syringe (Catalog # 355 1121) allows a secure, easy and rapid sampling of obex area.

Samples are stored at 2-8°C when purification is performed within 24 hours or can be stored frozen for several months. They can only be submitted to 3 freeze/thaw cycles. If these samples must be transported, they should be packaged in accordance with current local regulations.

2. COMPOSITION OF THE eseE DNA PURIFICATION KIT

| LABELING | TYPE OF REAGENTS | PACKAGING |
|---|---|---|
| Grinding Tube | Grinding tube containing ceramic beads in a buffer solution Preservatives: Proclin 300 (0.1%) and Sodium Azide (0.2%) | 2 bags (2 x 96 tubes) |
| Reagent A | Denaturing solution | 1 bottle (55 ml) |
| Reagent B | Clarifying solution Coloring: Bromophenol Blue | 1 bottle (55 ml) |
| Reagent C | Resolving buffer | 1 bottle (7 ml) |
| Proteinase K | Proteinase K Coloring: Phenol Red | 1 bottle (0.5 ml) |

## 2-4 PREPARATION OF REAGENTS

All reagents of the TeSeE™ Purification Kit except Proteinase K are ready for use. Reagent A is the dilution buffer for Proteinase K. The solution must be prepared in the following way (4 µl of Proteinase K in 1 ml of Reagent A.

| NUMBER OF SAMPLES | REAGENT A | PROTEINASE K |
|---|---|---|
| 2 | 1 ml | 4 µl |
| 10 | 3 ml | 12 µl |
| 18 | 5 ml | 20 µl |
| 26 | 7 ml | 28 µl |
| 34 | 9 ml | 36 µl |
| 42 | 11 ml | 44 µl |
| 50 | 13 ml | 52 µl |
| 58 | 15 ml | 60 µl |
| 66 | 17 ml | 68 µl |
| 74 | 19 ml | 76 µl |
| 82 | 21 ml | 84 µl |
| 90 | 23 ml | 92 µl |

The volumes should be carefully measured. Following the addition of the Proteinase K into Reagent A, rinse the pipet tip thoroughly in the diluted Proteinase K solution. After reconstitution, mix the solution by successive inversions until you obtain a homogeneous red solution.

## 2-5 STORAGE, SHELF LIFE

Store the TeSeE™ Purification Kit (Catalog # 360 0011) at 2–8°C. All reagents are stable at this temperature until the expiration date indicated on the kit (before and after bottles are opened). After dilution, the reconstituted Proteinase K solution must be used within 6 hours when stored at room temperature (18–30°C).

## 24 PROCEDURE

For semi-automated processing of the purification protocol, please refer to the TeSeE™ NSP operator's manual.
For fully automated processing of the purification protocol, please refer to the TeSeE™ Kev operator manual.

### 1. Sampling:

Take a mass of 350 ± 40 mg of dorsal portion of the obex at the level of the vagus nucleus.

Deposit the samples of nervous tissue in grinding tubes, close firmly and proceed to the grinding step in the homogenizer (Ribolyser - or TeSeE™ Precess 48 - system).

### 2. Sample grinding:

Place the tubes in the crown of the homogenizer (Ribolyser - or TeSeE™ Precess 48 - system). Perform one agitation cycle with the following instrument parameters:

|             | Ribolyser | TeSeE™ Precess 48 |
|-------------|-----------|-------------------|
| Time (sec.) | 45        |                   |
| Speed       | 6.5       |                   |
| Program     | -         | Program 1         |

If grinding is insufficient, another 1 or 2 agitation cycles can be performed. However, the temperature of the tube must return to room temperature (18-30°C) between each cycle. This can be accomplished by submersing the tubes in crushed ice. Allow 5 minutes between each agitation cycle to let the instrument cool down.

**3. Sample calibration:**

Remove the grinding tubes from the homogenizer and resuspend the homogenate by inversion before opening the tubes. Remove 250 µl using the calibration syringe and needle taking care to immerse the needle in the pellet of beads to avoid sampling poorly homogenized tissue fragments. Transfer each 250 µl sample into a 2 ml polypropylene micro test tube.

Note: At this stage, both the unused homogenate in the grinding tubes and the micro test tube samples can be stored closed at:

- room temperature (18–30°C) for 8 hours.
- 2–8°C (in ice or in the refrigerator) for 15 hours; or
- -20°C for 1 year.

In case of subsequent use, frozen samples must be thawed at room temperature (18–20°C) and mixed by inversion before taking a 250 µl sample. Samples can be submitted to a maximum of 3 freeze/thaw cycles.

**4. Proteinase K treatment:**

Add 250 µl of reconstituted Proteinase K solution into each micro test tube (see Section 2-4, Preparation of Reagents), mix by inversion (10 times) and incubate at 37°C ± 2°C in a heating block incubator for 10 ± 1 minutes.

No more than 5 minutes can pass from the time of addition of reconstituted Proteinase K and mixing by inversion, and no more than 2 minutes can pass from the time of inversion and the incubation at 37°C. Therefore, perform the procedure by dividing all the samples being processed into sets of tubes that can be processed together in the time allowed. The number of samples that can be processed in each set will vary according to equipment used and the expertise of the operator performing the procedure.

Optimally, mix immediately after adding Proteinase K.

Remove the micro test tubes from the heating block incubator in the same order in which they were placed in the incubator. Open them and add 250 µl of reagent B into each tube. Mix tubes by inversion until a homogeneous blue color is obtained. Observe the same order of distribution as described in step 4, above.

For each tube, do not exceed intervals of 2 minutes between removal of the tubes from the incubator and mixing.

### 6. Concentration of the PrP$^{res}$ (centrifugation):

Within 30 minutes after buffer B addition and mixing, centrifuge the micro test tubes for 7 minutes at 15,000 x g (20°C).

### 7. Sample clarification:

After centrifugation, discard the supernatant by inverting over a waste container.

Dry the micro test tubes by inverting onto absorbent paper for 5 minutes minimum.

Add 25 µl of reagent C into each micro test tube.

Do not exceed an interval of 10 minutes between the end of the drying operation and addition of reagent C.

025

Incubate immediately for 5 ± 1 minutes at 100°C ± 5°C. Do not exceed 2 minutes between the addition of reagent C and the beginning of the incubation.

Remove the micro test tubes from the incubator and mix with a Vortex (5 ± 2 seconds).

Samples can be stored for 5 hours at 2-8°C or frozen for 72 hours at -20°C. Frozen samples must be thawed at room temperature (18-30°C) and then mixed with a vortex agitator (5 ± 2 seconds) before use.

Please refer to TeSeE™ Detection Kit package insert (Catalog # 360 0012) for detailed detection assay protocol.

## 2-7 LIMITS OF THE PURIFICATION PROTOCOL

Difficulties can be encountered during the grinding step when using dehydrated samples or samples in the process of decomposition. If necessary, the grinding step (Section 2-6, step 2, Sample grinding) may need to be repeated several times for this type of sample.

026

# Bovine Spongiform Encephalopathy Antigen Test Kit, ELISA
(Bovine Obex)

# TeSeE™ DETECTION KIT

192 TESTS                 **Catalog # 360 0012**

REAGENT KIT FOR *IN VITRO* DETECTION OF PrP^res AFTER PURIFICATION

*USDA Permit Number 624*
*Product Code 5430.20*

**BIO-RAD** ███████████████████

The TeSeE™ Detection Kit is an immunoenzymatic technique (sandwich format) using 2 monoclonal antibodies for the detection of the abnormal prion protein which is resistant to Proteinase K digestion in nervous tissues of infected animals. The kit contains sufficient reagents to assay 192 samples. The solid phase is composed of 12 strips of 8 polystyrene wells coated with the primary monoclonal antibody. The secondary monoclonal antibody is conjugated to peroxidase for immunoenzymatic detection.

The assay includes the following reactive steps:

1.  Addition of negative (R3) and positive (R4) controls and of samples prepared with the reagents of the TeSeE™ Purification Kit (Catalog # 360 0011) into the wells of the microplate coated with the primary monoclonal antibody. This step is visually controlled, as there is a marked color difference between an empty well and a well containing a sample.

2.  Incubation.

3.  Washing, then addition of the secondary monoclonal antibody conjugated to peroxidase. This step is also visually controlled by the color difference between an empty well and a well containing the conjugate solution.

4.  Incubation.

5.  Washing, then addition of the substrate followed by color development of the substrate via the enzymatic activity bound to the solid phase.

6.  Stopping the color development, then determination of optical density at 450 nm - 620 nm (bichromatism mode) and interpretation of the results.

## 3-2 SAMPLES

The assay can only be performed on samples obtained from nervous tissues prepared with the reagents and under the conditions of use of the TeSeE™ Purification Kit (Catalog # 360 0011).

Purified samples must be diluted with reagent R6 of the TeSeE™ Detection Kit.

028

| LABELING | TYPE OF REAGENT | PACKAGING |
|---|---|---|
| R1 | **Microplate:** 12 strips of 8 wells coated with an anti-PrP monoclonal antibody. | 2 plates |
| R2 | **Wash solution:** 10-fold concentrated Tris-NaCl buffer pH 7.4. Preservative: Sodium merthiolate (0.01%) | 1 vial (250 ml) |
| R3 | **Negative control:** PBS Buffer pH 7.4 supplemented with BSA. Preservative: Proclin 300 (0.1%) | 1 vial (4 ml) |
| R4 | **Positive control:** PBS buffer pH 7.4 supplemented with BSA, lactose and non infectious synthetic peptide. Preservative: Proclin 300 (0.1%) | 1 vial (Lyophilized) |
| R6 | **Sample diluent:** PBS buffer pH7.2 supplemented with BSA and Phenol Red. Preservative: Proclin 300 (0.1%) | 1 vial (35 ml) |
| R7 | **Conjugate:** 10-fold concentrated peroxidase-labeled anti-PrP monoclonal antibody in PBS buffer pH 7.1 supplemented with bovine proteins and colored with Phenol Red. Preservative: Proclin 300 (0.1%) | 1 vial (2.5 ml) |
| R8 | **Peroxidase substrate buffer:** Solution of citric acid and sodium acetate pH 4.0 containing 0.015% $H_2O_2$ and 4% dimethylsulfoxide (DMSO). | 1 vial (60 ml) |
| R9 | **Chromogen:** Tetramethylbenzidine dihydrochloride (TMB) solution. | 1 vial (5 ml) |
| R10 | **Stop solution:** 1N sulfuric acid. | 1 vial (28 ml) |
| | **Adhesive films** | 8 |

029

Before use, let the reagents of the TeSeE™ Detection Kit adjust to room temperature (18-30°C) for a minimum of 30 minutes.

## 1 - Ready-to-use reagents

**Microplates (R1):** Before opening the vacuum-sealed bag, let the microplate adjust to room temperature (18-30°C) in its protective packaging to avoid any water condensation in the wells. Immediately return the unused rows, including desiccant pack, to the protective bag. Tightly close the bag after expelling any air, then store at 2-8°C. The negative control (R3), sample dilution solution (R6) and stop solution (R10) are ready to use.

## 2 - Reagents to reconstitute

**Wash solution (R2):** Dilute wash solution R2 1 to 10 in distilled water or ultrapure water (example: 100 ml of reagent R2 in 900 ml of distilled water).

**Positive control (R4):** Gently tap the bottle of positive control (R4) on the laboratory bench to detach any substance adherent to the rubber stopper. Open the bottle and dissolve the contents in 4 ml of diluent R6. Reseal the bottle and let stand for approximately 1 minute, occasionally inverting gently to facilitate dissolution.

**Conjugate (R7):** Dilute reagent R7 1 to 10 in the freshly reconstituted wash solution (example: 0.1 ml of reagent R7 in 0.9 ml of reconstituted wash solution), noting that 1 ml of ready-for-use conjugate is sufficient for 1 row. Mix gently by inversion (avoid using a vortex agitator).

**Substrate solution (R8 + R9):** Dilute reagent R9 1 to 11 in reagent R8 (example: 0.1 ml of reagent R9 in 1 ml of reagent R8) noting that 1.1 ml of the substrate solution is sufficient for 1 row. Mix gently by inversion (avoid using a vortex agitator).

3-5 STORAGE, SHELF LIFE

Store the kit at 2-8°C before use; all reagents are stable at this temperature until the expiration date indicated on the kit. The shelf life of the reagents after preparation is as follows:

| LABELING | REAGENT | SHELF LIFE |
|----------|---------|------------|
| R1 | Microplate in tightly closed bag | 1 month at 2-8°C |
| R2 | Diluted wash solution | 24 hours at room temperature (18-30°C)<br>2 weeks at 2-8°C |
| R4 | Reconstituted positive control | 2 hours at room temperature (18-30°C)<br>4 hours at 2-8°C<br>6 months at -20°C<br>It is recommended to divide the reconstituted solution into 0.5 ml aliquots and to store them immediately at -20°C. Can be submitted to 3 successive freeze/thaw cycles. |
| R7 | Reconstituted conjugate solution (with diluted wash solution) | 8 hours at room temperature (18-30°C) |
| R8 + R9 | Substrate solution | 6 hours at room temperature (18-30°C)<br>always protected from light |

## 3-6 PREPARATION OF SAMPLES FOR PrP<sup>res</sup> DETECTION BY ELISA

Samples must be diluted with 125 µl of reagent R6. Diluted samples must be mixed by pipetting the sample and diluent up and down in the tube just before distribution into the plate (R1).

031

3-7 PROCEDURE

For fully automated processing of the detection protocol, refer to the TeSeE™ Key 2 operator's manual.

Procedure for manual processing:

1. Remove the microplate rack and the required number of rows (R1) from the protective packaging. Replace the unused rows with the desiccant in the microplate protective bag and seal tightly.

2. Prepare the positive control R4.

3. Dispense into wells in the following order:
   - Wells A1, B1, C1, D1:      100 µl of negative control R3
   - Wells E1, F1:      100 µl of positive control R4
   - Wells G1, H1, etc.:      100 µl of sample diluted with reagent R6

4. Cover with adhesive film and incubate for 75 ± 15 minutes at 37°C ± 2°C.

5. Prepare wash solution R2.

6. Prepare conjugate solution R7.

7. Remove the adhesive film, perform 3 wash cycles. Do not let the microplate stand for more than 5 minutes after the last wash cycle. Dry by inversion on absorbent paper before performing the next step. Optimal washing conditions are obtained with PW40, PW41 or 1575 Bio-Rad plate washers with program TSE 3.

9.  Cover with adhesive film and incubate 60 ± 5 minutes at 2-8°C.

10. Prepare the substrate solution (R8 + R9).

11. Remove the adhesive film and perform 5 wash cycles. Do not let the microplate stand for more than 5 minutes after the last wash cycle. Dry by inversion on absorbent paper before performing the next step. Optimal washing conditions are obtained with PW40, PW41 or 1575 Bio-Rad plate washers with program TSE 5.

12. Add 100 µl of substrate solution into each well and incubate the plate in the dark at room temperature (18-30°C) for 30 ± 5 minutes. Do not use adhesive film during this incubation.

13. Add 100 µl of stop solution to each well using the same sequence and distribution rate as for the substrate solution.

14. Thoroughly wipe the bottom of the plate and determine the optical density at 450 nm (test filter) - 620 nm (reference filter) within 30 minutes after stopping the reaction (the rows must always be protected from light before reading).

033

3-8 CALCULATION AND INTERPRETATION OF THE RESULTS

### 1) Calculation of the mean optical density (OD) of the negative control

OD R3 = mean OD of the four R3 wells

### 2) Calculation of the cut-off value

The cut-off value is equal to: OD R3 + 0.210

**Example**

OD R3 = 0.020
Cut-off value = 0.020 + 0.210 = 0.230

### 3) Condition of validation of the test*

**• Negative control (R3) values:**

*a) Validation of the individual negative control values:*

The optical density of each individual negative control should be lower than 0.150, with the exception that a maximum of one individual aberrant value can be eliminated when its optical density is greater than or equal to 0.150.

**The test must be repeated if more than one of the negative controls lies outside of this limit.**

*b) Homogeneity of the negative control values:*

Calculate the mean of the negative controls with the individual remaining values.
Values higher than the mean of the negative controls + 40% (OD R3 + 40%) must be eliminated.

-    If one individual value is eliminated in a), one additional value can be eliminated in b).
-    If no negative control value is eliminated in a), a maximum of two values can be eliminated in b).

**The test must be repeated if more than two values of the negative control are eliminated:   [(criteria a) + b].**

**• Positive control (R4):**

The mean of the two positive control optical density values (OD R4) must be greater than or equal to an OD of 1.000.

**The test must be repeated if the mean of the two positive control optical density values (OD R4) is lower than this limit.**

**4) Interpretation of the results**

Samples with an optical density lower than the cut-off value are considered to be negative according to the TeSeE™ Detection Kit. However, OD readings just below the cut-off value (cut-off value -10%) must be interpreted as suspect and the corresponding samples should be retested in duplicate.

Samples with an optical density greater than or equal to the cut-off value are considered to be initially reactive according to the TeSeE™ Detection Kit and should be retested in duplicate, starting from the original homogenate, before the final interpretation. After repeating the test, the sample is considered to be positive when at least one of the duplicate measurements is positive (greater than or equal to the cut-off value).

The sample is considered to be negative according to the TeSeE™ Detection Kit when the two duplicate values are less than the cut-off value.

**Note:**

Samples retested in duplicate and found to be negative according to the TeSeE™ Detection Kit, where one of the two values is close to the cut-off value (cut-off value - 10%) must be confirmed by another method such as IHC in a USDA approved laboratory.

## 3-9 LIMITS OF THE TEST

A negative result means that the test sample does not contain any PrP$^{res}$ detectable by the TeSeE™ Detection Kit. However, as very low levels of PrP$^{res}$ may not be detected, such a negative result does not exclude the possibility of infection. Any sample with a reproducible positive result according to the test interpretation criteria must be confirmed by the IHC procedure as recommended by APHIS. The assay can only be performed on samples obtained from tissues prepared with the reagents and under the conditions of use of the TeSeE™ Purification Kit.

4 - MATERIAL REQUIRED BUT NOT SUPPLIED

- Distilled or ultrapure water
- 6° sodium hypochlorite (bleach) and 1M sodium hydroxide solutions
- Absorbent paper
- Disposable gloves
- Protective glasses or mask with visor

**Purification step:**

- 2 ml polypropylene micro test tubes with caps and appropriate tube rack
- 15 ml and 50 ml polypropylene conical test tubes
- Automatic or semiautomatic adjustable pipets able to distribute volumes between 20 µl and 500 µl
- Tissue homogenizer: Ribolyser or TeSeE™ Precess 48*
- Centrifuge* adapted to micro test tubes
- One micro test tube heating block* thermostated at 37°C ± 2°C and one micro test tube heating block* thermostated at 100°C ± 5°C
- For semi-automated purification of the sample: TeSeE™ NSP Systems
- For fully automated purification of the sample: TeSeE™ Key 1 system

**Detection step:**

- Automatic or semiautomatic adjustable or fixed pipets able to distribute 50 µl, 100 µl, 200 µl and 1000 µl
- 15 ml and 50 ml polypropylene conical test tubes
- 1000 ml graduated cylinder
- Contaminated waste containers.
- Microplate incubator* thermostated at 37°C ± 2°C
- Refrigerated chamber at 2–8°C
- Automatic or semiautomatic microplate washing system*
- Microplate reading apparatus* (equipped with 450 nm and 620 nm filters)
- For fully automated detection of the sample: TeSeE™ Key 2 system

*Contact Bio-Rad for detailed information about the instruments validated by our technical departments.

**5 - PRECAUTIONS**

The quality of the results depends on compliance with the following good laboratory practices:

- Reagents must be stored at 2-8°C.
- Do not use reagents with an expired shelf life.
- Do not use the reconstituted Proteinase K that has been stored at room temperature (18-30°C) over 6 hours.
- Do not mix or combine reagents derived from kits with different serial numbers during the same manipulation with the exception of reagents R2, R8, R9 and R10.
- Allow the reagents to adjust to room temperature (18-30°C) for a minimum of 30 minutes before use.
- Thoroughly reconstitute reagents, avoiding any contamination.
- Do not perform the test in the presence of reactive vapors (acids, alkalis, aldehydes) or dust, which could alter the enzymatic activity of the conjugate.
- Use polypropylene tubes only.
- Use thoroughly washed glassware, rinsed in distilled water, or preferably, use disposable material.
- Do not let more than 5 minutes elapse between the end of washing and the addition of the reagents into the microplate.
- The enzymatic reaction is very sensitive to all metals and metallic ions. Consequently, no metallic element must contact the various solutions containing the conjugate or the substrate.
- The substrate solution (substrate buffer + chromogen) must be colorless. The appearance of a color within a few minutes after reconstitution indicates that the reagent cannot be used and must be replaced. Preferably, the substrate solution should be prepared with disposable plastic containers and distribution material or glassware previously washed in 1N hydrochloric acid, rinsed in distilled water and dried. **Store the substrate solution protected from light.**
- Use a new pipet tip for each sample.
- Washing of the microplate wells is an essential step of the procedure. Follow the recommended number of washing cycles and ensure all wells are completely filled and completely emptied. Inadequate washing can give incorrect results.
- Never use the same container and pipet to distribute the conjugate and the substrate solution.

## 6 – HYGIENE AND SAFETY INSTRUCTIONS

- All reagents of the kit are intended for use in *in vitro* diagnosis.
- Wear disposable gloves when handling reagents and samples and wash your hands thoroughly after handling them.
- Do not mouth pipet.
- Use polypropylene containers due to the risk of glass containers breaking and causing potential wounds.
- All the materials directly in contact with the samples and the wash solutions must be considered as contaminated.
- Avoid splashing samples or solutions containing samples.
- Contaminated surfaces must be cleaned with 6° chlorometric (CHL) sodium hypochlorite solution (bleach). When the contaminating liquid is an acid, contaminated surfaces must first be neutralized with sodium hydroxide before using bleach. Surfaces must be rinsed with distilled water, dried with ethanol and wiped with absorbent paper. The material used for cleaning must be discarded in a special container for contaminated wastes.
- Samples, material and contaminated products must be eliminated after decontamination by one of these methods:
  - soaking in 1M sodium hydroxide for 1 hour at room temperature (18-30°C);
  - soaking in 6° chlorometric (CHL) sodium hypochlorite solution for 1 hour at room temperature (18-30°C);
  - autoclaving at 134°C minimum for at least 18 minutes, under 3 bars of pressure.

  **Note: never autoclave solutions containing bleach.**

- All operations involved in Bovine Spongiform Encephalopathy (BSE) screening tests are subject to regulations and must be performed in an isolated, limited and controlled access laboratory devoted exclusively to this activity. A laboratory coat, overshoes, gloves, mask with visor or simple mask with safety glasses are required to ensure the operator's safety.

- Operators must receive specific training concerning the risks related to TSE agents or prions and the validated modes of decontamination for unconventional agents. Biosafety measures must be in agreement with recommendations of government regulatory authorities of the country.

- Avoid any contact of the substrate buffer, chromogen and stopping solution with the skin and mucous membranes.

- Reagents A and C contain detergents and chaotropic agents. Use appropriate sampling devices to avoid contact with the skin and/or mucous membranes.

- Neutralize and/or autoclave all wash solutions or wash wastes or any liquid containing biological samples prior to their disposal.

- In general, hygiene conditions, biosafety measures, and good laboratory practices must be in agreement with the recommendation of the regulatory authorities of the country.

---

*TeS*E (TeS*E®) is a registered trademark of Bio-Rad in Australia, France, Ireland and other countries. The mark is filed, but not yet registered in the United States.*



TeSeE ® Purification kit 3551144

TeSeE ® kit Détection 3551145

Bio-rad-CFB-TeSeE-Presentation

BIO-RAD

040



—Civ. No. 06-544 Stewart Declaration
ATTACHMENT 4

**United States
Department of
Agriculture**

Marketing and
Regulatory
Programs

Animal and Plant
Health Inspection
Service

Veterinary Services

Center for Veterinary
Biologics
Suite 104
510 South 17th Street
Ames, IA 50010
(515) 232-5785
FAX (515) 232-7120

March 17, 2004

## CENTER FOR VETERINARY BIOLOGICS NOTICE NO. 04-08

Subject:     Diagnostic Test Kits for Bovine Spongiform Encephalopathy

To:          Biologics Licensees, Permittees, and Applicants
             Veterinary Services Management Team
             Directors, Center for Veterinary Biologics
             Area Veterinarians in Charge, VS
             State Veterinarians

### I.     PURPOSE

The purpose of this notice is to inform interested parties that the Center for Veterinary
Biologics (CVB) is providing additional information on the product restrictions for
veterinary biologics product license and permit applications for diagnostic test kits
(including "rapid tests") intended as an aid in the diagnosis of bovine spongiform
encephalopathy (BSE).

### II.     BACKGROUND

Numerous test methods (e.g., immunohistochemistry, ELISA, Western blot) and
commercial test kits have been developed to aid in the diagnosis of BSE. Some of these
kits have been approved by foreign regulatory officials (e.g., European Union, Japan) for
use in their BSE testing programs. Due to recent confirmed cases of BSE in North
America and the anticipated increase in surveillance for BSE in the U.S., the CVB will
issue U.S. Veterinary Biological Product Licenses or Permits.

In accordance with Title 9 Code of Federal Regulations §102.5(d), U.S. Veterinary
Biological Product Licenses will be issued with the following restrictions:

1. Sale and use in the United States restricted to laboratories approved by State and
Federal (USDA) animal health officials.

2. Potency testing and distribution and use of BSE test kits shall be under the supervision
or control of USDA, APHIS, Veterinary Services under such additional conditions as the
Administrator may require.



Veterinary Services – Safeguarding Animal Health
An Equal Opportunity Employer

Federal Relay Service
(Voice/TTY/ASCII/Spanish)
1-800-877-8339

In accordance with Title 9 Code of Federal Regulations §104.1, U.S. Veterinary Biological Product Permits will be issued with the following restrictions:

1. Sale and use in the United States restricted to laboratories approved by State and Federal (USDA) animal health officials.

2. Potency testing and distribution and use of BSE test kits shall be under the supervision or control of USDA, APHIS, Veterinary Services under such additional conditions as the Administrator may require.

3. Each shipment of biological product distributed and sold under this permit must be accompanied by an original certificate endorsed by a full-time salaried veterinarian of the agency responsible for animal health of the Government of the country of origin, or other assurances acceptable to APHIS, certifying that: 1) All ingredients of animal origin used to produce this product were not obtained from ruminants that have been in any country cited in 9 CFR 94.18 or countries considered to be equivalent status by the National Center for Import Export. 2) During the manufacturing process, the manufacturing facility does not receive, store, or process any ingredients of ruminant origin from countries cited in 9 CFR 94.18. 3) The product complies with all other provisions of 9 CFR 113.53.

## III.    ACTION

Interested parties should refer to Title 9, Code of Federal Regulations, Subchapter E; Veterinary Services (VS) Memorandum No. 800.50, Basic License Requirements for Applicants; VS Memorandum No. 800.101, U.S. Veterinary Biological Product Permits for Distribution and Sale; and VS Memorandum No. 800.73, General Requirements for Immunodiagnostic Test Kits, for guidance in applying for licensure. This information is available on the CVB website:

**www.aphis.usda.gov/vs/cvb/regsandguidance.htm**

Applications and supporting materials should be submitted to the CVB-Policy, Evaluation, and Licensing for review.


/s/ Byron E. Rippke for

Richard E. Hill, Jr.
Director
Center for Veterinary Biologics

**USDA**
**United States Department of Agriculture**



| Home | About USDA | | Agencies & Offices | Help | Contact Us | En Español |

You are here: **Home** / **Newsroom** / Release No. 0141.04

## Newsroom

**Search**
[ ] [Go]

**Browse by Subject**
▸ Agriculture

▸ Rural and Community Development

### News Release
Release No. 0141.04

Contact:
USDA Press Office (202) 720-4623

🖶 *Printable version*

**Statement by Bill Hawks, Undersecretary for Marketing and Regulatory Programs Regarding a Request by Creekstone for Private BSE Testing April 9, 2004**

   **WASHINGTON, April 9, 2004 --**"Yesterday, USDA officials informed Creekstone Farms Premium Beef that its request for a license to use rapid tests for Bovine Spongiform Encephalopathy (BSE) in a private marketing program can not be granted at this time. The test is now licensed for animal health surveillance purposes. The use of the test as proposed by Creekstone would have implied a consumer safety aspect that is not scientifically warranted.

   "The United States has taken aggressive measures in response to BSE to both protect consumer health and the animal herd. These measures include an enhanced surveillance system which will test a significant proportion of the population of high risk animals. As part of this system, USDA recently approved rapid tests for screening these animals to determine the presence of BSE in the cattle herd. This action and the approach are based on recommendations by an international panel of experts who reviewed our systems. That panel also explicitly noted that there is no scientific justification for 100 percent testing because the disease does not appear in younger animals.

   "We are continuing our discussions with all of our trading partners so that trade can resume based on international scientific standards set by the World Organization for Animal Health (OIE)."

                                    #

**Newsroom**
**News Releases**
○ **Latest Releases**

○ **2003 Releases**

○ **2002 Releases**

○ **2001 Releases**

○ **Agency Releases**

○ **Transcripts and Speeches**

○ **Subscribe**

**Reports**
**Agency Schedule/Calendar,**
○ **Annual Reports and Mid-Term Reports**

**Radio and TV Broadcasts**
○ **Radio and TV**

**Publications**
○ **USDA Publications**

**Events**
○ **Events by State**

FOIA | Accessibility Statement | Privacy Policy | Non-Discrimination Statement | Information Quality | FirstGov | White House

—Civ. No. 06-544 Stewart Declaration
ATTACHMENT 6



**PREMIUM BLACK ANGUS BEEF™**

DATE:    April 13, 2004

TO:    Secretary Ann Veneman
Secretary of Agriculture
United States Department of Agriculture
Email: agsec@usda.gov

Undersecretary J.B. Penn
United States Department of Agriculture
Email: Jb.Penn@usda.gov

Undersecretary Bill Hawks
United States Department of Agriculture
Email: Bill.Hawks@usda.gov

Chief of Staff Dale Moore
United States Department of Agriculture
Email: Dale.Moore@usda.gov

FROM:    John Stewart, C.E.O.        Bill Fielding, C.O.O.
Creekstone Farms Premium Beef    Creekstone Farms Premium
Office: (303) 255-9200        Office: (620) 741-3100
Email: angusinfo@cfpbeef.com    Email: bfielding@cfpbeef.com

SUBJECT:    RESPONSE TO USDA

On behalf of Creekstone Farms I want to thank you for the opportunity to have met with you in Washington, D.C. last Thursday, April 8. We had hoped for a different outcome to the meeting, however, and are very disappointed with USDA's decision not to allow Creekstone Farms to voluntarily test all of the cattle we process for bovine spongiform encephalopathy (BSE). As we have discussed in the various meetings held with the USDA over the past several weeks, BSE testing of our cattle is something our export customers and consumers are asking for, and we feel we should be able to provide it to them.

Creekstone Farms will challenge the USDA's decision, and are currently analyzing our legal options. We are challenging USDA's authority to control the sales of BSE diagnostic tests in the United States and your decision to prohibit companies like

Creekstone Farms from conducting 100% testing of young animals that would meet our customers' needs and requirements.

We are hopeful there will be a resolution to the current U.S. beef trade embargo with Japan. It is imperative to companies such as ours that trade be resumed. However, we understand the position of our Japanese customers, consumers and their government, as well as the challenges their staunch positions represent. They are requesting 100% testing of all beef bound for their market as the precursor to the resumption of trade. The USDA's current plan to test only older U.S. cattle for BSE will not meet this requirement. On Monday, Japanese Vice Agriculture Minister Mamoru Ishihara announced that the "U.S. government's decision not to accept [Creekstone's] offer is, frankly speaking, regrettable."

Creesktone Farms has received a tremendous amount of support during the past few weeks for our proposal to test all of our cattle for BSE. We will continue to work with our senators and congressmen, as well as industry experts, to help find a solution to this recent USDA decision. Please understand our situation as well as our consternation over why the USDA will not embrace our plan. Creekstone Farms plans to test more cattle than the USDA, at a lower cost. If our plan were to be implemented, we would test over 300,000 head of cattle over the course of a year, versus the USDA proposed cattle population of approximately 220,000 head. As well, the USDA is planning on spending a minimum of $70 million of taxpayer money to conduct these tests. The Creekstone Farms' plan will cost approximately $6 million, and our customers are willing to pay for the cost of the testing.

We ask that the USDA reverse its decision of last week and allow Creekstone Farms to test our beef for BSE. In addition, Creekstone Farms is asking for USDA approval of the following secondary options:

1) Expand the USDA's surveillance program to involve 1 million head of young animals.
2) Approve the procedure whereby Creekstone Farms is allowed to ship brain stem samples to Japan for BSE testing in their laboratories.
3) Approve Kansas State University as an official USDA laboratory with direction to establish Creekstone Farms as a satellite laboratory.
4) Approve the purchase of young Canadian cattle that would be BSE tested at our processing plant in Arkansas City, Kansas.

This letter is also giving notice to the USDA that our loss in revenue is a minimum of $200,000 per day. We will continue to track this loss on a daily basis to determine damages.

Creekstone Farms Premium Beef, LLC

Sales, Marketing, & Customer Service
12050 N. Pecos St.
Suite 300
Westminster, CO 80234
303-255-9200
303-255-9215 fax

Plant Operations
604 Goff Industrial Park Road
PO Box 1007
Arkansas City, KS 67005
620-741-3100
620-741-3195 fax

045

April 13, 2004

1. What legal grounds (policies/regulations) would prohibit a private industry from performing a Rapid Test method for BSE? If testing young cattle is not a food safety issue, does it fall under APHIS or FDA?

2. Why does Federal Register prohibit saving of small intestine unless the animal is BSE tested?

3. You have stated that BSE does not occur in cattle under 30 months of age. Why have you prohibited all SRM from all age groups of cattle processed? What is the science behind this decision?

4. How does USDA certify and approve Domestic and International sales/production of Natural or Organic Beef products? This would be an implied Consumer Safety Aspect that is not scientifically warranted. You have stated that BSE testing is an 'Implied Food Safety Aspect that is not scientifically justified'. How does this differ from Natural or Organic products? If testing is approved, why can't a label say BSE Tested?

5. How can the USDA justify spending $72,000,000 to test 221,000 head of cattle in 12 months ($325/head), when a private company will use the same test method as APHIS to test 300,000 head for $5,400,000 in 12 months ($18/head)? Also, this private company can fully implement testing in one week, why will it take APHIS five months to fully implement their program? Total preparation and training took 1 month.

6. Why is the USDA not immediately allowing Canadian cattle under 30 months of age to be sold into the US? If there is any concern, could Creekstone test Canadian cattle?

7. Given the USDA position that BSE Testing is not scientifically justified what exactly are the statistical odds and how do you rationalize not giving the people a choice? There have been BSE young cattle in Japan and England.

8. What will be the Governments position if a major Domestic customer requires packers to do something BSE related that is not scientifically justified? Will the packer be told he can not do it?

9. What is the statistical error on correctly determining cattle age using dentition?

—Civ. No. 06-544 Stewart Declaration
ATTACHMENT 7



**United States Department of Agriculture**

Office of the Secretary
Washington, D.C. 20250

June 1, 2004

Mr. Bill Fielding
C.O.O.
Plant Operations
Creekstone Farms Premium Beef
Post Office Box 1007
Arkansas City, Kansas 67005

Dear Mr. Fielding:

Thank you for your letter of April 13, 2004, regarding your request that the Department of Agriculture (USDA) allow Creekstone Farms to conduct its own testing for bovine spongiform encephalopathy (BSE).

We recognize your disappointment with USDA's decision. However, we remain convinced that allowing a company to use a BSE test in a private marketing program is inconsistent with USDA's mandate to ensure effective, scientifically sound testing for significant animal diseases and maintain domestic and international confidence in U.S. cattle and beef products. Because of your stated intent to pursue legal action in this matter, the Department of Justice has advised us not to provide a substantive reply to the issues raised in your letter at this time.

We continue working diligently, at the highest levels, to reopen international markets for U.S. beef producers based on our contention that current barriers against U.S. beef are scientifically unwarranted. We are sending an identical response to Mr. Stewart.

Sincerely,

Bill Hawks
Under Secretary
Marketing and Regulatory Programs

—Civ. No. 06-544 Stewart Declaration
ATTACHMENT 8

To:        Bill Hawks
           Under Secretary for Marketing and Regulatory Services

From:      Bill Fielding
           COO

Subject:   BSE Testing

Thank you for agreeing to discuss a few options that might allow Creekstone to BSE test. Please consider the following. I will come to Washington for a meeting on July 12th if you think it would be productive. We can go over this by phone on the 7th. We would drop any legal and/or political remedy if we could make significant progress on these points.

1. Direct Kansas State to approve the Creekstone LAB provided Creekstone meets all requirements of already approved labs/programs or preferably approve Creekstone directly.

2. Approve Creekstone to test all cattle over 30 months effective immediately.

3. Approve Creekstone to test cattle less than 30 months effective whenever foreign government restrictions have been lifted. The reason for doing this would be clearly stated as marketing only. This would enable us to respond to our customers' request.

4. On all cattle tested the small intestine excluding the distel ileum should be allowed for export complying with the Japanese specifications.

5. Establish a deadline of January 1st, 2005 if Japan has not changed their position then companies should be allowed to test.

6. Regarding testing protocol we would like to discuss options to minimize any market disruptions and still comply with our customer requirements.

We are open to any other ideas that can help us recapture our lost customers. Once the borders are reopened it would seem to negate any fear of everyone having to test or that the producer would bear the cost. Instead testing for marketing purposes would support higher cattle prices and increased demand similar to what is happening with "**Organic**" and "**All Natural**".

I hope we can take a step forward on this important issue.

Thank you,

Bill Fielding
COO

048



**United States Department of Agriculture**

Office of the Secretary
Washington, D.C. 20250

SEP 2 4 2004

Mr. Bill Fielding
Chief Operations Officer
Creekstone Farms Premium Beef, LLC
604 Golf Industrial Park Road
Arkansas City, Kansas  67005

Dear Mr. Fielding:

Thank you for your letter of August 19, 2004, reiterating your request that the Department of Agriculture (USDA) allow Creekstone Farms to conduct its own testing for bovine spongiform encephalopathy (BSE) under the auspices of Kansas State University.

We regret the apparent misunderstanding on the part of Creekstone Farms regarding USDA's position on this issue.  USDA's position was accurately represented by Dr. Randall Levings, Director of USDA's National Veterinary Services Laboratories, in his August 5, 2004, letter to Dean Ralph Richardson of Kansas State University.  As indicated in that response, Kansas State University does not have the authority to designate satellite laboratories for BSE testing.  We must again emphasize that USDA will continue to limit approval for conducting BSE tests to Federal and State/Federal cooperative laboratories, and will not authorize Creekstone Farms to conduct such testing.

Sincerely,

*Bill Hawks*

Bill Hawks
Under Secretary
Marketing and Regulatory Programs

049

An Equal Opportunity Employer

**USDA**

United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and Plant
Health Inspection
Service

Veterinary Services

National Veterinary
Services Laboratories

P.O. Box 844
1800 Dayton Avenue
Ames, IA 50010
(515) 663-7266
FAX (515) 663-7397

**RECEIVED**

AUG 0 9 2004

DEAN OF VET. MED.

August 5, 2004

Dean Ralph Richardson
College of Veterinary Medicine
Kansas State University
101 Trotter Hall
Manhattan, KS 66506-5601

Dear Dean Richardson:

Thank you for your letter of July 13, 2004, regarding Creekstone Farms' request to operate a satellite laboratory in connection with Kansas State University's participation in the Department of Agriculture's (USDA) bovine spongiform encephalopathy (BSE) surveillance program.

We are pleased to have Kansas State University participate in USDA's BSE testing program, and we appreciate your making us aware of Creekstone's request. As you are aware, in accordance with one of the recommendations provided by an international review panel, USDA announced the current surveillance plan to significantly augment BSE surveillance efforts for a period of 12 to 18 months. Under the plan, USDA has specified that testing of samples from targeted cattle will be conducted only at USDA's National Veterinary Services Laboratories in Ames, Iowa, and also within a geographically dispersed network of State and university laboratories that meet certain criteria. We selected 12 State laboratories, including Kansas State University, to assist in the surveillance efforts. This network has more than sufficient capacity to handle all of the testing we expect to occur.

Given the consequences that can result from these tests and the potential for governmental action, we believe that BSE testing is an inherently governmental function that must be conducted by Federal and State laboratories. This is crucial if we are to preserve domestic and international market confidence in U.S. agricultural commodities. Accordingly, USDA will continue to limit approval for conducting tests to Federal and State/Federal cooperative laboratories and would not authorize Creekstone Farms as a satellite laboratory. Additionally, we must clarify that, contrary to information provided to you by Creekstone Farms, Kansas State University does not have the authority to designate satellite laboratories for BSE testing.

**APHIS** *Safeguarding American Agriculture*
APHIS is an agency of USDA's Marketing and Regulatory Programs

An Equal Opportunity Provider and Employer

Federal Relay Service
(Voice/TTY/ASCII/Spanish)
1-800-877-8339

050

Dean Ralph Richardson

2.

Again, we are pleased that Kansas State University will participate in USDA's surveillance program, and we hope that this information is helpful in clarifying our laboratory policies in regard to BSE. Thank you again for writing.

Sincerely,

Randall L. Levings
Director