# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CREEKSTONE FARMS PREMIUM BEEF, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-544 (JR) |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, and MIKE JOHANNS, IN HIS CAPACITY AS THE SECRETARY OF AGRICULTURE, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CONSOLIDATED MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Overview of BSE and Measures to Address It . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Administrative History of Plaintiff's Request to Conduct its Own
           BSE Testing on All of its Cattle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    The Virus-Serum-Toxin Act and Implementing Regulations . . . . . . . . . . . . . . 10

    D.    Plaintiff's Complaint and Motion for Summary Judgment . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER
        OF LAW BECAUSE PLAINTIFF'S CLAIMS ARE MOOT . . . . . . . . . . . . . . . . . . . . 15

III.    PLAINTIFF'S ALTERNATIVE THEORIES OF INJURY ARE NOT
        LIKELY REDRESSABLE AND ARE TOO SPECULATIVE TO
        AFFORD PLAINTIFF STANDING TO PURSUE ITS CLAIMS . . . . . . . . . . . . . . . . 17

IV.    USDA'S REGULATIONS AUTHORIZING RESTRICTIONS ON
        THE USES FOR WHICH BIOLOGICAL PRODUCTS MAY BE SOLD
        ARE VALID AND REASONABLE IMPLEMENTATIONS OF VSTA'S
        LANGUAGE AND PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.    USDA's Regulations Authorizing Restrictions On the Uses for
           which Biological Products May be Sold Are Consistent With
           VSTA's Plain Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          1.    Regulation 102.5(d) is Authorized by VSTA . . . . . . . . . . . . . . . . . . . . 24

          2.    Regulation 104.1 is Authorized by VSTA . . . . . . . . . . . . . . . . . . . . . . . 30

    B.    USDA's Regulations Authorizing Use Restrictions Are Consistent
           With VSTA's Purpose As Reflected In The Act's Legislative History . . . . . . . 30

C.  USDA's Regulations Authorizing Use Restrictions Effectuate Congressional Intent, Or, Alternatively, Are Reasonable Interpretations Of VSTA Entitled To Substantial Deference ............................ 31

V.  USDA'S REGULATIONS INTERPRETING "ANALOGOUS PRODUCT FOR USE IN THE TREATMENT OF DOMESTIC ANIMALS" TO INCLUDE DIAGNOSTIC TESTS ARE VALID AND REASONABLE IMPLEMENTATIONS OF VSTA'S LANGUAGE ............................ 34

VI.  BSE TEST KITS FALL SQUARELY WITHIN USDA'S REGULATORY AUTHORITY UNDER VSTA .............................................. 40

A.  A BSE Test Kit Is An Analogous Product ................................ 40

B.  BSE Test Kits are Intended for "Use In The Treatment Of Domestic Animals." ................................................... 41

C.  BSE Test Kits Are Worthless for Use in the Treatment of Domestic Animals When Used to Diagnose BSE in a Non-Targeted Manner on All Slaughter-Aged Cattle ......................................... 42

D.  USDA's Determination That It Has Authority To Regulate BSE Test Kits Is Reasonable And Entitled To Deference ...................... 44

VII. USDA'S REGULATION OF BSE TEST KITS IS CONSISTENT WITH VSTA'S PURPOSES ..................................................... 47

CONCLUSION ......................................................... 53

## TABLE OF AUTHORITIES

**CASES**                                                            **PAGE(S)**

Adamo Wrecking Co. v. United States, 434 U.S. 275 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

American Fed. of Gov't Employees, 284 F.3d at 129 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

American Petroleum Institute v. EPA, 52 F.3d 1113 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . 29

Apotex Inc. v. FDA, 414 F. Supp. 2d 61 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Area Transp., Inc. v. Ettinger, 219 F.3d 671 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Arnold v. Intervet, Inc., 305 F. Supp. 2d 548 (D. Md. 2003) . . . . . . . . . . . . . . . . . . . . . . . 27, 33

Articulate Sys., Inc. v. Apple Computer, Inc., 53 F. Supp. 2d 62 . . . . . . . . . . . . . . . . . . . . . . . 19

Auer v. Robbins, 519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

BDPCS, Inc. v. FCC, 351 F.3d 1177 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Bankamerica Corp. v. United States, 462 U.S. 122 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Barnhardt v. Walton, 535 U.S. 212 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Beth Rochel Seminary v. Bennett, 624 F. Supp. 911 (D.D.C. 1985) . . . . . . . . . . . . . . . . . . . . 28

Blank v. United States, 400 F.2d 302 (5th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Burlington Northern R.R. Co. v. Surface Transp. Bd., 75 F.3d 685 (D.C. Cir. 1996) . . . . . . . 15

Capital Network Sys., Inc. v. Federal Communications Comm'n,
28 F.3d 201 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837
(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Christensen v. Harris County, 529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Consolidated Rail Corp. v. Interstate Commerce Comm'n, 43 F.3d 1528 (D.C. Cir. 1995) . . . 47

Crest A Apartments Ltd. II v. United States, 52 Fed. Cl. 607 (Fed. Cl. 2002) . . . . . . . . . . . .  30

Ethyl Corp. v. EPA, 51 F.3d 1053 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

Federal Election Comm'n v. National Rifle Ass'n of America, 254 F.3d 173
       (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

Garrelts v. SmithKline Beecham Corp., 943 F. Supp. 1023 (N.D. Iowa 1996) . . . . . . . . .  29, 51

Gettman v. DEA, 290 F.3d 430 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 22

Grand Labs., Inc. v. Harris, 488 F. Supp. 618 (D.S.D. 1980) . . . . . . . . . . . . . . . . . . . . . . . .  38

Hall v. State, 158 N.W. 362 (Neb. 1916) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 50

Kelley v. EPA, 15 F.3d 1100 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27, 34

Kimberlin v. Quinlan, 6 F.3d 789 (D.C. Cir. 1993), vacated on other grounds by
       515 U.S. 321 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 22

Kremens v. Bartley, 431 U.S. 119 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76 (D.D.C. 2006) . . . . . . . . . . . . . .  30

Loge v. United States, 662 F.2d 1268 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

Lorillard v. Pons, 434 U.S. 575 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Lubrizol Corp. v. EPA, 562 F.2d 807 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . .  17, 18, 23

Lynnbrook Farms v. Smithkline Beecham Corp., 79 F.3d 620 (7th Cir. 1996) . . . . . .  27, 33, 53

Miles v. City of New York, 2002 WL 31410346 (E.D. N.Y. 2002) . . . . . . . . . . . . . . . . . .  19, 22

Miller v. AT&T Corp., 250 F.3d 820 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 41

Morton v. Ruiz, 415 U.S. 199 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

Mylan Laboratories, Inc. v. Thompson, 389 F.3d 1272 (D.C. Cir. 2004) . . . . . . . . . . . . . . . .  46

NLRB v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13 (1st Cir. 1999) . . . . . . . . . .  27

National Labor Relations Board Union v. Federal Labor Relations Authority,
    834 F.2d 191 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Pegram v. Herdrich, 530 U.S. 211 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 41

Pharmaceutical Research and Mfrs. of America v. Thompson, 362 F.3d 817
    (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. USDA,
    415 F.3d 1078 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 44

Reno v. Flores, 507 U.S. 292 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Skidmore v. Swift & Co., 323 U.S. 134 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34, 38, 46

Smith v. City of Jackson, 544 U.S. 228 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37, 38

Steel Company v. Citizens for a Better Environment, 523 U.S. 83 (1998) . . . . . . . . . . . . . . .  17

The Honorable John H. McBryde v. Committee to Review Circuit Counsel and
    Disability Orders of the Judicial Conference of the United States,
    264 F.3d 52 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Mead Corp., 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . .  15, 34, 45, 46

United States v. O'Hagan, 521 U.S. 642 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

United States v. Rutherford, 442 U.S. 544 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Wachtel v. Office of Thrift Supervision, 982 F.2d 581 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . 27

Whitmore v. Arkansas, 495 U.S. 149 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

## STATUTES

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 48

12 U.S.C. § 78n(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

21 U.S.C. § 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 41

21 U.S.C. §§ 151-159 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

21 U.S.C. § 154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

21 U.S.C. § 154a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

21 U.S.C. § 159 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

29 U.S.C. § 156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## <u>RULES AND REGULATIONS</u>

9 C.F.R. § 93.400 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

9 C.F.R. §§ 93.401, 94.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9 C.F.R. § 101.2(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

9 C.F.R. §§ 102.1-102.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9 C.F.R. § 102.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

9 C.F.R. § 104.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 30, 45

9 C.F.R. § 310.22(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 C.F.R. § 589.2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

47 Fed. Reg. 26,458, 26,459 (June 18, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

62 Fed. Reg. 31326, 31327 (June 9, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

70 Fed. Reg. 460, 522 (January 4, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 44

## <u>LEGISLATIVE MATERIAL</u>

Hearing before the Committee on Agriculture on the Estimates of Appropriations
    for the Fiscal Year Ending June 30, 1914, (H.R. 28283), 62nd Cong. 24 (1913) . . . . . . 49

S. Rep. No. 62-1288, at 2 (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 51

S. Rep. No. 99-145 at 339, <u>reprinted in</u> 1985 U.S.C.C.A.N. 1676, 2005 . . . . . . . . . . . . . . . . . 52

## RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## MISCELLANEOUS

"Bovine Spongiform Encephalopathy in Japan: Consumers' Food Safety Perceptions
    and Willingness to Pay for Tested Beef," 49 *The Australian Journal of
    Agricultural and Resource Economics* 197, 199, 207 (2005) . . . . . . . . . . . . . . . . . . . . . 20

U.S. Meat Export Federation Chart, Total U.S. Beef Exports 1996-2005 . . . . . . . . . . . . . . . . 23

## INTRODUCTION

This case arises out of plaintiff's desire to conduct scientifically unjustified testing for bovine spongiform encephalopathy ("BSE"), commonly called "mad cow disease," on all of its cattle for slaughter in order to provide its customers and the general public with the misleading impression that plaintiff's beef is safer than other beef, and with the expectation that the government of Japan would permit plaintiff's beef to be sold there, even though Japan had an import ban on all U.S. beef in place at the time plaintiff filed its complaint. As a result of technological limitations of current testing methods for BSE, when used for food safety and marketing purposes, as proposed by plaintiff, private BSE testing is like a worthless virus, serum, or toxin portrayed as a panacea to an uninformed public, and, accordingly, defendants have lawfully denied plaintiff's request to purchase BSE test kits for the purpose of conducting such testing pursuant to their authority under the Virus-Serum-Toxin Act, 21 U.S.C. §§ 151-159 ("VSTA").

Defendants United States Department of Agriculture ("USDA") and Mike Johanns, the Secretary of Agriculture, (collectively "defendants") hereby oppose plaintiff's motion for summary judgment (dkt. no. 6) (July 15, 2006) and cross-move for summary judgment on plaintiff's complaint. Defendants are entitled to judgment as a matter of law in this action because, first, after plaintiff filed its complaint, Japan lifted its ban against U.S. beef and plaintiff has resumed selling its beef in Japan, rendering this case moot. Plaintiff's alternative theories of injury of diminished foreign and domestic sales and its assertion that conducting its own BSE testing would redress such injuries are too theoretical and speculative to afford plaintiff standing to maintain this action.

In addition, even if this case is not moot and plaintiff has standing to pursue this action,

defendants nevertheless are entitled to judgment as a matter of law on Counts 1 and 2 of the complaint.  As demonstrated below, USDA acted well within its statutory authority under VSTA in promulgating regulations authorizing restrictions on the uses for which biological products may be sold, regulations that form the basis for its restrictions on BSE testing.  Further, USDA reasonably concluded that diagnostic tests in general, and BSE test kits in particular, are subject to regulation under VSTA as "analogous products for use in the treatment of domestic animals."  Thus, defendants acted within their statutory authority in denying plaintiff's request to purchase BSE test kits to perform its own private BSE testing.  As a result, summary judgment should be granted in favor of defendants.

## BACKGROUND

### A.    Overview of BSE and Measures to Address It

BSE is a progressive and fatal neurological disorder of cattle.  Declaration of Dr. Lisa A. Ferguson ("Ferguson Decl.") ¶ 3 (attached as Exhibit 1).  BSE is believed to be transmitted through an abnormal form of a protein called a cellular prion protein.  Id.  It is spread to cattle primarily through the consumption of animal feed containing protein from ruminants[1] infected with BSE.  Id.

BSE was first diagnosed in the United Kingdom in 1986.  Id. ¶ 4.  There have since been more than 189,000 confirmed cases of BSE in cattle worldwide, from native-born cattle in more than twenty-five countries.  Id.  However, over 95 percent of all BSE cases have occurred in the United Kingdom, where the epidemic peaked between 1992 and 1993.  Id.  As a result of actions taken in the United Kingdom to mitigate BSE, however, the annual incidence has fallen

---

[1]  Ruminants are all animals that chew cud, such as cattle.  9 C.F.R. § 93.400.

dramatically, i.e., by 90 percent between 1992 and 1997.  Id.  Those mitigation measures include banning mammalian meat-and-bone meal in feed, excluding animals more than 30 months of age from the animal and human food chains, and destroying all animals showing signs of BSE or at high risk of developing it.  Id.

The incubation period for BSE ranges from two to eight years with an average of five years, meaning that on average it takes five years from the date a cow is infected with BSE for the cow to show any outward clinical signs of the disease, such as abnormal posture, inability to walk (non-ambulatory), and other impaired coordination.  Id. ¶ 5.  As a result, BSE generally affects older cattle, typically more than 30 months of age.  Id.  Only a few cases of BSE have been found in animals less than 30 months of age, and these have occurred primarily in countries with significant levels of circulating infectivity.  Id.  Of all the cattle that developed BSE in the United Kingdom epidemic, only 0.01 percent (one in 10,000) were under 30 months of age.  Id.  In the United States, the vast majority of cattle going to market are less than 24 months old, so the chances of identifying the presence of BSE in such cattle through current testing methods is minuscule at most.  Id.[2]

In response to the BSE outbreak in the United Kingdom, the United States has taken a number of steps to reduce the likelihood of tissue from a BSE-infected animal entering the food

---

[2]  Variant Creutzfeldt-Jakob disease (vCJD), a chronic, fatal, but rare neurodegenerative human disease, has been linked to exposure to BSE, most likely through consumption of contaminated cattle products.  Id. ¶ 7.  Only approximately 190 cases have been identified worldwide since 1986.  Id.  Approximately 95% were linked to exposure in the United Kingdom, and all are believed to have resulted from the consumption of beef connected to high-risk central nervous system tissues designated as "specified risk materials" (SRMs).  Id.  The relatively small number of cases of vCJD suggests a substantial species barrier that may protect humans from widespread illness due to BSE.  Id.  In fact, to become infected, humans may need exposure to about 10,000 times the level of infective tissues necessary to infect cattle.  Id.

or feed supply.  The most important of these measures include the Food and Drug

Administration's ("FDA") feed ban, imposed in 1997, which prohibits the feeding of ruminant

protein to other ruminants.  See 21 C.F.R. § 589.2000 (2005).  Such feed bans are generally the

predominant line of defense against the spread of BSE, and they have been highly effective in

other countries.  Ferguson Decl. ¶ 8.  In addition, the USDA's Food Safety and Inspection

Service promulgated regulations prohibiting cattle parts that have demonstrated BSE infectivity,

known as "specified risk materials" ("SRMs")[3], from being used in human food.  See 9 C.F.R. §

310.22 (2005); Ferguson Decl. ¶ 8.  The USDA also prohibited the importation of ruminants,

ruminant meat, and other ruminant products from countries known to have BSE, beginning in

1989.  See 9 C.F.R. §§ 93.401, 94.18 (2003); Ferguson Decl. ¶ 8.

 Additionally, since 1990, the USDA's Animal and Plant Health Inspection Service

("APHIS") has conducted surveillance testing of cattle in the United States in order to estimate

the prevalence of BSE in the nation's herd.  Ferguson Decl. ¶ 9.  In June 2004, APHIS

implemented an enhanced BSE surveillance program under which the agency, in a one-time

effort, set out to test as many cattle as possible in the high-risk population for a 12 to 18 month

period in order to obtain a snapshot of the U.S. cattle population and to provide a more accurate

estimate of the prevalence, if any, of BSE in that population.  Id.  The BSE testing is performed

exclusively by a number of government-affiliated labs; private testing is not permitted.  Id.  To

date, APHIS has tested over 750,000 cattle for BSE with only two positive results.  Id.  Analysis

of the test results indicates that the prevalence of BSE in the United States is less than one case

---

[3] SRMs include the distal ilium and tonsils of all cattle, as well as the brain, spinal cord, and other central nervous system materials in cattle of 30 months of age and over.  See 9 C.F.R. § 310.22(a) (2006).

per million adult cattle and estimates that out of the 42 million adult cattle population in the United States between four and seven cattle are expected to be infected with the disease.  Id. ¶ 10.  The enhanced testing program continued beyond its original 12 to 18 month period and lasted for nearly 26 months, when it concluded in August of this year, due to the extremely low prevalence of BSE in the U.S.  Id.  Testing continues, however, at an ongoing level of approximately 40,000 cattle a year.  Id.  The high-risk cattle that the APHIS surveillance testing targets include cattle older than 30 months of age, cattle exhibiting signs of central nervous system disorders, and non-ambulatory cattle.  Id.

The consensus among the international scientific community is that testing high risk cattle, as opposed to testing all cattle, is the most efficient method for detecting the presence of BSE, especially in light of the limits on current BSE testing methods.  Id. ¶ 6.  The earliest point at which current testing methods can detect a positive case of BSE is two to three months before a cow would demonstrate clinical signs of the disease.  Id.; Declaration of Dr. Byron Rippke ("Rippke Decl.") ¶ 9 (attached as Exhibit 2).  Given that the average incubation period of the disease is five years, testing young cattle is not practical and offers no food safety value because testing a young infected animal displaying no signs of the disease with the current methodology is overwhelmingly likely to produce false negative results.[4]  Ferguson Decl. ¶ 6.  Thus, a

_____

[4]  Because the vast majority of cattle for slaughter in the United States are under 24 months old, as noted previously, testing all cattle for slaughter would involve testing mostly young cattle under 24 months of age.  And due to the general inability of BSE testing to detect BSE in young normal-looking cattle, the World Organization for Animal Health (Office International des Epizooties ("OIE")) has not advocated the testing of all cattle for slaughter.  See  OIE, Terrestrial Animal Health Code – 2005, Appendix 3.8.4 Surveillance for Bovine Spongiform Encephalopathy, Article 3.8.4.2 (indicating that "[t]esting of routine slaughter cattle 36 months of age or less is of relatively little value.") (attached as Exhibit 26).

negative test on a young cow cannot be interpreted to mean that the cow is necessarily "BSE-free." Id. In addition, the BSE tests are not conducted on cuts of beef, but rather are performed on slaughtered cattle, prior to processing, to diagnose the presence of BSE. BSE testing thus is generally done on older, high risk cattle strictly for surveillance purposes, not as a food safety measure. Id.

The various BSE mitigation measures implemented in the United States have been largely successful, as there have been only three confirmed cases of cattle infected with BSE in this country. Id. ¶ 12. In December 2003, a BSE-positive cow was discovered in the state of Washington. Id. The cow, however, was born in Canada and was most likely exposed to BSE in Canada prior to its shipment to the United States. Id. In June 2005, the USDA announced that a U.S.-born cow in Texas had tested positive for BSE, and in March 2006, a cow in Alabama also tested positive for BSE. Id. No parts of either of these infected cows, however, entered the animal feed or human food supply. Id.

Despite the extremely low rate of BSE cases in the U.S. cattle population, many countries, including major importers such as Japan, initially imposed bans on the importation of U.S. beef following the discovery of the first case of BSE in the United States in December 2003. Ferguson Decl. ¶ 13. And in response to the detection of BSE in several cows in Japan, Japan began requiring BSE testing of all its cattle for slaughter. Id. Japan, however, has recently lifted its ban against U.S. beef and has resumed its imports after conducting inspections of several American beef processing facilities, including plaintiff's, without requiring 100% BSE testing. Id.

**B.**     **Administrative History of Plaintiff's Request to Conduct its Own BSE Testing on All of its Cattle**

In early 2004, shortly after Japan and other countries had imposed a ban on U.S. beef, plaintiff began petitioning USDA to allow plaintiff, itself, to purchase BSE test kits for the purpose of conducting BSE testing on all of the cattle that it processes at its Arkansas City, Kansas facility, with the hope that such a measure would persuade the Japanese government to accept plaintiff's beef products.  In a series of emails and letters dated February 19, 2004, February 25, 2004, and March 10, 2004, plaintiff's representatives requested USDA approval of plaintiff's plans to establish a BSE testing lab at its processing facility in Arkansas City, Kansas and to conduct its own BSE tests on all of its cattle for slaughter using the same test kits already in use by the USDA and in Japan.  See February 19, 2004 Email from M. O'Connor to J. Butler (attached as Exhibit 3); March 10, 2004 Letter from B. Fielding to J. Penn (attached as Exhibit 4).

Following these requests, on March 17, 2004, USDA's Animal and Plant Health Inspection Service's ("APHIS") Center for Veterinary Biologics ("CVB") issued its Notice No. 04-08.  See March 17, 2004 Notice No. 04-08 (attached as Exhibit 5).  In this notice, the CVB indicated that Biological Product Licenses for the manufacture of BSE test kits will be issued subject to the restrictions that sales of BSE test kits in the United States be limited to laboratories approved by State and Federal (USDA) animal health officials to be used in government surveillance testing for BSE, and that distribution and use of BSE test kits shall be under the supervision or control of USDA's APHIS Veterinary Services.  Id.

On April 8, 2004, at a meeting between representatives of plaintiff and USDA, USDA informed plaintiff that its request for a license to purchase BSE rapid test kits for use in a private

marketing program could not be granted, because BSE test kits were designed for animal health

surveillance purposes, whereas private testing, as plaintiff proposed, would serve no purpose as

an animal health measure and would imply a food safety aspect that is not scientifically justified.

See Ferguson Decl. ¶ 11.  USDA issued a press release the following day explaining its decision

and reiterating that USDA has taken a number of measures to protect consumer health and the

animal herd from BSE and that an international panel of experts noted that "there is no scientific

justification for 100 percent testing because the disease does not appear in younger animals."

April 9, 2004 USDA Press Release No. 0141.04 (attached as Exhibit 6).

Shortly thereafter, on April 13, 2004, plaintiff sent a letter to USDA explaining that

plaintiff was disappointed with USDA's decision not to allow plaintiff to purchase kits for

testing all of its cattle for BSE, that plaintiff intended to initiate a legal challenge to the decision,

and requesting USDA to reverse its decision.  See April 13, 2004 Letter from J. Stewart to J.B.

Penn (attached as Exhibit 7).  Plaintiff emphasized how important it was for beef trading to

resume with Japan and also requested that its testing laboratory be approved as a satellite

laboratory of Kansas State University.  See id.

In response, by letter dated June 1, 2004, USDA again denied plaintiff's request and

reiterated that "allowing a company to use a BSE test in a private marketing program is

inconsistent with USDA's mandate to ensure effective, scientifically sound testing for significant

animal diseases and maintain domestic and international confidence in U.S. cattle and beef

products."  June 1, 2004 Letter from B. Hawks to J. Stewart (attached as Exhibit 8).  USDA also

emphasized that foreign barriers to U.S. beef imports were scientifically unwarranted.  Id.

Plaintiff then sent a letter on July 13, 2004 to the dean of the College of Veterinary

Medicine at Kansas State University ("KSU") requesting KSU to approve plaintiff's laboratory as a satellite laboratory to KSU for BSE testing.  See July 13, 2004 Letter from J. Wilson to R. Richardson (attached as Exhibit 9).  After the dean notified USDA of plaintiff's request to become a satellite laboratory of KSU, USDA sent a letter to the KSU dean on August 5, 2004 explaining that the twelve state laboratories USDA selected to conduct BSE testing, including KSU, provided sufficient capacity to handle all of the BSE testing to be done under USDA's enhanced surveillance program, and that "BSE testing is an inherently governmental function that must be conducted by Federal and State laboratories."  See August 5, 2004 Letter from R. Levings to R. Richardson (attached as Exhibit 10).  The letter thus concluded that USDA would not authorize plaintiff as a satellite laboratory and indicated that KSU did not have authority to designate satellite laboratories for BSE testing.  Id.

Thereafter, on August 19, 2004, plaintiff sent a letter to USDA expressing its belief that USDA would accept plaintiff as a KSU satellite lab if KSU approved, and plaintiff asked USDA to notify KSU that KSU did have authority to designate plaintiff as a satellite lab.  See August 19, 2004 Letter from B. Fielding to B. Hawks (attached as Exhibit 11).  USDA responded by letter dated September 24, 2004, which indicated that USDA's position was accurately reflected in its August 5, 2004 letter to the KSU dean and reiterated that KSU did not have authority to designate plaintiff as a satellite laboratory for BSE testing.  See September 24, 2004 Letter from B. Hawks to B. Fielding (attached as Exhibit 12).  The letter repeated that USDA would limit approval for conducting BSE tests to Federal and State laboratories participating in USDA's BSE surveillance program and would not permit plaintiff to conduct such testing.  Id.

In the spring of 2006, plaintiff began contacting various members of Congress to enlist

-9-

their aid in persuading USDA to permit plaintiff to conduct its own BSE testing.  See Dan

Caterinicchia, Producer Battles to Test All Beef, Washington Times, April 28, 2006 (attached as

Exhibit 13).  On May 9, 2006, however, the House Appropriations Committee voted against an

amendment that would have required USDA to allow meatpackers, such as plaintiff, to conduct

private BSE testing.  See Libby George and Catharine Richert, Committee Approves $93.6

Billion Agriculture Spending Bill, Congressional Quarterly, May 9, 2006, at 2, 5 (attached as

Exhibit 14).  Committee members reportedly indicated that "private testing was a marketing

gimmick that eventually would destroy confidence in U.S. beef."  Charles Abbott, US House

Panel--No Mad Cow Testing by Meatpackers, Reuters, May 9, 2006 (attached as Exhibit 15).

### C.     The Virus-Serum-Toxin Act and Implementing Regulations

USDA has denied plaintiff's requests to conduct its own BSE testing pursuant to USDA's

authority under the Virus-Serum-Toxin Act, 21 U.S.C. §§ 151-159 ("VSTA").  The crux of

VSTA lies in section 151, which provides:

> It shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or
> exchange in the District of Columbia, or in the Territories, or in any place under
> the jurisdiction of the United States, or to ship or deliver for shipment in or from
> the United States, the District of Columbia, any territory of the United States, or
> any place under the jurisdiction of the United States, any worthless, contaminated,
> dangerous, or harmful virus, serum, toxin, or analogous product intended for use
> in the treatment of domestic animals, and no person, firm, or corporation shall
> prepare, sell, barter, exchange, or ship as aforesaid any virus, serum, toxin, or
> analogous product manufactured within the United States and intended for use in
> the treatment of domestic animals, unless and until the said virus, serum, toxin, or
> analogous product shall have been prepared, under and in compliance with
> regulations prescribed by the Secretary of Agriculture, at an establishment
> holding an unsuspended and unrevoked license issued by the Secretary of
> Agriculture as hereinafter authorized.

21 U.S.C. § 151.  VSTA was originally enacted in 1913 after an outbreak of hog cholera and in

response to significant economic losses suffered by American hog producers resulting from their

-10-

purchases of ineffective and dangerous anti-hog cholera serum.  See Hall v. State, 158 N.W. 362, 363 (Neb. 1916).  One of the chief purposes of VSTA is to control the use of dangerous and worthless viruses, serums, and analogous products.  S. Rep. No. 62-1288, at 2 (1913).

VSTA also provides the Secretary of Agriculture with broad authority to promulgate rules and regulations to implement the Act's provisions.  Section 154 of the statute provides:

> The Secretary of Agriculture is authorized to make and promulgate from time to time such rules and regulations as may be necessary to prevent the preparation, sale, barter, exchange, or shipment as aforesaid of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals, or otherwise to carry out this chapter, and to issue, suspend, and revoke licenses for the maintenance of establishments for the preparation of viruses, serums, toxins, and analogous products, for use in the treatment of domestic animals, intended for sale, barter, exchange, or shipment as aforesaid.

21 U.S.C. § 154.  Under this grant of authority, USDA has promulgated a series of regulations implementing the general provisions of VSTA.  In particular, the Department of Agriculture issued a regulation, 9 C.F.R. § 102.5, which requires manufacturers of biological products[5] to obtain licenses from USDA, and which explicitly authorizes restrictions on biological product licenses regarding the distribution of such products, or the uses for which they may be sold, as follows:

---

[5] USDA has established that "biological products" mean "all viruses, serums, toxins (excluding substances that are selectively toxic to microorganisms, e.g., antibiotics), or analogous products at any stage of production, shipment, distribution, or sale, which are intended for use in the treatment of animals and which act primarily through the direct stimulation, supplementation, enhancement, or modulation of the immune system or immune response.  The term 'biological products' includes but is not limited to vaccines, bacterins, allergens, antibodies, antitoxins, toxoids, immunostimulants, certain cytokines, antigenic or immunizing components of live organisms, and diagnostic components, that are of natural or synthetic origin, or that are derived from synthesizing or altering various substances or components of substances such as microorganisms, genes or genetic sequences, carbohydrates, proteins, antigens, allergens, or antibodies."  9 C.F.R. S 101.2.

-11-

> Where the Administrator determines that the protection of domestic animals or
> the public health, interest, or safety, or both, necessitates restrictions on the use of
> a product, the product shall be subject to such additional restrictions as are
> prescribed on the license.  Such restrictions may include, but are not limited to,
> limits on distribution of the product or provisions that the biological product is
> restricted to use by veterinarians, or under the supervision of veterinarians, or
> both.

9 C.F.R. § 102.5(d).  USDA also has required that a permit be issued to a person importing

biological products before a biological product may be imported into the United States.  See 9

C.F.R. § 104.1.  In addition, the Department of Agriculture has applied its expertise to define the

statutory term "analogous product" to include "[s]ubstances . . . which are intended for use in the

treatment of animals and which . . . act through the stimulation, supplementation, enhancement,

or modulation of the immune system or immune response; or . . . through the detection or

measurement of antigens, antibodies, nucleic acids, or immunity . . ."  9 C.F.R. § 101.2(2)(i)-(ii).

USDA also has established that "[t]he term treatment shall mean the prevention, *diagnosis*,

management, or cure of diseases of animals."  9 C.F.R. § 101.2(3) (emphasis added).  These

statutory provisions and regulations provide the basis for USDA's notice that the sale of BSE

test kits is restricted to laboratories approved by State and Federal animal health officials for use

in APHIS's program of BSE surveillance, and for the denial of plaintiff's request to purchase test

kits to conduct its own BSE testing on all of its cattle.  See Notice No. 04-08 (attached as Exhibit

5).

**D.    Plaintiff's Complaint and Motion for Summary Judgment**

On March 23, 2006, plaintiff filed its complaint in this action asserting in Count 1 that

USDA acted in excess of its statutory authority in violation of the Administrative Procedure Act,

5 U.S.C. § 706(2)(C), by promulgating the above-mentioned regulations codified at 9 C.F.R. §§

-12-

101.2, 102.5(d), which define certain statutory terms and explicitly authorize restrictions on product licenses respectively.[6]  See Complaint for Declaratory and Injunctive Relief ¶¶ 27-36 (dkt. no. 1) (Mar. 23, 2006) ("Complaint").  In Count 2, plaintiff alleges that USDA's refusal to allow plaintiff to purchase BSE test kits to test its own cattle and its refusal to permit plaintiff's laboratory to be operated as a satellite to KSU's veterinary laboratory are unlawful agency actions that exceed USDA's authority.  See id. ¶¶ 37-41.  In Count 3, plaintiff asserts that USDA's actions, including specifically its refusal to allow plaintiff to purchase BSE test kits to test its own cattle, are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

Pursuant to a joint stipulation between the parties establishing a schedule for cross-motions for summary judgment, plaintiff filed its motion for summary judgment on Counts 1 and 2 of its Complaint on July 15, 2006.[7]  In its motion, plaintiff argues that as a matter of law, USDA's regulations codified at 9 C.F.R. §§ 101.2, 102.5(d), and 104.1 are not authorized by VSTA and should be vacated.  See Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment (dkt. no. 6) (July 15, 2006) ("Pl.'s Mem.").  Plaintiff also asserts that USDA lacks authority specifically to regulate BSE test kits and to prohibit plaintiff from purchasing such test kits to test all of its cattle.  See id.

---

[6]  The complaint also alleges that USDA's regulations regarding establishment licenses and product licenses codified at 9 C.F.R. §§ 102.1-102.3 are invalid as exceeding USDA's authority under the VSTA.  See Complaint ¶ 33.  Plaintiff's challenges to these particular regulations, however, do not appear in plaintiff's Motion for Summary Judgment.

[7]  The parties agreed that due to the potentially dispositive nature of the claims in Counts 1 and 2, it would not be necessary to address the claims in Count 3 at this time.  See Joint Stipulation and Motion Regarding Submission of Cross-Motions for Summary Judgment (dkt. no. 3) (May 24, 2006).

## ARGUMENT

### I.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1).

Under the Administrative Procedure Act provision invoked by plaintiff in Counts 1 and 2 of its Complaint, a court may set aside agency action that is found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  See 5 U.S.C. § 706(2)(C).  Whether an agency exceeded its statutory authority under section 706(2)(C) is a question of law that is reviewed *de novo,* but where a statute is silent or ambiguous with respect to a specific issue, courts must defer to any reasonable agency interpretations of such statutory provisions.  See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984); National Labor Relations Board Union v. Federal Labor Relations Authority, 834 F.2d 191 (D.C. Cir. 1987); Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. USDA, 415 F.3d 1078, 1093 (9th Cir. 2005) (explaining that "[r]egulations are presumed to be valid, and therefore review is deferential to the agency" and that courts may not substitute their judgment for the agency's).  Such deference is required "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  United

States v. Mead Corp., 533 U.S. 218, 226-27 (2001).

## II.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF'S CLAIMS ARE MOOT.

Japan's recent decision to resume imports of U.S. beef, including specifically plaintiff's beef, renders plaintiff's claims moot.  "Article III [of the Constitution] confines federal courts to the resolution of actual cases or controversies, and thus prevents their passing on moot questions – ones where intervening events make it impossible to grant the prevailing party effective relief." Burlington Northern R.R. Co. v. Surface Transp. Bd., 75 F.3d 685, 688 (D.C. Cir. 1996); see also Kremens v. Bartley, 431 U.S. 119 (1977) (explaining that there must be a live case or controversy before the court in order for a case not to be moot).

The crux of plaintiff's Complaint is its assertion that USDA's rejection of plaintiff's request to purchase test kits to conduct its own BSE testing on 100 percent of its cattle has foreclosed Japan as a market for plaintiff's beef in light of Japan's ban against U.S. beef and its insistence on testing all cattle for BSE.  Although plaintiff makes passing references to other foreign markets, it is clear that plaintiff's primary concern is with its ability to sell beef in the Japanese market.  In its Complaint, plaintiff alleges that "[a] significant portion of Creekstone's products historically have been sold in Asia, especially Japan," Complaint ¶ 4, and that "Creekstone's ability to continue to sell to Japan and other foreign markets, which constituted a major portion of Creekstone's customer base prior to the discovery of BSE in the United States in December 2003, has been compromised by its inability to offer to test cattle from which it would supply those foreign markets," id. ¶ 5.  Plaintiff's CEO, John Stewart, states in his declaration that "[a]s a direct result of the loss of its export market in Japan based on the perception of the Japanese that U.S. beef products might be contaminated with BSE, Creekstone

-15-

has suffered losses of revenue amounting to more than $200,000 per day." Declaration of John

D. Stewart ¶ 17 (Exhibit 1 to Plaintiff's Motion for Summary Judgment) (dkt. no. 6) (July 15,

2006) ("Stewart Decl."). In fact, in 2003, before it imposed its ban, Japan was the top importer

of U.S. beef, purchasing approximately $1.4 billion worth of American beef, and plaintiff sold

roughly 30 percent of its beef production to Japan. See Aya Takada, Japan Says U.S. Suit Won't

Change Beef Trade Rules, Reuters, March 24, 2006 (attached as Exhibit 16); Phyllis Jacobs

Griekspoor, Creekstone Prepares to Resume Exports to Japan, Wichita Eagle, July 29, 2006

(attached as Exhibit 20).

　　　　After extensive negotiations with the United States, however, on July 27, 2006, Japan

lifted its ban on U.S. beef without requiring 100 percent BSE testing and has begun importing

U.S. beef again. See Ferguson Decl. ¶ 13; Carl Freire, Japan's Health Minister Announces

Lifting of Ban on US Beef Imports, Associated Press, July 27, 2006 (attached as Exhibit 18)

(indicating that the end of the ban followed a month-long tour of 35 U.S. meatpacking plants by

Japanese inspectors and "restores access to a lucrative market for U.S. exporters."). Plaintiff,

itself, has resumed exporting its beef to Japan without having to conduct BSE testing on all of its

cattle. See Kansas Meatpackers Say South Korea Move Will Boost Sales, Associated Press,

September 12, 2006 (attached as Exhibit 19); Phyllis Jacobs Griekspoor, Creekstone Prepares to

Resume Exports to Japan, Wichita Eagle, July 29, 2006 (attached as Exhibit 20). Accordingly,

the thrust of plaintiff's alleged injury has disappeared. Even if plaintiff ever suffered a loss of

exports to Japan due to USDA's refusal to allow private testing for BSE, that is no longer the

case, and there is no meaningful justification for granting the relief plaintiff requests. As a

result, plaintiff's case should be dismissed as moot. See The Honorable John H. McBryde v.

-16-

<u>Committee to Review Circuit Counsel and Disability Orders of the Judicial Conference of the United States</u>, 264 F.3d 52, 55 (D.C. Cir. 2001) (stating that "[i]f events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").

### III.    PLAINTIFF'S ALTERNATIVE THEORIES OF INJURY ARE NOT LIKELY REDRESSABLE AND ARE TOO SPECULATIVE TO AFFORD PLAINTIFF STANDING TO PURSUE ITS CLAIMS.

In an attempt to save its case from mootness as a result of Japan's recent lifting of its ban against U.S. beef, plaintiff has creatively alleged that even with the re-opening of the Japanese market, plaintiff is still injured by USDA's refusal to allow plaintiff to conduct its own BSE testing of all of its cattle because, without such testing, consumers in Japan and other foreign markets will not purchase as much of plaintiff's beef as they did previously and plaintiff will not be able to expand its sales of premium beef products in the United States. <u>See</u> Complaint ¶¶ 5, 17; Pl.'s Mem. at 7; Stewart Decl. ¶¶ 4-5, 17. Such claims, however, are not sufficiently concrete to qualify as actual injuries-in-fact, and plaintiff has not provided convincing evidence that conducting BSE testing on all of its cattle would redress such purported injuries. As a result, plaintiff lacks standing to assert its claims for relief based on these theories of injury.

The doctrine of "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992), and "the party invoking federal jurisdiction bears the burden of establishing its existence." <u>Steel Company v. Citizens for a Better Environment</u>, 523 U.S. 83, 104 (1998). The familiar three-part test for standing is whether the plaintiff has demonstrated that it has (1) suffered a concrete and particularized injury that is actual or imminent, not merely conjectural or hypothetical; (2) the injury must be fairly traceable to the defendant's action; and (3) the injury must likely be

redressed by a favorable court decision.  See, e.g., Lujan, 504 U.S. at 560-61.

Here, plaintiff has not demonstrated that its alleged injury of potentially "greatly diminished sales" in Japan or other foreign markets even after the ban against U.S. beef has been lifted is an actual concrete injury that is likely to be redressed if plaintiff is permitted to conduct BSE testing on all of its cattle.  Complaint ¶ 17; see also Lujan, 504 U.S. at 561 (indicating that at the summary judgment stage, a plaintiff may not rely merely on allegations but must offer proof by affidavits or other credible evidence of its factual assertions).  Plaintiff relies heavily on reports of two surveys taken of Japanese consumers to support its contention that its beef sales will remain low despite the end of the ban against U.S. beef.  See id.; Pl.'s Mem. at 7.  Plaintiff refers to a news report of a December 2005 telephone poll by the Kyodo News Agency in which 75 percent of the Japanese respondents indicated that they were currently unwilling to eat U.S. beef, and over 50 percent believed that the Japanese government should require BSE testing of all U.S. cattle processed for shipment to Japan.  Id.  Plaintiff also mentions a report of a December 2001 survey of Japanese consumers which concluded that they were willing to pay a 50 percent premium on average for BSE-tested beef.  Pl.'s Mem. at 7.

As an initial matter, these polls are contained merely in a news report and a journal article and are not supported by an expert declaration.  As a result, they are not sufficiently competent evidence to satisfy plaintiff's burden of proving injury-in-fact and redressability in order to defeat defendants' motion for summary judgment.  See, e.g., Kimberlin v. Quinlan, 6 F.3d 789, 797 n.15 (D.C. Cir. 1993) (explaining that although it is not necessary for a nonmoving party to produce evidence admissible at trial to avoid summary judgment, hearsay evidence is not normally enough to survive a motion for summary judgment and finding that two

-18-

newspaper articles were not sufficient to save plaintiff's claims from summary judgment),

vacated on other grounds by 515 U.S. 321 (1995); Miles v. City of New York, 2002 WL

31410346, *4 n.3 (E.D. N.Y. 2002) (explaining that press articles are inadmissible hearsay and

may not be used to defeat summary judgment); Articulate Sys., Inc. v. Apple Computer, Inc., 53

F. Supp. 2d 62, 75 (finding that trade journal articles were hearsay and could not be considered

on a motion for summary judgment).[8]  Further, neither of these polls specifically indicates that

Japanese consumers would buy more quantities of beef or spend higher amounts on beef from

U.S. producers, such as plaintiff, if the U.S. producers were able to perform BSE testing on all of

their cattle.  As suggested by the Kyodo poll, the Japanese who are reluctant to eat U.S. beef may

be reluctant to do so regardless of whether it is tested for BSE, and those willing to pay a

premium for beef from BSE-tested cattle may be willing to do so only for domestically raised

Japanese cattle.  Plaintiff's hypothesis that if it is permitted to conduct BSE testing on all of its

cattle then Japanese consumers will purchase more of plaintiff's beef is entirely speculative and

completely contingent on the behavior of third party Japanese consumers who are not subject to

the Court's jurisdiction.  Accordingly, plaintiff has not established that its purported injury of

prolonged diminished beef sales likely would be redressed by a court order permitting plaintiff to

test all of its cattle for BSE.  See Gettman v. DEA, 290 F.3d 430, 436 (D.C. Cir. 2002) (finding

that plaintiff's contention that DEA's decision not to reschedule marijuana precluded plaintiff

from providing consulting services to more customers was purely speculative and noting that

"such speculative claims dependent on the actions of third parties do not create standing for the

---

[8]  To the extent the Court gives consideration to the polls and articles cited by plaintiff,
the Court should afford equal weight to defendant's press reports rebutting plaintiff's
contentions.

-19-

purposes of establishing a case or controversy under Article III."); Area Transp., Inc. v. Ettinger, 219 F.3d 671, 672-73 (7th Cir. 2000) (finding it too speculative that school bus operator's alleged economic injury of being at a competitive disadvantage would be redressed by desired order from Federal Transit Agency requiring operator's competitor to repay prior grants and forbidding competitor from receiving future grants).

In any event, the polls cited by plaintiff tend to exaggerate the extent to which U.S. beef sales may lag below normal levels following the end of the Japanese ban. The fact that the Kyodo poll indicated that 75 percent of its Japanese respondents stated that they were unwilling to eat U.S. beef does not necessarily suggest that U.S. beef sales in Japan will fail to return to the levels they were prior to the Japanese ban.[9] In fact, the first shipment of U.S. beef to Japan since Japan lifted its ban, consisting of approximately five metric tons of beef, sold out the first day it was offered at Tokyo area stores, indicating that the Japanese are eager to purchase U.S. beef even without 100 percent BSE testing. See Lester Aldrich, USMEF Says Japanese Consumers Snapping Up US Beef, Dow Jones Newswires, August 9, 2006 (attached as Exhibit 21). Furthermore, since the Japanese ban ended, more and more Japanese restaurants and

---

[9] In addition, the December 2001 survey is too dated to be reliable, and was conducted immediately after the first BSE-infected cow was identified in Japan during the height of public concern regarding BSE and in the midst of intense negative media coverage on the subject, which the researchers themselves acknowledged could have skewed the results and inflated the amount that Japanese consumers would be willing to pay for meat from BSE tested cattle. See Jill J. McCluskey, et al., "Bovine Spongiform Encephalopathy in Japan: Consumers' Food Safety Perceptions and Willingness to Pay for Tested Beef," 49 The Australian Journal of Agricultural and Resource Economics 197, 199, 207 (2005). The researchers also noted that the poll's data were collected from a consumer cooperative which may have also biased the results. McCluskey at 201-02 (explaining that "[u]sing data collected from customers at a consumer cooperative may represent a bias as consumer cooperatives usually target quality-conscious consumers by offering 'safe foods'" and concluding that "[t]herefore, our sample may be more willing than average to pay a premium for safety-assured food products.").

supermarkets have started to sell U.S. beef products, demonstrating a steady increase in U.S.

beef consumption.  See Japan's Yoshinoya to Put Beef Bowls Back on Menu, Agence France

Presse, September 6, 2006 (reporting that Japanese fast food chain putting its beef bowl, which

uses U.S. beef, back on its menu and that another Japanese restaurant chain serving Korean

barbecue will resume serving U.S. beef) (attached as Exhibit 22); Jason Vance, More Japanese

Supermarkets Decide to Sell U.S. Beef, Ag News for America, September 1, 2006 (attached as

Exhibit 23).  As a result, plaintiff's contention that, despite the end of the ban on U.S. beef,

Japanese consumers will continue to refrain from consuming plaintiff's beef, unless it is tested

for BSE, is merely conjectural and does not amount to a concrete injury-in-fact.  See Whitmore

v. Arkansas, 495 U.S. 149, 150, 155, 158 (1990) (indicating that the injury alleged cannot be

"conjectural or hypothetical," "remote," "speculative," or "abstract," but must be "certainly

impending").[10]

        The same problems of speculation plague plaintiff's additional assertion that it is being

denied the ability to expand its U.S. sales of beef by USDA's decision to prohibit plaintiff from

purchasing BSE test kits for use on all of its cattle.  See Complaint ¶ 5.  The only corroborating

support offered by plaintiff for this contention is a March 2006 MSNBC informal internet survey

which merely indicated that 35 percent of the respondents felt "very much" concerned about

BSE entering the U.S. food supply and that 37 percent said that they have been eating less beef

since BSE was first discovered in the United States.  See Stewart Decl. ¶ 5.  As with the polls

---

        [10]  In any event, to the extent that plaintiff might continue to experience lower beef sales,
such lost sales are more directly the result of the discovery of BSE in the United States, or any
number of other unknown factors, and are not fairly traceable to defendants' denial of plaintiff's
request to purchase kits for BSE testing on all of its cattle.  Plaintiff thus also fails to satisfy the
causation element of standing.

regarding Japanese consumers, this MSNBC internet survey is complete hearsay and not sufficiently credible to fulfill plaintiff's burden of establishing injury and redressability to survive summary judgment.  See, e.g., Kimberlin, 6 F.3d at 797 n.15, vacated on other grounds by 515 U.S. 321 (1995); Miles, 2002 WL 31410346, *4 n.3.  Moreover, this general concern over BSE is far from direct support for the proposition that U.S. consumers would, in fact, purchase more of plaintiff's beef products if plaintiff could conduct BSE testing.[11]  Indeed, the theoretical nature of plaintiff's contention is evidenced by the contention itself; plaintiff merely states that it "believes" it could expand its sales in the United States if permitted to perform BSE testing on the cattle it processes for domestic consumption.  Complaint ¶ 5.  As explained above, such speculative assertions of injury and redressability which are also dependent on the actions of third party U.S. consumers are not sufficient to satisfy the requirements for standing under Article III.  See Whitmore, 495 U.S. at 150, 155, 158; Gettman, 290 F.3d at 436.

Finally, to the extent that plaintiff contends that other foreign markets, besides Japan, remain closed to its beef shipments, plaintiff offers no evidence indicating that if it were allowed to test all of its cattle for BSE, these other unidentified foreign countries would resume imports of plaintiff's beef products.  See Complaint ¶ 5 (alleging that "Creekstone's ability to continue to sell to Japan and other foreign markets" has been hindered by its inability to test its cattle for BSE.)  Again, plaintiff fails to carry its burden of demonstrating that its purported injury is likely to be redressed by the court-ordered relief it seeks.[12]  See Lujan, 504 U.S. at 560-61 (indicating

---

[11]  In reality, U.S. domestic beef sales have remained strong even after the discoveries of BSE cases in this country.  See 70 Fed. Reg. 460, 522 (January 4, 2005).

[12]  In addition, whether plaintiff's beef is completely shut out of these unidentified foreign markets is questionable at best.  Since the time that many countries began imposing bans

that burden is on plaintiff to establish elements of standing and that a plaintiff may not rely

merely on allegations but must offer proof by affidavits or other credible evidence of its factual

assertions to survive summary judgment).  Accordingly, plaintiff does not have standing to

pursue this case based on these speculative alternative theories of injury and redressability.

IV.    **USDA'S REGULATIONS AUTHORIZING RESTRICTIONS ON THE USES FOR WHICH BIOLOGICAL PRODUCTS MAY BE SOLD ARE VALID AND REASONABLE IMPLEMENTATIONS OF VSTA'S LANGUAGE AND PURPOSE.**

A.    **USDA's Regulations Authorizing Restrictions On the Uses for which Biological Products May be Sold Are Consistent With VSTA's Plain Language.**

Even if the Court determines that the case is not moot and plantiff has standing to pursue

this action, defendants still are entitled to summary judgment on Counts 1 and 2 of the

Complaint because USDA acted within its authority under VSTA in promulgating the

regulations and restrictions challenged by plaintiff.  Plaintiff's facial challenges to the

regulations in question fail because plaintiff cannot demonstrate that "no set of circumstances

exists under which the regulation[s] would be valid."  Reno v. Flores, 507 U.S. 292, 300-301

_____

on U.S. beef in December 2003, all six of the largest importers of U.S. beef have re-opened their markets or eased restrictions on U.S. beef.  See U.S. Meat Export Federation Chart, Total U.S. Beef Exports 1996-2005 (identifying top export markets for U.S. beef in 2003 as Japan, Mexico, South Korea, Canada, China/Hong Kong, and Taiwan) (attached as Exhibit 24); Carl Freire, Japan's Health Minister Announces Lifting of Ban on US Beef Imports, Associated Press, July 27, 2006 (attached as Exhibit 18); June 2006 USDA Report "An Economic Chronology of Bovine Spongiform Encephalopathy in North America" at 4, 15 (indicating that Canada, Mexico, Hong Kong, and Taiwan have resumed trade in American beef) (Exhibit 2 to Pl.'s Mem.).  Most recently, following inspections of several U.S. meatpacking plants, South Korea announced that it would resume imports of U.S. boneless beef products from cattle under 30 months of age.  See South Korea Partially Opens Beef Market, Bone Fragments Unresolved, Inside U.S. Trade, September 15, 2006 (attached as Exhibit 25).  In fact, plaintiff already has started to freeze beef in order to ship it to South Korea.  Id.

(1993) (internal quotations and citations omitted).

### 1.    Regulation 102.5(d) is Authorized by VSTA.

Contrary to plaintiff's assertions, VSTA endows the USDA with broad authority to issue regulations governing products used in the treatment of animals.  As noted above, section 154 of the statute provides that "[t]he Secretary of Agriculture is authorized to make and promulgate from time to time such rules and regulations *as may be necessary to prevent* the preparation, sale, barter, exchange, or shipment as aforesaid of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product *for use in the treatment of domestic animals*, or otherwise to carry out this chapter . . . ."  21 U.S.C. § 154 (emphasis added).  Pursuant to this expansive delegation of authority, USDA has issued numerous regulations relating to products used in the treatment of animals, including a regulation authorizing the Administrator of APHIS to impose "restrictions on the use of a product" licensed for sale by USDA where such restrictions are necessary to protect domestic animals or the public health, interest, or safety.  9 C.F.R § 102.5(d).  As noted previously, USDA relied on this regulation to impose conditions on manufacturers' biological product licenses for BSE test kits that (1) restrict the sale of BSE test kits to government laboratories approved by USDA for use in the government's BSE surveillance program and (2) require that the distribution and use of BSE test kits be subject to the supervision and control of USDA.  See Notice No. 04-08 (attached as Exhibit 5).

Plaintiff alleges that regulation 102.5(d) is invalid under VSTA because section 154 does not explicitly mention restrictions on "use" but merely references restrictions on "preparation, sale, barter, exchange, or shipment."  See Pl.'s Mem. at 18-19.  Plaintiff, however, misinterprets the meaning of section 154 and ignores the fact that the statute explicitly authorizes USDA to

-24-

restrict the "preparation, sale, barter, exchange, or shipment" of biological products . . . "for *use* in the treatment of domestic animals . . . ."  21 U.S.C. § 154 (emphasis added).  In other words, the statute explicitly authorizes restrictions on the uses for which viruses, serums, toxins, or analogous products may be prepared, sold, bartered, exchanged, or shipped in order to prevent such products from being used in a manner that would be worthless, dangerous, or harmful to domestic animals.  Regulation 102.5(d) fits squarely within the plain language of section 154 as it authorizes USDA to impose restrictions on the uses for which licensed manufacturers of biological products (i.e. viruses, serums, toxins, or analogous products) may prepare, sell, barter, exchange, or ship them.  9 C.F.R. § 102.5(d).  As plaintiff points out, VSTA allows USDA to regulate manufacturers of biological products.  See Pl.'s Mem. at 24.  And regulation 102.5(d) specifically regulates such manufacturers; it allows for restrictions to be placed on the U.S. Veterinary Biological Product Licenses that must be obtained by manufacturers in order to produce biological products.  See 9 C.F.R. 102.5 (title of section reading "U.S. Veterinary Biological Product Licenses").  Contrary to plaintiff's suggestion, regulation 102.5(d) is not a direct use restriction on buyers of biological products.  Instead, as mentioned, it is a regulation on the manufacturers of biological products that allows for restrictions to be placed on the uses for which manufacturers may prepare, sell, barter, exchange, or ship biological products.  In this manner, section 154 of VSTA explicitly authorizes the use restrictions contemplated in regulation 102.5(d).

    In any event, even if the Court determines that the plain language of section 154 does not unambiguously authorize the restrictions on the uses of biological products provided for in regulation 102.5(d), USDA's provision for such restrictions is a reasonable interpretation of

section 154's language and structure.  Plaintiff's assertion that section 154's list of activities to be regulated is limited to "preparation, sale, barter, exchange, or shipment" and does not include "use" is based on an extremely narrow reading of this statutory provision and completely overlooks the phrase "for use in the treatment of domestic animals."  Read as a whole, and incorporating this phrase, the statute reasonably can be interpreted to authorize regulations restricting the uses for which biological products may be prepared, sold, bartered, exchanged, or shipped, which is what regulation 102.5(d) does.

In addition, plaintiff's constricted reading of section 154 also ignores the prefatory phrase "as may be necessary to prevent," which also expands the ability of USDA to regulate beyond just the "preparation, sale, barter, exchange, or shipment" of products.  Clearly, there may be circumstances where restrictions on the "use" of a product "may be necessary to prevent the preparation, sale, barter, exchange, or shipment" of a product used to treat domestic animals. Such "use" restrictions may be necessary to close loopholes and remove incentives to circumvent regulations directed at the "preparation, sale, barter, exchange, or shipment" of products.  For instance, it would be anomalous to allow a farmer to continue to use a dangerous virus that a manufacturer gave to him where the manufacturer has been found to have violated prohibitions against the preparation and shipment of the harmful virus.

Further, plaintiff's reliance on the principle that the mention of a group of items in a statute implies the exclusion of other items, see Pl.'s Mem. at 20-21, is misplaced with respect to section 154.  That principle does not contemplate the expansive phrases "for use in the treatment of domestic animals" or "as may be necessary to prevent" as modifiers of the list of items, and the statute discussed in the case cited by plaintiff in support of this principle does not contain any

comparable modifying phrases.  See Wachtel v. Office of Thrift Supervision, 982 F.2d 581, 584-

86 (D.C. Cir. 1993) (discussing requirement in 12 U.S.C. § 1818(b)(6)(A) that a depository

institution "make restitution or provide reimbursement, indemnification, or guarantee against

loss" and limiting remedies to those listed).[13]

By contrast, courts have found that statutory grants of rulemaking authority employing

the phrase "as may be necessary" confer broad interpretative power to regulatory agencies.  See

NLRB v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 32 (1st Cir. 1999) (explaining

that terms of 29 U.S.C. § 156 authorizing the NLRB "to make such rules and regulations as may

be necessary to carry out the provisions of the Act" grant the NLRB broad rulemaking

authority).  Plaintiff's narrow construction of section 154 also is contrary to the decisions of

several courts which have found that the Secretary of Agriculture's authority to issue regulations

specifically under section 154 is expansive.  See Lynnbrook Farms v. Smithkline Beecham

Corp., 79 F.3d 620, 624 (7th Cir. 1996) (explaining that section 154 of VSTA "broadly confers

on the USDA" the authority to promulgate regulations); Arnold v. Intervet, Inc., 305 F. Supp. 2d

548, 550 (D. Md. 2003) (stating that the Department of Agriculture has "plenary authority

granted by Congress to regulate the field of animal vaccines.").  Accordingly, USDA's

regulation 102.5(d) authorizing use restrictions on biological product licenses is a valid

regulation under USDA's authority to promulgate "regulations as may be necessary to prevent

the preparation, sale, barter, exchange, or shipment" of products "for use in the treatment of

_____

[13]  Plaintiff also cites to Kelley v. EPA, 15 F.3d 1100, 1108 (D.C. Cir. 1994) to support
its principle of statutory construction.  See Pl.'s Mem. at 20-21.  Nothing in the cited portion of
Kelley, however, supports or even discusses the principle that the mention of a group of items in
a statute implies the exclusion of other items.

-27-

domestic animals" under section 154 of VSTA.[14]

Plaintiff also argues that neither the phrase "or otherwise to carry out this chapter" when read in context, nor the legislative history of the 1985 amendments provides a basis for concluding that Congress intended to effect a wholesale expansion of USDA authority under VSTA.  See Pl.'s Mem. at 22-23.  These arguments, however, are also unavailing because the

---

[14] In addition, regulation 102.5(d) is also authorized by section 154's grant of general authority to USDA to issue regulations needed "otherwise to carry out this chapter."  21 U.S.C. § 154.  Clearly, the plain language affording USDA the broad power to make rules "otherwise to carry out this chapter" authorizes the USDA, in the exercise of its experience and expertise, to allow the APHIS Administrator to impose use restrictions on products where the Administrator determines that such restrictions are warranted, as provided in regulation 102.5(d).

Plaintiff contends that the language "otherwise to carry out this chapter" cannot form a statutory basis for regulation 102.5(d) because this phrase was added to VSTA by amendment in 1985, nine years after the terms of regulation 102.5(d) were first promulgated.  See Pl.'s Mem. at 21.  Plaintiff's argument, however, lacks merit.  Plaintiff ignores the fact that regulation 102.5(d) has been in place for nearly thirty years, and when Congress amended section 154 in 1985 it did not alter any of the terms of regulation 102.5(d), and in fact expanded USDA's authority to issue regulations by adding the phrase "otherwise to carry out this chapter."  Therefore, under the principles of the legislative re-enactment doctrine, Congress has implicitly endorsed the provisions of regulation 102.5(d).  See, e.g., Lorillard v. Pons, 434 U.S. 575, 580-81 (1978) (explaining that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); United States v. Rutherford, 442 U.S. 544, 554 n.10 (1979) (finding that when an agency's statutory construction has been made available to the public and to Congress and Congress "has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned."); Beth Rochel Seminary v. Bennett, 624 F. Supp. 911, 917 (D.D.C. 1985) (noting that "[i]t is hornbook law that reenactment of a statute by Congress without change approves and adopts the prior administrative construction" and explaining that the statute involved in the case had been amended three times after the regulation in question had been published but none of the revisions altered the terms of the regulation).  Adherence to the terms of regulation 102.5(d) is particularly warranted here where Congress's 1985 amendment to section 154 of the VSTA not only did not alter the provisions for restrictions in regulation 102.5 but actually expanded USDA's authority to promulgate regulations generally with the addition of the phrase "or otherwise to carry out this chapter."  In addition, the issue before the Court at the moment is whether regulation 102.5(d) is presently authorized under the current terms of VSTA.  The Court should not countenance plaintiff's attempt to go back in time to challenge the validity of regulation 102.5(d) before the phrase "otherwise to carry out this chapter" was added to section 154.

authorization for use restrictions contained in regulation 102.5(d) does not qualify as a wholesale expansion of USDA authority, but rather is a direct implementation of VSTA's mandate to USDA to prevent manufacturers of biological products from preparing, selling, bartering, exchanging, or shipping such products for uses that may be worthless, dangerous, or harmful in the treatment of domestic animals.  Furthermore, regulation 102.5(d) is, at the very least, a reasonable measure designed to assist USDA in effectuating any other restrictions on "preparation, sale, barter, exchange, or shipment" of biological products.  Accordingly, USDA's promulgation of regulation 102.5(d) is a valid exercise of the agency's authority under the plain terms of VSTA.[15]

---

[15] Contrary to plaintiff's contention, the statement in <u>American Petroleum Institute v. EPA</u>, 52 F.3d 1113, 1119 (D.C. Cir. 1995), that "EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area" does not negate the validity of USDA's regulation 102.5(d) in the present case.  <u>See</u> Pl.'s Mem. at 22.  In <u>American Petroleum</u>, EPA's regulation in question could have resulted in an increase in toxic emissions while the statute specifically required the reduction of toxic emissions.  <u>See</u> 52 F.3d at 1119.  Thus, the regulation was in direct conflict with the statutory terms.  In the present case, however, regulation 102.5(d)'s authorization of use restrictions acts in conjunction with and complements VSTA's restrictions on the preparation, sale, barter, exchange, or shipment of biological products.  Similarly, the finding in <u>Garrelts v. SmithKline Beecham Corp.</u>, 943 F. Supp. 1023, 1066 (N.D. Iowa 1996), that the 1985 expansion of VSTA to permit the federal regulation of intrastate trade in animal vaccines did not expand the reach of VSTA to preempt state regulation of human health risks from animal vaccines also fails to threaten the validity of regulation 102.5(d).  <u>See</u> Pl.'s Mem. at 23.  The court in <u>Garrelts</u> concluded merely that VSTA does not pertain to physical injuries of humans resulting from animal vaccines.  The case did not involve use restrictions of any kind or mention regulation 102.5(d).  Nor did the case contain any discussion of the addition of the phrase "otherwise to carry out this chapter."  As a result, the <u>Garrelts</u> decision is inapposite with respect to the validity of 102.5(d).

## 2.    Regulation 104.1 is Authorized by VSTA.

Plaintiff also argues that USDA's rule requiring a permit to import a biological product into the United States, codified at 9 C.F.R. § 104.1, should be struck down to the extent it authorizes restrictions on the uses for which BSE test kits may be imported.  See Pl.'s Mem. at 19-20.  Plaintiff, however, did not assert a challenge to regulation 104.1 in its Complaint, and plaintiff is not permitted to assert such a challenge for the first time on summary judgment.  See, e.g., Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 91 n.16 (D.D.C. 2006) (refusing to consider claims raised by plaintiff for the first time at the summary judgment stage); Crest A Apartments Ltd. II v. United States, 52 Fed. Cl. 607, 613 (Fed. Cl. 2002) (refusing to consider claims asserted by plaintiff in its motion for summary judgment but not pleaded in its complaint).  In any event, USDA's reliance on regulation 104.1 to impose limitations on the uses for which BSE test kits may be imported into the United States is valid under the broad rulemaking authority granted to the agency in section 154 of VSTA, and for the same reasons use restrictions under regulation 102.5(d) are valid, as discussed above.

## B.    USDA's Regulations Authorizing Use Restrictions Are Consistent With VSTA's Purpose As Reflected In The Act's Legislative History.

Contrary to plaintiff's contentions, VSTA's legislative history confirms that regulation 102.5(d)'s authorization of limitations on the uses for which licensed manufacturers of biological products may sell them is not only permitted by the Act's plain language, but also serves the Act's purposes.  Plaintiff's discussion of VSTA's legislative history omits any reference to the 1913 Senate Report that accompanied VSTA at the time of its original enactment.  See Pl.'s Mem. at 23-26.  The Senate Report indicates that VSTA was enacted

. . . for the purpose of preventing the introduction into the United States of

-30-

> dangerous and worthless viruses, serums, and analogous products for use in the treatment of domestic animals, some of which products may be the means of introducing diseases not now known in the United States, and *also for the purpose of controlling the use*, by preventing the interstate shipment, of similar dangerous and worthless products that may be manufactured within the United States.

S. Rep. No. 62-1288, at 2 (1913) (emphasis added). Subsequent legislative commentary reiterates the fact that one of VSTA's aims is to regulate the use of biological products. See 62 Fed. Reg. 31326, 31327 (June 9, 1997) (explaining that "[t]he main purpose of VSTA is to protect those who *use* veterinary biologics from products which are worthless, contaminated, dangerous, or harmful") (emphasis added). Clearly, the use restrictions contemplated by regulation 102.5(d) are consistent with the purposes of VSTA.

C.  **USDA's Regulations Authorizing Use Restrictions Effectuate Congressional Intent, Or, Alternatively, Are Reasonable Interpretations Of VSTA Entitled To Substantial Deference.**

In light of the broad authority conferred on USDA to issue regulations under the plain language of section 154 of VSTA and the legislative history indicating that one of the purposes of VSTA is to control the use of products that treat domestic animals, USDA's regulations, specifically 9 C.F.R. § 102.5(d), permitting use restrictions on biological products are authorized clearly and directly under section 154 of the statute, or, at a minimum, are reasonable interpretations of VSTA and thus deserve considerable deference by the Court.

The Supreme Court's decision in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), sets forth the familiar analysis for determining the validity of an agency's implementation of a statute. First, a reviewing court must determine if the statute plainly and unambiguously directly addresses the particular question at issue, and if it does, the court must give effect to that clear expression of congressional intent. Id. at 842-843. If the

court determines, however, that the statute is silent or ambiguous with respect to the specific issue contested in the litigation, then the court must defer to any reasonable agency interpretations of such statutory provisions.  Id. at 843-844; see also Apotex Inc. v. FDA, 414 F. Supp. 2d 61, 67 (D.D.C. 2006).  To uphold the agency's implementation of the statute, the court does not need to conclude that the agency's interpretation is the only permissible interpretation but merely must find the agency's construction reasonable.  Chevron, 467 U.S. at 843 n.11. Further, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."  Id. at 844.

As discussed previously, section 154 of VSTA explicitly authorizes USDA to take steps necessary to prevent the sale of harmful or ineffective biological products for use in the treatment of animals, and regulation 102.5(d) merely implements that express authority by providing for use restrictions on the licenses issued to manufacturers to produce and sell biological products in the United States.  Accordingly, the court must uphold regulation 102.5(d) as a manifestation of Congress's clear intent under VSTA to allow USDA to prevent biological products from being sold for ineffective or dangerous uses in the treatment of animals.  See Chevron, 467 U.S. at 842-843 (courts "must give effect to the unambiguously expressed intent of Congress.").

Even if section 154 of VSTA were silent or ambiguous with respect to such restrictions in particular, USDA has reasonably construed section 154's broad grant of authority to promulgate regulations "as may be necessary to prevent the preparation, sale, barter, exchange, or shipment" of biological products "for use in the treatment of domestic animals, or otherwise to carry out this chapter," as authorizing USDA to issue regulations providing for restrictions on

the uses for which makers of biological products may sell them.  Under <u>Chevron</u>, that

permissible interpretation of the statute must be accepted as authoritative.  <u>Chevron</u>, 467 U.S. at

843-844.

      Under similar circumstances, in <u>United States v. O'Hagan</u>, 521 U.S. 642, 666-673

(1997), the Supreme Court found that an SEC rule that prohibited acts that were not themselves

fraudulent, deceptive, or manipulative was a reasonable and valid regulation pursuant to a statute

that instructed the SEC "'by rules and regulations [to] define, and prescribe means reasonably

designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.'"

(quoting 15 U.S.C. § 78n(e)).  The Court reasoned that the terms "means reasonably designed to

prevent" expanded the SEC's authority to reach acts broader than just "fraudulent, deceptive, or

manipulative" acts specifically enumerated in the statute.  <u>Id.</u> at 672-73 (explaining that the

statute's "rulemaking authorization gives the Commission latitude, even in the context of a term

of art like 'manipulative,' to regulate nondeceptive activities as a 'reasonably designed' means of

preventing manipulative acts") (additional internal quotations and citations omitted).  Similarly,

VSTA's language authorizing regulations "as may be necessary to prevent" allows USDA to

reach activities beyond just the "preparation, sale, barter, exchange, or shipment" of biological

products listed in the statute and reasonably permits the restrictions on the use of biological

products authorized by USDA in regulation 102.5(d).

      In light of VSTA's broad delegation of rulemaking authority to USDA, which has been

acknowledged repeatedly, <u>see</u> <u>Lynnbrook Farms v. Smithkline Beecham Corp.</u>, 79 F.3d 620, 624

(7th Cir. 1996); <u>Arnold v. Intervet, Inc.</u>, 305 F. Supp. 2d 548, 550 (D. Md. 2003), as well as the

agency's expertise in the field, the Court must uphold USDA's regulations authorizing use

restrictions on biological products as reasonable implementations of VSTA terms.[16]

## V.    USDA'S REGULATIONS INTERPRETING "ANALOGOUS PRODUCT FOR USE IN THE TREATMENT OF DOMESTIC ANIMALS" TO INCLUDE DIAGNOSTIC TESTS ARE VALID AND REASONABLE IMPLEMENTATIONS OF VSTA'S LANGUAGE.

VSTA's broad delegation of authority to USDA also sanctions the agency's regulations regarding diagnostic tests.  Contrary to plaintiff's contentions, USDA reasonably interpreted VSTA's authorization of regulations pertaining to any "virus, serum, toxin, or analogous product for use in the treatment of domestic animals" to include diagnostic tests.  See 21 U.S.C. § 154.

Plaintiff correctly notes that USDA does not consider diagnostic tests to be viruses, serums, or toxins per se.  Instead, the agency reasonably considers diagnostic tests to qualify as "analogous product[s] for use in the treatment of domestic animals" under section 154 of VSTA. USDA has defined analogous products to include diagnostic instruments in several ways in its general regulation setting forth administrative terminology codified at 9 C.F.R. § 101.2.  In particular, section 101.2(2)(ii) defines "analogous products" as including "[s]ubstances, at any

---

[16]  Plaintiff's assertion that regulation 102.5(d) is not entitled to deference because USDA failed to provide a complete explanation of the statutory authority for the rule is unpersuasive. See Pl.'s Mem. at 26.  Plaintiff relies on Adamo Wrecking Co. v. United States, 434 U.S. 275, 287 (1978), to support its argument, but that case involved the interpretation of a criminal statute in which ambiguities are resolved in favor of defendants, not federal agencies.  Id. at 285. Moreover, Adamo was decided six years before Chevron and applied the analysis in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), discussing factors such as the thoroughness of an agency's consideration, the validity of its reasoning, and the consistency of its rules.  Id. at 287 n.5.  Courts have determined, however, that the Supreme Court's subsequent decision in Chevron, "sets forth the reigning rationale for judicial deference to agency interpretation of statutes . . . ." Kelley v. EPA, 15 F.3d 1100, 1108 (D.C. Cir. 1994).  As demonstrated, USDA's regulations are entitled to deference under Chevron analysis.  See United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) (holding that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.").

stage of production, shipment, distribution, or sale, which are intended for use in the treatment of

animals through the detection or measurement of antigens, antibodies, nucleic acids, or

immunity." Diagnostic tests clearly satisfy this definition because they commonly detect or

measure antigens, antibodies, nucleic acids, or immunity. See Rippke Decl. ¶ 6. In addition, as

noted previously, regulation 101.2 also employs the term "biological products" and explains that

that term means:

> all viruses, serums, toxins . . . or analogous products . . . which are intended for
> use in the treatment of animals and which act primarily through the direct
> stimulation, supplementation, enhancement, or modulation of the immune system
> or immune response. The term "biological products" includes but is not limited
> to vaccines, bacterins, allergens, antibodies, antitoxins, toxoids,
> immunostimulants, certain cytokines, antigenic or immunizing components of
> live organisms, and *diagnostic components* . . . .

9 C.F.R. 101.2 (emphasis added). Furthermore, the regulation establishes that the term

"treatment" means "the prevention, *diagnosis*, management, or cure of diseases of animals." 9

C.F.R. 101.2(3) (emphasis added). As illustrated, the definitions of "biological products" and

"treatment" explicitly include diagnostic measures.[17]

These regulatory definitions are reasonable interpretations of VSTA's general and

ambiguous term "analogous product[s] for use in the treatment of domestic animals" which are

subject to USDA regulation. See 21 U.S.C. § 154. To be sure, as plaintiff contends, the plain

language of VSTA does not specifically mention diagnostic tests, see Pl.'s Mem. at 27-28, but

---

[17] Regulation 101.2's additional definition of "analogous product," which includes
"[s]ubstances . . . which are similar to biological products in that they act, or are intended to act,
through the stimulation, supplementation, enhancement, or modulation of the immune system or
immune response," 9 C.F.R. S 101.2(2)(i), also arguably encompasses diagnostic products, given
that many diagnostic mechanisms interact with the immune system as a means of identifying an
ailment or condition. See Rippke Decl. ¶ 6.

neither does it specifically exclude such tests from its purview.  Instead, after listing the specific

terms virus, serum, and toxin, the statute makes use of the broad, catchall phrase "analogous

product for use in the treatment of domestic animals" and leaves it to the expertise of USDA to

determine what additional products fit under this category.  See, e.g., Chevron, 467 U.S. at 843

("'The power of an administrative agency to administer a congressionally created . . . program

necessarily requires the formulation of policy and the making of rules to fill any gap left,

implicitly or explicitly, by Congress.'") (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

Here, USDA reasonably determined that diagnostic instruments, among many other products,

qualify as "analogous products for use in the treatment of domestic animals" under section 154.

     While diagnostic tests are not directly equivalent to viruses, serums, or toxins, they are

analogous to them.  See Webster's II New College Dictionary 40 (1995) (defining "analogous"

as "[c]orresponding in a way that allows the drawing of an analogy" and defining "analogy" as

"[c]orrespondence in some respects between otherwise dissimilar things.").  Like viruses,

serums, or toxins, diagnostic tests "utilize antigens, antibodies, and an immune response to

detect disease in animals."  Rippke Decl. ¶ 6.[18]  Diagnostic test kits frequently rely on the

interaction of antibodies and antigens to stimulate, modulate, or detect the immune system of an

animal, as do products made with viruses, serums, or toxins.  Id. ¶¶ 5-6.

---

[18]  Plaintiff cites to the decisions in Loge v. United States, 662 F.2d 1268 (8th Cir. 1981),
and Blank v. United States, 400 F.2d 302 (5th Cir. 1968), as examples of cases finding that
certain items were not "analogous products" in other contexts.  Pl.'s Mem. at 30 n.12.  Neither of
these cases, however, is helpful to plaintiff's argument.  First, these cases had nothing to do with
diagnostics or diagnostic tests whatsoever, and neither of them involved an interpretation of
VSTA.  In addition, the court in Loge merely found that a "shed virus" did not satisfy the
requirements of a very specific and narrow regulatory definition of "analogous product;" it did
not find that an agency regulation exceeded statutory authorization, as plaintiff contends here.

Moreover, diagnostic tests certainly may be "use[d] in the treatment of domestic animals."  Diagnosis is an inherent and commonsense aspect of any treatment.  Rippke Decl. ¶ 11.  A disease or condition must first be diagnosed before it can be remedied properly.  See Pegram v. Herdrich, 530 U.S. 211, 228 (2000) (explaining that treatment decisions "are choices about how to go about diagnosing and treating a patient's condition . . . ."); Miller v. AT&T Corp., 250 F.3d 820, 830-31 (4th Cir. 2001) (finding that physician's evaluation of patient's condition through physical examination and blood test constituted "treatment").  Further, even if diagnosis is considered as an activity separate and distinct from treatment, diagnostic products are certainly *used in* the treatment of animals, which is all that is required under section 154 of VSTA.  See 21 U.S.C. § 154 (statute reads "for use in the treatment of domestic animals" not "for treatment of domestic animals").  As just explained, diagnosis of a disease is a preliminary step that must be completed before effective treatment can occur.  Accordingly, USDA's various regulatory provisions under section 101.2 that include diagnostics as one type of an "analogous product for use in the treatment of domestic animals" are reasonable agency interpretations entitled to deference.  See, e.g., Chevron, 467 U.S. at 843 (courts must defer to reasonable agency constructions of ambiguous statutory terms).

Plaintiff's assorted arguments asserting that USDA's regulations pertaining to diagnostics are not entitled to deference and should be struck down are not compelling.  Plaintiff repeatedly complains that USDA offered no explanation for its authority to include diagnostic measures as analogous products under VSTA and claims that USDA's regulations, therefore, are entitled to no weight, citing Justice O'Connor's concurring opinion in Smith v. City of Jackson, 544 U.S. 228 (2005), for support.  See Pl.'s Mem. at 30-31.  As mentioned previously, focusing

exclusively on the factors discussed in <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), such as

the thoroughness of an agency's consideration or explanation of its regulatory decisions as a

method of judicial review of agency action ignores the analysis subsequently set forth in

<u>Chevron</u>.  <u>See</u> <u>supra</u> note 16.  In addition, Justice O'Connor's opinion in <u>Smith</u> was in the

minority, and she merely found that an EEOC policy statement, in her view, did not actually

interpret any statutory language; she did not refer to a lack of an explanation as a reason for not

deferring to the agency.  <u>See</u> <u>Smith</u>, 544 U.S. at 264-65.[19]  Moreover, agency statutory

interpretations contained in actual regulations, such as USDA's regulation 101.2, as opposed to

mere policy statements, clearly are entitled to <u>Chevron</u> analysis.  <u>See</u> <u>Christensen v. Harris</u>

<u>County</u>, 529 U.S. 576, 587 (2000) (stating that "the framework of deference set forth in *Chevron*

does apply to an agency interpretation contained in a regulation.").

Plaintiff's additional argument that the fact that USDA's regulations encompassing

diagnostics were not issued contemporaneously with the passage of VSTA in 1913 means that

the regulations deserve no deference also suffers from the defect of relying exclusively on the

<u>Skidmore</u> analysis and overlooking <u>Chevron</u>.  To support its argument, plaintiff relies on two

cases – <u>Bankamerica Corp. v. United States</u>, 462 U.S. 122 (1983), and <u>Grand Labs., Inc. v.</u>

<u>Harris</u>, 488 F. Supp. 618 (D.S.D. 1980) –  which both pre-date the decision in <u>Chevron</u>.

Furthermore, the Court in <u>Bankamerica</u> recognized that "[m]ere failure of administrative

agencies to act is in no sense a binding administrative interpretation that the Government lacks

the authority to act" in all cases.  <u>Bankamerica</u>, 462 U.S. at 122-23.  Moreover, USDA has

---

[19]  Further, Justice Scalia, in his concurring opinion in <u>Smith</u>, found that the case was "an
absolute classic case for deference to agency interpretation."  <u>Id.</u> at 243.

explained repeatedly that advances in science and technology since 1913 have warranted amendments to its regulations and definitions under VSTA.  See, e.g., 62 Fed. Reg. 31,326, 31,328 (June 9, 1997) (explaining that amendment to update the definition of "biological products" will provide "definitions that reflect current usage and accommodate advances in scientific knowledge."); 47 Fed. Reg. 26,458, 26,459 (June 18, 1982) (stating that development of genetic engineering technology "has introduced a new generation of biological products for use in the treatment of disease in animals.").  Thus, the fact that USDA included diagnostics in its regulatory definitions sixty years after the passage of VSTA provides no basis whatsoever for withholding deference to the agency's reasonable interpretations.[20]

Plaintiff's remaining observations that other statutes specifically mention "diagnosis" and that the legislative history of VSTA fails to discuss issues regarding "diagnosis" or "diagnostic tests," see Pl.'s Mem. at 31-34, do not warrant vacating USDA's regulations addressing diagnostics under VSTA.  Contrary to plaintiff's intimations, neither a statute's plain text nor its legislative history needs to explicitly authorize and mirror every aspect of a federal regulation in order for the regulation to be valid.  Administrative agencies commonly are charged with reconciling statutory ambiguities and filling statutory voids.  See Chevron, 467 U.S. at 843-44.  As long as the statute's clear language does not specifically contradict the terms of a regulation, reasonable agency interpretations of silent or ambiguous statutory provisions are entitled to

---

[20]  Plaintiff's reliance on Lubrizol Corp. v. EPA, 562 F.2d 807 (D.C. Cir. 1977) is also misplaced.  See Pl.'s Mem. at 32.  In Lubrizol, the statutory terms that EPA was implementing were limited to the very specific and narrow terms "fuel or fuel additive," which the court ultimately found did not cover motor vehicle engine oil additives.  See Lubrizol, 562 F.2d at 809. The statute at issue did not contain any sort of catchall phrase such as "or analogous product for use in . . ." like the one in VSTA, leaving little room for agency interpretation.

judicial deference and should not be overturned.  See id.  Accordingly, simply because VSTA's

terms and its legislative history do not explicitly authorize diagnostic tests to be regulated by

USDA does not mean that the agency's conclusion that diagnostics may be regulated as

"analogous product[s] for use in the treatment of domestic animals" is unreasonable.  To the

contrary, as demonstrated, USDA reasonably includes diagnostic components under its VSTA

regulations, and none of plaintiff's arguments compels a different conclusion.

## VI.    BSE TEST KITS FALL SQUARELY WITHIN USDA'S REGULATORY AUTHORITY UNDER VSTA.

Having determined that diagnostic tests in general are subject to USDA regulation under

VSTA, USDA also reasonably decided that specific diagnostic tests -- BSE test kits in particular

-- may be regulated under its VSTA authority and its implementing regulations.  As discussed

previously, USDA imposed restrictions on biological product licenses regarding the uses for

which BSE test kits may be sold in its March 17, 2004 Notice No. 04-08 (attached as Exhibit 5).

USDA acted within its statutory and regulatory authority in promulgating those restrictions.[21]

### A.    A BSE Test Kit Is An Analogous Product.

Just as diagnostic tests generally are products analogous to viruses, serums, or toxins in

that they commonly rely on the interaction of antibodies and antigens to evoke a response in an

animal's immune system, so too are BSE test kits.  See supra section V.  As explained in the

---

[21] The issue here is whether USDA's authority to regulate diagnostic tests extends *as a general matter* to BSE test kits.  The issue of whether USDA was required to make an exception to license restrictions prohibiting the sale of BSE test kits for purposes other than government surveillance testing, in order to permit plaintiff to conduct private testing for its own marketing purposes, is the subject of Count 3 of the Complaint.  As such, pursuant to the parties' stipulation, see Joint Stipulation and Motion Regarding Submission of Cross-Motions for Summary Judgment (dkt. no. 3) (May 24, 2006), that issue is not before the Court at this time.

declaration of Dr. Byron Rippke, as well as in plaintiff's own description of BSE test kits, BSE test kits contain antibodies that interact and bind with the abnormal prion protein antigens thought to cause BSE.  See Rippke Decl. ¶ 7; Pl.'s Mem. at 8-9.  The binding of the antibodies to the prion protein antigens is an immunological reaction that can be detected and indicates the presence of BSE.  Rippke Decl. ¶ 7.  In this manner, BSE test kits are similar to viruses, serums, or toxins.  Plaintiff's own proffered definitions indicate that serums "contain[] antibodies and [are] used to transfer immunity to another individual" and that toxins are "capable of inducing neutralizing antibodies or antitoxins."  Pl.'s Mem. at 35 n.14.  Accordingly, although BSE test kits certainly are not viruses, serums, or toxins per se, their use of antibodies to spur an immunological response make them sufficiently similar as to reasonably be considered "analogous products" under VSTA.[22]

**B.      BSE Test Kits are Intended for "Use In The Treatment Of Domestic Animals."**

As a matter of commonsense, BSE test kits are also "use[d] in the treatment of domestic animals," as required under VSTA.  See 21 U.S.C. §§ 151, 154.  BSE test kits are used to diagnose the presence of the BSE disease in cattle, and, as explained above, diagnosis is an inherent aspect of treatment.  See supra section V; Pegram v. Herdrich, 530 U.S. 211, 228 (2000); Miller v. AT&T Corp., 250 F.3d 820, 830-31 (4th Cir. 2001).  Treatment, thus, has a broader meaning than just the remedying or curing of diseases.  Regulation 101.2(3) recognizes

_____

[22] Further, as explained previously in section V, USDA reasonably defined "analogous products" as including "[s]ubstances, at any stage of production, shipment, distribution, or sale, which are intended for use in the treatment of animals through the detection or measurement of antigens, antibodies, nucleic acids, or immunity".  9 C.F.R. § 101.2(2)(ii).  BSE test kits satisfy this definition because they contain antibodies that detect and bind to the abnormal prion protein antigens that indicate the presence of BSE.  See Rippke Decl. ¶¶ 7-8.

this fact and defines "treatment" to mean "the prevention, diagnosis, management, or cure of diseases of animals." 9 C.F.R. § 101.2(3). Accordingly, even though the BSE tests are applied to cattle that are already dead and there presently is no known cure for BSE, the fact that the BSE tests are used to diagnose the presence of BSE means that they are used in the treatment of domestic animals.

In addition to providing a diagnosis, BSE testing also helps to "manage" the disease by allowing the government, through its surveillance testing, to estimate the prevalence of the disease in order to determine the effectiveness of other mitigation measures in place. See Ferguson Decl. ¶ 9. Thus, BSE tests also are used in the treatment of animals as tools to manage the disease. Finally, over the long-run and in the aggregate, current government BSE surveillance testing contributes to the knowledge of the disease and may increase the chances of developing therapies or cures for the disease in the future. Rippke Decl. ¶ 10. Accordingly, as building blocks for a potential cure, BSE tests are used in the treatment of domestic animals, and thus are subject to USDA regulation under VSTA.

**C.    BSE Test Kits Are Worthless for Use in the Treatment of Domestic Animals When Used to Diagnose BSE in a Non-Targeted Manner on All Slaughter-Aged Cattle.**

While BSE test kits are effective at diagnosing the disease when used on high-risk cattle exhibiting clinical signs of abnormalities, as in the government's surveillance testing program to provide an estimate of the prevalence of BSE in the cattle population, they are ineffective, misleading, and essentially worthless as an animal health measure when used, as proposed by plaintiff, to diagnose the disease in all slaughter-aged normal-looking cattle. See April 9, 2004 USDA Press Release (attached as Exhibit 6). When used in this improper manner, BSE test kits

thus qualify for regulation under VSTA as "worthless, contaminated, dangerous, or harmful" products "for use in the treatment of domestic animals." 21 U.S.C. § 154.

As discussed previously, the vast majority of cattle that are processed into beef in the United States are less than 24 months old. See Ferguson Decl. ¶ 5. However, the average incubation period for the BSE disease is five years, meaning that on average it takes five years from the date a cow is infected with BSE for the cow to show any outward clinical signs of the disease, such as abnormal posture, inability to walk, or other impaired coordination. See id. Given that the earliest point at which current BSE testing methods can detect a positive case of BSE is only two to three months before a cow would demonstrate clinical signs of the disease, see id. ¶ 10; Rippke Decl. ¶ 9, testing all young normal-looking cattle for slaughter, as proposed by plaintiff, is not practical and offers no animal health or food safety value because testing a young infected animal with the current methodology would likely produce false negative results, Feguson Decl. ¶ 10.[23] Accordingly, when used to diagnose the presence of BSE in all cattle for slaughter, as proposed by plaintiff, BSE test kits are worthless and subject to regulation under VSTA.[24] See 70 Fed. Reg. 460, 475 (Jan. 4, 2005) (explaining that performing BSE testing on

---

[23] One of plaintiff's own exhibits confirms this fact. See Stanley B. Prusiner, "Detecting Mad Cow Disease," Scientific American (July 2004) (attached as Exhibit 3 to Pl.'s Mem.). In his article, Dr. Prusiner explains that "[t]hese [BSE] rapid tests, however, have limitations. They depend on [BSE prions] accumulating to detectable amounts – quite often, relatively high levels – in an animal's brain. Yet because BSE often takes three to five years to develop, most slaughtered-aged cattle, which tend to be younger than two years, usually do not test positive, even if they are infected. Therefore, these tests are generally most reliable for older bovines, regardless of whether they look healthy or are 'downers.'" Id. at 91.

[24] Plaintiff's argument that its particular intent to use BSE testing solely as a food safety measure "to provide its customers additional peace of mind" confirms that the tests will not be used in the treatment of animals, Pl.'s Mem. at 38, is unavailing. A product's intended use is based on objective criteria indicating the intent of the manufacturer, such as "representations,

all slaughter-aged cattle is scientifically unjustified and serves no meaningful purpose regarding human or animal health); Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. USDA, 415 F.3d 1078, 1099-1100 (9th Cir. 2005) (finding that limitations on current BSE testing methods support USDA's policy against private non-targeted BSE testing of all cattle for slaughter such that policy was not arbitrary and capricious).[25]

### D.    USDA's Determination That It Has Authority To Regulate BSE Test Kits Is Reasonable And Entitled To Deference.

As demonstrated above, USDA reasonably determined that BSE test kits fall within its statutory jurisdiction under VSTA.  Contrary to plaintiff's assertions, USDA did not misinterpret VSTA and there is a statutory basis supporting USDA's regulation of BSE test kits.  While

---

claims, packaging, labeling, or appearance," 9 C.F.R. § 101.2(1), and does not vary with the subjective intent of every possible user.  As a result, plaintiff's subjective intended use for BSE test kits is not material to a determination of whether such test kits are "used in the treatment of domestic animals," and is completely irrelevant with respect to USDA's authority to regulate BSE test kits and their uses generally.  Further, even under plaintiff's proposed use, BSE test kits would still be used to diagnose the presence of the disease in slaughtered cattle, even though the disease would not be remedied.  As demonstrated, diagnosis is one aspect of treatment, so plaintiff's proposed use of BSE test kits would qualify as "use in the treatment of domestic animals."  In addition, as demonstrated, when used in a non-targeted manner on all slaughter-aged cattle, BSE test kits are worthless, whether the testing is conducted for food safety purposes as part of a marketing campaign, as intended by plaintiff, or whether such testing is conducted for animal health purposes.

[25] As mentioned above, surveillance testing for BSE, by contrast, is performed on high-risk cattle, which include cattle exhibiting signs of central nervous system disorders and non-ambulatory cattle.  Ferguson Decl. ¶¶ 9-10.  Because USDA's surveillance testing targets high risk and generally older cattle, in which the disease, if present, has had a sufficient amount of time to mature to become detectable, the BSE tests are more effective at correctly determining whether a cow has BSE.  In other words, the chances of false negatives are considerably less under surveillance testing of high risk cattle than what they would be if the BSE tests were used to test the generally younger cattle going to market for alleged food safety purposes.  See 70 Fed. Reg. 460, 475 (Jan. 4, 2005) (explaining that BSE tests are not likely to produce false negative results when testing high risk cattle).

VSTA's terms do not explicitly authorize regulation of BSE tests per se, neither do its terms explicitly prohibit such regulation. Not surprisingly, the 1913 Act does not speak directly to BSE test kits, but its general terms and its broad delegation of authority to USDA to implement its provisions support VSTA's application to such test kits.

Furthermore, USDA's imposition of restrictions on BSE test kits is entitled to substantial deference. Although USDA's official regulation of BSE test kits in Notice No. 04-08 and its repeated denials of Creekstone's specific requests to use BSE test kits in a series of letters were not issued pursuant to formalized notice-and-comment rulemaking procedures, USDA's regulation of BSE test kits still warrants considerable deference. As discussed previously, USDA's regulations codified at 9 C.F.R. § 102.5(d) (authorizing use restrictions on biological product licenses) and 9 C.F.R. § 104.1 (requiring a permit to import biological products into the United States) each were promulgated subject to notice-and-comment rulemaking and each are reasonable agency interpretations of VSTA's statutory terms entitled to deference under Chevron. See supra § IV. In regulating BSE test kits in Notice 04-08, USDA simply applied, interpreted, and implemented its own regulations 102.5(d) and 104.1, which carry the force of law by virtue of authority delegated from Congress. See United States v. Mead Corp., 533 U.S. 218, 230-31 (2001) (finding that "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). Congress clearly delegated general authority to USDA to make binding "rules and regulations as may be necessary" to implement VSTA's provisions, see 21 U.S.C. § 154, and USDA issued regulations

-45-

102.5(d) and 104.1 under that authority. Accordingly, USDA's regulation of BSE test kits in

Notice 04-08 and in its letters denying Creekstone's requests was promulgated in the exercise of

its delegated authority from Congress as an implementation of its rules carrying the force of law.

As a result, under the principles of <u>Mead</u>, the agency's restrictions on BSE test kits warrant

<u>Chevron</u> deference, even though those particular restrictions were not imposed under notice-and-

comment rulemaking. See <u>Mead</u>, 533 U.S. at 230-32 (explaining that lack of notice-and-

comment rulemaking is not, by itself, a complete bar to the application of <u>Chevron</u> deference);

<u>Barnhardt v. Walton</u>, 535 U.S. 212, 221-22 (2002) (affording agency interpretations of Social

Security Act provisions <u>Chevron</u> deference despite fact that interpretations did not emerge out of

notice-and-comment rulemaking); <u>Mylan Laboratories, Inc. v. Thompson</u>, 389 F.3d 1272, 1279-

80 (D.C. Cir. 2004) (giving <u>Chevron</u> deference to agency's letter decision, even though it was not

issued through notice-and-comment rulemaking); <u>Pharmaceutical Research and Mfrs. of</u>

<u>America v. Thompson</u>, 362 F.3d 817, 821-22 (D.C. Cir. 2004) (applying <u>Chevron</u> deference to

Secretary's Medicaid approval letters because he had an express congressional delegation of

authority to review and approve state Medicaid plans and, therefore, his actions carried the force

of law).[26]

---

[26] Even if the Court were to decide that USDA's authority to regulate BSE test kits in
Notice No. 04-08 was not entitled to <u>Chevron</u> deference, it nevertheless, at a minimum, would be
entitled to some deference and respect under the principles of <u>Skidmore v. Swift & Co.</u>, 323 U.S.
134 (1944). In light of USDA's experience and expertise in administering the requirements of
VSTA, its determination that BSE test kits are subject to regulation under VSTA has the "power
to persuade." See <u>Skidmore</u>, 323 U.S. at 140; <u>Mead</u>, 533 U.S. at 234-35 (explaining that an
agency interpretation not subject to <u>Chevron</u> deference may merit some level of deference given
the experience and information available to the agency); <u>American Fed. of Gov't Employees</u>,
284 F.3d at 129 (finding that USDA's modified inspection program, while not entitled to
<u>Chevron</u> deference, was entitled to some deference in light of agency's experience and informed
judgment administering meat and poultry inspection laws).

Moreover, because USDA interpreted and applied its own regulations 102.5(d) and 104.1 in imposing the restrictions on BSE test kits under Notice 04-08, see Notice No. 04-08 (attached as Exhibit 5), the BSE test kit restrictions also are entitled to substantial deference as an agency's interpretation of its own regulations.  See Auer v. Robbins, 519 U.S. 452, 461 (1997) (finding that agency's interpretation of its own regulation is controlling unless clearly erroneous or contrary to the regulation); Federal Election Comm'n v. National Rifle Ass'n of America, 254 F.3d 173, 182 (D.C. Cir. 2001) (explaining that court reviews an agency's interpretation of its own regulations under "an exceedingly deferential standard.") (internal quotations and citations omitted); Consolidated Rail Corp. v. Interstate Commerce Comm'n, 43 F.3d 1528, 1532 (D.C. Cir. 1995) (according "special deference" to ICC's application of its own regulations); Capital Network Sys., Inc. v. Federal Communications Comm'n, 28 F.3d 201, 206 (D.C. Cir. 1994) (explaining that "courts accord even greater deference to agency interpretations of agency rules than they do to agency interpretations of ambiguous statutory terms.").

At bottom, USDA reasonably interpreted VSTA and applied its regulations to impose restrictions on BSE test kits.  As a result, the Court must accord these restrictions and USDA's decision to deny Creekstone's requests to conduct its own BSE testing considerable deference.

## VII.    USDA'S REGULATION OF BSE TEST KITS IS CONSISTENT WITH VSTA'S PURPOSES.

Plaintiff contends that USDA lacks authority generally to restrict the use of BSE test kits simply because the agency, at times, referred to economically based reasons for denying plaintiff's particular request to purchase test kits to conduct its own private BSE testing, alleging that such economic concerns are unrelated to VSTA's purpose of protecting animal health.  See Pl.'s Mem. at 40-44.  At the outset, it is noteworthy that plaintiff, in so arguing, is challenging

-47-

USDA's reasons for denying plaintiff's request for an exception to USDA's policy of restricting

BSE testing to government-approved labs for surveillance purposes.  <u>See</u> Pl.'s Mem. at 41

(referring to the denial of "Creekstone's requests" and "Creekstone's plans").  In this manner,

plaintiff is actually asserting its claim in Count 3 of its Complaint that USDA acted arbitrarily

and capriciously in denying plaintiff's request to perform its own BSE testing on all of its cattle

for slaughter in violation of 5 U.S.C. § 706(2)(A).  <u>See</u> <u>generally</u> Complaint ¶¶ 42-51, ¶ 44

(alleging that VSTA "does not address human health or consumer protection concerns" and "is

not concerned with maintaining domestic or international confidence in U.S. livestock or

products").  Raising this claim at this time, however, is improper because it is contrary to the

agreement between the parties that, due to the potentially dispositive nature of the claims in

Counts 1 and 2, it would not be necessary to address the claims in Count 3 at this time.  <u>See</u> Joint

Stipulation and Motion Regarding Submission of Cross-Motions for Summary Judgment (dkt.

no. 3) (May 24, 2006).  Accordingly, the Court should not consider plaintiff's attack on the

reasons why USDA denied plaintiff's request to purchase test kits to conduct its own BSE

testing at this time.

  In any event, to the extent the Court believes that this argument is properly asserted at

this juncture, USDA acted consistently with VSTA's various purposes in establishing its policy

of limiting BSE testing to government-approved labs for surveillance purposes and in denying

plaintiff's request for an exception to this policy.  Contrary to plaintiff's contentions, USDA's

policy against private testing does promote animal health.  USDA explained to plaintiff that its

restrictions on BSE testing were necessary "to ensure effective, scientifically sound testing for

significant animal diseases . . . ."  June 1, 2004 Letter from B. Hawks to J. Stewart (attached as

Exhibit 8); see also April 9, 2004 USDA Press Release No. 0141.04 (attached as Exhibit 6)

(explaining that BSE tests are licensed for animal health surveillance purposes and that there is

no scientific justification for plaintiff's proposed use of BSE tests to conduct testing on 100% of

its cattle for slaughter).  By ensuring that BSE test kits are used in a scientifically sound and

effective manner to accurately diagnose the presence or absence of the disease, USDA is

protecting animal health.  As discussed previously, effective and accurate diagnosis of the

disease allows the government, through its surveillance testing, to manage the disease, see 9

C.F.R. § 101.2 (3), by correctly estimating the prevalence of the disease in order to determine the

effectiveness of other mitigation measures in place designed to limit the spread of the disease.

See Ferguson Decl. ¶ 9.  Clearly, reliable verification as to whether or not BSE is spreading to

other cattle is a measure that promotes animal health.  In addition, the effective use of BSE test

kits also contributes to the knowledge of the disease and may increase the chances of developing

therapies or cures for the disease in the future, thus enhancing animal health.  See Rippke Decl. ¶

10.

     VSTA's terms themselves indicate that, in addition to protecting animal health, the Act is

concerned with assuring the purity, safety, and efficacy of biological products.  See 21 U.S.C. §

154a (providing USDA authority to issue special licenses "on such conditions as are necessary to

assure purity, safety, and a reasonable expectation of efficacy.").  As mentioned, USDA

explained to plaintiff that its restrictions on BSE testing were necessary to ensure that the testing

is done in a scientifically sound and effective manner.  See June 1, 2004 Letter from B. Hawks to

J. Stewart.  In this fashion as well, USDA's BSE testing restrictions are consistent with VSTA's

purposes.

Indeed, plaintiff's argument that USDA's regulation of BSE test kits is contrary to VSTA's purposes is based on plaintiff's unduly restrictive view that VSTA's purpose is limited exclusively to the protection of animal health.  To the contrary, the Act's legislative history and statutory language indicate that VSTA serves multiple purposes, including not only protecting animal health but also protecting the economic health of the livestock industry, particularly the financial interests of farmers and livestock owners.  In testimony before Congress at the time of VSTA's passage, a USDA representative explained that the Act was necessary "in order to protect the farmer and stock raiser from improperly made and prepared serums, toxins, and viruses."  See Hearing before the Committee on Agriculture on the Estimates of Appropriations for the Fiscal Year Ending June 30, 1914, (H.R. 28283), 62nd Cong. 24 (1913) (statement of Dr. A. M. Farrington, Asst. Chief Bureau of Animal Industry, Dept. of Agriculture).  VSTA, thus, was needed to shield farmers and livestock owners from the economic burdens of costly and ineffective snake oil products marketed as serums and the continued losses of their livestock to disease.  See Hall v. State, 158 N.W. 362, 363 (Neb. 1916) (stating that the "Department of Agriculture, realizing the losses that were resulting to hog raisers of the country from the promiscuous manufacture and distribution of anti-hog cholera serum, secured the enactment of a law intended to regulate the preparation, sale, and distribution of such serum.").

The Act itself reflects its concern with the business aspects of the livestock trade by noting Congress's finding that "regulation of the products and activities as provided in this chapter is necessary to prevent and eliminate burdens on [interstate] commerce and to effectively regulate such commerce."  21 U.S.C. § 159.  Plaintiff also briefly acknowledges that VSTA's purpose extends beyond just the protection of animal health to include "the related economic

-50-

interests of livestock owners." Pl.'s Mem. at 40, Heading IV.[27]  Accordingly, in addition to
ensuring animal health, VSTA's purpose clearly encompasses the protection of the economic
well-being of the livestock industry, which USDA has sought to promote through its regulation
of BSE test kits.[28]

        USDA, therefore, validly considered economic interests, which it is responsible for under
VSTA as well as other statutes, in denying Creekstone's request for an exception to its policy of
not permitting private BSE testing on all cattle for slaughter.  As noted by plaintiff, USDA
denied plaintiff's request to use BSE tests in a private marketing program in order to "ensure
effective, scientifically sound testing for significant animal diseases and maintain domestic and
international confidence in U.S. cattle and beef products."  June 1, 2004 Letter from B. Hawks to
J. Stewart.[29]  Obviously, maintaining domestic and international confidence in U.S. cattle and

---

        [27]  Plaintiff's reliance here on the decision in Garrelts v. SmithKline Beecham Corp., 943
F. Supp. 1023, 1066 (N.D. Iowa 1996), is misplaced.  In Garrelts, the court found merely that
VSTA did not extend to the regulation of human physical health risks from animal vaccines, thus
the statute did not preempt state law tort claims by a farmer who was physically injured from
exposure to a cattle vaccine otherwise regulated under VSTA.  Nowhere did the court find that
VSTA's purpose was exclusively to protect animal health or that VSTA is not concerned with
economic harm that can result from defective vaccines and analogous products.

        [28]  In addition, as discussed previously in section IV.B., one of VSTA's primary purposes
is "controlling the use . . . of similar dangerous and worthless products that may be manufactured
within the United States."  S. Rep. No. 62-1288, at 2 (1913) .

        [29]  Even if the Court were to conclude that VSTA's purposes do not extend to these
economic considerations, the fact that USDA implemented its regulations and policies regarding
BSE testing for these additional economic reasons would not render its regulations and policies
invalid.  As demonstrated above, USDA's policies serve VSTA's unquestioned purpose of
promoting animal health, and as long as any additional reasons for its actions are not inconsistent
with that purpose, its actions remain valid.  See BDPCS, Inc. v. FCC, 351 F.3d 1177, 1183 (D.C.
Cir. 2003) (explaining that "[w]hen an agency offers multiple grounds for a decision, we will
affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the
agency would not have acted on that basis if the alternative grounds were unavailable").

beef products protects the economic interests of livestock owners and beef producers, and thus is

consistent with VSTA's purpose.  In addition, protecting consumers from paying more for

privately BSE tested beef based on misleading implications of the enhanced safety of such beef

is also a reasonable measure to regulate the economic condition of this market.  Correcting

market deficiencies and information asymmetries pertaining to the effectiveness of BSE test kits

is akin to intervening in the trade of bogus serums that inspired the passage of VSTA in the first

place.[30]  Accordingly, USDA's economically based reasons for placing restrictions on BSE test

kits and denying plaintiff's requests are entirely consistent with and advance VSTA's purposes.[31]

USDA also has indicated that its restrictions on BSE testing prohibiting private testing

are necessary because "BSE testing is an inherently governmental function" that is required to

ensure uniform and consistent procedures for administering the tests.  August 5, 2004 Letter

from R. Levings to R. Richardson (attached as Exhibit 10).  This stated purpose is entirely

---

[30]  USDA's prohibition against private BSE testing also prevents beef producers from having to incur increased costs of conducting the BSE testing, which, although useless for animal health and food safety purposes, might otherwise be necessary to remain competitive if private BSE testing were permitted.

[31]  The decision in Ethyl Corp. v. EPA, 51 F.3d 1053 (D.C. Cir. 1995), does not compel a different conclusion.  In Ethyl, the court determined that the EPA exceeded its authority under a particular waiver provision of the Clean Air Act by considering the public health implications of a fuel additive instead of limiting its consideration to whether the additive would "cause or contribute to a failure of any emission control device or system," as explicitly provided in the specific statutory waiver provision. Id. at 1058-59.  Unlike the present case, in Ethyl, the court was not attempting to identify the general purposes of the Clean Air Act as a whole, but rather was interpreting one specific and narrow provision of the statute, which clearly did not mention public health as a criteria for consideration.  By contrast, as demonstrated above, aspects of VSTA's language and legislative history clearly establish that the statute as a whole was enacted to do more than just protect animal health; it was also intended to pursue other public interest goals like shielding livestock owners from certain financial hardships and securing the economic well-being of the industry.

consistent with Congress's explicit recognition in 1985 of "the need for uniform national standards" in the markets for animal vaccines and related products subject to VSTA.  S. Rep. No. 99-145 at 339, reprinted in 1985 U.S.C.C.A.N. 1676, 2005; see also Lynbrook Farms v. SmithKline Beecham Corp., 79 F.3d 620, 625 (7th Cir. 1996) (explaining that "Congress thus concluded that uniform, federal standards would better serve livestock owners, veterinarians, and the American public.").  USDA's BSE test kit restrictions, accordingly, also serve VSTA's purpose of establishing uniform national standards for such testing in the livestock industry.

As demonstrated, USDA's restrictions on BSE test kits and its denial of plaintiff's request for an exemption from those restrictions are consistent with and advance the various purposes of VSTA and should be upheld.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment should be denied, and defendants' cross-motion for summary judgment should be granted.

Dated: September 22, 2006                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            KENNETH L. WAINSTEIN
                                            United States Attorney

                                            /s/ Edward H. White_____
                                            JAMES J. GILLIGAN
                                            EDWARD  H. WHITE (D.C. Bar No. 468531)
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue, N.W.  Room 6110
                                            Washington, D.C. 20530
                                            Tel: (202) 514-5108
                                            Fax: (202) 318-4268
                                            email: ned.white@usdoj.gov

                                            Attorneys for Defendants