IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
CREEKSTONE FARMS PREMIUM BEEF, LLC,               )
                                                  )
            Plaintiff,                            )
                                                  )
      vs.                                         )   Civil Action No. 06-544 (JR)
                                                  )
UNITED STATES DEPARTMENT OF AGRICULTURE,          )
and MIKE JOHANNS, IN HIS CAPACITY AS THE          )
SECRETARY OF AGRICULTURE,                         )
                                                  )
            Defendants.                           )
_____  )


**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**

**OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ...........................................................................1

ARGUMENT ...............................................................................................4

I.    THIS COURT HAS JURISDICTION TO HEAR CREEKSTONE'S CLAIMS.4

    A.    Creekstone's Claims Are Not Moot. ...............................................4

    B.    Creekstone Has Standing To Present Its Claims. .........................6

II.   USDA'S EXPANSIVE INTERPRETATION OF THE VSTA TO APPLY TO
    DIAGNOSTIC TESTS AND TO THE USE OF BIOLOGICAL PRODUCTS
    IS UNPERSUASIVE AND NOT ENTITLED TO DEFERENCE ....................10

    A.    The VSTA Is Neither Ambiguous Nor Susceptible to USDA's
        Interpretations ...........................................................................10

            1.  Regulation of the Use of Biological Products ..............................12

            2. Regulation of Diagnostic Tests ......................................................18

    B.    USDA's Expansive Interpretation of the VSTA Is Not Entitled to
        Deference. ...................................................................................21

            1.   No Deference for Interpretations Expanding the Scope of the Agency's
               Authority ........................................................................21

            2.   No deference for Statutory Interpretations Not Accompanied by Further
               Explication ......................................................................22

            3.   Little Deference for Statutory Interpretations that Were Far from
               Contemporaneous or Consistent ......................................25

    C.    The Reenactment Doctrine Does Not Save USDA's Unsupported
        Interpretation of the VSTA .......................................................27

III.  USDA LACKS STATUTORY AUTHORITY TO REGULATE BSE TEST KITS
    IN PARTICULAR ...........................................................................29

    A.  BSE Test Kits Are Not "Analogous Products." .............................30

B.  BSE Test Kits Are Not, and Would Not Be, Used in the Treatment of
Animal Disease ..............................................................................................33

C.  BSE Test Kits Are Not Worthless, Contaminated, Dangerous or Harmful.34

IV.  USDA'S RESTRICTIONS ON BSE TEST KITS ON ECONOMIC GROUNDS
ARE OUTSIDE ITS AUTHORITY UNDER THE VSTA .................................39

V.  USDA IS NOT ENTITLED TO SUMMARY JUDGMENT .............................45

CONCLUSION .......................................................................................................45

EXHIBIT 1    Supplemental Declaration of John D. Stewart

EXHIBIT 2    Declaration of Boyd R. Oase of Kowalski's Markets

EXHIBIT 3    Declaration of James R. Kiley of Wild by Nature Markets

EXHIBIT 4    Declaration of Darin Parker of Parker International Inc.

EXHIBIT 5    Declaration of Kyu O Kim of NY-SK Trading, LLC

EXHIBIT 6    Declaration of Steve Erdley of Penn Traffic Company

EXHIBIT 7    *Hearing before the Committee on Agriculture on the Estimates of
Appropriations for the Fiscal Year Ending June 30, 1914, H.R. 28283*, 62d
Cong. 20-32 (1913) (testimony of Dr. A.M. Farrington, Asst. Chief, Bureau
of Animal Indus., Dept. of Agric.)

EXHIBIT 8    Declaration of Paul W. Brown, M.D.

EXHIBIT 9    Report on the Monitoring and Testing of Ruminants for the Presence of
Transmissible Spongiform Encephalopathy (TSE) in the EU in 2005

EXHIBIT 10    Declaration of Linda A. Detwiler, D.V.M.

EXHIBIT 11    Supervie and Castagliola, "The Unrecognized French BSE Epidemic," 35
*Vet. Res.* 349-362 (2004)

## TABLE OF AUTHORITIES [1]

### FEDERAL CASES

*62 Cases of Jam v. United States*, 340 U.S. 593 (1951) .....................................43

*AFL-CIO v. Brock*, 835 F.2d 912 (D.C. Cir. 1987) ........................................28

*\*Adamo Wrecking Co. v. United States*, 434 U.S. 275 (1978) .............................22, 23, 26

*American Fin. Servs. Ass'n v. FTC*, 767 F.2d 957 ), *cert. denied*, 475 U.S. 1011 (1986 .....................................................................................42

*American Petroleum Institute v. EPA*, 52 F.3d 1113 (D.C. Cir. 1995) ....................11

*\*Animal Health Institute v. USDA*, 487 F. Supp. 376 (D. Colo. 1980) .....................13

*Area Transp., Inc. v. Ettinger*, 219 F.3d 671 (7th Cir. 2000) ..............................8

*Arnold v. Intervet, Inc.*, 305 F. Supp. 2d 548 (D. Md. 2003)...............................21

*Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687 (1995)...............................................................................15, 28

*\*Barnett v. Weinberger*, 818 F.2d 953 (D.C. Cir. 1987) ..........................23, 24, 26, 27, 28

*Better Government Assoc. v. U.S. Dept. of Interior*, 780 F.2d 86 (D.C. Cir. 1986) ...........5

*\*Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204 (1988)...............................25

*Burlington Northern R.R. Co. v. Surface Transportation Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996) ......................................................................6

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)...........................................................................29

*Lorillard v. Pons*, 434 U.S. 575 (1978) ....................................................29

*Chevron. Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654 (D.C. Cir. 2003)......................................................17, 18, 22, 23, 26

*Christensen v. Harris Cty.*, 529 U.S. 576 (2000).........................................25

*\*City of Chicago v. Environmental Defense Fund*, 511 U.S. 328 (1994)...................16, 17

*City of New Haven v. HUD*, 809 F.2d 900 (D.C. Cir. 1987) ..............................5

*Continental Airlines, Inc. v. U.S. Department of Transportation* , 856 F.2d 209 (D.C. Cir. 1988) ...................................................................26

*Dolan v. United States Postal Service*, 126 S. Ct.1252 (2/22/2006) ......................14

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568 (1988) .....................................................44

*Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075 (D.C. Cir. 1996)...............................22

*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995) ...................................11, 22

*\*ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071 (D.C. Cir. 2002).................18

*\*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ......................13, 29

*Federal National Mortgage Ass'n v. United States*, 56 Fed. Cl. 228 (Ct. of Claims 2003) ...............................................................................23

*\*Friends of the Earth, Inc. v. EPA*, 446 F.3d 140 (D.C. Cir. 2006) ........................22

*\*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) ...................................4

*\*Garrelts v. Smithkline Beecham Corp.*, 943 F. Supp. 1023 (N. D. Ia. 1996) ...........28, 44

*\*General American Transp. Corp. v. ICC*, 872 F.2d 1048 (DC Circuit 1989) ................28

---

[1] Asterisk denotes authorities principally relied on.

*Gettman v. DEA*, 290 F.3d 430 (D.C. Cir. 2002)................................................8

*\*Grand Laboratories, Inc. v. Harris*, 488 F. Supp. 618, 619 (D.S.D. 1980), *rev'd on other grounds*, 660 F.2d 1288 (8th Cir. 1981)................................................33

*Independent Insurance Agents of America, Inc. v. Hawke*, 211 F.3d 638 (2000) .............15

*International Union, UAW v. Brock*, 816 F.2d 761 (D.C. Cir. 1987)................................28

*Investment Co. Inst. v. Camp*, 401 U.S. 617 (1971)................................................23

*\*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86 (1993)................................................22

*Kelley v. U.S. EPA*, 15 F.3d 1100 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1110 (1995)]................................................17

*Koszola v. F.D.I.C.*, 393 F.3d 1294 (D.C. Cir. 2005)................................................28

*Lorillard v. Pons*, 434 U.S. 575 (1978) ................................................29

*\*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................7, 8

*Lynn Martin v. Occupational Safety and Health Review Commission*, 499 U.S. 144 (1991)................................................26

*McBryde v. Committee To Review Circuit Counsel and Disability Orders*, 264 F.3d 52 (D.C. Cir. 2001)................................................7, 8

*\*Michigan Citizens for an Independent Press v. Thornburgh*, 868 F.2d 1285 (D.C. Cir. 1989) ................................................17

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001)................................................11

*Miller v. AT&T Corp.*, 250 F.3d 820 (4th Cir. 2001) ................................................19

*\*Natural Resources Defense Council v. Reilly*, 983 F.2d 259 (D.C. Cir. 1993) .............22

*Pacific Power & Light Co. v. FPC*, 184 F.2d 272 (D.C. Cir. 1950)................................28

*PanAmSat Corp. v. F.C.C.*, 198 F.3d 890 (D.C. Cir. 1999) ................................................25

*Pegram v. Herdrich*, 530 U.S. 211 (2000)................................................19

*Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654, 662 (D.C. Cir. 2003) ................................................23

*\*Railway Labor Executives' Ass'n v. National Mediation Bd.*, 29 F.3d 655, *cert. denied*, 514 U.S. 1032 (1995) ................................................21, 26

*\*Railway Labor Executives' Ass'n v. National Mediation Bd.*, 988 F.2d 133 (D.C. Cir. 1993), *aff'd on rehearing en banc*, 29 F.3d 655 (1994), *cert. denied*, 514 U.S. 1032 (1995)................................................17, 18, 42

*Reno v. Flores*, 507 U.S. 292 (1993) ................................................11

*Rodriguez v. United States*, 480 U.S. 522 (1987) ................................................12, 42

*\*SEC v. Sloan*, 436 U.S. 103 (1978)................................................23

*Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640 (D.C. Cir. 1998)................................11

*Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365 (5th Cir. 1997) ................................................14

*\*Sierra Club v. Morton*, 405 U.S. 727 (1972) ................................................7

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001)................................................29

*Texas & Pacific Railway Co. v. Pottorff*, 291 U.S. 245 (1934)................................................15

*United States v. Mead*, 533 U.S. 218 (2001) ................................................23

*\*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001)................................................13

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................8

**STATE CASES**

*Hall v. Nebraska*, 100 Neb. 84, 158 N.W. 362 (1916) ...................................................16

## STATUTES

Administrative Procedure Act, 5 U.S.C. § 706(2) ......................................30, 38, 39, 40, 42
Act of July 1, 1902, ch. 1378, 32 Stat. 728...............................................................13, 31
Agricultural Bioterrorism Protection Act of 2002, 7 U.S.C. § 8401 ...........................15, 29
Virus Serum Toxin Act, 21 U.S.C. §§ 151-154...................................................... *passim*
21 U.S.C. § 151.........................................................................11, 19, 29, 35, 43
21 U.S.C. § 152.........................................................................11, 19, 25, 29
21 U.S.C. § 153.........................................................................................25
21 U.S.C. § 154.........................................................................12, 13, 18, 19, 29, 38
28 U.S.C. § 2680(b).....................................................................................14
29 U.S.C. § 2611(11)...................................................................................19
P.L. 99-198, 99 Stat. 1654-56.........................................................................27
Sections 211-213 of the Public Health Security and Bioterrorism Preparedness
    and Response Act of 2002, P.L. 107-188, 116 Stat. 647 ............................................29

## REGULATORY MATERIALS

9 C.F.R. Chapter I Subchapter E.......................................................................25
9 C.F.R. § 101.2(2) ...................................................................20, 21, 33, 34
9 C.F.R. § 102.5(d) ...................................................................................12, 39
9 C.F.R. § 104.1 ......................................................................................25, 29
29 C.F.R. § 825.114(b) ...............................................................................19
62 Fed. Reg. 31,326 (June 9, 1997)...................................................................27, 32
70 Fed. Reg. 460, 461 (Jan. 4, 2005) ................................................................32

## LEGISLATIVE MATERIALS

*Hearing before the Committee on Agriculture on the Estimates of Appropriations*
    *for the Fiscal Year Ending June 30, 1914*, H.R. *28283*, 62d Cong. 20-32
    (1913)  (Reply Memo Exh.  7).......................................................................16
S. Rep. No. 99-145.....................................................................................28

## MISCELLANEOUS

OIE Terrestrial Animal Health Code – 2005, Appendix 3.8.4, Surveillance
    for Bovine Spongiform Encephalopathy ............................................................37
Report on the Monitoring and Testing of Ruminants for the Presence of
    Transmissible Spongiform Encephalopathy (TSE) in the EU in 2005 ......................35
Supervie and Castagliola, "The Unrecognized French BSE Epidemic," 35 *Vet.*
    *Res.* 349-362 (2004).................................................................................37
2B Sutherland Stat. Constr. § 49.09...................................................................28

## SUMMARY OF ARGUMENT

With hardly a word of analysis (prior to this case), the Department of Agriculture ("USDA") has interpreted a statute designed to keep companies from producing and marketing fraudulent vaccines and serums for treatment of diseases in animals as an almost unlimited grant of authority to restrict or preclude activities related in any way to animal diseases. Even if it were appropriate to uphold such an action on the basis of *post hoc* rationalizations of counsel, here those rationalizations are inconsistent with basic principles of statutory interpretation, often lack citation or plausible support, and in some instances simply do not make sense even on their face.

For example, USDA's argument that this case is moot is based entirely on USDA's improper characterization of plaintiff Creekstone Farms Premium Beef's case as solely an attempt by Creekstone to export beef to Japan. Neither the Complaint, Creekstone's Motion for Summary Judgment, nor the Declaration filed by Creekstone's founder and then-CEO characterized Creekstone's claims that narrowly. To the contrary, Creekstone continues to have strong, valid reasons for wanting to use BSE test kits.

USDA's claim that Creekstone lacks standing rests on a similarly narrow view of what this case is about and the relief Creekstone is seeking. Clearly Creekstone, which believes the benefits to its business of testing all its cattle for BSE warrants the multi-million-dollar cost of testing, is suffering both economic and non-economic injuries from USDA's unlawful refusal to allow Creekstone access to BSE test kits, injuries that this Court obviously could alleviate by striking down USDA's restrictions on BSE test kit use.

USDA's defense of its regulations restricting the use of diagnostic tests, as well as its actions concerning BSE test kits in particular, is based on a convoluted reading of the simple

language of the VSTA and on its observation that Congress did not specifically prohibit USDA from regulating BSE test kits.  But the Supreme Court and the U.S. Court of Appeals for the District of Columbia have consistently rejected such attempts to find congressional authorization from the absence of a prohibition.  The VSTA on its face does not extend to restrictions on the use of biological products, nor the restriction of access to diagnostic tests (especially diagnostic tests, like the BSE test kits at issue here, which do not operate through stimulation of an animal's immune system).  USDA's interpretation of the VSTA is not subject to deference, because (1) it expands the Department's authority beyond the literal bounds of the statute; (2) it is not a contemporaneous interpretation of the statute but rather one that USDA invented 60 years later; (3) USDA's regulations were not accompanied by any analysis of the VSTA's statutory language or legislative history, or really by any explanation; and (4) at least with respect to import permits and to BSE test kits in particular, USDA's regulations were not announced in a rulemaking or any similar formal pronouncement.

But even if USDA's regulatory authority under the VSTA extended to controlling who uses biological products, and for what purpose, and to regulating diagnostic tests that operate in a manner analogous to viruses, serums, or toxins, USDA cannot legally ban all private use of BSE test kits.  First, BSE test kits do not function as "analogous products;" and second, they are not used in the treatment of an animal disease.  (In fact, USDA claims it can bar Creekstone from using BSE test kits precisely because they are not being used in the treatment of animals.)  Third, using BSE test kits to screen cattle slaughtered for human consumption for BSE hardly makes them "worthless."  To the contrary, even USDA's improperly limited view of the benefits of BSE testing admits that testing can identify carcasses infected with this fatal disease months before the cattle would have any outward signs of BSE that might keep them out of the food chain. And

renowned BSE experts submitting declarations in support of this Reply Memorandum establish the benefits of more extensive BSE testing, a practice adopted by almost every country in the world that has been exposed to BSE.

Finally, even assuming that USDA's regulations were authorized by the VSTA, and assuming also that USDA could, consistent with the VSTA, assert jurisdiction over the use of BSE test kits in particular, USDA's filings in this case now make it clear that USDA is not really regulating BSE test kits in order to protect animal health or even to protect the economic well-being of farmers and ranchers.  Rather, USDA is trying to protect large meatpackers from competition that Creekstone and others who want to test will pose.  Put another way, USDA wants to deprive American consumers of the opportunity to buy beef from BSE-tested cattle.  This goal not only is far beyond what Congress authorized in the VSTA, it is contrary to basic tenets about the role of government to protect competition and foster this nation's free-market economy.

For any one of these reasons, Creekstone is entitled to summary judgment on its claims that USDA's actions preventing Creekstone from conducting BSE tests on the cattle it slaughters are beyond USDA's statutory authority.  Moreover, even if the Court were to determine that Creekstone has not demonstrated that it is entitled to summary judgment on those claims, that still would not mean that USDA has carried its burden of justifying summary judgment for USDA on those claims.  Nor, of course, would it mean that USDA is entitled to summary judgment on Creekstone's third claim: that USDA acted arbitrarily and capriciously even if it was within its statutory authority—a claim that has yet to be briefed.

**ARGUMENT**

**I.  THIS COURT HAS JURISDICTION TO HEAR CREEKSTONE'S CLAIMS.**

A.  Creekstone's Claims Are Not Moot.

USDA's argument that Creekstone's claims are moot is easily disposed of.  Contrary to USDA's misreading of Creekstone's Complaint, Creekstone's desire to test voluntarily for BSE is not limited to gaining access to Japan's market.  In addition to expanding its customer base, voluntary testing would enable Creekstone to enhance its brand and competitiveness.  Creekstone domestic and international customers will purchase more Creekstone beef, and at a higher price, if Creekstone can assure those customers that its products come from cattle that were tested for BSE.  Moreover, because of lingering concerns over the safety of U.S. beef, Creekstone and other U.S beef producers have not been able to recapture market share in the Japanese and Korean markets—making BSE testing still relevant for those markets.

USDA mistakenly states that "plaintiff's primary concern is with its ability to sell beef in the Japanese market."  USDA Consolidated Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("USDA Memo") at 15.  Creekstone's Complaint and the Supplement Declaration of its former CEO and current consultant John Stewart make clear that Creekstone is challenging the USDA's ban against voluntary testing for BSE, not a foreign government's trade policy.  *See* Stewart Supplemental Declaration, Exhibit 1 to this Reply, ¶¶ 2-3, 5, 8.  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of that practice."  *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 189 (2000).  Here, by contrast, there has been no cessation of USDA's ban on voluntary BSE

testing, making mootness not even an issue.  By definition, this case is not moot.  *See Better*

*Government Assoc. v. U.S. Dept. of Interior*, 780 F.2d 86, 91 (D.C. Cir. 1986) (challenges "to the

legality of the standards utilized" by a government agency were not moot where "the utilization

of the guidelines and the regulation . . . has continued," even though specific claim seeking relief

was moot where agency had granted relief); *City of New Haven v. HUD*, 809 F.2d 900, 904 (D.C.

Cir. 1987) (same).

Access to the Japanese market is but one component of Creekstone's desire to conduct

voluntary BSE testing.  In addition to Japan, Creekstone wishes to gain access to Korean and

other overseas markets as well as to expand its U.S. sales by offering beef from BSE-tested cattle.

Exh. 1 (Stewart Supp. Decl.) ¶ 2.  And beyond access to markets, Creekstone will be able to sell

more beef at higher prices to both its foreign and domestic customers if the beef is from cattle

tested for BSE.  *Id*. ¶¶ 2, 6, 7; Creekstone customer declarations, Exhibits 2- 6.  Thus, irrespective

of Japan's lifting its ban, Creekstone could increase the demand for its beef if it can test for BSE.

In addition, Creekstone's business model is to sell the finest Angus beef in the world.  By

offering its customers beef from BSE-tested cattle, Creekstone intends to reinforce its reputation

for excellence, safety, and superior beef products.  *See* Exh. 1 (Stewart Supp. Decl.) ¶ 8.  USDA

concedes this point by admitting that one of its reasons for denying Creekstone permission to test

for BSE is USDA's concern that Creekstone's competitors would feel obligated to BSE test as

well lest they be at a disadvantage.  *See* USDA Memo at 52 n.30.  USDA's recognition that

allowing Creekstone to offer customers BSE-tested beef would boost Creekstone's brand and

provide a competitive edge alone defeats USDA's mootness argument.

Moreover, despite Japan and Korea lifting their respective U.S. beef bans, Creekstone

(and other U.S. beef producers) still cannot sell as much U.S. beef as before.  Exh. 1 (Stewart

Supp. Decl.) ¶¶ 2-6 and attachments.  This is because Japanese and Korean customers remain

concerned about the safety of U.S. beef.  Exh. 1 ¶¶ 3, 4, 6 and attachments.  In contrast to U.S.

beef, Japan requires all of its beef to be tested for BSE, and Australia has never had a case of

BSE, putting Creekstone and other U.S. beef producers at a competitive disadvantage.  Exhibit 1

¶ 3 and Attach. A.  Creekstone's desire to test for BSE is motivated in part to compete more

effectively for overseas customers, again defeating USDA's mootness argument.

In sum, there is absolutely nothing about Japan's lifting its U.S. beef ban that "make[s] it

impossible to grant [Creekstone] effective relief."  USDA Memo at 15, quoting *Burlington*

*Northern R.R. Co. v. Surface Transportation Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996) (emphasis

added).  The relief Creekstone seeks from this Court is an order permitting it to test for BSE, not

to open or keep open Japan's beef market.  Creekstone has set forth a host of reasons for wanting

to conduct voluntary BSE testing irrespective of Japan resuming U.S. beef imports.  USDA's

mootness argument that "plaintiff's alleged injury has disappeared" (USDA Memo at 16) is best

understood as an Article III standing challenge.  But for the reasons set forth in the next Part, that

challenge also fails.

### B.  Creekstone Has Standing To Present Its Claims.

USDA claims that Creekstone lacks standing to pursue its claims because (a) Creekstone

has not made a sufficiently concrete demonstration that Creekstone could be selling more beef

and/or at a higher price were it not for USDA preventing Creekstone from testing its cattle for

BSE and (b) Creekstone has not "provided convincing evidence" that being able to test its cattle

for BSE would remedy that injury.  USDA Memo at 17.[1]  USDA misstates Creekstone's basis for

---

[1] The weakness of USDA's argument is exposed by its facially untenable claim that Creekstone
"has creatively alleged" this injury in "an attempt to save its case from mootness as a result of

standing, misstates the legal standards for standing, and attempts to substitute its own speculation about consumer demand for Creekstone's specific information.

Creekstone's basic injury is that it is prohibited from testing its cattle for BSE in order to enhance its brand and distinguish Creekstone beef in the marketplace and to fulfill the demands of its customers, many of whom will buy more beef at higher prices if it is tested for BSE. The direct cause of that injury is USDA's unlawful actions, restricting the licensing and permitting of BSE test kits, preventing the manufacturers of BSE test kits and the Kansas State University laboratory authorized to conduct BSE testing from cooperating with Creekstone, and refusing to approve Creekstone's proposed Hazard Analysis Critical Control Points (HACCP) program for voluntary BSE testing. Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl. Memo") at 11-14. This Court can redress Creekstone's injuries by invalidating the USDA regulations and actions that prevent Creekstone from BSE testing and by ordering USDA not to interfere with Creekstone activities that are outside USDA's jurisdiction. *See* Pl. Memo at 2.

USDA argues that Creekstone must show a definite economic injury, and a definite economic benefit from a ruling in its favor, in order to have standing to challenge the USDA's unlawful action. USDA Memo at 17-23. But the law is very clear that economic injury is not the only kind of injury that establishes standing. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734-45 (1972); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992). Indeed, the very case that USDA principally relies upon in its mootness argument, *McBryde v. Committee To Review Circuit Counsel and Disability Orders...*, 264 F.3d 52 (D.C. Cir. 2001), (cited at USDA Memo at

---

Japan's recent lifting of its ban against U.S. beef." USDA Memo at 17. In fact, Japan lifted its ban on U.S. beef 12 days <u>after</u> Creekstone filed its Motion for Summary Judgment (*see* USDA Memo at 16) and <u>four months</u> after Creekstone described this basis for standing in Paragraph 17-18 and 26 of its Complaint.

16-17) held that Judge McBryde had standing to challenge a reprimand handed down by the Fifth Circuit—clearly not an action to remedy an economic injury. *Id.* at 56-57. USDA makes no argument, nor could it, that there is anything speculative about Creekstone's desire to perform BSE testing on its cattle, or about USDA's actions that are preventing Creekstone from doing so.[2] If USDA's position were the law, then businesses' fundamental right to judicial review of unlawful agency actions would be thwarted. Indeed, in USDA's view, its refusal to approve a new vaccine could not be subjected to judicial review because the vaccine manufacturer could not provide "convincing evidence" that it could sell the vaccine if it were approved!

The law instead, as set down by the Supreme Court, is that a private party aggrieved by government action directed at it has standing to challenge that action: "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561.

---

[2] Creekstone's assertions of injury and redressability thus are not dependent on the actions of third parties, as USDA assumes. USDA Memo at 19, 22. The cases that USDA cites for its standing argument all involve indirect claims involving third parties, not attempts to redress government action directed at the plaintiff. *Whitmore v. Arkansas*, 495 U.S. 149 (1990), considered whether a third party could challenge a death sentence imposed on a capital murder defendant. The injury in *Area Transp., Inc. v. Ettinger*, 219 F.3d 671, 673 (7th Cir. 2000), rested on whether, if the Federal Transit Agency issued the order to a competing school bus operator that the plaintiff sought, the competitor would choose to forego future federal grants. The plaintiff in *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002) hoped that he could sell consulting services to third parties who would use marijuana if the DEA legalized its use. There is no comparison at all between Creekstone's demonstrated interest in pursuing its business plan involving BSE testing and Mr. Gettman's "at best reciting injury to his philosophical interest." *Id.* at 435.

But even if economic injury were necessary to demonstrate standing, there is no question that Creekstone has suffered and is continuing to suffer economic injury.  *See* Stewart Decl., Pl. Memo Exh. 1, at ¶¶ 3, 6, 17 (Creekstone has lost about 35% of its revenue due to BSE concerns and is prepared to spend $6,000,000 per year to perform BSE testing itself to help recover that lost demand); *see also* Stewart Supplemental Decl., Exh. 1 to this Reply, at ¶ 4 (Creekstone's average sales to Japan in the past two months have been less than one-twentieth of what they were prior to the discovery of BSE in the United States), ¶ 8.  USDA's purported evidence to the contrary is both speculative and beside the point.  The agency spends pages in its memorandum arguing about the accuracy or significance of polls that have consistently shown Japanese consumers to be reluctant to purchase U.S.-origin beef, and a poll of over 75,000 Americans reporting that more than a third are "very concerned" about BSE.  *Compare* USDA Memo at 18-22 *with* Pl. Memo Exh. 1 at ¶¶ 4-5.  Yet one of USDA's own exhibits confirms that "polls show many Japanese consumers still have some doubts about the safety of the U.S. product and are reluctant to buy" U.S. beef.  USDA Memo Exh. 12.  USDA even asserts, bizarrely, that a poll indicating that 75% of Japanese respondents were unwilling to eat U.S.-origin beef now that BSE has been found in the United States "does not necessarily suggest that U.S. beef sales in Japan will fail to return to the levels they were prior to the Japanese ban."  USDA Memo at 20.

Creekstone's standing to bring this lawsuit does not stand or fall on any poll.  The import of those polls is that they support and confirm Creekstone's own information regarding the effect of BSE on U.S. and foreign markets.  Whatever the accuracy of these polls, they certainly influence the thinking of the distributors and retail chains to which Creekstone sells its products, and they supplement Creekstone's personal communications with those distributors and with consumers (and thus are not hearsay because they are offered to show their existence, and not the

truth of the reported consumer sentiments). *Cf.* Exhibits 2-6 (declarations of Creekstone's brokers and of supermarket chains). USDA's speculation that demand for beef will increase (and, apparently, will be totally unaffected by BSE concerns) cannot defeat direct information about the market obtained by Creekstone, which of course is an expert in factors affecting demand for its products. *See* Pl. Memo Exh. 1 (Stewart Decl.) ¶¶ 4-5, 16-17; Exh. 1 (Stewart Supplemental Decl.) ¶¶ 2-4.[3] While Creekstone's own declaration ought to suffice, the attached declarations from Creekstone's customers that they would purchase more Creekstone beef, and would pay a higher price, if Creekstone could provide beef from BSE-tested cattle, conclusively defeat USDA's speculations and arguments that Creekstone is not suffering injury from the agency's test ban. *See* Exhibits 2 - 6.

## II.  USDA'S EXPANSIVE INTERPRETATION OF THE VSTA TO APPLY TO DIAGNOSTIC TESTS AND TO THE USE OF BIOLOGICAL PRODUCTS IS UNPERSUASIVE AND NOT ENTITLED TO DEFERENCE.

### A.  The VSTA Is Neither Ambiguous Nor Susceptible to USDA's Interpretations.

USDA claims that the VSTA authorizes it to control not only the manufacture and sale of a virus, serum, toxin, or analogous product (which USDA refers to as "biological products"), but also who may use such biological products and for what purpose. USDA also claims that the "biological products" that it can regulate the use of include "diagnostic products" like BSE test kits. But those authorizations cannot be found in the plain language of the VSTA.

USDA has taken a very simple statute, which gives the Department authority to regulate the manufacture and sale of specific products, and transformed it into a license to control other products and other kinds of activities. Some of USDA's ostensible reasons may appear noble –

---

[3]  USDA's assertion that information previously provided by Creekstone does not reflect recent improvements in the Japanese market is contradicted by Exh. 1 ¶¶ 3-4. Additionally, it ignores the fact that access to the Korean market is still highly restricted. Exh. 1 ¶¶ 2, 5-6 and Attach. E.

to benefit public health and welfare – but that kind of generic goal does not give an agency *carte blanche* to regulate whatever it wishes.

The law could not be more clear: "Agency authority may not be lightly presumed. 'Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.'" *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001) (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995). "'Thus, we will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.'" *Id*. (quoting *American Petroleum Institute v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995)).[4]

"Mere ambiguity in a statute is not evidence of congressional delegation of authority." *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998). But in this case, there is not even ambiguity. The statute states very clearly what products are covered: a "virus, serum, toxin or analogous product used in the treatment of domestic animals." 21 U.S.C. § 151. It states clearly what activities are covered: the preparation, sale, barter, exchange, or importation of such products. *Id*. at §§ 151-152. And it states clearly when those activities may be prohibited: when such products are "worthless, contaminated, dangerous, or harmful"; are not "prepared, under and in compliance with regulations prescribed by the Secretary of Agriculture, at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture"; or are imported without a permit. *Id*.

---

[4] USDA's reliance on *Reno v. Flores,* 507 US 292, 300-301 (1993), to say that Creekstone must "demonstrate that 'no set of circumstances exists under which the regulation[s] would be valid'" (USDA Memo at 23) is misplaced. In that case, the respondents were not challenging the regulation's application in a specific instance, it had not yet been applied in a particular instance, and there was no record concerning the INS's interpretation of the regulation. *Id*. That clearly is a very different situation than is presented in the instant case.

The statute simply does not authorize USDA to regulate activities other than the preparation, sale, barter, exchange, or importation of biological products. It does not say that USDA can prohibit or regulate the use of a biological product—in this case, who may use it and for what purpose.[5] Nor does the statute authorize regulation of diagnostic tests—products that are not analogous to a virus, serum, or toxin—just because they are used in the treatment of animals. Ignoring those simple, albeit inconvenient for USDA, truths, USDA resorts to (illogical) claims that its actions promote public health and welfare and protect the interests of ranchers, encouraging this Court to "simplistically…assume[e] that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (*per curiam*) (emphasis in original).

1.   Regulation of the Use of Biological Products

USDA asserts that its authority in 21 U.S.C. § 154 to issue regulations "as may be necessary to prevent the preparation, sale, barter, exchange, or shipment… of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals" "explicitly authorizes restrictions on the uses for which viruses, serum, toxins, or analogous products may be prepared, sold, bartered, exchanged, or shipped.…" USDA Memo at 25. This contention is absurd on its face. Saying that USDA can regulate the manufacture and sale of products intended for use in the treatment of domestic animals is not the same as saying USDA can regulate the use of such products. (And indeed, Congress knows well how to regulate the use of products when it wishes to do so. *See* Pl. Memo at 24-25, 31-32.)

---

[5] USDA's assertion that "regulation 102.5(d) is not a direct use restriction on buyers of biological products" (USDA Memo at 25) is pure semantics (and irrelevant). Without congressional authorization to regulate how and by whom biological products are used, and for what purpose, USDA cannot indirectly do so through unlawful limitations in licenses and permits issued to biological product manufacturers.

Under USDA's theory of how the statutory language should be read, if a statute authorized DOT to regulate seat belts, air bags, and other safety devices intended for use in motor vehicles, DOT would be authorized to regulate who may drive motor vehicles, and where, as well!

Not surprisingly, USDA offers no case law in support of its unorthodox reading of the VSTA, nor even any formal interpretation previously published by USDA. The phrase "for use in the treatment of domestic animals" clearly limits, rather than expands, "virus, serum, toxin, or analogous product." Just as clearly, the phrase must have been used in the VSTA to distinguish it from the Act of July 1, 1902, ch. 1378, 32 Stat. 728, which authorized the Public Health Service to regulate any "virus, therapeutic serum, toxin, antitoxin, or analogous product...applicable to the prevention, treatment, or cure of diseases or injuries of man." *See Animal Health Institute v. USDA*, 487 F. Supp. 376, 378-79 (D. Colo. 1980) (VSTA modeled after the 1902 Act).

Contrary to USDA's theory of statutory construction, authority to regulate a whole new class of activities, affecting vastly more businesses and individuals, must be found in a clear statement of congressional delegation of that authority, not in a strained and ungrammatical interpretation offered by the agency in litigation to justify its desired scope of authority.[6] "Congress…does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see also FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–160 (2000).

Remarkably, USDA also argues that 21 U.S.C. § 154, because it authorizes USDA to issue regulations "as may be necessary to prevent the preparation, sale, barter, exchange, or

---

[6] Moreover, even if USDA were correct that the phrase "for use in the treatment of domestic animals" allowed it to regulate how a biological product is used, that still would not authorize USDA to dictate who may use the product and for what purpose.

shipment" of worthless or dangerous biological products, "also expands the ability of USDA to regulate beyond just the 'preparation, sale, barter, exchange, or shipment' of products."  USDA Memo at 26.  Once again, USDA offers no case law, legislative history, or even its past statements or rulemaking interpreting the VSTA to support or explain this contention.  USDA contends that "clearly" restrictions on how a biological products may be used, by whom, and for what purpose "may be necessary to close loopholes and remove incentives to circumvent regulations directed at the 'preparation, sale, barter, exchange, or shipment' of products."  *Id.* Apparently USDA believes that Congress made it a crime not only for a manufacturer to produce and sell a dangerous biological product, but for a farmer to continue to use such a product, as well.  *See id.*  Quite simply, it is not for USDA to decide to "close loopholes" that Congress chose not to regulate.  Even if there were such a need for this kind of regulation, this supposed "[n]eed for regulation cannot alone create authority to regulate." *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365, 371 (5th Cir. 1997).

Over and over, courts have rejected interpretations of a series of words in a statute that go beyond the scope of the words in the series, as does USDA's interpretation here.  USDA's claim of authority to regulate the use of biological products parallels a claim that the Supreme Court rejected earlier this year:  The plaintiff in *Dolan v. United States Postal Service*, 126 S. Ct. 1252 (Feb. 22, 2006), relied on a provision concerning liability for "loss, miscarriage, and negligent transmission" of mail,  28 U.S.C. § 2680(b).  The Court observed that, since both "loss" and "miscarriage" "refer to failings in the postal obligation to deliver mail in a timely manner to the right address, it would be odd if 'negligent transmission' swept far more broadly to include injuries like those alleged here—injuries that happen to be caused by postal employees but involved neither failure to transmit mail nor damage to its contents."  126 S. Ct. at 1254.

Similarly, in this case it would be odd indeed if Congress intended, in authorizing regulation of the preparation, sale, barter, exchange, or shipment of dangerous or worthless products used to stimulate or enhance the immune system of animals, to regulate how such products may be used, by whom, and for what purpose—activities carried out by the users of the products rather than their manufacturers, and after the products have already been prepared, sold, and shipped.

*Texas & Pacific Railway Co. v. Pottorff*, 291 U.S. 245, 257-59 (1934), also resembles the instant case, in that the Court both (a) refused to find that a national bank could expand its statutory authorization for "banking" to include pledging its assets to secure a private deposit, and (b) also reasoned that, if that power had been authorized, there would have been no need to amend the banking statute later to provide a limited power to pledge.[7]  So, too, in this case the enactment of the Agricultural Bioterrorism Protection Act of 2002, 7 U.S.C. § 8401, which gave USDA limited authority to regulate the possession and use of dangerous biological products, is evidence that the VSTA should not be read to give broad authorization to regulate who may use biological products and for what purpose (as is the legislative history confirming that Congress did not believe the VSTA empowered USDA to regulate the use of biological products).  *Cf*. Pl. Memo at 24-25.[8]  USDA offers no response to that application of the canon of statutory construction, followed in *Pottorff,* to the history of the VSTA and related legislation.

---

[7] As the D.C. Circuit observed in *Independent Insurance Agents of America, Inc. v. Hawke*,  211 F.3d 638 (2000), "[t]he pre-*Chevron* vintage of *Pottorff* is irrelevant," since the Supreme Court had already made clear at that time that decisions of the Comptroller of the Currency were generally entitled to deference.

[8]  *Cf. Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 696-701 (1995) (fact that Congress in 1982 authorized the issuance of permits for "incidental take" of endangered species is strong evidence that Congress understood the preexisting statutory prohibition on "take" of endangered species to include indirect as well as direct "take").

USDA does offer one reference to legislative history of the VSTA that mentions use of biological products. USDA Memo at 31.[9] But that mention of use, put into context, in no way suggests that Congress meant to include regulatory authority over how a biological product may be used or by whom. Rather, the passage refers to "controlling the use" of dangerous and worthless viruses, serum, and analogous products "by preventing the interstate shipment" of such products that may be manufactured within the United States. The focus of the passage from the Senate Report, like the focus of the statutory language that Congress ultimately adopted, is not on how biological products are used, or by whom, but on regulating the manufacture, sale, and shipment of dangerous or worthless products.[10] In any event, this phrase from the Senate Report could not endow USDA with authority not set out forth the statute. [11]

USDA asks this Court to ignore the venerable principle *expressio unius est exclusio alterius*, on the grounds that the "principle does not contemplate the expansive phrases 'for use in

---

[9] USDA also refers to "[s]ubsequent legislative commentary," by which it means its own 1997 description of the VSTA. USDA Memo at 31. But it is hard to see how the passage from a USDA Federal Register notice that USDA quoted, that the "main purpose of VSTA is to protect those who use veterinary products from products which are worthless, contaminated, dangerous, or harmful" in any way justifies USDA's conclusion here that "[c]learly the use restrictions contemplated by regulation 102.5(d) are consistent with the purposes of VSTA." *See* USDA Memo at 31. What should be clear from that passage instead is that the purpose of the VSTA is to protect those who use biological products from harmful or worthless products, not to regulate and constrain those who use biological products.

[10] *Cf.* Exhibit 7 at 23-25 (USDA official explaining request for authority over toxins and viruses, with no mention of restricting who could use toxins and viruses or regulating diagnostic products); *Hall v. Nebraska*, 100 Neb. 84, 88-89, 158 N.W. 362, 363-64 (1916) ("We do not understand that the federal government undertakes to regulate those who sell serum after it has been disposed of by the manufacturer.")

[11] *See City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 337 (1994) (where Senate Committee report included statement that "all waste management activities of such a facility, including the *generation*, transportation, treatment, storage and disposal of waste shall be covered by the exclusion," Court declined to find that waste generation was excluded, because "it is the statute, and not the Committee Report, which is the authoritative expression of the law, and the statute prominently *omits* reference to generation."). Moreover, the "controlling the use" phrase in the Senate Report relates only to domestic manufacture of products, and not to those that are imported into the United States, like Bio-Rad's BSE tests. *Cf.* USDA Memo at 30-31.

the treatment of domestic animals' or 'as may be necessary to prevent' modifiers of the list of

items…."  USDA Memo at 26-27.  USDA offers no authority for this claimed corollary to the

principle, nor any further explanation why it would be that phrases that make the list more

specific or otherwise qualify it would suggest that Congress did not intend the agency's authority

to be limited to the enumerated list of items or activities.  This Court should reject USDA's

unsupported attempts to expand its jurisdiction beyond the authorities enumerated in the VSTA,

just as other courts have consistently rejected agency claims that authority to regulate one thing

implies authority to regulate something else, because it would be consistent with or helpful to the

stated or intended purposes of the statute.  *See, e.g.*, *City of Chicago*, 511 U.S. at 329, *supra* n.11;

*Railway Labor Executives' Ass'n v. National Mediation Bd.,* 988 F.2d 133, 139 (D.C. Cir. 1993),

*aff'd on rehearing en banc*, 29 F.3d 655 (1994), *cert. denied*, 514 U.S. 1032 (1995) (Board

cannot assume duties not given to it by Congress); *Michigan Citizens for an Independent Press v.

Thornburgh*, 868 F.2d 1285, 1293 (D.C. Cir. 1989) (canon of *expressio unius est exclusio alterius*

can determine whether statute is clear, and therefore no need to resort to *Chevron* deference).[12]

Arrogating to itself regulatory authority over a whole different set of activities, conducted

by a different group of people, is simply not the kind of necessary filling of 'gaps" in a statute's

regulatory scheme that *Chevron* contemplated.  *Cf.* USDA Memo at 36.  The "mere existence of

an agency does not give it the power to assert authority that Congress has not delegated.   It is

absurd to suggest that, under the second prong of *Chevron*, there is a statutory 'gap to fill' or a

---

[12] USDA disputes the relevance of *Kelley v. U.S. EPA*, 15 F.3d 1100 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1110 (1995).  USDA Memo at 27 n. 13.  The citation Creekstone provided in its Memo in Support was, unfortunately, incorrectly limited (citing to p. 1108 rather than pp. 1106-1108).  But the case indeed is relevant as an example of how courts look to the list of things a statute has authorized an agency to do and decline to find statutory authority for the agency to regulate in additional areas (in that case, specifying who will be subject to statutory liability for hazardous waste cleanup).

statutory 'ambiguity' to cure whenever a statute fails to specify some authority that an agency

seeks to invoke.   This cannot be the meaning of *Chevron,* for it would allow federal agencies to

claim limitless authority except in those few circumstances where Congress has expressly said

'thou shalt not' exercise such authority." *Railway Labor Executives' Ass'n*, 988 F.2d at 194

(Edwards, J., concurring).

2. Regulation of Diagnostic Tests

USDA admits that the VSTA says nothing about regulating diagnostic products (USDA

Memo at 35), but "neither does it specifically exclude such tests from its purview." *Id.* at 36.

The latter is true, but it falls short of authorizing USDA's regulation of diagnostic tests.  The

Supreme Court and the D.C. Circuit have repeatedly admonished regulatory agencies that

statutory authority for an agency to act "may not be *presumed* based solely on the fact there is not

an express withholding of jurisdiction." *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d

1071, 1088 (D.C. Cir. 2002).

The interpretation of the VSTA that USDA advances for purposes of this lawsuit is that

"diagnostic products are certainly *used in* the treatment of animals, which is all that is required

under section 154 of VSTA."  USDA Memo at 37.  Again, USDA vastly overstates the meaning

of the qualifier "intended for use in the treatment of domestic animals," appearing to suggest that

anything broadly defined as "treatment" is therefore regulated under the VSTA.  Moreover, even

if Congress had given USDA authority to regulate a product just because it is used in the

"treatment of domestic animals," that would not include authority to regulate products that are

used solely to detect a disease (and especially those, such as BSE test kits, used solely to detect

infection in dead animals).[13]  The cases USDA cites (USDA Memo at 41) provide no support for its position:  *Pegram v. Herdrich*, 530 U.S. 211, 228 (2000) contains a discussion of two types of actions by HMO administrators: "eligibility decisions," which concern whether a particular condition or medical procedure for its treatment is covered by the patient's health insurance plan, and "treatment decisions," which "are choices about how to go about diagnosing and treating a patient's condition: given a patient's constellation of symptoms, what is the appropriate medical response?"  *Id*.  Not only to did the *Pegram* court not define "treatment," but it used the terms "diagnosing" and "treating" as if they are two different types of activities, joined by the conjunction "and."  Nor does *Miller v. AT&T Corp*., 250 F.3d 820, 830-31 (4th Cir. 2001), contain any independent analysis of the meaning of the word "treatment"—it merely applies a Family and Medical Leave Act regulation, 29 C.F.R. § 825.114(b), which defines "treatment" to include "examinations to determine if a serious health condition exists and evaluations of the condition," and defers to an agency determination that the statutory phrase "continuing treatment by a health care provider," 29 U.S.C. § 2611(11), is broad enough to cover such examinations.  This is a far different question than whether Congress meant for "virus, serum, toxin, or analogous product used in the treatment of domestic animals" to include a test procedure and reagents used to determine whether an animal has (or had) a disease.

Additionally, to be susceptible to regulation under the VSTA, a diagnostic product would have to be both a "virus, serum, toxin, or analogous product" and "used in the treatment of domestic animals."  21 U.S.C. §§ 151, 152, 154.  Something is not "analogous" to a virus, serum,

---

[13]  USDA claims its open-ended regulation of diagnostic products is justified because the VSTA refers to viruses, serums, toxins, or analogous products "for use in the treatment of domestic animals," rather than "for treatment of domestic animals."  USDA Memo at 37.  USDA does not explain how a biological product that is not "for treatment of domestic animals" could be "used in the treatment of domestic animals."  Creekstone suggest that to the extent there is a distinction, though it seems unlikely there could be, it is a distinction without a difference.

or toxin just because it is "used in the treatment of domestic animals," but that is what USDA seems to assume.   In USDA's expansive view of the VSTA's targeted language, presumably even a thermometer could be regulated under the VSTA, simply because it is "used in the treatment of domestic animals."   USDA's attempt to turn a limiting qualifier into a very broad congressional delegation of regulatory authority is simply not borne out by the language or legislative history of the VSTA.[14]

USDA regulations state that "biological products," include vaccines, antibodies, antitoxins, immunostimulants, "and diagnostic components, that are of natural or synthetic origin, or that are derived from synthesizing or altering various substances or components of substances…." 9 C.F.R. § 101.2.  Read literally, a "diagnostic component" (an undefined term) need not have anything to do with the defining characteristic of "viruses, serum, toxins, or analogous products," which is that they "act primarily through the direct stimulation, supplementation, enhancement, or modulation of the immune system or immune response."[15] Similarly, USDA defines "analogous products" to include either "[s]ubstances…which are similar in function to biological products in that they act, or are intended to act, through the stimulation, supplementation, enhancement, or modulation of the immune system or immune response, or [s]ubstances… which are intended for use in the treatment of animals through the detection or measurement of antigens, antibodies, nucleic acids, or immunity;…" *Id.* (emphasis added).  Thus, USDA has explicitly de-coupled these diagnostic tests from any requirement that

---

[14] It also conflicts with a number of more-specific statutory authorities over diagnostic tests, including the Food, Drug and Cosmetic Act, as noted in Pl. Memo at 31-32, 38 n.14.

[15] 9 C.F.R. § 101.2 (definition of "biological products").  USDA offers no response to the fact that USDA has, in other regulations, made a clear distinction between products that operate through an immune response—and are subject to regulation under the VSTA—and those that do not, even if the same or similar components are involved.  *See* Pl. Memo at 36, 38.

they be similar in function to the viruses, serum, toxins, and analogous products that VSTA by its terms covers.

Under the interpretation of "analogous product" advanced by USDA's counsel, if Congress authorized the Department of Transportation to regulate the manufacture and distribution in commerce of automobiles, motorcycles, trucks, and analogous products, DOT could regulate the construction (and use) of highways or racetracks, as well.  The definitions in 9 C.F.R. § 101.2 do not represent "gap-filling" of an ambiguous statute.   Rather USDA's "position in this case amounts to the bare suggestion that it possesses plenary authority to act within a given area simply because Congress has endowed it with some authority to act in that area."[16] *See Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 671 (D.C. Cir. 1994) (*en banc*), *cert. denied*, 514 U.S. 1032 (1995).  The D.C. Circuit has "categorically reject[ed] that suggestion."  *Id.*

B.   <u>USDA's Expansive Interpretation of the VSTA Is Not Entitled to Deference.</u>

USDA claims that its interpretations of the VSTA as authorizing it to regulate types of products and activities not addressed in the statute are entitled to great deference.  But USDA cannot overcome the large body of precedent rejecting just such claims by agencies seeking to expand the authority granted to them by Congress.

1.   No Deference for Interpretations Expanding the Scope of the Agency's Authority

---

[16] USDA cites an opinion of the District Court for the District of Maryland which described USDA as having "plenary authority granted by Congress to regulate the field of animal vaccines."  USDA Memo at 27, quoting *Arnold v. Intervet, Inc.*, 305 F. Supp. 2d 548, 550 (D. Md. 2003).  But the question there was whether USDA's regulatory authority to approve and regulate the manufacture of animal vaccines preempted state tort law claims against vaccine manufacturers, not whether USDA has authority to regulate everything remotely related to animal vaccines.  Even "plenary authority" to regulate the field of animal vaccines does not on its face imply authority to regulate tests for detecting animal diseases.

USDA virtually ignores the extensive precedent declining to accord any deference to an agency interpretation of a statute that gives itself expanded authority. *See* Pl. Memo at 27; *see also John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 108-109, (1993); *Natural Resources Defense Council v. Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993). An agency simply "may not 'avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy.'" *Friends of the Earth*, *Inc. v. EPA*, 446 F.3d 140, 145 (D.C. Cir. 2006), quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996); see also *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060-61 (D.C. Cir. 1995) (rejecting interpretation that added factors to a list of factors to be considered, even though there were policy justifications for the additional factors, observing "Congress has neither explicitly or implicitly delegated discretionary authority to the Agency to consider other factors 'in the public interest'…." *Id.* at 1060.).

2.   No Deference for Statutory Interpretations Not Accompanied by Further Explication

Creekstone has established  that USDA's interpretations of the VSTA are entitled to little or no weight because they were announced with virtually no explanation of how they were derived. Pl. Memo at 26-27, 30-31, 41. USDA does not deny this. Rather, its principal response is to assert that one of the cases Creekstone cited, *Adamo Wrecking  Co. v. United States*,  434 U.S. 275, 287 (1978), was decided before *Chevron* and is therefore no longer good law. USDA Memo at 34 n.16. Unfortunately for USDA's argument, the principal for which Creekstone cited *Adamo Wrecking*, that an agency's statutory interpretation announced without explanation or analysis is entitled to little weight, has been relied upon by the Supreme Court and the D.C. Circuit many times since *Chevron*.

For example, *Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654, 662 (D.C. Cir. 2003) discusses the inapplicability of *Chevron* deference to situations where the agency has not provided any explanation for its interpretation. "Because the manual thus contains no reasoning that we can evaluate for its reasonableness, the high level of deference contemplated in Chevron's second step is simply inapplicable." *Id.*, citing *Adamo Wrecking*, as well as *SEC v. Sloan*, 436 U.S. 103, 118 (1978) (reaching the same conclusion "where this Court can only speculate as to the Commission's reasons for reaching the conclusion that it did" because the agency's orders did not "address[ ] in any detail the statutory authorization under which it took [the] action").[17]

*Barnett v. Weinberger*, 818 F.2d 953, 960-64 (D.C. Cir. 1987), another post-*Chevron* decision, declined to accord *Chevron*-like deference to the Department of Defense's interpretation of a statute under circumstances quite similar to the instant case:

> In sum, the regulations in question were issued after what appears to have been cursory consideration, were accompanied by neither explanation nor justification, and were given a breadth that does not comport with the purposes animating the statute purportedly interpreted. These elements buttress our conclusion that the regulations are not entitled to significant weight in delineating the scope of the statute's "custodial care" provision.

*Id.* at 963 (footnote omitted). The Court considered it important that the Department offered no explanation or discussion of the regulations providing the interpretation at the time they were issued, "nor was any attempt made to support the regulations by an analysis of the legislative history underlying the statute." *Id.*, citing *Adamo Wrecking*, 434 U.S. at 237 n.5, *SEC v. Sloan*, 436 U.S. at 117-18, and *Investment Co. Inst. v. Camp*, 401 U.S. 617, 627 (1971) (declining to

---

[17] *See also Federal National Mortgage Ass'n v. United States, 56 Fed. Cl. 228, 236-37* (Ct. of Claims 2003) (noting that *United States v. Mead*, 533 U.S. 218 at 228 (2001), held no *Chevron* deference is due to an IRS interpretation for which "no reasoning is given" (citing *Adamo Wrecking*)).

defer to an agency "in significant part because agency failed to buttress its interpretation with an opinion or other supportive statement," 818 F.2d at 963).

The interpretations of the VSTA USDA relies on to prevent Creekstone from testing its cattle for BSE were all announced by USDA with virtually no explanation of why they represent permissible and reasonable interpretations of the targeted language of the VSTA.[18] *See* Pl. Memo at 26-27, 30-31, 41.  USDA's argument now that it has explained the basis for those interpretations in subsequent Federal Register notices related to other provisions of its VSTA regulations would make no sense even if those explanations were adequate.  *See* USDA Memo at 39 (apparently claiming that recent developments in genetic engineering technology and other "advances in scientific knowledge" somehow justified USDA deciding 60 years after the passage of VSTA that it should regulate the use of biological products to promote public health and welfare and that diagnostic tests are analogous to vaccines and serums).  But aside from the fact that these would be *post facto* rationalizations in any event, the passages USDA cited do not even state, much less purport to explain, that scientific advances justify expanding USDA's regulations under the VSTA to address use of biological products and regulation of diagnostic products.  If general scientific advancement were sufficient to justify an agency regulating outside the terms of a statute, the words and choices of Congress could be rendered meaningless with each new discovery or invention.

---

[18] In its opposition to Creekstone's Motion for Summary Judgment, USDA relies on opinions interpreting comprehensive, far-reaching statutes, like the securities and labor laws, in which Congress delegated to administrative agencies broad authority to regulate a whole sector of the economy or aspect of commerce.  USDA Memo at 27, 33.  Such statutes necessarily imply broader authority for the agency and greater leeway to adopt implementing regulations than a statute like the VSTA, enacted to address specific concerns about particular types of products in particular uses.

Moreover, USDA's interpretation of the VSTA's provisions for permitting the importation of biological products, 21 U.S.C. §§ 152-153, as additionally authorizing regulation of the use of those products once they have been imported, is not even contained in the USDA regulations implementing those provisions, much less supported by any explanation.[19]  *See* Pl. Memo at 19-20.   For that reason, it is entitled to little or no deference under *Christensen v. Harris Cty.*, 529 U.S. 576 (2000).

In fact, the only explanation that we have for USDA's interpretations of its authority under the VSTA to regulate the use of diagnostic products like BSE test kits is that provided by USDA's counsel in this litigation.  Pursuant to well-established precedent, this Court should reject such *post hoc* rationalizations of counsel.  *See*, *e.g.*, *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212-13 (1988); *PanAmSat Corp. v. F.C.C.*, 198 F.3d 890, 897 (D.C. Cir. 1999).  This Court also should not accord any deference to USDA's interpretations of its

_____

[19]   USDA asserts that Creekstone is barred from requesting that the Court strike down 9 C.F.R. § 104.1—which on its face says nothing of restricting the manner in which an imported biological product can be used, or by whom, or for what purpose—if, contrary to Creekstone's position, the Court finds that that particular regulation does authorize such restrictions, because Creekstone did not include a demand in its complaint that 9 C.F.R. § 104.1 be overturned. *See* USDA Memo at 30; *cf*. Pl. Memo at 19-20.  Creekstone's Complaint did, however, state that "If USDA's regulations implementing the VSTA, at 9 C.F.R. Chapter I Subchapter E are broad enough to cover the BSE test kits as described above, then those regulations are beyond the scope of the rulemaking authority granted to USDA in the VSTA."  Complaint Count 1 ¶ 31.  The USDA regulation on import permits, 9 C.F.R. § 104.1, is contained in 9 C.F.R. Chapter I Subchapter E. The prayer for relief in the Complaint also asks the Court to "Enter judgment declaring that USDA lacks authority to restrict the use of BSE rapid test kits or to issue licenses for the production of such test kits that limit to whom they may be distributed or how they may be used" and to enjoin USDA "from implementing or enforcing any prohibition on Creekstone acquiring or using USDA-approved BSE rapid test kits for purposes of routinely screening for BSE cattle that Creekstone processes (including any restriction on the sale of such test kits to Creekstone)." Creekstone does not believe that 9 C.F.R. § 104.1 authorizes restrictions on the use of imported diagnostic tests like the Bio-Rad BSE test kits, and so it does not need to be vacated, but if the Court concludes that it does give that authority to USDA, then Creekstone submits that the provisions of the Complaint noted here provide a sufficient request for relief to allow the Court to hold the regulation *ultra vires* and vacate it in this summary judgment proceeding.

authority under the VSTA, consistent with *Adamo Wrecking* and subsequent cases, and should conduct its own analysis of the breadth of the VSTA provisions, using the traditional tools of statutory construction described above and in Creekstone's Memorandum in Support.

      3.   Little Deference for Statutory Interpretations that Were Far from Contemporaneous or Consistent

As Creekstone established, agency interpretations that are not contemporaneous with a statutes's enactment and that do not reflect long-held positions of the agency generally are entitled to less deference than more contemporaneous interpretations. *See* Pl. Memo at 30. USDA's primary response is to claim—again without any citation—that this principle of statutory interpretation no longer applies after the Supreme Court's *Chevron* decision. *See* USDA Memo at 38-39. In fact, this principle has been applied repeatedly and consistently post-*Chevron*: "It is well established that the prestige of a statutory construction by an agency depends crucially upon whether it was promulgated contemporaneously with enactment of the statute and has been adhered to consistently over time." *Barnett v. Weinberger*, 818 F.2d at 961-62 (footnote omitted) (giving little weight to an interpretation first announced 11 years after enactment of statute). *See also Continental Airlines, Inc. v. U.S. Department of Transportation*, 856 F.2d 209, 216-217 (D.C. Cir. 1988) (relying on an agency's 1979 contemporaneous interpretation of applicable statute rather than a more recent one); *Lynn Martin v. Occupational Safety and Health Review Commission*, 499 U.S. 144 (1991) (stating that the consistency of application of interpretations bears on the reasonableness of the agency's position under *Chevron*); *Railway Labor Executives,* 29 F.3d at 669-70 (finding it "telling" that the Board had not asserted its claim that it had latent authority under the statute to allow carriers or the Board itself to initiate investigations for the first 50-plus years of the statute's 60-year history).

USDA has given virtually no explanation for why the Department failed, for the first two-thirds of the life of the VSTA, to recognize that it had the authority it now claims: authority to regulate who may use biological products and for what purpose and to regulate diagnostic tests as well as biological products themselves.  In fact, so far as Creekstone has been able to determine, the instant case is the first time ever that USDA has exercised this purported authority to prevent a company from performing tests on its own livestock (let alone on the carcasses of animals it has already slaughtered).  *See also* Exh. (10 Detwiler Decl.) ¶ 24.

C.   The Reenactment Doctrine Does Not Save USDA's Unsupported Interpretation of the VSTA.

Finally, USDA claims that its interpretation of the VSTA as authorizing USDA to restrict who may have access to biological products and for what purpose they may use them has been blessed by Congress and must be deferred to under the "reenactment" doctrine.[20] USDA Memo at 28 n.14.  Under that doctrine, courts "have frequently considered whether reenactment of a statute after promulgation of an agency interpretation that is highly publicized or otherwise communicated to Congress may be regarded as ratification by acquiescence." *Barnett v. Weinberger*, 818 F.2d at 963 n.89.  But the VSTA was not reenacted when it was amended in 1985; rather, Congress simply expanded a few of the provisions of the VSTA, primarily to eliminate a dichotomy that had existed between regulation of biological products shipped across state lines and those manufactured and used within the same state.  *See* P.L. 99-198, 99 Stat. 1654-56; S. Rep. No. 99-145, Sept. 30, 1985, at 338-39, *reprinted in* 1985

---

[20] USDA seems to make that claim only with respect to its asserted authority over the use of biological products, and not its claim that diagnostic tests are "analogous products" subject to regulation under the VSTA.  *See* USDA Memo at 28 n.14.  Presumably that is because the expansion of the definition of "analogous product" in 9 C.F.R. § 101.2 to include substances "which are intended for use in the treatment of animals through the detection or measurement of antigens, antibodies, nucleic acids, or immunity" did not occur until 1997.  *See* 62 Fed. Reg. 31,326 (June 9, 1997).

U.S.C.C.A.N. 2004-2005; *Garrelts v. Smithkline Beecham Corp.*, 943 F. Supp. 1023, 1065-66

(N. D. Ia. 1996) (legislative history of 1985 amendments indicates narrow purpose of

amendments); *see also* Pl. Memo at 22-23; *cf. Babbitt v. Sweet Home*, 515 U.S. at 729 (Scalia,

J., dissenting) (subsequently enacted provision authorizing permits for "incidental take" of

endangered species does not implicate reenactment doctrine for agency interpretation of the

prohibition on "take" of endangered species).

      Moreover, for the reenactment doctrine to apply, Congress must have been made aware

of the agency interpretation at issue. *See, e.g.*, *Barnett v. Weinberger*, 818 F.2d at 963 n.89. In

particular, "application of the legislative reenactment doctrine requires a showing of both

Congressional awareness and 'express congressional approval of an administrative

interpretation if it is to be viewed as statutorily mandated.'" *General American Transp. Corp.

v. ICC*, 872 F.2d 1048, 1053 (DC Circuit 1989) (*quoting AFL-CIO v. Brock*, 835 F.2d 912, 915

(D.C. Cir. 1987)); *accord*, *International Union, UAW v. Brock*, 816 F.2d 761, 767 (D.C. Cir.

1987) (finding no "*affirmative* step taken by Congress that indicates an intent to ratify the

agency's interpretation" (emphasis in original)); *accord, Koszola v. F.D.I.C.,* 393 F.3d 1294

(D.C. Cir. 2005); *see also Pacific Power & Light Co. v. FPC*, 184 F.2d 272, 275 (D.C. Cir.

1950) ("before a mere reenactment can be given conclusive effect as a congressional adoption

of an administrative interpretation, it must be shown that Congress was conscious that it was

doing so."); 2B Sutherland Stat. Constr. § 49.09 (reenactment doctrine "does not apply when

nothing indicates that the legislature had its attention directed to the administrative

interpretation upon reenactment.").[21]  USDA offers no evidence to this effect.  And in fact, the

---

[21] *Cf. Lorillard v. Pons*, 434 U.S. 575, 581–85 (1978), the case relied on by USDA (detailing
Congress's familiarity with the statute and judicial interpretations of it and describing indications
of Congress's intention to incorporate a contemporaneous construction of the statute).

regulation that USDA claims authorizes restrictions on the use of an imported biological

product, and which was promulgated prior to the amendment of the VSTA in 1985, does not

make any mention at all of such restrictions.  *Cf.* 9 C.F.R. § 104.1; *see also* Pl. Memo at 34

n.11 (no mention of regulating diagnostic tests in legislative history of 1985 VSTA

amendments).

       USDA also implies that its interpretation of the VSTA as authorizing prohibitions on

private BSE testing must be deferred to because of a vote by the House Appropriations

Committee not to adopt a rider to an appropriations bill that would have required USDA to

allow Creekstone and others to conduct private BSE testing.  USDA Memo at 10.  But even a

negative vote by Congress on a bill is "a particularly dangerous ground on which to rest an

interpretation of a prior statute."  *Solid Waste Agency of Northern Cook County v. U.S. Army

Corps of Engineers*, 531 U.S. 159, 169-70 (2001).  *Accord*, *Central Bank of Denver, N.A. v.

First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994); *Brown & Williamson*, 529

U.S. at 155.  A failed committee vote on an appropriations rider lacks any legal significance.[22]

## III.  USDA LACKS STATUTORY AUTHORITY TO REGULATE BSE TEST KITS IN PARTICULAR.

       To be subject to USDA's regulatory authority under the VSTA, something must be

both a "virus, serum, toxin, or analogous product" and "used in the treatment of domestic

animals."  21 U.S.C. §§ 151, 152, 154.  And for USDA to "prevent the preparation, sale, barter,

---

[22] In contrast, USDA offers no response to Creekstone's demonstration, from the text and legislative history of the Agricultural Bioterrorism Protection Act of 2002, sections 211-213 of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, P.L. 107-188, 116 Stat. 647, that Congress did not believe USDA's regulatory authority extended to who may use biological products.  *See* Pl. Memo at 24-25; *see also Brown & Williamson, 529 U.S. at 133* ("the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.") (citations omitted).

exchange, or shipment" of such a product, it must be "worthless, contaminated, dangerous, or harmful." Id. at § 154. As Creekstone showed in its Pl. Memo at 34-40, test kits used for BSE screening of apparently healthy cattle at slaughter do not meet any of those criteria.[23]

A. BSE Test Kits Are Not "Analogous Products."

The commonsense meaning of "virus, serum, toxin, or analogous product" is that analogous products are other products that, similar to the viruses, serums, and toxins mentioned specifically in the VSTA, are given to animals to supplement the animal's antibodies or to cause the animal's immune system to generate more of its own antibodies, to prevent or mitigate the effects of disease. USDA itself has expressed that understanding of what "analogous product" means. See Pl. Memo at 29, 38 n.14. Creekstone has demonstrated that this interpretation of "analogous products" is also consistent with the legislative history of the VSTA, is reflected in USDA's own regulations contemporaneous with and extending for decades after enactment of the VSTA, and is similar to the way courts have interpreted virtually identical language to "virus, therapeutic serum, toxin, antitoxin, or analogous product" in the human version of the VSTA, the

---

[23] USDA attempts to narrow the scope of this argument by distinguishing between "whether USDA's authority to regulate diagnostic tests extends as a general matter to BSE test kits" and "whether USDA was required to make an exception to license restrictions prohibiting the sale of BSE test kits for purposes other than government surveillance testing, in order to permit plaintiff to conduct private testing for its own marketing purposes." USDA claims that the latter is the subject of Count 3 of the Complaint and therefore not covered by the current process and motions for summary judgment. USDA memo at 40 n.21. To the contrary, the issue Creekstone has raised is whether the VSTA authorizes USDA to prohibit the sale of BSE test kits for uses other than government surveillance testing. That is a question of whether USDA's license restrictions and other actions regarding by whom BSE test kits may be used and for what purposes are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of 5 U.S.C. § 706(2)(C)—the subject of Counts 1 and 2 of the Complaint.

Act of July 1, 1902, ch. 1378, 32 Stat. 728, on which the VSTA was modeled.  Pl. Memo at 23-25, 27-30.[24]

Even if USDA is correct that "[d]iagnostic test kits frequently rely on the interaction of antibodies and antigens to stimulate, modulate, or detect the immune system of an animal, as do products made with viruses, serums, or toxins" (USDA Memo at 36), that would not mean that such test kits are "analogous products" to vaccines and similar products used to prevent or cure diseases.  *See* pp. 19-21, *supra*.  But in any event, as Creekstone has shown, USDA itself has recognized that certain products made from microorganisms may be "analogous products" in some settings and products unregulated by the VSTA in others.  Pl. Memo at 36-38.  So even if diagnostic test kits "frequently" involve the stimulation or modulation of the immune system of an animal, as USDA maintains, that does not suggest that all diagnostic test kits, including BSE test kits, must be "analogous products" subject to USDA's regulatory authority under the VSTA.

For example, EPA provided this description of substances that may or may not be "analogous products," depending on how they are used:

> It is now recognized in the scientific literature that the generation or stimulation of an immune response involves both antigens and certain protein regulatory factors referred to as cytokines.  *Some* cytokines (e.g. interleukins) serve as an essential components in the generation and expression of an immune response, without which the vaccine would be worthless.... Cytokines are *also* produced in many body tissues and *act on cell types other than those of the immune system*.

> Cytokines of natural or synthetic origin can be prepared as products for administration to animals.  Because of the diverse biological activity of the cytokines, *not all products consisting of these substances would be regulated under the VSTA*.  Many of these cytokines intended to be used as drugs would fall under the jurisdiction of the Food and Drug Administration.  *In such instances, the VSTA would not apply.*

---

[24]  USDA tries to dismiss the cases cited by Creekstone as irrelevant because they were not interpreting the VSTA.  USDA Memo at 36 n.18.  But, as Creekstone indicated, the language of the human version of the VSTA is almost identical, and courts have held that they should be interpreted similarly.  *See* p. 13, *supra;* Pl. Memo at 30 n.10

>Both cytokines and immunomodulators are analogous to biological products
>*when they are used* to stimulate, supplement, enhance, or modulate the immunity
>of animals in the treatment of disease.  Products consisting of these substances
>*that work through the immune mechanisms in the treatment of specific disease*
>appropriately fall within the definition of "biological products."

62 Fed. Reg. 31,326, 31,327 (June 9, 1997) (emphasis added.)   BSE test kits, which are used to

determine whether an animal carcass is infected with a disease that does not even involve the

animal's immune system, are not a product that works through the immune system to treat a

specific disease, and therefore should not be considered an "analogous product" under this USDA

rulemaking precedent.

USDA's declarant, Dr.Rippke (whose declaration provides no information about his

training and qualifications other than that he has worked at USDA for 20 years and in the

implementation of the VSTA—which addresses hundreds of products besides the few related to

BSE—for the last 10 years), provides only the barest of analysis to support his conclusion that

BSE test kits are analogous to viruses, serums, and toxins.  *Cf*. USDA Memo Exh. 2 ¶¶ 7-8.  In

contrast, in Exhibit 8 to this Reply, Paul W. Brown, M.D., a real expert in neurology and in

transmissible spongiform encephalopathies in particular, explains that "BSE tests do not involve

the immune system of the animal that is tested.  There is a sharp distinction between using

immunological means to prevent foreign pathogen infections (e.g., active and passive

immunization) and the use of an immunologic reagent (e.g., an antibody) to detect infectious

prion proteins obtained from the body of an infected host.  The use of such a test has nothing

whatsoever to do with the immune system of the infected (and now dead) animal."  *Id*. ¶ 16.  In

fact, USDA has already acknowledged that BSE itself does not even work through the immune

system of the cattle it afflicts: "The BSE agent does not evoke any demonstrated immune

response or inflammatory reaction in host animals."  70 Fed. Reg. 460, 461 (Jan. 4, 2005).  As

Dr. Brown says, "USDA thinking on this point is very confused."  Exh. 8 ¶ 16.  Dr. Rippke's

conclusory statements notwithstanding, there is nothing about BSE test kits, which do not involve

the immune system of cattle and in fact can only be administered to dead cattle, that makes them

analogous to vaccines and therapeutic serums administered to animals to prevent or cure

disease.[25]

    B.   <u>BSE Test Kits Are Not, and Would Not Be, Used in the Treatment of Animal
           Disease.</u>

    USDA sets out a circular argument: BSE test kits are "intended for use in the treatment of

domestic animals," even though there is no treatment for BSE and USDA claims that routine

testing of normal-appearing cattle at slaughter has no BSE mitigation benefit.  USDA Memo at

40-44.  USDA then claims authority to prevent access to BSE test kits for routine testing because,

it alleges, they are worthless for the treatment of domestic animals in that use.  The Court should

reject this attempt to "have it both ways."

    USDA's claim that a test which is used to determine whether meat from a slaughtered

animal might be infected is "intended for use in the treatment of domestic animals" is

nonsensical, especially given that there is no known treatment for the infection and the test can

---

[25]  USDA also relies on its regulation (which, as Creekstone has already shown, is inconsistent
with the VSTA in any case, Pl. Memo at 29-31), 9 C.F.R. § 101.2(2)(ii), which defines
"analogous products" to include substances that do not even act on the immune system but rather
are used for "the detection or measurement of antigens, antibodies, nucleic acids, or immunity."
USDA asserts that BSE test kits fall under that definition and are therefore analogous products in
any event because they are tests for "antigens."  USDA Memo at 41 n.22.  But USDA's reference
for that contention, ¶¶ 7-8 of the Rippke declaration, refers to BSE test kits as acting "through the
immunological detection of specific antigens found in animal tissue indicative of disease," even
though it also states that  "antigens" are materials "that, as a result of coming in contact with
appropriate tissues of an animal body, stimulate an immune response."  *Id.* ¶ 7.  *See also Grand
Laboratories, Inc. v. Harris*, 488 F. Supp. 618, 619 (D.S.D. 1980), *rev'd on other grounds*, 660
F.2d 1288 (8th Cir. 1981) (referring to "antigen" as "the biological component intended to
produce an immune response").  Given that BSE does not involve an immune response in cattle
(*see* text *supra*), Dr. Rippke's description of BSE test kits as identifying "antigens," meaning the
prion proteins believed to cause BSE, is internally inconsistent and should be disregarded.

only be used on cattle that are already dead.  *See* USDA Memo at 41-42.  USDA relies in part on

its regulations that the determination of whether a product is intended for the use in the treatment

of domestic animals is to be based on objective criteria indicating the intent of the manufacturer.

9 C.F.R. § 101.2(1); *see* USDA Memo at 43 n.24.  Here, BSE test kit manufacturers, such as Bio-

Rad, market millions of BSE test kits a year to countries that conduct BSE tests on the carcasses

of all animals presented for slaughter (mandatory above a certain age in EU countries).  Given

USDA's assertion that BSE test kits are ineffective for BSE disease mitigation purposes unless

applied to targeted cattle with symptoms that might be indicative of BSE, the marketing of BSE

test kits for other purposes provides an incontrovertible objective indication that BSE test kits, as

the manufacturer intends them to be used and as intended to be used by Creekstone, are not

"intended for use in the treatment of domestic animals," despite USDA's assertion to the

contrary.  *Cf. id*. Thus, USDA's actions dictating that BSE test kit manufacturers and importers

cannot sell the test kits for purposes other than treating BSE in cattle are *ultra vires.*

    C.  <u>BSE Test Kits Are Not Worthless, Contaminated, Dangerous or Harmful.</u>

       Having asserted authority to regulate the use of BSE test kits by Creekstone and other

meat producers because BSE test kits are intended for use in the diagnosis of BSE in cattle,

USDA turns around and claims (for the first time in writing, *cf.* Pl. Memo Exh. 1 Attachments

5, 7, and 10) that BSE test kits are "ineffective…and essentially worthless as an animal health

measure when used, as proposed by plaintiff, to diagnose the disease in all slaughter-aged

normally-looking cattle." USDA Memo at 42.  Since Creekstone never claimed that its planned

BSE testing would be valuable as an animal human health measure and never proposed to use it to diagnose BSE for the purpose of treating animals, this is really a "straw man" argument.[26]

In any case, USDA's claim that the VSTA authorizes it to ban private use of BSE test kits because they are worthless when applied to brain tissue from "slaughter-aged normally-looking cattle" is contradicted by a wide array of facts and indeed even USDA's own assertions.  The countries of the European Union performed BSE tests on almost 9 million cattle that were healthy-appearing at slaughter in 2005 alone.  *Report on the Monitoring and Testing of Ruminants for the Presence of Transmissible Spongiform Encephalopathy (TSE) in the EU in 2005*, European Commission, 20 June 2006, p. 12 Table B1, available at http://ec.europa.eu/food/food/biosafety/bse/annual_reps_en.htm (attached as Exhibit 9).  A significant portion of the BSE cases found in the EU in 2005 (114 of 491 cases) were in healthy-looking cattle tested at slaughter.  *Id*. at p. 18 Chart B3.  France, Germany, and Italy currently test all cattle over 24 months of age, and Germany allows voluntary testing of cattle 24 months and younger.  *Id*. at p. 8 Table 2.  Japan currently tests cattle of all ages at slaughter, and Japanese officials consider BSE testing a measure for "ensuring the safety of meat."  Pl. Memo at 9-10 and Exh. 5 at 2-3.  While most cattle slaughtered in the U.S. are under 30 months of age, BSE has been detected in cattle younger than that, although infrequently.  Declaration of Linda A. Detwiler, D.V.M. (Exh. 10) ¶ 22; Ferguson Decl. (USDA Memo Exh. 1) at ¶ 5; Pl. Memo Ex. 5 at 2 (BSE in 21 and 23 month old cattle in Japan).  In addition, the usual method of estimating the age of cattle, dentition, is inherently inaccurate.  Exh. 8 (Brown Decl.) ¶ 11.

---

[26]  USDA does not contend that BSE test kits are "contaminated, dangerous, or harmful," 21 U.S.C. § 151.  USDA's claim that BSE test kits as proposed to be used by Creekstone are "misleading" (USDA Memo at 42) does not relate directly to any criterion for regulation under the VSTA.  In any event, USDA does not suggest that BSE test kits are ineffective at determining whether concentrations of BSE prions above the detection limit of the test are found in the tested tissue.  Thus there is nothing inherent about the test itself that is misleading.

Under these facts, USDA cannot simply declare that BSE test kits are worthless when used on healthy-looking cattle under 30 (or 24) months of age (which USDA refers to as "slaughter-age").  USDA's arguments do not hold up to even cursory examination.  USDA asserts that BSE test kits applied to healthy-appearing cattle at normal slaughter age could "miss" BSE-infected cattle—but only because the BSE infection in the animal has not progressed far enough for the BSE tests to detect it.  USDA Memo at 43.  But if no BSE testing is performed on slaughter-aged, healthy-appearing cattle, then 100% of those infected cattle will enter the food chain.  Catching even a few such cases of this fatal, incurable disease would obviously be of great value.  Exh. 8 (Brown ) ¶ 11; Exh. 10 (Detwiler) ¶ 21.  In fact, neither of USDA's declarants say that BSE testing would be worthless; the closest they come is to say that USDA's targeted testing "is the most efficient method" of monitoring for BSE.  USDA Memo Exh. 1 ¶ 6.[27]

USDA asserts that BSE can only be detected 'two to three months before a cow would demonstrate clinical signs of the disease."  USDA Memo at 43.  Even that would be valuable, of

_____

[27] USDA describes its targeted testing of a fraction of the cattle most likely to test positive for BSE as testing "to accurately diagnose the presence or absence of the disease" (USDA Memo at 49), and a negative inference could be made from Dr. Ferguson's declaration that USDA's targeted testing can "be interpreted to mean that the animal is necessarily 'BSE-free'" (Ferguson Decl. ¶ 6).  But in fact, the testing USDA is conducting, just like the testing Creekstone proposes for its cattle, will only diagnose the presence of BSE if the disease has progressed quite far.  *See* Ferguson Decl. at ¶ 6 ("there is a long period in the life of an infected animal when current tests would not detect the disease").  Thus, even USDA's "targeted" testing can result in "false negative" test results, if infected animals that are non-ambulatory or suspect for other reasons are BSE-tested at a time when infectious prions are not concentrated enough in their brain stem to be identified in available tests.  Only if cattle fall into one of the groups which USDA is testing (because, e.g., they are having trouble walking, or have died of unknown causes) and they have BSE which has spread to the point where the animal will die of BSE within a few months will the testing USDA is conducting identify BSE-infected cattle.  USDA's emphasis on "false negative" results in tests that Creekstone proposes to perform, when USDA's own testing also could result in false negative results, is additional confirmation that USDA's claim that BSE tests are "worthless" is just that—an assertion unsupported by the  facts.

course, but it seriously understates the value of BSE testing.[28]  USDA simply chooses to ignore

information that demonstrates the inaccuracy of its "2-3 months" argument.  For example, on

August 24, 2006 the Canadian Food Inspection Agency (CFIA) issued a report on a 50-month-old

cow from Alberta, Canada that was confirmed to be BSE-infected on July 13, 2006.  *See*

(Detwiler Decl.) Attach. B.  The conclusion of the CFIA (which has dealt with four times as

many BSE cases as USDA), was that "in this instance, had the cow not succumbed to an

unrelated disease and had a brain stem sample submitted for BSE testing, it would probably have

been four to eight months longer before the cow would have displayed symptoms that might have

caused it to be tested because of suspicion of BSE."  Exh. 8 (Brown Decl.) ¶ 5.

Moreover, it is undisputed that, when countries have gone from testing only cattle with

outward signs that might indicate BSE to testing all cattle above a certain age, they have detected

many more cases of BSE.  Analysis of the experience in France as it went from "passive" testing

only of suspect animals, to testing of all cattle over 30 months of age, to testing all cattle over 24

months, shows that passive surveillance was picking up only a fraction of the cases of BSE

infection that were detectable with BSE rapid tests.  Supervie and Castagliola, "The

Unrecognized French BSE Epidemic," 35 *Vet. Res*. 349, 351-52, 358, 361 (2004) (attached as

Exhibit 11).  This may be in part because the clinical signs of BSE are "very subtle."  *See* USDA

Memo Exh. 26 at Article 3.8.4.2 ¶ 1.  In fact, both of the indigenous cases of BSE discovered in

the U.S. were in cattle with ambiguous or no clinical features.  Exh. 8 Attach. C at 1817.

---

[28] The OIE Terrestrial Animal Health Code – 2005, Appendix 3.8.4, Surveillance for Bovine
Spongiform Encephalopathy, on which USDA relies in part (USDA Memo Exh. 26), recognizes
that cattle where BSE is detectable but clinical signs have yet to appear is a larger group than
those showing clinical signs.  *Id*. at Article 3.8.4.1 ¶ 2.c.

USDA also ignores the growing data about "atypical" BSE infection, which usually is

not accompanied by any outward signs even at an advanced state of infection.  *See* Exh. 8 ¶ 8

and Attach. C.  "Thus, some cattle that on visual inspection appear normal are infected, and this

fact negates any argument about a limited window of 'pre-clinical' positivity in BSE tests, as

there are no signs leading to a suspicion of infection.  The *only* way that these cattle are

identified as BSE-infected is through testing."  Exh. 8 (Brown Decl.) ¶ 8 (citation omitted).  Far

from making BSE testing of asymptomatic cattle worthless, it makes such testing essential for

an understanding of this aspect of the disease.  *Id*. ¶ 14.

In short, "[p]reventing voluntary testing while at the same time dramatically reducing

government testing does not make any sense for the protection of animal and human health and

is further indication that voluntary BSE testing is not 'worthless.'"  Exh. 8 (Brown Decl.) ¶ 15.

USDA's statutory authority under the VSTA to prevent the sale or shipment of biological

products extends only to those that are "worthless, contaminated, dangerous, or harmful."  21

U.S.C. § 154.  When USDA acts to prevent distribution of BSE test kits to all but USDA

contractors because USDA believes that it is not cost-effective to use USDA-approved test kits

on all healthy-looking, slaughter-age cattle (or because USDA believes the use of those test kits

will have economic consequences for beef producers or national and international consumer

confidence in beef, as discussed in the following section), USDA is not acting to ban a

"worthless" product, and therefore it is acting outside its statutory authority in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

Much of the declaration of Lisa Ferguson (USDA Memo Exh. 1) seems to be aimed at

convincing the Court that BSE is a dwindling, not-very-serious problem.  Although overstated,

that is in any case beside the point, since nothing about the VSTA would authorize USDA to

prevent the sale or shipment of a vaccine or a diagnostic test for a rare disease.[29]  If a vaccine

were developed to treat a rare but invariably fatal disease, which only 0.001% of the U.S. cattle

herd of 90 million head may contract, could USDA prohibit the manufacture and sale of that

vaccine because USDA decided the disease was not important enough to warrant ranchers'

purchasing the vaccine?

## IV.  USDA'S RESTRICTIONS ON BSE TEST KITS ON ECONOMIC GROUNDS ARE OUTSIDE ITS AUTHORITY UNDER THE VSTA.

As Creekstone has explained, USDA acts outside of its statutory authority, in violation

of section 706(2)(C) of the Administrative Procedure Act when it prevents access to and use of

BSE test kits for reasons outside of the purposes and criteria expressed in the VSTA.  Pl.

Memo at 41-43.  In particular, since USDA is banning access to BSE test kits for purposes

unrelated to the purposes of the VSTA, such as promoting domestic and international

confidence in beef, controlling costs of meatpackers, and the like, USDA is acting outside its

statutory authority.  Pl. Memo at 42, 44.[30]

USDA asserts that this issue goes to whether USDA acted in an arbitrary and capricious

manner (Count 3 of the Complaint), and not Counts 1 and 2, which are the subject of

Creekstone's current Motion for Summary Judgment.  But to the extent that USDA has

promulgated regulations that it now asserts authorize it to restrict the use of biological products

---

[29] The declarations of Drs. Brown and Detwiler (Exhibits 8 and 10 to this Reply Memo) make it very clear that (1) much of what Dr. Ferguson states as unqualified fact is actually more of an educated guess and (2) BSE is far from eliminated and indeed recent developments (ignored by Dr. Ferguson's declaration) make voluntary BSE testing even more important.  *See also*, *e.g*., Exh. 11 at 357 (referring to "animals slaughtered in the late stage of incubation when it is *hypothesized* that infected tissues are infectious" (emphasis added); Exh. 8 Attach. C at 1820; Pl. Memo Exh. 3 at 91 (Dr. Prusiner explaining why the feed ban will reduce but not eliminate BSE.)

[30] Creekstone also noted that, if the reference in USDA regulations at 9 C.F.R. § 102.5(d) to "the protection of domestic animals or the public health, interest, or safety, or both" could be read to authorize restrictions on biological products for purposes unrelated to the efficacy or safety of such products, then that regulation should be struck down as *ultra vires*, as well.  Pl. Memo at 43.

for reasons other than for animal health and has issued product licenses, advisories, and other communications concerning BSE tests for purposes that have nothing to do with its regulatory authority in the VSTA, USDA has acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of 5 U.S.C. § 706(2)(C)—the subject of Counts 1 and 2 of the Complaint.[31]  (Of course, if the Court believes that this issue more appropriately falls under Count 3 of the Complaint, then the Court could simply defer ruling on this particular argument until it is briefed in connection with a summary judgment motion on Count 3 (should Creekstone be denied summary judgment on both Counts 1 and 2).)

　　　USDA's substantive response is to assert (1) that its actions preventing private parties from BSE testing further the purposes of the VSTA by protecting animal health and (2) that regulating BSE test kits to achieve various economic or market ends is also authorized by the "purpose" of the VSTA.  Neither of these arguments makes sense.

　　　USDA has said or implied numerous times that its policy of preventing BSE testing of healthy-appearing cattle at slaughter (i.e., those least likely to have BSE) promotes animal health.  *See, e.g.*, USDA Memo at 48.  But USDA has never explained how that could be.  Just because BSE testing of healthy-appearing younger cattle is unlikely to identify a case of BSE does not mean that such testing would be harmful to animal health.  A "false negative" result (which USDA in any case would expect to be extremely rare, since it estimates that there are seven or fewer BSE-infected cattle in the U.S., Defendants' Statement of Undisputed Material Facts ¶ 5) could not be more "harmful" to animal health than not testing the animal at all.

---

[31] In contrast, Creekstone would be presenting an argument covered by Count 3 of the Complaint if it were arguing here that, even if USDA were authorized by the VSTA to regulate the use of biological products for reasons other than to protect domestic animals (and, indirectly, their owners) from ineffective or harmful biological products, it was arbitrary and capricious for USDA to exercise that authority in order to protect Creekstone's competitors from having to test themselves or for other unreasonable reasons.

USDA's illogical pretext for banning private BSE testing is further exposed by the fact that virtually every developed country with BSE tests 100% of cattle over 24 or 30 months of age, and Japan tests all cattle presented for slaughter.  *See* Section III.C., *supra*.  The value of large-scale testing is reinforced by the statements of internationally recognized experts on BSE and the management of BSE and similar diseases, Dr. Paul Brown and Dr. Linda Detweiler (Exhs. 8 and 10), that it is important to perform a greater amount of BSE testing in the United States and that any data on the presence or absence of BSE in cattle slaughtered in the United States is of value.  Since Creekstone's proposed voluntary testing would not prevent any government testing for BSE, but would only provide supplemental data, there is simply no reason to conclude that Creekstone's proposed use of BSE test kits would adversely affect animal health.[32]  USDA does not even attempt to explain its bald assertion that Creekstone's voluntary testing would interfere with USDA's efforts "to accurately diagnose the presence or absence of the disease" and, "through its surveillance testing, to manage the disease."  USDA Memo at 49.  *Cf.* Rippke Decl. (USDA Memo Exh. 2) (stating that current USDA BSE testing "will contribute to the knowledge of the disease and may increase the chances of developing therapies or potential cures for the disease in the future," but omitting any mention of the effect of voluntary BSE testing as proposed by Creekstone); Ferguson Decl. (USDA Memo Exh. 1) (stating that USDA's testing of targeted animals is "the most efficient method for detecting the presence of BSE" (¶ 6), but never even claiming that Creekstone's proposed testing would interfere with USDA's "surveillance testing" for BSE).

---

[32] Perhaps an argument could be made to that effect if Creekstone's testing would use up limited laboratory capacity or test kit manufacturing capacity that otherwise could be used for higher-priority BSE testing.  But USDA has not made such an argument, and in fact Creekstone has constructed its own laboratory for BSE testing and there is no shortage of BSE test kit manufacturing capacity (especially now that USDA has reduced its BSE testing by 90%).

If there was any doubt before, it is clear after reading the USDA Memo that USDA's prohibition of the manufacture and sale of BSE test kits, except for use in USDA's own BSE testing program, is an action to further USDA's views of what is good for domestic and foreign markets for beef and for the financial health of U.S. meatpackers, rather than to prevent the manufacture and sale of a worthless or harmful biological product as the VSTA directs. It therefore is an action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). USDA openly acknowledges that it was acting for purposes of "maintaining domestic and international confidence in U.S. cattle and beef products," "protecting consumers from paying more for privately BSE tested beef," and "correcting market deficiencies and information asymmetries pertaining to the effectiveness of BSE test kits." USDA Memo at 51-52. Tellingly, for the first time USDA admits its motivation that prohibiting private BSE testing "also prevents beef producers from having to incur increased costs of conducting the BSE testing, which, although useless for animal health and food safety purposes, might otherwise be necessary to remain competitive if private BSE testing were permitted." *Id*. at 52 n.30.

USDA's defense of its actions is to claim that, although not directly authorized by any of the provisions of the VSTA, they are "consistent with VSTA's purpose." USDA Memo at 52. Creekstone does not dispute that Congress enacted the VSTA in part to protect the economic interests of livestock owners from biological products that would harm their livestock or would be worthless. But a regulatory action is not authorized by a statute just because it is consistent with the statute's purposes. A specific grant of authority from Congress is necessary. *Rodriguez v. United States*, 480 U.S. 522, 526 (1987); *American Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 965), *cert. denied*, 475 U.S. 1011 (1986)); *Railway Labor Executives' Ass'n*, 988 F.2d at 141 n.10

("However sensible the Board's view that stability in labor relations would be promoted by [the challenged regulation] …, Congress has not so provided.")   If USDA's position were the law, then USDA could also, for example, dictate to biological products manufacturers the maximum amount they could charge for each product, because keeping prices low would benefit the economic interests of livestock owners and beef producers.  *See also 62 Cases of Jam v. United States*, 340 U.S. 593, 600 (1951) ("In our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop.")

A biological product is not "worthless, contaminated, dangerous, or harmful" for "use in the treatment of domestic animals," 21 U.S.C. § 151, because USDA thinks that its use would put others at a competitive disadvantage or would interfere with "maintaining domestic and international confidence in U.S. cattle and beef products."[33]  This Court should be particularly cautious about inferring in the VSTA authority to restrict access to biological products for purposes of preventing competition among meat producers—even competition on grounds that USDA believes would be inappropriate—or consumer access to information. Other government agencies are charged with regulating competition and fraudulent representations to consumers.  Imposing such limitations on speech carries with it important Constitutional constraints.  And action by USDA—or indeed any government agency— specifically designed to favor one set of competitors (large meatpackers with low margins) over

---

[33] USDA Memo at 51-52.  In any event, USDA provides no explanation for this contention, which is counterintuitive, especially given that 100% testing (of all cattle, in Japan, and of cattle over 24 months in France and Germany, and over 30 months in the remainder of the EU, *see* p. 35, *supra*) is already the norm in many of those international markets, and consumers in Asia have been seeking testing for imported beef.  This Court should not simply accept USDA's unsupported assertion that more testing for BSE would make consumers less confident in the safety of U.S. beef.  *See also* Exhibits 1-6.

others (Creekstone and other high-end meatpackers with an interest in BSE testing) is not only

inappropriate as a matter of policy, it likely is unconstitutional.  The Court should refrain from

interpreting the "VSTA's purpose" as authorizing such potentially unconstitutional actions.

*See Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485

U. S. 568, 575 (1988) (courts should construe a statute to avoid constitutional problems "unless

such construction is plainly contrary to the intent of Congress").

In any event, USDA's argument is that its restriction of access to BSE test kits is

consistent with the VSTA's purpose to protect farmers and ranchers from economic losses

associated with harmful or ineffective biological products.  USDA Memo at 50-51.  But even

this broad, vague claimed authority does not support USDA's claim that actions to protect

consumers from paying more for BSE-tested beef (USDA Memo at 52) are consistent with the

VSTA's purpose "to protect the economic interests of livestock owners and beef producers"

(*id*.), since actions to protect consumers of meat do not relate to the financial well-being of

farmers and ranchers *per se* at all.  (Instead, USDA now makes the remarkable claim that the

VSTA authorizes it to "regulate the economic condition of [the beef] market."  *Id*.)  Even if

authorization to ban private use of BSE test kits could be derived solely from the purposes of

the VSTA, none of those purposes supports USDA actions ostensibly directed at providing

accurate information to beef consumers or protecting beef producers from competition.[34]

---

[34]  Contrary to USDA's assertion (USDA Memo at 51 n.27), *Garrelts v. Smithkline Beecham Corp*., 943 F. Supp. 1023 (N. D. Ia. 1996), is very relevant to this case.  After an extensive analysis of the 1913 enactment of the VSTA and its amendment in 1985, the *Garrelts* court concluded that in both instances "Congress's concern was regulation of the worthlessness, contamination, dangerousness, or harmfulness of animal vaccines to *livestock*, not the general duties of product manufacturers…to safeguard human users of their products…."  *Id*. at 1068 (emphasis in original); *see also id*. at 1066-67.  Obviously, the economic interests of beef processors and consumers are even further removed from that congressional purpose.

## V.  USDA IS NOT ENTITLED TO SUMMARY JUDGMENT.

USDA has offered almost no argument directed specifically to its cross-motion for summary judgment, apparently believing that, if its arguments against Creekstone's summary judgment motion are successful, then USDA will be entitled to summary judgment itself.  That is, of course, not the way the law works.

First, as USDA has noted, by agreement Creekstone has only moved for summary judgment on Counts 1 and 2 of its Complaint, leaving Count 3 for a fuller development of the record if the Court should conclude that Creekstone is not entitled to summary judgment on either Count 1 or Count 2.[35]  *See* Pl. Memo at 1 n.1; USDA Memo at 13 n.7.  Secondly, the Court could decide that Creekstone has not qualified for summary judgment on Counts 1 and 2, without finding that USDA has met its burden of demonstrating that there is no genuine issue as to any material fact and that USDA is entitled to judgment as a matter of law on those counts (which USDA certainly has not).  *See* Fed. R. Civ. P. 56(c).

### CONCLUSION

For the reasons explained above and in Creekstone's Memorandum in Support of its Motion for Summary Judgment, Creekstone is entitled to summary judgment on Counts 1 and 2 of its Complaint, and for the relief sought therein.

Dated:  November 3, 2006                     Respectfully submitted,

                                      __ /s/ Russell S. Frye _____ _
                                      Russell S. Frye (D.C. Bar No. 331124)

---

[35] The only argument that USDA has even asserted that could apply to Count 3 of Creekstone's complaint is that the Court lacks jurisdiction to hear Creekstone's claims because they are moot or do not present a redressable injury.  As Creekstone has demonstrated in Section I of this memorandum, those arguments are misguided and unavailing.

FryeLaw PLLC
P.O. Box 33195
Washington, DC 20033-0195
(202) 572-8267
rfrye@fryelaw.com


   /s/ William L. Miller
William L. Miller (D.C. Bar No. 443191)
The William Miller Group, PLLC
1666 Connecticut Avenue, N.W.
Washington, DC 20009
(202) 256-2306
wmiller@williammillergroup.com


   /s/ Peter C. Choharis
Peter C. Choharis (D.C. Bar No. 444787)
2771 Woodley Place, NW
(202) 422-8312
Washington, D.C. 20008
pchoharis@yahoo.com


Attorneys for Plaintiff
CREEKSTONE FARMS PREMIUM BEEF, LLC