Creekstone Farms Premium Beef v. USDA
Civ. Action No. 06-544 (JR)
Plaintiff's Summary Judgment Reply and Opposition

EXHIBIT 7

$25,000 inserted for the creation of an additional Weather Bureau station, such as is desired, at Dallas, Tex.

Mr. McLaughlin. What is the need of a station at Dallas, Tex., when you have a station only 30 miles away?

Mr. Moore. That is a very good question to propound, because it comes up to us so often. We say to a community asking for a Weather Bureau station: "We have one near you which will supply you with maps, bulletins, and reports." Finally, they will come to us, when they get to be a big city, and they will say, "Our city is so large now we should have a Weather Bureau station; we have a big cotton exchange," and if it is a port, "We have a maritime association, and we feel we ought to have as full and complete weather reports as any other port or as any other city, and that we should have them placed before our commercial interests as early as some adjacent city." We then say, "All right," and we recognize their claim, provided they have a population of over 50,000, but not otherwise.

Mr. Rubey. Is it not more a matter of civic pride than necessity?

Mr. Moore. Many times that is so; I would say that ninety out of every hundred requests that come to us—which I never bring to you gentlemen—for the establishment of a Weather Bureau station are matters of local pride rather than of real necessity. I can bring from my files right now, or inside of an hour, 100, if not 200, letters and petitions for the establishment of Weather Bureau stations, signed by Senators and Representatives, as well as by commercial organizations. We have already answered them and said, "We can serve you just as efficiently as may be or as ought to be; we can give you all the required information from the stations we now have"; and I also inform them that I can not recommend the station and that I will not favor it if it is brought before the committee. I tell you that because I wish to show you gentlemen that I do not bring before this committee anything but urgent cases. We are actually more concerned in holding down the appropriations for the Weather Bureau than in increasing them. You may think that strange when I tell you I want several hundred thousand dollars of increase, but it is a fact and my records will prove it. I could simply deluge this committee with requests of that sort, but we try never to bring you a case unless we honestly believe it is necessary. You know there is no patronage in the Weather Bureau; no political considerations at all, but only the merits of the cases. But the problem of great ocean service is one that will force itself upon this committee in course of time because of the necessity of the case, and it will have to carry some day if it does not to-day.

The Chairman. Professor, we are very much obliged to you.

## STATEMENT OF DR. A. M. FARRINGTON, ASSISTANT CHIEF BUREAU OF ANIMAL INDUSTRY, DEPARTMENT OF AGRICULTURE.

The Chairman. We will take up the increases first, and the first one I notice is "one chief clerk and executive assistant, change of title and increase of $250 submitted." How long has this chief clerk been in that employment?

Dr. FARRINGTON. For quite a number of years. He has been in different positions.

The CHAIRMAN. He is now drawing twenty-five hundred?

Dr. FARRINGTON. Yes, sir. He is an exceedingly efficient and capable man.

The CHAIRMAN. What is his name?

Dr. FARRINGTON. C. C. Carroll.

Mr. LEVER. What is the reason for the change in title, Doctor?

Dr. FARRINGTON. The increase of his duties in connection with executive work.

Mr. HAWLEY. What is his present title?

Dr. FARRINGTON. Chief clerk.

Mr. LEVER. What are his present duties there; what does he do?

Dr. FARRINGTON. He has charge of the clerks in the bureau, has general supervision of the accounts, and the general duties of a chief clerk. The duties of a chief clerk are defined by law, and it is desired to give him more authority to do executive work.

Mr. LEVER. Does he exercise the authority to O. K. bills that are paid? Is he in charge of that? Has he charge of the correspondence that goes out and comes in?

Dr. FARRINGTON. The correspondence on certain subjects; he has supervision especially with regard to the matter of rentals of buildings.

Mr. LEVER. What additional duties are you going to give him as executive assistant?

Dr. FARRINGTON. To look after the construction of buildings, to employ labor outside of Washington, and other duties of that nature.

The CHAIRMAN. The next increase I notice is on page 14, "51 clerks, at $1,000, increase of 6 submitted, 3 by transfer from lump fund for general expenses and 3 new places." Give us your reasons for these new places.

Dr. FARRINGTON. That is due to the general increase in the work of the bureau, and part of that is explained in the note on page 16, where it is explained that the clerks are taken from the lump fund and transferred to the statutory fund.

The CHAIRMAN. The next I notice is on page 14, "64 clerks, at $900 each, increase of 2 by transfer from lump fund for general expenses; 1 at $720, with increase of $180, and the other at $700, with increase of $200." I suppose the same reasons apply to that?

Dr. FARRINGTON. The same reasons apply to that; yes, sir. We have crossed out some of those salaries at $720 and $700. Now we have only a few salaries at that figure. They were increased in the last appropriation bill to $900.

The CHAIRMAN. Doctor, under general expenses there is new language in the provision here, and you can let us know what you think about it, or we will pass that over and take it up later before the subcommittee.

Dr. FARRINGTON. What page is that?

The CHAIRMAN. Page 16, in the proviso:

*Provided*, That hereafter all the provisions of the said act approved March 3, 1905, shall apply to any railroad company or other common carrier whose road or line forms any part of a route over which cattle or other live stock are transported in the course of shipment from any quarantined State or Territory or the District of Columbia, or from the quarantined portion of any State or

Territory or the District of Columbia, into any other State or Territory or the District of Columbia.

That is new language inserted in this bill?

Dr. FARRINGTON. That is explained partially in the note on page 18. It is due to a decision of the courts that when a live-stock shipment is brought out of a quarantined area and landed in a State which is not in quarantine and taken up by a new railroad that the regulations of the department do not apply to the shipment by the new line which has taken up the shipment.

The CHAIRMAN. It follows the shipment through the new lines?

Dr. FARRINGTON. To destination.

The CHAIRMAN. In the next provision you want an increase of $50,000—

For inspection and quarantine work, including all necessary expenses for the eradication of scabies in cattle, the inspection of southern cattle, the supervision of the transportation of live stock, and the inspection of vessels, the execution of the 28-hour law, the inspection and quarantine of imported animals, including the establishment and maintenance of quarantine stations and the alteration of buildings thereon, the inspection work relative to the existence of contagious diseases and the tuberculin and mallein testing of animals, $654,000.

That is an increase of $50,000?

Dr. FARRINGTON. Yes, sir.

Mr. ZAPPONE. That is the inspection and quarantine work.

The CHAIRMAN. The note says something about that. We will ask Dr. Melvin about that. Give us some information in regard to the cattle-tick work. You asked for $250,000 last year. You now ask for $300,000. I thought that work was going on finely and that you were extending the tick work quite rapidly?

Dr. FARRINGTON. That amount is asked for in order that we may still further extend it. The work has been carried on previously by all the Southern States except Florida, and now the State of Florida has taken it up, and we want to enter more fully into cooperation with these States and increase the progress of tick eradication. It was formerly the case that the Government appropriation was larger than that made by the States, but now the appropriation made by the States in total exceeds that made by the Government. This increased appropriation is asked for in order that we make take up new work and continue to exterminate this tick until it is entirely eradicated.

Mr. LEVER. What area have you already entirely cleaned up?

Dr. FARRINGTON. About one-fourth of the area that was originally infected in 1906. During the last fiscal year about 25,000 square miles have been released from quarantine.

The CHAIRMAN. Inasmuch as we are to have a hearing on that early in January—the committee voted to hear these gentlemen—perhaps we can get some new information from them.

Mr. HAWLEY. Is the tick-infested area extending?

Dr. FARRINGTON. No, sir.

Mr. HAWLEY. There are no new areas infected?

Dr. FARRINGTON. No, sir. When an area is once cleaned up it remains clear. We are extending the work through the South into new areas. The tick when once eradicated never comes into the cleaned area again.

Mr. LEVER. Did I understand you to say that the area that you have cleaned up becomes reinfested again occasionally?

Dr. FARRINGTON. No, sir; it does not.

Mr. LEVER. How do you guard against that?

Dr. FARRINGTON. By regulations and cooperation of the States and counties. We do not allow any tick-infested cattle to be shipped into the counties and areas which are clean.

Mr. MCLAUGHLIN. It is necessary to keep up your work in a supervisory way over those sections, is it not?

Dr. FARRINGTON. As a rule it is not necesary; that work is done by States.

Mr. MCLAUGHLIN. Is this the way of it, that after the territory is once cleaned up you abandon it, and the State keeps it clean?

Dr. FARRINGTON. Yes, sir.

Mr. MCLAUGHLIN. That is so in all cases?

Dr. FARRINGTON. Yes, sir.

Mr. YOUNG. You do that by means of quarantine lines, Doctor?

Dr. FARRINGTON. We do that also by preventing the shipment of all tick-infested cattle into the free area.

Mr. YOUNG. That is true in my State.

Mr. MCLAUGHLIN. You pay some attention to it by preventing tick-infested cattle from being shipped into the clean area when it is once cleaned up. But you do no work in the territory which is once cleaned up?

Dr. FARRINGTON. No, sir.

Mr. LEVER. Doctor, on page 17 I notice you have considerable new language:

> That from and after July 1, 1913, it shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or exchange in the District of Columbia or in the Territories or in any place under the jurisdiction of the United States or to ship or deliver for shipment from one State or Territory or the District of Columbia to any other State or Territory or the District of Columbia, any worthless, contaminated, dangerous, or harmful virus or serum, toxin, or analogous product intended for treatment of domestic animals; and no person, firm, or corporation shall prepare, sell, barter, exchange, or ship as aforesaid any virus, serum, toxin, or analogous product manufactured within the United States and intended for use in the treatment of domestic animals, unless and until the said virus, serum, toxin, or analogous product shall have been prepared under and in compliance with the regulations prescribed by the Secretary of Agriculture at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture as hereinafter authorized.

And so on. Will you give the committee some explanation for the reason for that and what you hope to accomplish by it?

Dr. FARRINGTON. That is an entirely new provision, and the item, as drafted, follows very closely the law which is now in operation in the United States Public Health Service, where they supervise the manufacture of toxins and viruses which are prepared for the treatment of human beings. Within the last few years viruses, serums, and toxins have been made for treating animals, and it is found that it is necessary to supervise the manufacture of these products so that only serums of good quality shall be produced for sale to farmers and stock raisers. You know, perhaps, that the bureau has formulated a plan for the treatment of hog cholera by serum, and there have been a great many new plants started up for the manufacture of this serum, and the bureau has no control over that manufacture. We have authority to buy serums in the open market and examine them. In a recent examination we tested 12 of them and 4 were

found entirely worthless. Some were fair, but there were only 3 which were found potent and good. This legislation is asked for in order to protect the farmer and stock raiser from improperly made and prepared serums, toxins, and viruses.

Mr. LEVER. I have not gone into any careful examination of this language here, but does it give you the power not only to regulate the importations of this virus and toxin, but also the power to regulate the domestic manufacture of it?

Dr. FARRINGTON. Yes, sir.

Mr. LEVER. Both?

Dr. FARRINGTON. Both.

Mr. LEVER. How are you going to get at the supervision of the imported serums in a practical way? Do you examine it at the port of entry or the point of destination?

Dr. FARRINGTON. At the port of entry.

Mr. LEVER. You would unpack all this stuff and subject it to your own system of analysis?

Dr. FARRINGTON. Yes, sir. There would be little hog-cholera serum imported, but there might be serums of other kinds imported.

Mr. LEVER. Is there any considerable amount of serums imported into this country?

Dr. FARRINGTON. I believe not, but I am not positive on that point.

Mr. LEVER. So that your work does really deal with the domestic manufacture of it?

Dr. FARRINGTON. Yes, sir.

Mr. LEVER. I happened to see the hog cholera serum manufactured at the Kansas Agricultural College this summer, and I was very much interested in it. Would you have the right, under this provision, to go there and examine the serum on the ground?

Dr. FARRINGTON. Yes, sir; and examine their system of making it to see whether it is properly done; to see whether the serum is potent and will accomplish what it is intended to accomplish.

Mr. LEVER. And then you would tag it as you do in the case of meat inspection in the packing houses?

Dr. FARRINGTON. No, sir; we woud issue a permit to the plant which would allow them to go on and make it. If they do not make it properly we revoke that permit and stop them from manufacturing it. That is the system applied now by the United States Public Health Service in regard to toxins, etc., which are made under their supervision.

Mr. LEVER. As a matter of fact, you would have to examine every particle of it to find out whether it is potent?

Dr. FARRINGTON. We would only examine the serum itself occasionally, but we would examine the method by which they prepare it to see that the manufacturers understand the method of preparing it, do the work properly, and have the facilities and material on hand with which to make it.

Mr. LEVER. As a matter of fact, the very best plants occasionally send out serums that are not effective; is that not true?

Dr. FARRINGTON. Only to a slight extent.

Mr. LEVER. I understand; to a limited degree.

Dr. FARRINGTON. I think the plants which know how to make it properly prepare a serum that is efficient, and that it is tested before it goes out from the plant.

Mr. LEVER. The only thing you would do would be to examine the method and if it is a correct one you would issue a license to manufacture it, and place it in interstate commerce?

Dr. FARRINGTON. That is it exactly.

Mr. HAWLEY. Did any of the samples which you examined contain deleterious matter?

Dr. FARRINGTON. No, sir.

Mr. HAWLEY. They may have been injected into the hog without harming it, but would have done no good?

Dr. FARRINGTON. They may have been injected without doing harm, but would not have done any good.

Mr. MCLAUGHLIN. A short time ago I was talking with a member who was suggesting an increased appropriation for the use of the serum to prevent hog cholera; he seemed to think it was good work and ought to be extended rapidly, and money enough ought to be provided for the purpose. What do you propose in this bill; any considerable increase of money or appropriation for your use along that line?

Dr. FARRINGTON. No, sir; this request for money is entirely to supervise the plants where serum is made.

Mr. MCLAUGHLIN. Have you asked an appropriation for the purpose of cooperating with the States or institutions for the use of that serum?

Dr. FARRINGTON. No, sir.

Mr. LEVER. I overlooked asking you the reason for the increase of $20,000 "for all necessary expenses for investigations and experiments in dairy industry, cooperative investigations of the dairy industry in the various States, inspection of renovated-butter factories and markets." That is at the bottom of page 16 and the top of page 17.

Dr. FARRINGTON. That is due to the natural increase of the work, and it is also asked for in order to have a greater supervision over the renovated-butter factories. We would have the power to condemn certain products before they now make them into butter. I think Mr. Rawl explained that to the committee last year. The law now says that we can supervise the plants, but we can not condemn any cream or butter which is in that plant and which we know at the beginning is improper to be used in butter. It can be made up and shipped into a State, and if we seize it at the time it is being shipped then we can condemn it; but we can not condemn it in the factory, and the idea is to give us increased power to regulate the material that is put into this renovated butter.

Mr. LEVER. We gave you that in the act last year, did we not?

Dr. FARRINGTON. No, sir; I think not.

Mr. LEVER. You have not asked for any change in language; you just ask for an increase in money?

Dr. FARRINGTON. Yes, sir.

The CHAIRMAN. We had a discussion about that last year.

Dr. FARRINGTON. I think the power was not given.

Mr. LEVER. It is in the proviso at the top of page 17:

*Provided*, That the sanitary provisions for slaughtering, meat-canning, or similar establishments, as set forth in the act of June 30, 1906 (34 Stats., p. 676), are hereby extended to cover renovated-butter factories as defined in the act of May 9, 1902 (32 Stats., p. 196), under such regulations as the Secretary of Agriculture may prescribe.

As I have understood it, that language gave you the authority to condemn this stuff if it were not of the character prescribed by the department.

Dr. FARRINGTON. I may be mistaken.

Mr. ZAPPONE. It was made a law last year, and was omitted because it is continuing legislation.

Dr. FARRINGTON. I think probably you are right about that. The request is for an increase in money so as to give us the men to enforce that provision. I think that is the idea.

The CHAIRMAN. Now, this Bethesda Experiment Station: It looks to me as if you ought to ask for a decrease. Some of those investigations must have come to an end, or are about to do so. What have you done about the rats you had there?

Dr. FARRINGTON. I think they have been moved to Beltsville.

The CHAIRMAN. I knew the zebra had. I did not know whether the rats had or not.

Dr. FARRINGTON. The guinea pigs have.

The CHAIRMAN. I am well acquainted with the zebra; I have seen him. I thought the rats had been dispensed with.

Dr. FARRINGTON. We are trying to sell the hybrids; an advertisement for the sale is now inserted in several newspapers.

Mr. STANLEY. Do they make good work animals?

Dr. FARRINGTON. They are hardly old enough for that. They can be driven about, but I do not think they have tried to work them yet.

Mr. STANLEY. Are they striped like the zebra?

Dr. FARRINGTON. Yes, sir; they have stripes across the withers and on the forelegs.

The CHAIRMAN. I see, on page 19, you have some new language here:

> And hereafter the Secretary of Agriculture is authorized to prepare and sell at cost such pathological and zoological specimens as he may deem of scientific or educational value to scientists or others engaged in the work of hygiene and sanitation: *Provided*, That all moneys received from the sale of such specimens shall be deposited in the Treasury as miscellaneous receipts.

Dr. FARRINGTON. That item refers to pathological and zoological specimens for use at health exhibits and meetings of sanitary associations. We had a number of such specimens on exhibition at the Congress of Hygiene and Demography which was held here last September. They attracted a good deal of attention, and a number of people from boards of health wanted specimens similar to those. We had very urgent requests to supply them for use at their exhibits. It costs something to get them up—first, to get the specimens and then to prepare them. They are prepared according to a process which preserves the colors and makes them very fine for exhibiting, and Dr. Melvin considered that he wanted authority to detail persons to prepare the specimens and have them for sale as needed.

The CHAIRMAN. On the same page, Doctor, I want to ask you about an item I looked over this morning, and I want to ask you if all these salaries for the dairy industry—$42,060 in the aggregate—are spent in Washington?

Dr. FARRINGTON. Yes, sir.

The CHAIRMAN. You have one senior dairyman and two dairymen at $2,000 each, two dairymen at $1,980 each, and five dairymen at

$1,800 each, and four dairymen at $1,620 each, and one dairyman at $1,500. Is that work all done here in this city?

Dr. FARRINGTON. In the city and at Beltsville.

The CHAIRMAN. If I read it right, at Beltsville, as the figures are given on page 20, you have salaries for the dairy industry which amount to $63,492. So that you have $42,960 plus $63,492 for the purpose of dairy investigations. I can see how those at Beltsville are going on, but do you not reach results in this very work here that will sometime come to an end, if they are experimental?

Dr. FARRINGTON. There are always new problems coming up. These men, although they have their headquarters in Washington, are sent out to various milk association meetings, and they address such meetings.

The CHAIRMAN. They are itinerant lecturers?

Dr. FARRINGTON. Yes, sir.

The CHAIRMAN. I can see that in some cases their services as experts may be needed in a large country with great industries in the dairy line, but in a good many places the dairymen have their own men, their own experts, to attend to this work. I just want to get at the bottom facts to see if at some time there could not be some reduction there.

Dr. FARRINGTON. The bureau desires to extend the work in dairying to the Pacific Coast States. I know we are taking up new work in Utah and trying to encourage the dairy industry there, and also in the irrigation regions.

The CHAIRMAN. Out of Washington you have all this dairy work going on; I suppose it is at Beltsville chiefly, is it not? You have 14 dairymen out of Washington. They can not be all located at Beltsville. They must be out in the country somewhere.

Dr. FARRINGTON. They are cooperating with the States. In the States of Wisconsin and Minnesota I know dairymen are located, and they are working also in South Carolina and Georgia.

The CHAIRMAN. Now, we come to page 26, Doctor, and you have a new item there, with a request for the sum of $300,000. You mention swine, goats, and reindeer, and whatnot.

Dr. FARRINGTON. In connection with the inspection of reindeer meat, you will remember that the Interior Department—the Bureau of Education—has been encouraging the raising of reindeer by the Eskimos and Indians in Alaska, and they have a surplus of the deer on hand and have begun to slaughter them and ship the meat to Seattle. It has been found that the meat is not salable because it is infected with a parasite (cysticercus), and the people in Alaska will not eat it, and neither will the people in Seattle. The idea is, at the request of the Secretary of the Interior, to have inspectors stationed in Alaska to inspect this meat, and such inspectors also will cooperate with the authorities there in preventing the dissemination of these parasites which infect the meat.

Mr. HAWLEY. Are they in the living animals or after the meat is slaughtered?

Dr. FARRINGTON. They are in the living animals, but do not show at all until it is slaughtered.

The CHAIRMAN. It seems to me this ought to have been in a separate bill, and not in an appropriation bill. This session of Congress

is too short to discuss a measure like that. If we were to go into this before a full committee, it would take a long time; and if we presented it on the floor of the House without doing that, we would be criticized.

Dr. FARRINGTON. The amount of money needed for this inspection is just a small portion of the increase.

The CHAIRMAN. You ask for $800,000 here to develop a work which is entirely new. If we presented it in this way on the floor of the House we would be ridiculed.

Mr. LEVER. What part of this amount is to be used for that purpose and what part is to be used for the promotion of men in the meat-inspection service?

Dr. FARRINGTON. The larger portion is to be used for the promotion of men in the meat-inspection service. This reindeer matter is just a side issue; probably one or two thousand dollars only would be used for that.

Mr. LEVER. Why do you need this amount of money for the promotion of those men, when I notice that you have an unexpended balance of $20,000 of the $3,000,000 permanent appropriation?

Dr. FARRINGTON. It is considered that we could not, in such a large appropriation, expend this much closer than that amount, and we have not had promotions for several years, and our men are leaving the service.

The CHAIRMAN. That is what the note says, and that is what I wanted to bring out. Are not these gentlemen getting as much money as they would get in private work?

Dr. FARRINGTON. With your consent I will ask Dr. Steddom if he will answer questions relating to that.

The CHAIRMAN. Dr. Steddom, give us the reason for the increase, and tell us whether these people are leaving your service or not.

Dr. STEDDOM. The principal reasons are, first, to increase the salaries of those who are now in the employ of the bureau and doing the actual work of inspecting the meats under the meat-inspection amendment. The second reason is on account of the normal increase in business. We have now reached the point where we can make no increase at all, and we can not extend the operations of the meat-inspection work. I am informed by our accountant that we are up to the present time just $900 in advance of our pro rata for the year. That is running entirely too close for safety, and, as I have just said, we have informed firms and persons who have applied for Federal meat inspection that we could not give them any encouragement, because we have not the money and no prospect of any increase for the present fiscal year.

The CHAIRMAN. Are these veterinarian inspectors as well as the regular inspectors?

Dr. STEDDOM. All employees, including meat inspectors, veterinary inspectors, and inspectors' assistants.

The CHAIRMAN. Now, Doctor, I have before me the letter of the Secretary of the Treasury giving an itemized account of expenditures in all of this inspection work, the names of the men, and their places. I notice that in Augusta, Ga., the inspector gets $1,600, with an additional compensation per month of $25, which makes his salary $1,900. In Boston, Mass., the veterinary inspector gets $2,500,

and additional compensation per month of $35, which gives him $2,920; at Buffalo, N. Y., the salary is the same and $30 additional compensation per month, which gives him $2,860; and so on. So, in fact, these gentlemen are getting all the way from two thousand to thirty-seven hundred and forty dollars per annum. In Chicago the veterinary inspector receives $3,300, with additional compensation per month of $35, making his total salary $3,720. It looks to the layman and the practical business man that that is sufficient.

Dr. STEDDOM. Capt. Lamb, in regard to the item of additional compensation, that is money actually spent by the inspector for his transportation for the purpose of visiting the various establishments, so that should not be considered a part of his salary.

The CHAIRMAN. It is not stated clearly, then.

Mr. STANLEY. That ought not to be misleading. The word "compensation" implies something paid the man in lieu of expense, like rent or something of that sort.

Dr. STEDDOM. I might say that in the commissions of these men it is stipulated that this additional compensation is for hire of buggy or for saddle horse, to be owned by them and for official use.

The CHAIRMAN. I think that is in a different class.

Mr. STANLEY. That is not traveling expenses.

Mr. McDERMOTT. The Union Stock Yards in Chicago are a mile or more square, and there is absolutely no other way of getting around except by horse and buggy, because very few automobiles are allowed there, and the doctor has to go from one big packing house to another, and the stockyards are a mile square.

Mr. STANLEY. I am not objecting to the amount, but the phraseology ought to state what it is for.

Mr. LEVER. Take your veterinarian inspector at Boston, Mass. His salary is $2,500 and his additional compensation is $35; and then on another column the veterinarian inspector is allowed $96.50 for traveling expenses. How do you differentiate those propositions?

Dr. STEDDOM. This extra compensation is for the hire of horse and buggy or for saddle horses for use in the immediate vicinity. The amount for traveling expenses is for a separate item entirely. It includes his supervision of work outside his station at substations, which may be anywhere from 10 to 50 miles away, and also the travel of members of his force to make investigations of violations and similar investigations under orders from the Washington office.

Mr. LEVER. Is this horse owned by the inspector or is it a Government horse?

Dr. STEDDOM. Owned by the inspector.

Mr. LEVER. You are really giving him rent for the horse?

Dr. STEDDOM. Yes; and its keep. I would like to say, before we get away from this subject, that it is not these higher salaried men in charge in whom we are so much interested as it is some of the other men. We have not in mind just now the promotion of these men; it is these other men who are receiving a thousand or nine hundred dollars, and some of the other men who are getting fourteen and sixteen hundred dollars, and some of them getting eighteen hundred. These men are, quite a number of them, leaving the service for better pay in other employment.

The CHAIRMAN. The question would arise, if you want an increase in salary. Why not ask for more money under the general appropriation and not bunch it, so to speak, in new language and couple it with reindeer and these other things?

Mr. HAWLEY. I would like to ask a question. This appropriation for meat inspection is a permanent appropriation?

Dr. STEDDOM. Yes, sir.

Mr. HAWLEY. If it were an annual item, as other items in the bill are, you could increase that $3,000,000 to meet the needs of that inspection service; increase it, say, to three million three hundred thousand. Being an annual appropriation, you are reduced to the necessity of adding an additional item in that bill. Is that the situation?

The CHAIRMAN. That is just what I was trying to bring out when I asked the question.

Dr. STEDDOM. We need more money. This $3,000,000 is a permanent annual appropriation.

Mr. HAWLEY. The point I am making is that if it were just an annual item you would ask for an increase in the annual item, instead of asking for a new item?

Dr. STEDDOM. Yes, sir.

Mr. McDERMOTT. Last year you had 308 inspectors at twelve hundred, and this year you have cut that number to 282 at twelve hundred. Why do you make a reduction?

Dr. STEDDOM. Probably they have left the service.

Mr. McDERMOTT. Then Secretary Wilson writes a letter, in which he says:

> At present the promotions are made on the basis of merit, taking into consideration both efficiency and length of service, and examinations are held at intervals to determine who is entitled to promotion.

You have not had an examination in the last three years. You have had only one in the last six years.

Dr. STEDDOM. We did not examine the men, because we had no money to pay them.

Mr. McDERMOTT. You can increase their salaries on the basis of merit.

Mr. HAWLEY. They could increase the salaries if they had the money.

Dr. STEDDOM. That is true.

Mr. LEVER. You have not increased their salaries, because you did not have the money; is that the idea?

Dr. STEDDOM. We can not increase the salaries unless we have the money.

Mr. LEVER. You have not had an examination in six years for promotion?

Mr. McDERMOTT. Only one.

Dr. FARRINGTON. We started one this spring on the Pacific coast, and intended to hold another one this fall, but as we did not have the money, Dr. Melvin thought we had better not hold the examination, and have the men anticipate that they were going to get a promotion. We have some ready for promotion.

Mr. McDERMOTT. You cut down 26 men on the $1,200 list, $200 each. That is a decrease of $5,200, and if you had men eligible you could put them up into those places.

Mr. STANLEY. Have you had any promotions without examination?

Dr. FARRINGTON. In some grades.

Mr. STANLEY. How many have you promoted without examination?

Dr. FARRINGTON. About 200.

Mr. MCDERMOTT. When these men went into the service six years ago they went in with the understanding that they would be increased for efficiency?

Dr. FARRINGTON. You mean the 300?

Mr. MCDERMOTT. It is down to 282 now.

The CHAIRMAN. Have you demoted any of these people?

Dr. FARRINGTON. Yes, sir; a few of them have been demoted.

Mr. STANLEY. How do you determine their efficiency, and their right to promotion without examination?

Dr. FARRINGTON. That is done when they remain in the same grade. Our veterinarians remain veterinary inspectors; they are promoted in the same grade. But our inspectors' assistants have a chance to become meat inspectors, and we have to examine them in cooperation with the Civil Service Commission.

Mr. STANLEY. The examination is only necessary to promote from one grade to another; within that one grade you can exercise your own discretion?

Dr. FARRINGTON. Yes, sir.

Mr. LEVER. Doctor, have you thought of the proposition of reducing your force and thereby giving the men on the work an increase in salary?

Dr. FARRINGTON. We have had to reduce the force, or I should say, rather, that we have had to get along with a less number of men.

Mr. LEVER. The point I am making is whether or not you are not crowded now with your force. Where you have three men, could you not do the same work with two men? Where you have four men could you not do it with three? I have heard that statement made by men familiar with the packing houses. I do not know how true it is.

Dr. FARRINGTON. I think that would not be true in many cases.

Mr. WHITACRE. In that connection, on page 29 of this letter I see it says, "East Liverpool, Ohio, 1 meat inspector." This is a small town of about 10,000 people. Are the meat inspectors scattered all over the country in such places, and what do they do?

Dr. FARRINGTON. They are stationed in the packing houses. Probably that is a place where meat is processed.

Mr. WHITACRE. There is no packing house there.

Dr. FARRINGTON. There must be a branch house of one of the big packers, Armour or Swift. Our inspectors supervise the processing of meats and see that all meat that is shipped interstate is United States inspected and passed.

Mr. MCDERMOTT. There might be a sausage factory there?

Dr. FARRINGTON. Yes, sir.

Mr. MCDERMOTT. A small factory located at a town would have to have an inspector?

Dr. FARRINGTON. Yes, sir.

Mr. WHITACRE. At that factory?

Dr. FARRINGTON. If they did an interstate business, they would have to have the inspection.

Mr. WHITACRE. The inspectors are appointed——

Dr. FARRINGTON (interrupting). Through civil-service examination.

The CHAIRMAN. We are much obliged to you, Doctor, for coming before the committee.

## STATEMENT OF HON. CHARLES C. CARLIN, A REPRESENTATIVE FROM VIRGINIA ON TUBERCULAR CATTLE SLAUGHTERED TO PROTECT THE MILK SUPPLY IN THE DISTRICT OF COLUMBIA.

Mr. CARLIN. Mr. Chairman and gentlemen of the committee, the chairman is perfectly correct in saying that I will not take long, because I have a regard for your time as well as for my own.

I simply want to bring to the attention of the committee more closely a measure that is pending here for the protection of the milk supply of the District of Columbia, and, incidentally, the protection of the dairymen who are interested in furnishing that milk.

There is, as you all know nowadays, what is called a tuberculin test. In order to protect the city, it is claimed by the health officer here that that test has to be applied to the animals that are supplying milk to the District of Columbia. The Secretary of Agriculture did apply the test to the animals in the District of Columbia, and found authority under existing law to pay for those animals when they were ordered to be destroyed, as they were the property, of course, of the individuals who owned them. But in the surrounding country, in Maryland and Virginia, he could not find authority under the law to make payment for the animals which he considered were necessary to be destroyed in order to protect the milk supply of this District.

In Virginia we have met the question partially by an appropriation from the State. I think last year we appropriated some $20,000 or $25,000, upon the theory of the well-known principle that you can not take private property for public use without compensation, we have reached the conclusion that you can not order the destruction of the animal without paying the individual who owns the animal. The process of doing it is, of course, a matter of detail. I think they pay probably two-thirds of the value of the property.

Mr. HAWLEY. How many were killed in Virginia last year, and how many in Maryland?

Mr. CARLIN. In Maryland there is no statute providing for compensation to the owner.

Mr. HAWLEY. Well, how many were killed without compensation?

Mr. CARLIN. I do not know how many; but large numbers were found to be unfit for milk supply in the District of Columbia. And we have reached the point now where it is impossible for the District of Columbia to protect itself. This is the common council for the District of Columbia; and Congress has got to take care of it. And it is impossible for the farmers and the dairymen in that section to surrender their animals without compensation. Various States have adopted the practice. The principle is a sound one. If the property is to be taken for the public good, there is not any question that the public should bear the cost.