UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CREEKSTONE FARMS PREMIUM
BEEF, LLC,

        Plaintiff,

     v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,

        Defendants.

Civil Action No. 06-544 (JR)

**MOTION FOR LEAVE TO APPEAR AS *AMICUS CURIAE*
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     Wild Oats Markets, Inc. ("Wild Oats"), a party interested in the outcome of this litigation and desiring to assist the Court in resolving it, hereby files this motion for leave to appear as *amicus curiae* and to present argument in opposition to the cross-motion for summary judgment filed in this matter [dkt. 10] by the United States Department of Agriculture and Secretary of Agriculture Mike Johanns (together, "the USDA").

**Reason to Appear**

     Wild Oats submits this motion to address one point asserted in the USDA cross-motion: that testing for bovine spongiform encephalopathy ("BSE") is "worthless" when performed for food safety or marketing purposes. *See* USDA Consolidated Memorandum in Support of Cross-Motion ("USDA Mem."), at 1, 5, 42. As discussed below, testing of cattle for BSE would eliminate from the food supply meat from animals with elevated levels of this disease. Consumers would therefore benefit from testing and from being informed about it through truthful, nonmisleading marketing programs.

7235528_1

## Position of the Parties on this Motion

Prior to filing this motion counsel for Wild Oats sought consent from both counsel to Creekstone and counsel to USDA. Counsel for Creekstone advised that Creekstone had no objection to Wild Oats' participation in this matter as *amicus curiae*. Counsel for USDA advised that the government objected to Wild Oats' participation in the case as *amicus curiae*.

## Interest of Wild Oats

Wild Oats is a leading national retailer of natural and organic food. The company operates 74 full service supermarkets in 23 states, each offering consumers a wide variety of the highest quality food, health and wellness products. The company was founded in 1987 and its mission is to enhance the lives of its customers, employees, and shareholders by operating a successful business based on products and education that support health and well-being.

Wild Oats uses great care in selecting the products it offers for sale to consumers. The company's commitment to quality is unsurpassed in the industry, and it uses rigorous criteria based on scientific research to ensure that all of the products it sells are made naturally, without artificial colorings, preservatives, flavorings or other synthetic additives. Wild Oats strives to feature products that contribute to its customers' health and well-being, and does so by partnering with product manufacturers and vendors that meet rigorous environmental and social standards.

Wild Oats is also responsive to its customers' concerns. At the forefront of those concerns is the desire to know that foods Wild Oats carries are wholesome, nutritious and safe. Wild Oats therefore makes every effort to ensure that they are. The company carefully selects its suppliers with this consideration in mind, and bases its decisions regarding product selection on the most current and reliable scientific research available. Wild Oats also monitors industry trends and scientific developments so it is knowledgeable about the issues affecting consumers.

**Facts Regarding BSE and Testing**

Among the issues of greatest concern to Wild Oats customers in recent years has been BSE. This disease occurs when healthy cattle consume feed containing protein derived from other cattle infected with BSE. The disease, which is fatal in cattle, attacks their brains, leads to degeneration of their mental and physical abilities, and ultimately causes their death.

BSE is of concern to consumers because the consumption of meat tainted with BSE is believed to cause a fatal human disease, variant Creutzfeldt-Jakob Disease ("vCJD"). Over the past twenty years, nearly 200 cases of vCJD have been identified, and most of these are believed to have resulted when consumers ate beef products contaminated with BSE.

Because of this risk to public health, the federal government has taken several steps to reduce the chances that consumers will exposed to beef infected with BSE. For example, the government has banned certain "specified risk materials" ("SRM") derived from older cattle from use as human food. SRM include animal parts in which BSE concentrations are known to be greatest in diseased cattle, such as the brain, spinal cord and intestines. In addition, the government has prohibited the use of meat and other bovine tissues from being added to cattle feed. The government has also conducted testing of older and visibly impaired cattle to help assess the level of incidence of BSE within the domestic cattle herd.

These measures, however, have not eliminated the risk that American consumers could contract vCJD from consuming beef infected with BSE. In fact, the government's restrictions on the use of beef tissues in cattle feed have been criticized as being insufficient to prevent cross-contamination by feed intended for non-ruminants, such as hogs and chickens, in which beef tissues can be used.[1] Questions have also been raised whether the government's feed ban has

---

[1] In October 2005 the U.S. Food and Drug Administration proposed to ban SRM from being used in feed given to any animals. *See* 70 Fed. Reg. 58570 (Oct. 6, 2005). That proposal has not been finalized.

been adequately enforced.[2]  In addition, the government recently cut back the amount of testing it is doing by a substantial margin.[3]  Over the past several years at least three cattle infected with BSE have been identified in the domestic herd, and the government has continued to allow cattle imports from countries in which the incidence of BSE is believed to be greater than in the United States, including Canada.[4]

Protocols exist today to test cattle for BSE.  In fact, the government follows these protocols in its own limited testing program.  Such testing is performed at the time of slaughter and meat from tested cattle is either held or tracked pending receipt of test results.  *See* Creekstone Mem., at 11.  As the government admits, these tests are sensitive enough to identify cattle infected with BSE several months before they show visible signs of the disease.  *See* USDA Mem., at 5-6.

Because of concerns relating to BSE, many other developed countries where BSE has been found now test all or a large portion of the cattle processed for human consumption for BSE.  In Europe, several countries test all cattle in excess of 24 months of age when they are slaughtered, and others test all cattle in excess of 30 months of age.  These countries perform these tests for one reason:  because testing provides additional assurance that cattle infected with BSE are removed from the food supply.

## Argument

By prohibiting beef processors in the United States from testing cattle for BSE, USDA is preventing them from acquiring information regarding the safety and quality of the products they

---

[2] *See* "Beef Delays in Mad Cow Protection," Consumer Reports (January 2005), at 29 (Ex. 1).

[3] *See* "USDA to Cut Back BSE Testing Program," University of Minnesota Center for Infectious Disease Research and Policy ("CIDRAP") (July 20, 2006) (Ex. 2).

[4] *See* "Canada Finds Eighth Case of BSE," CIDRAP (Aug. 23, 2006) (Ex. 3).

sell, and preventing Wild Oats and other retailers from providing that information to consumers. Consumers want that information and would use it in making their purchasing decisions, and there is no valid reason for the government to prevent them from having it.

      1.      Speech concerning products offered for sale to consumers is protected by the First Amendment.  *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566 (1980); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 763 (1976).  The free flow of information about consumer products is "indispensable to the proper allocation of resources in a free enterprise system because it informs the numerous private decisions that drive the system."  *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 481-82 (1995) (citation and quotation omitted).  In fact, a consumer's interest in receiving this information "may be as keen, if not keener by far, than his interest in the day's most urgent political debate."  *Id.*

      2.      The government's ban on BSE testing implicates the First Amendment rights of food retailers and consumers because the purpose and inevitable effect of that ban is to prevent retailers from communicating information on products it sells, and to prevent consumers from receiving it.  *See United States v. O'Brien,* 391 U.S. 367, 377, 384-85 (1967); *see also City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417-19 (1993); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 582-83 (1983); *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 94-95 (1977).  In this case, USDA's response to Creekstone's request to conduct BSE testing, and the brief the government has filed in this case, leave no doubt that USDA's policy is achieving its intended result:  to prevent producers from gathering and disseminating BSE test data.  *See* USDA Mem., at 1, 42-44 & n.24.

3. USDA claims that representations about test results would be "misleading" because "a negative test on a young cow cannot be interpreted to mean that the cow is necessarily 'BSE-Free.'" *Id.* at 5-6. Assuming this is true, Creekstone has not said it wants to tell its customers that its products are "BSE-Free." Nor from this one example is it reasonable to assume that every <u>other</u> statement that might be made about BSE testing is necessarily misleading so as to warrant a blanket ban. While complete prohibitions prevent misleading speech, they also prevent truthful, nonmisleading speech, and the government may not adopt one "simply to spare itself the trouble" of distinguishing the former from the latter. *See Edenfield v. Fane,* 507 U.S. 761, 775-77 (1993); *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 646 (1985).

4. USDA's ban on BSE testing advances no substantial governmental interest. According to the agency, a ban is needed (a) "to maintain domestic and international confidence in U.S. cattle and beef products," (b) because if individual producers were allowed to test their products for BSE, other producers would have no choice but to test their products as well, and (c) to prevent consumers from thinking that "they should pay more for beef from BSE-tested cattle."[5]

a. The claim that "confidence in American beef would decline" is conclusory and provides no basis for restricting the right of beef processors and retailers to communicate truthful information about their products to consumers. *See Edenfield,* 507 U.S. at 770 (government "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree . . . [and] mere speculation or conjecture" is not enough); *Zauderer,* 471 U.S. 648-49 ("unsupported assertions" about possible harms cannot justify speech

---

[5] *See* Declaration of John D. Stewart ¶¶ 12-14 (Exhibit 1 to Creekstone's Motion for Summary Judgment); *id.* Attachment 7 (Letter from B. Hawks to J. Stewart, June 1, 2004); USDA Mem., at 7-10, 51.

restrictions).  In fact, it is reasonable to assume that the only way consumer confidence in the domestic beef supply would be shaken is if testing revealed a significant incidence of BSE in the domestic cattle herd.  If that is true, then there is a far greater reason to allow such testing than there could ever be to prevent it.

   b. Fear about industry impact from purchasing decisions does not permit USDA to ban information that might drive those decisions.  Whether, or the extent to which, other beef processors felt compelled to test their products for BSE is a matter that should be left to market forces.  If, by their purchasing decisions, consumers signal that they want beef that has been tested, then other processors will follow suit.  If some consumers, but not all, demonstrate such a preference, then some processors, but not all, will test.  Moreover, those processors who do not test can always market their products based on other factors.  *See Virginia Board,* 425 U.S. at 770 (if one store is allowed to advertise drug prices, second store's business could be hurt, but "nothing prevents [second store] from marketing [its] own assertedly superior product, and contrasting it with [first store's]"); *see also Peel v. Attorney Registration and Disciplinary Comm'n,* 496 U.S. 91, 101 & n.10 (1990) (attorney can advertise he is "certified" by trial advocacy organization, despite potential negative inference with respect to other, uncertified, attorneys).  This process, based on the free flow of commercial information, ensures that products available for sale are ones that consumers want to buy.  Banning processors from obtaining and communicating information about their products interferes with this process and undermines the efficient functioning of the market.  *See Ibanez v. Florida Department of Business and Professional Regulation,* 512 U.S. 136, 144-48 (1994); *Zauderer,* 471 U.S. at 640 n.9; *Bates v. State Bar of Arizona,* 433 U.S. 350, 364 (1977).

c. Speculation about how consumers might value information about BSE testing is not a valid basis to ban producers from communicating it. "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart,* 517 U.S. at 502. The "commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented." *Id. See also Edenfield,* 507 U.S. at 767.

Indeed that is precisely the government's approach with respect to scores of other products available on the market today: consumers, not government regulators, decide whether particular features or representations are worth any increase in cost. For example, stores today contain a vast array of products with characteristics that some consumers consider valuable, but which other consumers consider unimportant. The Court might take judicial notice of such products, based on nothing more than a walk through virtually any supermarket in America, where it will find a wide array of foods that contain "no artificial flavors, colorings, or preservatives," others made "without use of synthetic pesticides, fertilizers, or hormones," and still more that are "caffeine free," "chlorine free," arsenic free," "certified," "kosher," "dolphin-safe," "organic," "natural," "hand-picked," "vine-ripened," "sun-dried," "stone ground," "cold processed," "aged for three years," and "filtered through layers of ancient rock."[6]

---

[6] *See generally* 7 U.S.C. § 205.105 (USDA rules allow product manufacturers to label and advertise foods as "organic" if they are produced without use of "synthetic substances and ingredients"); 21 C.F.R. § 101.29 (FDA rules allow food to be labeled as "kosher," as long as they "meet certain [unspecified] religious dietary requirements."); http://www.fsis.usda.gov/Fact_Sheets/Meat_&_Poultry_Labeling_Terms/index.asp (USDA fact sheet on labeling terms allowed, including "certified" as an official mark of "quality").

In sum, USDA has not articulated in its Motion for Summary Judgment any substantial governmental interest that is served by its policy of banning beef processors from obtaining and communicating BSE test data to consumers. For all the reasons set forth in Creekstone's Opposition to that motion, and for the reasons set forth herein, the Court should declare that policy null and void.

## Conclusion

For all the foregoing reasons, Wild Oats seeks leave to appear as *amicus curiae* in this matter, and to present the arguments in this brief, upon which it urges the Court to deny USDA's Motion for Summary Judgment.

Respectfully submitted,

/s/ Thomas B. Smith
Thomas B. Smith
D.C. Bar No. 412192
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW
Washington, DC  20005
(202) 508-4600

Counsel for Wild Oats Markets, Inc.

Date:  November 3, 2006

Counsel of Record Served by CM/ECF
Pursuant to Local Rule 5.4(d)