# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | |
| CREEKSTONE FARMS PREMIUM BEEF, LLC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-544 (JR) |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| AGRICULTURE, and MIKE JOHANNS, IN HIS ) | |
| CAPACITY AS THE SECRETARY OF ) | |
| AGRICULTURE, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Despite plaintiff's efforts to ignore the broad grant of authority the Virus-Serum-Toxin Act, 21 U.S.C. §§ 151-159 ("VSTA"), vests in the United States Department of Agriculture ("USDA") to implement its general terms, a straightforward reading of VSTA's provisions indicates that USDA acted well within its statutory authority when it refused to permit the sale of test kits for bovine spongiform encephalopathy ("BSE") (commonly known as "mad cow disease") for use in plaintiff's proposed plan to conduct its own private testing of all of its cattle for slaughter for marketing purposes.

As an initial matter, however, defendants USDA and Mike Johanns, the Secretary of Agriculture (collectively "defendants"), are entitled to summary judgment because Japan's recent lifting of its ban against U.S. beef renders this case moot. Although plaintiff now attempts to shift the focus of its complaint away from its desire simply to regain its "ability" to sell beef in Japan, it is clear that at the time plaintiff filed this action, its overarching concern was with resuming its exports of beef to Japan. And with respect to plaintiff's now apparent heightened interest in increasing its foreign and domestic sales, plaintiff still has not provided sufficient evidence to establish that conducting its own BSE testing would necessarily result in increasing its sales to their previous levels, thus preventing plaintiff from having standing to assert its claims.

In any event, as alluded to above, USDA's regulations authorizing restrictions on the uses for which biological products may be sold, including diagnostic tests in general and BSE test kits in particular, are permissible implementations of VSTA's language, and are not based solely on VSTA's absence of express prohibitions against such regulations, as contended by plaintiff. To the contrary, USDA relied on its broad delegation of expert authority under VSTA

and applied its expertise in promulgating the rules and regulations challenged by plaintiff.

Under Chevron, these reasonable interpretations of VSTA's terms are entitled to deference

regardless of whether the regulations were promulgated contemporaneously with the passage of

VSTA or were accompanied with an extensive explanation.  Accordingly, summary judgment

should be granted in favor of defendants.

## ARGUMENT

### I.   JAPAN'S LIFTING OF ITS BAN AGAINST U.S. BEEF RENDERS PLAINTIFF'S CASE MOOT.

In light of Japan's decision in July 2006 to lift its ban against U.S. beef, a decision which

came after plaintiff filed its complaint in this action, it is not surprising that plaintiff now strives

to emphasize its supposed need to conduct its own BSE testing as a means to increase other

foreign and domestic sales rather than as a means to gain access to Japan's beef market once

again, which was the featured goal of its complaint.  See Reply in Support of Plaintiff's Motion

for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment at

4-6 (dkt. no. 14) (Nov. 3, 2006) ("Pl.'s Reply and Opp'n").  Plaintiff, however, cannot avoid its

overriding concern with opening up the Japanese beef market to U.S. beef that plaintiff clearly

expressed in its complaint in this action.  See Complaint for Declaratory and Injunctive Relief ¶

5 (dkt. no. 1) (Mar. 23, 2006) ("Complaint") (alleging that "Creekstone's ability to continue to

sell to Japan and other foreign markets, which constituted a major portion of Creekstone's

customer base prior to the discovery of BSE in the United States in December 2003, has been

compromised by its inability to offer to test cattle from which it would supply those foreign

markets.") (emphasis added).  Statements in the original declaration of plaintiff's former CEO,

John Stewart, confirm that plaintiff's fundamental purpose for seeking to test its own cattle for

BSE was to be able to resume exporting its beef to Japan.  <u>See</u> Declaration of John D. Stewart ¶ 17 (Exhibit 1 to Pl.'s Motion for Summary Judgment) (dkt. no. 6) (July 15, 2006) (stating that "[a]s a direct result of the <u>loss of its export market in Japan</u> based on the perception of the Japanese that U.S. beef products might be contaminated with BSE, Creekstone has suffered losses of revenue amounting to more than $200,000 per day.") (emphasis added).

While plaintiff now alleges that, despite Japan's lifting of its ban on U.S. beef and plaintiff's resumption of its beef exports to Japan, it still needs to perform its own BSE testing in order to increase its sales domestically and in other international markets, <u>see</u> Pl.'s Reply and Opp'n at 4-6, those claims were, at most, mentioned merely in passing in plaintiff's complaint and now are being emphasized only in an attempt to save its complaint from being moot.  As demonstrated by plaintiff's complaint, however, the fact remains that the central purpose for plaintiff's lawsuit and its desire to conduct its own BSE testing was to regain access to the Japanese market.  Now that the Japanese market is open again, an order from the Court allowing plaintiff to perform BSE testing on its own cattle would not provide any meaningful relief; thus, plaintiff's case should be dismissed as moot.  <u>See The Honorable John H. McBryde v. Committee to Review Circuit Counsel and Disability Orders of the Judicial Conference of the United States</u>, 264 F.3d 52, 55 (D.C. Cir. 2001) (stating that "[i]f events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").

## II.    PLAINTIFF HAS NOT SATISFIED ITS BURDEN OF DEMONSTRATING CAUSATION AND REDRESSABILITY TO WARRANT STANDING TO PURSUE ITS CLAIMS.

Even if the Court finds that plaintiff's case is not moot, plaintiff lacks standing to pursue its alternative theories of injury allegedly stemming from reduced domestic and international

sales of beef because plaintiff has failed to offer sufficient credible evidence that the cause of its

injuries is its inability to conduct its own BSE testing, and that if it were allowed to perform its

own BSE tests these injuries would be remedied effectively.[1]

      Plaintiff's own statements indicate that the real cause of its purported economic injuries

is the actual discovery of BSE in the United States, not plaintiff's inability to perform its own

BSE testing on its cattle.  In his supplemental declaration, plaintiff's former CEO, John Stewart,

states that "[b]ecause of a prior discovery of bovine spongiform encephalopathy ("BSE")

infection in a Canadian-raised cow in Washington State on December 23, 2003, the Korean and

Japanese markets were closed to U.S. beef exporters until very recently."  Stewart Supp. Decl. ¶

1; see also id. ¶ 4 (asserting that "the fact is that Japanese consumption of U.S. beef is now only

a tiny fraction of what it was before the discovery of BSE in the United States.").  Clearly,

plaintiff was selling plenty of beef without conducting any BSE testing prior to the discovery of

BSE in cattle in the United States.  Accordingly, plaintiff's purported injury of diminished beef

---

[1] Plaintiff's novel attempt to define its theory of injury as something other than an economic one is unavailing.  Plaintiff claims that "its basic injury is that it is prohibited from testing cattle for BSE in order to enhance its brand and distinguish Creekstone beef in the marketplace and to fulfill the demands of its customers, many of whom will buy more beef at higher prices if it is tested for BSE."  Pl.'s Reply and Opp'n at 7.  While plaintiff alludes to general goals such as "enhancing its brand," clearly plaintiff's concerns fundamentally all boil down to seeking to increase its sales and revenues, which plaintiff alleges have been diminished since the discovery of BSE in the United States.  See, e.g., id. at 5; Supplemental Declaration of John D. Stewart (Exhibit 1 to Pl.'s Reply and Opp'n) ("Stewart Supp. Decl.") ¶¶ 4, 8 (asserting that plaintiff's sales of beef to Japan since the ban was lifted are much less than what they were before the ban was imposed).  And while economic injury, to be sure, is not the only type of injury sufficient to warrant standing, as plaintiff notes, see Pl.'s Reply and Opp'n at 7, it clearly is the type of injury that plaintiff is relying on in order to maintain this action.  Accordingly, plaintiff's theory that its mere inability to conduct private BSE testing, without more, is sufficient to qualify as injury in fact is not valid, and plaintiff must establish that its economic injuries were caused by its inability to conduct its own BSE testing and would be redressed if it were allowed to perform such testing in order to have standing to bring this action.

sales is not fairly traceable to USDA's prohibition against private BSE testing of cattle. See

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (explaining that second prong of

three-part test for standing is whether plaintiff has demonstrated that the injury is fairly traceable

to the defendant's action). Instead, the real cause of any of its economic injuries is the discovery

itself of BSE in the United States. Plaintiff thus lacks standing to assert this action on this basis

alone.

Furthermore, despite plaintiff's belief that BSE testing is the panacea that will solve all of

its problems, plaintiff has not satisfied its burden of offering sufficient credible evidence that

conducting its own BSE testing on all of its cattle for slaughter would adequately redress its

alleged economic injuries. As mentioned above, plaintiff has repeatedly asserted that its sales of

beef have dropped dramatically since the discovery of BSE in the United States, and it has

further alleged that despite the re-openings of several international markets to U.S. beef, such as

Japan's and South Korea's, it has not sold (at least not yet) as much beef as it was selling before

the bans were imposed. See Pl.'s Reply and Opp'n at 5 (indicating that "despite Japan and

Korea lifting their respective U.S. beef bans, Creekstone (and other U.S. beef producers) still

cannot sell as much U.S. beef as before."); Stewart Supp. Decl. ¶ 4 (expressing concern that

"Creekstone will be unable to attain its previous levels of exports to Japan without some means

to assure Japanese consumers in response to their concerns about BSE and U.S. beef."").

Plaintiff, however, has failed to provide any compelling evidence establishing that if plaintiff

were able to perform its own BSE testing on its cattle, its sales would, in fact, return to the levels

they were at before the discovery of BSE in the United States. Plaintiff relies heavily on several

declarations from an assortment of its customers for support that BSE testing would redress its

-5-

injuries. <u>See</u> Declarations of Plaintiff's Customers (attached as Exhibits 2-6 to Pl.'s Reply and Opp'n). While each of these declarations, in the same cursory cookie cutter fashion[2], generally suggests that plaintiff's customers would purchase more beef at higher prices if plaintiff's beef came from cattle tested for BSE, none of the declarations specifically indicates that plaintiff's sales of beef would return to the same level they were prior to the discovery of BSE in cattle in the United States.[3] Simply increasing its beef sales by some minimal and undefined amount, even if true, is not sufficient to redress plaintiff's injuries effectively. In addition, plaintiff offers no evidence indicating that if plaintiff were allowed to perform BSE testing then South Korea would ease its restrictions on bone fragments that plaintiff contends is a significant impediment to selling beef there. <u>See</u> Stewart Supp. Decl. ¶ 5. Accordingly, plaintiff has not carried its burden of establishing that its purported injuries are likely to be redressed by a court order permitting plaintiff to test all of its cattle for BSE. <u>See</u> <u>Lujan</u>, 504 U.S. at 560-61 (explaining that third prong of three-part test for standing is whether plaintiff has demonstrated that its injury is likely to be redressed by a favorable court decision).[4]

---

[2] The mass-produced nature of plaintiff's customers' declarations is particularly evident in the declaration from Parker International, which still contains the brackets around the limited portions of information that apparently were to be supplied by the customers. <u>See</u> Exhibit 4 to Pl.'s Reply and Opp'n.

[3] Furthermore, each of these declarations is based on rank speculation that the declarant's own customers would be willing to purchase more beef at higher prices if it were tested for BSE. <u>See</u> <u>id.</u> There is no evidence, however, indicating how much more such consumers would be willing to pay for such tested beef and how much additional volume of beef they would be willing to purchase.

[4] Plaintiff's additional assertion that it is suffering an actual injury by being denied the ability to expand its domestic sales of beef by USDA's decision not to permit plaintiff to conduct its own BSE testing lacks merit. <u>See</u> Complaint ¶ 5. Plaintiff is not contending that its domestic sales of beef have decreased; rather, plaintiff is contending that it is being denied an opportunity to increase its domestic sales beyond what they currently are. Such claims are inherently

III.   **VSTA'S LANGUAGE AUTHORIZES USDA'S REGULATIONS PROVIDING FOR RESTRICTIONS ON THE USES FOR WHICH BIOLOGICAL PRODUCTS MAY BE SOLD.**

Contrary to plaintiff's assertions, USDA's authority to promulgate regulations permitting restrictions on the uses for which biological products may be sold is not based merely on the fact that VSTA does not expressly prohibit such restrictions on the uses of products.  See Pl.'s Reply and Opp'n at 11.[5]  Instead, VSTA's clear language authorizes USDA to restrict the "preparation, *sale*, barter, exchange, or shipment . . . of any worthless, contaminated, dangerous, or harmful virus, serum toxin, or analogous product for *use* in the treatment of domestic animals . . . ."  21 U.S.C. § 154 (emphasis added).  The statute thus authorizes, inter alia, restrictions on the sale or shipment of viruses, serums, toxins, or analogous products for uses that would be worthless (or dangerous or harmful) in the treatment of disease in domestic animals.  In other words, USDA may regulate the manufacturers' ability to sell biological products in order to prevent such products from being used in a manner that would be worthless, dangerous, or harmful in the treatment of domestic animals.  Accordingly, contrary to plaintiff's assertions, restrictions

_____

speculative, and courts have frequently denied standing based on such theories.  See, e.g., Gettman v. DEA, 290 F.3d 430, 436 (D.C. Cir. 2002) (finding that contention that DEA's decision not to reschedule marijuana precluded plaintiff from providing consulting services to more customers was purely speculative and noting that "such speculative claims dependent on the actions of third parties do not create standing for the purposes of establishing a case or controversy under Article III.").

[5]  Plaintiff's contention that USDA's reliance on Reno v. Flores, 507 U.S. 292 (1993) is misplaced is incorrect.  See Pl.'s Reply and Opp'n at 11 n.4.  Reno involved a facial challenge to a regulation, and while USDA has applied the regulations in question here, plaintiff's claim in Count 1 also presents a facial challenge to the regulations in this case by alleging that the regulations were promulgated in excess of statutory authority.  See Complaint ¶¶ 27-36. Accordingly, as indicated in Reno, plaintiff must demonstrate that "no set of circumstances exist under which the regulation[s] would be valid."  Reno, 507 U.S. at 300-01.  As explained herein, plaintiff has failed to satisfy this burden.

pertaining to the sale of biological products for use in the treatment of domestic animals do not involve an entirely new class of activities not mentioned in VSTA, nor does the authority for such restrictions emanate from a mere mousehole in VSTA.  See Pl.'s Reply and Opp'n at 13. Instead, as demonstrated, VSTA's language explicitly contemplates USDA restrictions prohibiting sales or shipments of biological products for worthless uses.  As a result, USDA's regulation codified at 9 C.F.R. § 102.5(d), which allows for restrictions to be placed on the uses for which manufacturers of biological products may prepare, sell, barter, exchange, or ship their products, is explicitly authorized under section 154 of VSTA.

Plaintiff continues to portray regulation 102.5(d) and USDA's restrictions on product licenses for BSE test kits found in Notice No. 04-08 as unauthorized direct restrictions on buyers' uses of biological products and BSE test kits.  To the contrary, regulation 102.5(d) and the restrictions in Notice No. 04-08 do not regulate *buyers* of biological products like plaintiff. Instead, they regulate *manufacturers* of biological products and BSE test kits by placing restrictions on the product licenses manufacturers need in order to be able to produce biological products.  And, as discussed, they allow for restrictions to be placed on the uses for which the manufacturers may *sell* their products.  See 9 C.F.R. § 102.5; Notice No. 04-08 (attached as Exhibit 5 to Consolidated Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Cross-Motion")).

Importantly, plaintiff does not contest that VSTA authorizes restrictions on the "sale" of biological products, which is exactly what the regulations do.  USDA's restrictions on product licenses for BSE test kits in particular indicate that sales of such tests kits, in addition to their

use, are restricted to government labs approved by USDA.  See Notice No. 04-08.  Thus,

USDA's decision not to allow BSE test kit manufacturers to sell their test kits to plaintiff clearly

is authorized under VSTA.

       In addition, USDA's authority to impose restrictions on the uses for which biological

products may be sold also stems from VSTA section 154's prefatory phrase "as may be necessary

to prevent," which authorizes USDA to regulate beyond just the "preparation, sale, barter,

exchange, or shipment" of products.  See 21 U.S.C. § 154.  Plaintiff asserts that USDA offered

no case law or other support for the proposition that a phrase like "as may be necessary to

prevent" reasonably can be interpreted to expand an agency's authority to regulate beyond the

specifically enumerated statutory terms.  See Pl.'s Reply and Opp'n at 13-14.  Plaintiff's

assertion, however, is flatly wrong.  USDA specifically cited NLRB v. Beverly Enterprises-

Massachusetts, Inc., 174 F.3d 13, 32 (1st Cir. 1999), which, in relevant part, found that the terms

of 29 U.S.C. § 156 authorizing the NLRB "to make such rules and regulations *as may be

necessary* to carry out the provisions of the Act" grant the NLRB broad rulemaking authority.

See Defendants' Cross-Motion at 27 (emphasis added).  Moreover, defendants also discussed the

Supreme Court's decision in United States v. O'Hagan, 521 U.S. 642, 666-673 (1997), which

found that a statute that instructed the SEC "'by rules and regulations [to] define, and prescribe

*means reasonably designed to prevent*, such acts and practices as are fraudulent, deceptive, or

manipulative'" granted the SEC sufficient latitude to regulate activities that were not themselves

fraudulent, deceptive, or manipulative as 'reasonably designed' means of preventing fraudulent,

deceptive, or manipulative acts (quoting 15 U.S.C. § 78n(e)) (emphasis added).  See Defendants'

Cross-Motion at 33.[6]

Furthermore, plaintiff's reliance on <u>Dolan v. United States Postal Service</u>, 126 S. Ct. 1252 (2006), to support its assertion that the mention of a group of items in a statute implies the exclusion of other items is completely misplaced with respect to section 154 of VSTA. <u>See</u> Pl.'s Reply and Opp'n at 14-15. The statutory provision at issue in <u>Dolan</u> limited exceptions to the waiver of sovereign immunity to "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." 28 U.S.C. § 2680(b). Unlike VSTA, this statute does not contain any modifying phrases comparable to "as may be necessary to prevent" that would expand an agency's authority to regulate beyond the enumerated list of items.

Plaintiff's additional argument that the enactment of the Agricultural Bioterrorism Protection Act of 2002, 7 U.S.C. § 8401 ("ABPA"), which, in part, authorizes USDA to issue regulations governing the possession and use of biological agents that USDA determines pose a severe threat to animal or plant health, is evidence that VSTA does not authorize restrictions on the uses of biological products is without merit. <u>See</u> Pl.'s Reply and Opp'n at 15. In the first place, the two statutes are directed at different materials that present utterly different concerns. The fact that Congress recently authorized USDA to restrict the possession and use of dangerous biological agents that could be used as instruments of bioterrorism says nothing about the scope

---

[6] Plaintiff also asserts that reliance on VSTA's grant of general authority to USDA to issue regulations needed "otherwise to carry out this chapter," 21 U.S.C. § 154, is improper because this phrase was added to VSTA by amendment after the terms of regulation 102.5(d) were first promulgated and the re-enactment doctrine does not apply. <u>See</u> Pl.'s Reply and Opp'n at 27-29. Regardless of whether the re-enactment doctrine strictly applies in this situation though, Congress's addition of the language "otherwise to carry out" further evidences Congress's intent to vest USDA with expansive authority to regulate under VSTA and supports its imposition of restrictions on the uses for which biological products may be sold.

of authority that Congress previously granted USDA to restrict sales of biological products for worthless uses that are marketed to farmers for the treatment of their animals.  And to the extent that the two statutes may overlap, plaintiff's argument rests on the faulty assumption that different federal statutes cannot grant an agency overlapping regulatory authority.  To the contrary, it is a longstanding principle of statutory interpretation that "[w]hen two federal statutes overlap, courts <u>must</u> give effect to both, if at all possible."  <u>United States v. Philip Morris Inc.</u>, 263 F. Supp. 2d 72, 76 (D.D.C. 2003) (emphasis in original).  "Mere overlap between or among federal statutes is not enough to show that one of them is meant to be exclusive over a given subject matter; one of the statutes 'may be merely affirmative, or cumulative, or auxiliary.'"  <u>Id.</u> (quoting <u>United States v. Borden Co.</u>, 308 U.S. 188, 198 (1939)).  There is nothing in conflict between ABPA and VSTA, and ABPA itself recognizes that some of its provisions may overlap with VSTA and exempts products that may already be regulated under VSTA and other overlapping statutes.  <u>See</u> 7 U.S.C. § 8401(g)(1)(C)(i) & (ii).  Thus, simply because another statute authorizes USDA to adopt restrictions on the uses of biological products relating to animals does not at all suggest that restrictions on the sales of such products to prevent them from being used in a worthless manner are not also authorized under VSTA.

Plaintiff also contends that the 1913 Senate Report's explicit indication that one of VSTA's purposes is to "control[] the use, by preventing the interstate shipment, of similar dangerous and worthless products," <u>see</u> S. Rep. No. 62-1288, at 2 (1913), does not support USDA's regulations on the uses for which biological products may be sold because this phrase was not set forth in the statute itself and it merely contemplates prohibiting interstate shipments of such products.  <u>See</u> Pl.'s Reply and Opp'n at 16.  As explained above, however, section 154 of

-11-

VSTA does explicitly authorize restrictions on the uses for which biological products may be sold, and the Senate Report clearly indicates that preventing the worthless use of such products is a permissible goal of sales restrictions under the statute and supports the reasonableness of USDA's interpretation of VSTA.

As demonstrated, the language of section 154 of VSTA authorizes USDA's regulations providing for restrictions on the uses for which biological products may be sold.[7]

## IV.    VSTA'S LANGUAGE AUTHORIZES USDA'S REGULATIONS PERTAINING TO DIAGNOSTIC TESTS.

In its argument that USDA's regulations regarding diagnostic tests are invalid, plaintiff again repeats the proposition that it is improper for an agency to presume it has authority to regulate under a statute based merely on the fact that the statute does not expressly forbid such regulation.  See Pl.'s Reply and Opp'n at 18.  This argument, however, is misguided because USDA's authority to regulate diagnostic tests under VSTA is not based merely on the fact that VSTA does not expressly forbid regulation of diagnostic tests.  Rather, USDA's authority is based on VSTA's general language authorizing regulations pertaining to any "virus, serum,

---

[7] Plaintiff argues that even though its complaint did not assert a challenge specifically to USDA's regulation codified at 9 C.F.R. § 104.1, which requires a permit to import a biological product into the United States, its complaint did challenge USDA's regulations generally codified at 9 C.F.R. Chapter 1 Subchapter E, which includes § 104.1.  See Pl.'s Reply and Opp'n at 25 n.19.  The complaint's general reference to an entire subchapter of regulations, however, does not provide defendants with "fair notice of what plaintiff's claim is and the grounds upon which it rests" and thus fails to satisfy the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure.  See Conley v. Gibson, 355 U.S. 41, 47 (1957).  Furthermore, plaintiff offers no explanation for why it did not specifically challenge regulation 104.1 in its complaint, but did so for the first time in its motion for summary judgment.  This practice is not allowed and the Court should not consider plaintiff's challenge to regulation 104.1.  See, e.g., Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 91 n.16 (D.D.C. 2006) (refusing to consider claims raised by plaintiff for the first time at the summary judgment stage).

toxin, or analogous product for use in the treatment of domestic animals." <u>See</u> 21 U.S.C. § 154.

While diagnostic tests are not directly equivalent to viruses, serums, or toxins, USDA reasonably

interpreted VSTA's broad, catchall phrase "analogous product for use in the treatment of

animals" to include diagnostic tests. <u>See</u> 9 C.F.R. § 101.2. Thus, VSTA's general terms

authorize regulation of diagnostic tests.

     Plaintiff also argues that diagnostic tests are not "used in the treatment of domestic

animals" because diagnosis, it claims, is distinct from treatment. <u>See</u> Pl.'s Reply and Opp'n at

18-19. Plaintiff asserts that the cases cited by defendants – <u>Pegram v. Herdrich</u>, 530 U.S. 211,

228 (2000) and <u>Miller v. AT&T Corp.</u>, 250 F.3d 820, 830-31 (4th Cir. 2001) – provide no support

for defendants' position and treat the terms "diagnosing" and "treating" as separate activities.

<u>See</u> Pl.'s Reply and Opp'n at 19. To the contrary, these cases suggest that diagnosis is an aspect

of treatment and, at a minimum, support the reasonableness of USDA's determination that

diagnostic tests can be used in the treatment of domestic animals. <u>See</u> <u>Pegram</u>, 530 U.S. at 228

(explaining that treatment decisions "are choices about how to go about diagnosing and treating

a patient's condition . . . ."); <u>Miller</u>, 250 F.3d at 830-31 (finding that physician's evaluation of

patient's condition through physical examination and blood test constituted "treatment").[8] In any

event, even if diagnosis is considered as an activity distinct from treatment, diagnostic products

clearly are *used in* the treatment of animals. <u>See</u> 21 U.S.C. § 154 (statute reads "for use in the

---

     [8] Plaintiff acknowledges that in <u>Miller</u>, the Fourth Circuit gave deference to an agency
determination that the statutory phrase "continuing treatment by a health care provider" is broad
enough to cover diagnostic examinations and evaluations to determine if a serious health
condition exists. <u>See</u> Pl.'s Reply and Opp'n at 19. As such, <u>Miller</u> is directly applicable to the
instant case, where USDA has determined that the statutory phrase in VSTA "analogous product
for use in the treatment of domestic animals" is broad enough to cover diagnostic tests.

treatment of domestic animals" not simply "for treatment of domestic animals").

Plaintiff's additional contentions that USDA assumes that just because a product is "used in the treatment of domestic animals" it is analogous to a virus, serum, or toxin and that USDA has removed any requirement that diagnostic tests be similar in function to viruses, serums, or toxins are incorrect.  See Pl.'s Reply and Opp'n at 19-21.  As noted in defendants' prior brief, USDA recognizes that diagnostic tests need to be "analogous" to viruses, serums, or toxins to qualify for regulation under VSTA.  See Defendants' Cross-Motion at 36.  And the declaration of Dr. Byron Rippke clearly establishes that diagnostic tests are similar in function to viruses, serums, or toxins in that they frequently rely on the interaction of antibodies and antigens to stimulate, modulate, or detect the immune system of an animal.  See Rippke Decl. ¶¶ 5-6 (Exhibit 2 to Defendants' Cross-Motion).  Accordingly, USDA's regulations regarding diagnostic tests are valid implementations of VSTA's statutory terms.

## V.    USDA'S INTERPRETATIONS OF VSTA ARE ENTITLED TO SUBSTANTIAL DEFERENCE.

Plaintiff's arguments that USDA's interpretations of VSTA authorizing regulations pertaining to diagnostic tests and to the uses for which biological products may be sold do not merit court deference overlook the broad grant of authority that VSTA provides to USDA and improperly elevate the factors regarding deference discussed in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), into requirements for deference.  As discussed in defendants' prior brief, USDA's reasonable interpretations of VSTA in exercise of its rulemaking authority under the statute are entitled to deference as such under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) , regardless of the factors discussed in Skidmore.

Plaintiff first makes the conclusory assertion that USDA's interpretations unduly expand

-14-

the scope of its authority beyond the text of VSTA and therefore are entitled to no deference at all.  See Pl.'s Reply and Opp'n at 21-22.  As explained in greater detail above, however, VSTA's terms reasonably authorize the sale and use restrictions and the regulations regarding diagnostic tests at issue in this action.  See supra sections III and IV.[9]  And nothing in the text of VSTA explicitly prohibits such regulations.  Accordingly, USDA is not claiming expanded authority for itself that is not already reasonably authorized in VSTA's language and in its broad delegation of authority to USDA to make rules carrying the force of law.  See Lynnbrook Farms v. Smithkline Beecham Corp., 79 F.3d 620, 624 (7th Cir. 1996) (explaining that section 154 of VSTA "broadly confers on the USDA" the authority to promulgate regulations); Arnold v. Intervet, Inc., 305 F. Supp. 2d 548, 550 (D. Md. 2003) (stating that the Department of Agriculture has "plenary authority granted by Congress" under VSTA); United States v. Mead Corp., 533 U.S. 218, 230-31 (2001) (finding that "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."); Chevron, 467 U.S. at 843 ("'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'") (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

_____

[9]  With respect to USDA's regulations that control the sales and uses of products that treat domestic animals, moreover, VSTA's language plainly and unambiguously authorizes such regulations, specifically 9 C.F.R. § 102.5(d).  See supra section III.  As a result, the Court must uphold these restrictions as a manifestation of Congress's clear intent to allow USDA to prevent biological products from being sold for ineffective or dangerous uses in the treatment of animals, and there is no need even to determine whether deference is warranted.  See Chevron, 467 U.S. at 842-843 (courts "must give effect to the unambiguously expressed intent of Congress.").

Plaintiff's additional contentions that USDA's statutory interpretations are not entitled to deference because they were not accompanied by extensive explanations and were not made contemporaneously with the passage of VSTA in 1913 incorrectly portray these Skidmore factors as requirements for deference.  See Pl.'s Reply and Opp'n at 22-27.  However, these are just factors that courts may use to help them make the ultimate determination of whether an agency's interpretation is reasonable; they are not each required to be present in order for a regulation to warrant court deference, nor is the presence or absence of one of these factors dispositive on whether deference should be afforded.  Instead, as established more recently in Chevron, where Congress has delegated law-interpreting power to an agency, courts must give deference to any reasonable agency interpretations of silent or ambiguous statutory provisions. See Chevron, 467 U.S. at 843-44; Mead, 533 U.S. at 226-27; Kelley v. EPA, 15 F.3d 1100, 1108 (D.C. Cir. 1994) (indicating that Chevron "sets forth the reigning rationale for judicial deference to agency interpretation of statutes . . . .").  Accordingly, simply because USDA's regulations were not accompanied with extensive explanations or were not all promulgated contemporaneously with VSTA in 1913 does not mean that its regulations are not entitled to Chevron deference as reasonable interpretations of VSTA.[10]  To the contrary, as explained in

---

[10]  Plaintiff's emphasis of the contemporaneousness factor, moreover, lacks merit.  See Pl.'s Reply and Opp'n at 26-27.  Although this factor may be relevant in some cases, to suggest that it is necessary to warrant deference would require all regulations to be adopted nearly simultaneously with the passage of legislation and would inappropriately limit discretion of agencies to refine or improve regulatory approaches to problems in light of changed circumstances or further development of agency experience and expertise.  See American Trucking Assoc., Inc. v. Atchison, T. & S.F.R. Co., 387 U.S. 397, 416 (1967) (finding that "regulatory agencies do not establish rules of conduct to last forever; they are supposed . . . to adapt their rules and practices to the Nation's needs in a volatile, changing economy.  They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday."); Permian Basin Area Rate Cases, 390 U.S. 747, 784 (1968) (stating that

greater detail above and in Defendants' Cross-Motion, USDA has reasonably construed VSTA's broad grant of authority to promulgate regulations "as may be necessary to prevent the preparation, sale, barter, exchange, or shipment" of biological products "for use in the treatment of domestic animals, or otherwise to carry out this chapter," 21 U.S.C. § 154, as authorizing USDA to issue regulations providing for restrictions on the uses for which makers of biological products may sell them and regulations regarding diagnostic tests for animal disease.  See 9 C.F.R. §§ 101.2; 102.5(d).  These regulations on their face are reasonable implementations of VSTA and thus are entitled to deference.

## VI.     VSTA'S LANGUAGE AUTHORIZES REGULATION OF BSE TEST KITS IN PARTICULAR.

### A.     BSE Test Kits Are Analogous Products.

Plaintiff's principal argument underlying its assertion that BSE test kits are not products analogous to viruses, serums, or toxins is that BSE test kits, it believes, do not prevent, treat, or cure disease, instead they merely diagnose the presence of disease.  See Pl.'s Reply and Opp'n at 32-33.  Plaintiff's argument, however, fails to recognize that, under VSTA, BSE test kits do not need to be the same as viruses, serums, or toxins or have the same ultimate purpose; rather they

---

"administrative authorities must be permitted . . . to adapt their rules and policies to the demands of changing circumstances.").  Moreover, USDA has explained that advances in science and technology since 1913 have warranted amendments to its regulations and definitions under VSTA.  See, e.g., 62 Fed. Reg. 31,326, 31,328 (June 9, 1997) (explaining that amendment to update the definition of "biological products" will provide "definitions that reflect current usage and accommodate advances in scientific knowledge."); 47 Fed. Reg. 26,458, 26,459 (June 18, 1982) (stating that development of genetic engineering technology "has introduced a new generation of biological products for use in the treatment of disease in animals.").  Thus, the fact that USDA included diagnostics in its regulatory definitions sixty years after the passage of VSTA merely shows that the agency was appropriately conforming its regulatory approach to advances in technology, and provides no basis for withholding deference to the agency's reasonable interpretations.

need only be "analogous" or similar to these substances.  <u>See</u> Webster's II New College

Dictionary 40 (1995) (defining "analogous" as "[c]orresponding in a way that allows the

drawing of an analogy" and defining "analogy" as "[c]orrespondence in some respects between

otherwise dissimilar things.").  As explained previously by defendants, BSE test kits are similar

to viruses, serums, and toxins in that they involve the interaction of antibodies and antigens to

evoke an immunological response.  <u>See</u> Defendants' Cross-Motion at 40-41; Rippke Decl. ¶ 7.

Plaintiff does not dispute that BSE test kits contain antibodies that interact and bind with

abnormal prion protein antigens.  And plaintiff's own definitions indicate that serums and toxins

also involve the use of antibodies to spur an immunological reaction.  <u>See</u> Pl.'s Motion for

Summary Judgment at 35 n.14 (indicating that serums "contain[] antibodies and [are] used to

transfer immunity to another individual" and that toxins are "capable of inducing neutralizing

antibodies or antitoxins.").

      Plaintiff, instead, focuses on purported differences in purpose between BSE test kits and

viruses, serums, and toxins.  As plaintiff points out, viruses, serums, and toxins generally use

"immunological means to prevent foreign pathogen infections" and BSE test kits use "an

immunologic reagent to detect infectious prion proteins obtained from the body of an infected

host."  <u>See</u> Pl.'s Reply and Opp'n at 32.  Those differences in purpose, however, merely indicate

that these analogous products are not exactly the same.  As explained, the similar methodologies

of using antibodies and antigens to spur an immunological response that BSE test kits, viruses,

serums and toxins employ make them sufficiently similar as to reasonably be considered

"analogous products" under VSTA.[11]  Accordingly, the mere fact that viruses, serums, and toxins are commonly used for the purpose of preventing or curing a disease and that BSE test kits are used to diagnose a disease does not mean that these products are not analogous.[12]

B.    **BSE Test Kits are "Intended for Use in the Treatment of Domestic Animals."**

Plaintiff merely repeats its previous assertions that because there presently is no known cure for BSE and BSE tests are applied to cattle that are already dead simply to diagnose the presence of the disease, BSE tests therefore are not used in the treatment of domestic animals. See Pl.'s Reply and Opp'n at 33-34.  Once again, however, plaintiff overlooks the fact that diagnosis is an inherent aspect of any treatment or, at the very least, is a preliminary step that is *used in* the treatment of a disease or ailment.  See supra § IV; Pegram v. Herdrich, 530 U.S. 211, 228 (2000); Miller v. AT&T Corp., 250 F.3d 820, 830-31 (4th Cir. 2001).  Furthermore, BSE testing also serves to "manage" the disease by allowing the government, through its targeted surveillance testing to estimate the prevalence of the disease in order to evaluate the effectiveness of other mitigation and prevention measures in place.  See Declaration of Lisa Ferguson ("Ferguson Decl.") ¶ 9 (Exhibit 1 to Defendants' Cross-Motion); 9 C.F.R. § 101.2(3) (defining "treatment" to mean "the prevention, *diagnosis*, *management*, or cure of diseases of animals.") (emphasis added).  In addition, by contributing to the knowledge of the disease, BSE

---

[11]  Plaintiff relies heavily on an EPA description of the role of cytokines in the generation or stimulation of an immune system response.  See Pl.'s Reply and Opp'n at 31-32.  Defendants, however, are not claiming that the use of cytokines makes BSE tests analogous to viruses, serums, or toxins.  Instead, as explained, it is the BSE test kits' use of antibodies and antigens and their interaction to evoke an immunological response that makes the test kits analogous to viruses, serums, or toxins.  See Rippke Decl. ¶ 7.

[12]  Furthermore, BSE test kits are used in the "treatment" of disease in the sense that diagnosis is an inherent aspect of any treatment.  See supra § IV; infra § VI.B.

testing, in the long-run, may increase the chances of developing therapies or cures for the disease in the future, and therefore can reasonably be said to be used in the treatment of domestic animals in that manner as well. Rippke Decl. ¶ 10.

Plaintiff also points to USDA's regulation indicating that a product's intended use is determined through an objective standard based on factors evincing the intent of the product's manufacturer. See 9 C.F.R. § 101.2(1). Plaintiff asserts that BSE test kit manufacturers market the test kits to countries that use them in a non-targeted manner on all cattle for slaughter, which USDA believes renders the test kits ineffective for diagnosing the disease. See Pl.'s Reply and Opp'n at 34. Therefore, according to plaintiff, BSE test kits are not intended for use in the treatment of domestic animals. Id. This attenuated argument, however, is unavailing because test kit manufacturers market BSE test kits for the purpose of diagnosing the presence of BSE. The fact that some countries may then use them in an ineffective and worthless manner does not alter the objective intended use of the test kits.[13]    Accordingly, because BSE test kits objectively are intended to be used to diagnose the presence of the disease, and, as demonstrated, diagnosis is an inherent aspect of treatment, BSE test kits are "intended for use in the treatment of domestic animals" as required under VSTA.

   C.    **BSE Test Kits Are Worthless for Use in the Treatment of Domestic Animals When Used to Diagnose BSE in a Non-Targeted Manner on All Slaughter-Aged Cattle.**

Plaintiff argues that it is inconsistent for USDA to assert that BSE test kits are intended

---

    [13]  Plaintiff offers no evidence that BSE test kit manufacturers themselves actually market the test kits to be used for non-targeted testing of all cattle for slaughter, even though some countries may use them that way. In any event, even if the test kits are used in this manner, their *intended* use still is to diagnose the presence of BSE, even though the test kits would not be effective in performing that function on all slaughter-aged cattle. See infra § VI.C.

for use in the treatment of domestic animals yet also claim that they are worthless.  See Pl.'s

Reply and Opp'n at 33, 34.  Plaintiff fails to grasp, however, the simple fact that USDA is not

claiming that BSE test kits are worthless in general, but rather they are worthless when used in

the particular manner proposed by plaintiff – that is, when they are used to test all slaughter-aged

cattle in a non-targeted manner to diagnose the presence of BSE.[14]

      As explained in defendants' prior brief, nearly all cattle that are processed into beef in the

United States are less than 24 months old, but the average incubation period for the BSE disease

is five years, meaning that it typically takes five years from the date a cow is infected with BSE

for the cow to show any outward clinical signs of the disease, such as impaired coordination or

inability to ambulate.  See Defendants' Cross-Motion at 43; Ferguson Decl. ¶ 5.  The earliest

point at which current BSE testing methods can detect a positive case of BSE, however, is only

two to three months before a cow would exhibit clinical signs of the disease.  See Ferguson Decl.

¶ 6; Rippke Decl. ¶ 9.[15]  Accordingly, testing all young normal-looking cattle for slaughter, as

---

    [14]  In other words, USDA is merely regulating sales of BSE test kits to prevent this
particular worthless use of this otherwise effective product.  Products can be useful for some
purposes and worthless for others.  For example, toothpaste is effective when used to clean teeth,
but would be completely worthless if used as arthritic cream.  Here, as explained previously,
BSE test kits are effective at detecting and diagnosing the disease when used on high-risk cattle
exhibiting clinical signs of abnormalities, as in the government's surveillance testing program to
provide an estimate of the prevalence of BSE in the cattle population, and hence are "intended
for use in the treatment of domestic animals" in this manner.  See Defendants' Cross-Motion at
42, 44 n.25.  As explained above, however, BSE tests kits are worthless when used to test all
cattle for slaughter as proposed by plaintiff.

    [15]  Plaintiff asserts that BSE test kits may be able to detect the presence of BSE four to
eight months before clinical signs would appear in an infected cow.  See Pl.'s Reply and Opp'n
at 37.  Plaintiff's assertion, however, is based merely on speculation from the Canadian Food
Inspection Agency regarding one particular 50-month-old cow.  See id.  In any event, even if
BSE test kits in some instances were able to detect BSE four to eight months prior to the onset of
clinical symptoms, that still would not be nearly early enough to justify testing all cattle for

proposed by plaintiff, is virtually useless and offers no animal health (or food safety) benefit

because testing a young infected animal with current BSE test methods would almost certainly

produce a false negative result due to the fact that the disease would not have progressed far

enough to be detectable.  See Ferguson Decl. ¶ 6.[16]

     Plaintiff asserts that its proposed manner of BSE testing is not worthless because many

European countries and Japan conduct extensive BSE testing on normal-looking cattle, and that

France, in particular, started testing all cattle above a certain age, regardless of their outward

symptoms, and discovered more cases of so-called "atypical" BSE infection.  See Pl.'s Reply

---

slaughter, which typically are under 24 months of age, because the average incubation period is
five years (60 months), which plaintiff does not dispute.  See Plaintiff's Response to Defendants'
Statement of Undisputed Material Facts ¶ 1 (dkt. no. 15) (Nov. 6, 2006).

    [16]  For these reasons, the consensus of the international scientific community is that
testing of all cattle for slaughter is not warranted.  See Ferguson Decl. ¶ 6; World Organization
for Animal Health (Office International des Epizooties ("OIE")), Terrestrial Animal Health Code
– 2005, Appendix 3.8.4 Surveillance for Bovine Spongiform Encephalopathy, Article 3.8.4.2
("OIE Animal Health Code") (indicating that "[t]esting of routine slaughter cattle 36 months of
age or less is of relatively little value.") (Exhibit 26 to Defendants' Cross-Motion).
Significantly, plaintiff concedes that this is OIE's position.  See Plaintiff's Response to
Defendants' Statement of Undisputed Material Facts ¶ 8.  In addition, plaintiff's assertion that
BSE test kits are not "ineffective at determining whether concentrations of BSE prions *above the
detection limit of the test* are found in the tested tissue," Pl.'s Reply and Opp'n at 35 n.26
(emphasis added), completely ignores the fact that when the test kits are applied to young,
normal-looking cattle at slaughter, even if one such cow were infected with BSE, it would not
have accumulated a sufficient concentration of BSE prions to be detectable by the tests.  One of
plaintiff's own exhibits confirms this fact.  See Stanley B. Prusiner, "Detecting Mad Cow
Disease," Scientific American (July 2004) at 91 (Exhibit 3 to Plaintiff's Motion for Summary
Judgment) (explaining that "[t]hese [BSE] rapid tests, however, have limitations.  They depend
on [BSE prions] accumulating to detectable amounts – quite often, relatively high levels – in an
animal's brain.  Yet because BSE often takes three to five years to develop, most slaughtered-
aged cattle, which tend to be younger than two years, usually do not test positive, even if they
are infected.  Therefore, these tests are generally most reliable for older bovines, regardless of
whether they look healthy or are 'downers.'").  Thus, in this manner, if plaintiff were allowed to
conduct its own BSE testing and market its beef as "BSE tested," it would give a misleading
impression that its beef was somehow safer than beef that has not been tested.

and Opp'n at 35, 37-38.  The fact that other countries undertake certain testing practices,

however, does not establish that those practices are worthwhile.  As mentioned, the World

Organization for Animal Health ("OIE") has determined that it is not useful to routinely test

slaughter cattle aged 36 months or less.  See supra n.16.  Further, other countries such as Canada

conduct targeted BSE testing of high-risk cattle, not testing of all cattle for slaughter.  See

Attachment B to Detweiler Decl. (Exhibit 10 to Pl.'s Reply and Opp'n).  In any event, most of

the countries plaintiff references only test cattle *over* 24 months of age, not *under* 24 months.

See Pl.'s Reply and Opp'n at 35 ("France, Germany, and Italy currently test all cattle *over* 24

months of age . . . .") (emphasis added).  Plaintiff, however, proposes to test cattle that will

nearly all be *under* 24 months old, since the vast majority of cattle slaughtered in the United

States are younger than 24 months, which plaintiff does not dispute.[17]  See Plaintiff's Response

to Defendants' Statement of Undisputed Material Facts ¶ 2.  As noted, the chances of identifying

the presence of BSE through current testing methods in such slaughter-aged cattle is extremely

low, rendering it impractical.  See Ferguson Decl. ¶¶ 5-6.[18]

---

[17]  Plaintiff indicates that a significant number of the BSE cases discovered in Europe in 2005 (114 of 491) were in healthy-looking cattle tested at slaughter.  See Pl.'s Reply and Opp'n at 35.  Plaintiff fails to disclose, however, that nearly all of these cattle were *over* 30 months old. See Report on the Monitoring and Testing of Ruminants for the Presence of Transmissible Spongiform Encephalopathy (TSE) in the EU in 2005 (Exhibit 9 to Pl.'s Reply and Opp'n) at 8, Table 2 (indicating that the age limit used in the sampling of bovine animals in the "healthy-slaughtered" category was greater than 30 months for nearly every country).  As noted, however, plaintiff proposes to test cattle under 24 months old.

[18]  Plaintiff points out that BSE has been detected in cattle younger than 30 months old. See Pl.'s Reply and Opp'n at 35.  Such instances, however, have been extremely rare.  In the United Kingdom, where the outbreak of BSE was by far most prevalent, only 0.01 percent of the cattle there diagnosed with BSE were under 30 months of age.  Ferguson Decl. ¶ 5.  Further, the cases in which BSE has been detected in cattle less than 30 months of age have occurred primarily in countries with significant levels of circulating infectivity, like the U.K.  Id.

Furthermore, plaintiff's reference to "atypical" BSE infection, which involves asymptomatic cattle being infected with BSE, would not make plaintiff's proposed testing worthwhile because atypical BSE infection generally occurs in older cattle where the BSE prions have reached a detectable level.  See Brown Decl. ¶ 9 (Exhibit 8 to Pl.'s Reply and Opp'n) (indicating that the cases of atypical BSE have been found in older cattle).  Thus, Plaintiff's proposed testing would not be uncovering cases of "atypical" infection because plaintiff would be testing much younger cattle presented at slaughter.

Plaintiff's additional contention that even though its proposed testing may result in some false negatives and thus miss some cases of BSE infection, its testing would be better than having no testing at all is unavailing.  See Pl.'s Reply and Opp'n at 36.  Plaintiff's assertion rests on the assumption that plaintiff's testing would catch a few cases of BSE that otherwise would not be caught, but that assumption is not warranted.  As demonstrated, plaintiff would be testing cattle predominantly under 24 months of age, and the chances of a cow under 24 months-old testing positive for BSE, even if it were infected, are virtually non-existent, due to the limitations of current BSE testing technology.  See supra notes 16 and 18 and accompanying text; Detwiler Decl. ¶ 22 (indicating that the only reported BSE-positive cases of animals under 24 months-old have not been confirmed).[19]

---

Moreover, there has never been a confirmed case of BSE identified in cattle under the age of 24 months.  See Detwiler Decl. ¶ 22 (indicating that two BSE-positive cases of animals under 24 months old in Japan in 2003 still await confirmation).

[19]  While it is true that USDA's program of targeted testing of high-risk cattle could also result in false negatives, see Pl.'s Reply and Opp'n at 36 n.27, the frequency of false negative results would be much lower in targeted testing than in plaintiff's proposed testing of all cattle for slaughter.  See Ferguson Decl. ¶ 6 (explaining that testing targeted cattle is the most efficient method for detecting BSE); OIE Animal Health Code, Article 3.8.4.2 (non-targeted testing of

Finally, plaintiff alleges that simply because its proposal to test all cattle for slaughter might not be cost-effective or might reduce consumer confidence in U.S. beef does not mean that such testing is "worthless," and that just because BSE may be a rare disease does not give USDA statutory authority to regulate BSE test kits.  <u>See</u> Pl.'s Reply and Opp'n at 38-39.  As explained repeatedly herein, however, USDA has established that plaintiff's proposed use of BSE test kits on all cattle for slaughter would be "worthless" due to the prolonged incubation period of the disease and the limitations of current BSE tests to detect the disease in its early stages, not simply because plaintiff's proposed testing would not be cost-effective and would damage consumer confidence in U.S. beef.  <u>See</u> <u>Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. USDA</u>, 415 F.3d 1078, 1099-1100 (9th Cir. 2005) (finding that limitations on current BSE testing methods support USDA's policy against private non-targeted BSE testing of all cattle for slaughter such that policy was not arbitrary and capricious). Similarly, USDA's authority to regulate BSE test kits is not based on the rarity of the disease but rather on the fact that BSE test kits satisfy VSTA's requirement of being "worthless" when they are used for indiscriminate testing of all cattle, as explained above.  Accordingly, USDA acted within its statutory authority by prohibiting manufacturers from selling BSE test kits for use in private non-targeted testing of all cattle for slaughter.

### D.     USDA's Determination That It Has Authority To Regulate BSE Test Kits Is Reasonable And Entitled To Deference.

As explained above, USDA reasonably determined that BSE test kits satisfy the statutory criteria under VSTA.  In doing so, USDA evaluated the available scientific information

---

young cattle is of little value).

regarding both BSE test kit technology and the disease itself and made the determination that

BSE testing of all cattle for slaughter is worthless, unwarranted, and subject to its regulation

under VSTA.  See, e.g., April 9, 2004 USDA Press Release No. 0141.04 (Exhibit 6 to

Defendants' Cross-Motion) (explaining that there is no scientific justification for plaintiff's

proposed use of BSE tests to conduct testing on 100% of its cattle for slaughter).  As shown

previously, there is no significant factual disagreement between plaintiff's experts and

defendant's experts regarding the science behind BSE test kits and how they function.  But to the

extent there is a dispute, the Court should defer to USDA's determinations of highly technical

and scientific issues.  See, e.g., National Committee for the New River, Inc. v. FERC, 373 F.3d

1323, 1327 (D.C. Cir. 2004) (indicating that courts should grant an extreme degree of deference

to an agency's evaluation of scientific data within its technical expertise); Oceana, Inc. v. Evans,

384 F. Supp. 2d 203, 214 (D.D.C. 2005) (explaining that special deference is owed to an

agency's reliance on its own scientific expertise).[20]  At bottom, the dispute between plaintiff and

defendants centers on the interpretation of VSTA's statutory terms, namely "analogous,"

---

[20] In fact, plaintiff's submission of various declarations and exhibits pertaining to scientific information to support its assertions that USDA lacks authority to regulate BSE test kits is an improper attempt to have the Court review material that was not first presented to USDA and to make a de novo determination regarding the validity of USDA's actions.  See, e.g., Declarations of Paul Brown and Linda Detweiler (Exhibits 8 and 10 to Pl.'s Reply and Opp'n). Plaintiff should have presented such evidence at the time it originally sought USDA approval to purchase BSE test kits in 2004 so that these materials could have been made part of the administrative record.  Plaintiff, however, failed to do so, and it cannot now purport to supplement the record before the agency.  Thus, it is improper for the Court to consider this evidence presented for the first time at this stage of the litigation.  See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985) (explaining that "[t]he focal point for judicial review [in actions arising under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court.").  Accordingly, aside from just giving deference to USDA's expertise, the Court should disregard plaintiff's evidentiary submissions altogether.

"treatment," and "worthless," and whether BSE test kits satisfy these criteria. USDA's exercise

of its own scientific expertise and its broad delegation of authority under VSTA dictate that its

interpretation concluding that BSE test kits do satisfy VSTA's criteria is entitled to substantial

deference. See Chevron, 467 U.S. at 843-44; Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1320

(D.C. Cir. 1998) (finding that FDA's determination of what is required to establish "sameness"

for purposes of the Federal Food, Drug, and Cosmetic Act depended on the agency's evaluations

of scientific data within its area of expertise and was thus entitled to a high level of deference

from the court). Furthermore, the Court should not second-guess this expert determination and

substitute its own judgment for the agency's. See Chevron, 467 U.S. at 844 (explaining that "a

court may not substitute its own construction of a statutory provision for a reasonable

interpretation made by the administrator of an agency.").

      Moreover, USDA's official regulation of BSE test kits in Notice No. 04-08, and in a

number of letters denying plaintiff's requests, applied, interpreted, and implemented USDA's

own regulations (9 C.F.R. §§ 102.5(d), 104.1), which carry the force of law by virtue of clearly

delegated authority from Congress, and are entitled to deference even though these BSE test kit

restrictions were not issued pursuant to formalized notice and comment rulemaking procedures.

See United States v. Mead Corp., 533 U.S. 218, 230-31 (2001) (finding that "administrative

implementation of a particular statutory provision qualifies for Chevron deference when it

appears that Congress delegated authority to the agency generally to make rules carrying the

force of law, and that the agency interpretation claiming deference was promulgated in the

exercise of that authority.").[21]  Plaintiff apparently concedes this point because it does not, in its reply and opposition brief, maintain its objection to affording deference to USDA's restrictions on BSE test kits based on their lack of formalized rulemaking.  Accordingly, because USDA reasonably interpreted VSTA and applied its own regulations to impose restrictions on BSE test kits, the Court must accord considerable deference to those restrictions.

## VII.    USDA'S ECONOMIC REASONS FOR REGULATING BSE TEST KITS ARE CONSISTENT WITH VSTA'S PURPOSES.

USDA rejected plaintiff's request for the principal reason that granting it would be inconsistent with USDA's duty "to ensure effective, scientifically sound testing for significant animal diseases," June 1, 2004 Letter from B. Hawks to J. Stewart (Exhibit 8 to Defendants' Cross-Motion), which is entirely consistent with the agency's mandate under VSTA to prevent the sale of biological products for uses that would be worthless in the treatment of domestic animals.  Plaintiff repeats its flat assertion that merely because USDA also referred to economically-based reasons for imposing restrictions on the uses for which BSE test kits can be sold, USDA exceeded its statutory authority under VSTA because, according to plaintiff, VSTA's sole purpose is to protect animal health.  See Pl.'s Reply and Opp'n at 39-40.  Even if plaintiff were correct that VSTA's sole purpose is to promote animal health, which it is not, plaintiff offers no support whatsoever for its proposition that an agency exceeds its textual

---

[21]  The agency's BSE test kits restrictions also warrant substantial deference as agency interpretations of its own regulations.  See, e.g., Capital Network Sys., Inc. v. Federal Communications Comm'n, 28 F.3d 201, 206 (D.C. Cir. 1994) (explaining that "courts accord even greater deference to agency interpretations of agency rules than they do to agency interpretations of ambiguous statutory terms.").

statutory authority if it regulates for purposes in addition to the statute's purpose.[22] To the contrary, as long as the reasons for an agency's actions are not inconsistent with a statute's purpose, the agency's actions remain valid even if undertaken for purposes in addition to the statute's primary purpose. See BDPCS, Inc. v. FCC, 351 F.3d 1177, 1183 (D.C. Cir. 2003) (explaining that "[w]hen an agency offers multiple grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable").

Plaintiff also tries to counter USDA's statement that the policy of limiting BSE testing to government-approved labs for surveillance purposes promotes animal health by arguing that private testing of all healthy-looking younger cattle for slaughter is not harmful to animal health even if it produces misleading results. See Pl.'s Reply and Opp'n at 40. Plaintiff, though, fails to understand that USDA's targeted surveillance testing of high-risk cattle ensures scientifically sound testing to enable the agency to more accurately diagnose the presence or absence of the disease. See Ferguson Decl. ¶ 6. Permitting private testing, such as plaintiff envisions, would

---

[22] As noted in defendants' prior brief, plaintiff's attack on USDA's reasons for denying plaintiff's request to conduct its own private BSE testing fundamentally is a claim under Count 3 of plaintiff's complaint, which asserts that USDA acted arbitrarily and capriciously in prohibiting plaintiff from performing its own BSE testing in violation of 5 U.S.C. § 706(2)(A). See generally Complaint, Count 3, ¶¶ 42-51, ¶ 44 (alleging that VSTA "does not address human health or consumer protection concerns" and "is not concerned with maintaining domestic or international confidence in U.S. livestock or products"). The Court should not consider this claim at this time because the parties agreed that, due to the potentially dispositive nature of the claims in Counts 1 and 2, it would not be necessary to address Count 3 at this time. See Joint Stipulation and Motion Regarding Submission of Cross-Motions for Summary Judgment (dkt. no. 3) (May 24, 2006).

interfere with that objective.[23]  Having more reliable test results allows the government to more

accurately estimate the prevalence of the disease, which enables it to determine the effectiveness

of other mitigation measures in place designed to limit the spread of BSE.  See id. ¶ 9.  Reliably

verifying whether BSE is spreading to other cattle clearly promotes animal health.

       In any event, contrary to plaintiff's claims, VSTA's purpose is not limited solely to

protecting animal health, but rather also includes protecting the economic health of the livestock

industry and the financial interests of farmers and livestock owners in particular.  As explained

previously, see Defendant's Cross-Motion at 50-51, both legislative history and

contemporaneous case law indicate that VSTA was necessary, in part, to protect farmers and

livestock owners from the economic burdens of costly and ineffective serums, toxins, and viruses

and the losses of their livestock to disease.  See Hearing before the Committee on Agriculture on

the Estimates of Appropriations for the Fiscal Year Ending June 30, 1914, (H.R. 28283), 62nd

Cong. 24 (1913) (statement of Dr. A. M. Farrington, Asst. Chief Bureau of Animal Industry,

---

       [23]  Although plaintiff claims that defendants have not explained how plaintiff's proposed
BSE testing would interfere with USDA's surveillance testing, see Pl.'s Reply and Opp'n at 41,
clearly USDA's prohibition against plaintiff's proposed testing removes a source of inaccurate or
misleading test results, thus enhancing the accuracy of the overall results.  In this manner,
forbidding private testing of all cattle for slaughter also serves VSTA's purpose of assuring the
purity, safety, and efficacy of biological products.  See 21 U.S.C. § 154a (providing USDA
authority to issue special licenses "on such conditions as are necessary to assure purity, safety,
and a reasonable expectation of efficacy.").  In addition, preventing plaintiff from conducting its
own private BSE testing and restricting such testing to government labs also ensures that
uniform and consistent procedures are employed to administer the tests, which is another one of
VSTA's purposes.  See S. Rep. No. 99-145 at 339, reprinted in 1985 U.S.C.C.A.N. 1676, 2005
(indicating Congress's explicit recognition in 1985 of "the need for uniform national standards"
in the markets for animal vaccines and related products subject to VSTA; see also Lynbrook
Farms v. SmithKline Beecham Corp., 79 F.3d 620, 625 (7th Cir. 1996) (explaining that
"Congress thus concluded that uniform, federal standards would better serve livestock owners,
veterinarians, and the American public.").

Dept. of Agriculture); Hall v. State, 158 N.W. 362, 363 (Neb. 1916) (stating that the

"Department of Agriculture, realizing the losses that were resulting to hog raisers of the country

from the promiscuous manufacture and distribution of anti-hog cholera serum, secured the

enactment of a law intended to regulate the preparation, sale, and distribution of such serum.").

Plaintiff does not appear to contest the evidence indicating VSTA's concern with

economic issues.[24]  Instead, plaintiff strangely asserts that regulatory actions are not authorized

by a statute just because they are consistent with a statute's purposes.  See Pl.'s Reply and Opp'n

at 42-43.  Defendants, however, are not making such an argument.  As indicated previously in

sections III, IV, V, and VI, defendants have demonstrated that their regulations and restrictions

regarding BSE testing are statutorily authorized by VSTA's language.  In the present section,

defendants merely are explaining that those regulations and restrictions are also consistent with

VSTA's several purposes in response to plaintiff's assertion that they are not.  Defendants have

never asserted that its regulations and restrictions regarding BSE testing are authorized under

VSTA merely because they are consistent with VSTA's purposes.  Accordingly, plaintiff's

argument is completely misplaced and does not alter the fact that USDA's economic

justifications, in addition to its other reasons, for prohibiting private BSE testing of all cattle at

slaughter serve VSTA's various purposes.[25]

─────────────────────

[24]  Curiously, plaintiff even acknowledges that "Congress enacted VSTA in part to protect the economic interests of livestock owners from biological products that would harm their livestock or would be worthless," yet continues to assert that USDA's economically-based reasons for prohibiting private testing of all slaughter-aged cattle for BSE are inappropriate.  See Pl.'s Reply and Opp'n at 42.

[25]  Plaintiff further contends that USDA's claim that its prohibition against private BSE testing of all cattle for slaughter protects consumers from unnecessarily paying more for BSE-tested beef is at odds with its claim that such prohibition serves the economic interests of

## VIII. USDA'S BSE TEST KIT RESTRICTIONS REGULATE CONDUCT NOT COMMERCIAL SPEECH AND THUS DO NOT IMPLICATE ANY FIRST AMENDMENT PROTECTIONS.

Out of left field, in its amicus brief, Wild Oats Markets, Inc. ("Wild Oats") conjures up an extremely attenuated theory alleging that by prohibiting beef processors from conducting their own private BSE testing, USDA is preventing those processors from acquiring information regarding the beef they sell and thereby preventing retailers such as Wild Oats from obtaining that information and then passing that information on to beef consumers in violation of the First Amendment. See Motion for Leave to Appear as *Amicus Curiae* in Opposition to Defendants' Motion for Summary Judgment ("Amicus Brief") (dkt. no. 17) (Nov. 3, 2006) at 4-5. The First Amendment is not nearly so broad, however, and applies only to speech or forms of conduct that are inherently expressive, not conduct itself like BSE testing. See, e.g., Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 126 S. Ct. 1297, 1307, 1310 (2006) (explaining that First Amendment protection extends only to speech and to conduct that is inherently expressive and finding that statute which requires law schools to offer military recruiters the same access to their campuses and students as is provided to nonmilitary recruiters regulated conduct not speech because it affects what the law schools do not what they say and that this conduct was not

---

livestock owners and beef producers. See Pl.'s Reply and Opp'n at 44. To the contrary, banning private BSE testing helps both beef consumers and beef producers because it prevents producers from incurring the increased costs associated with what would be essentially worthless BSE testing, and those costs thus would not be passed on to consumers. Similarly, plaintiff's assertion that USDA's policy against private BSE testing of all cattle for slaughter is designed to favor large meatpackers over smaller ones and that such policy is likely unconstitutional lacks any merit. See Pl.'s Reply and Opp'n at 43-44. A large meatpacker, just as easily as a small one, could wish to charge higher prices for beef under the guise that it has been tested for BSE and is somehow safer than untested beef, but USDA's ban against private BSE testing applies to all meatpackers equally.

inherently expressive) (emphasis in original).  USDA's restrictions on BSE testing affect what

beef producers may <u>do</u> not what they may <u>say</u>.[26]  All of the cases Wild Oats relies upon are

highly distinguishable and involve either direct restraints on various forms of advertising or

clearly expressive conduct.  <u>See, e.g.</u>, <u>Central Hudson Gas & Electric Corp. v. Public Serv.</u>

<u>Comm'n</u>, 447 U.S. 557 (1980) (regulation banned promotional advertising of utility); <u>Virginia</u>

<u>State Bd. of Pharmacy v. Virginia Citizens Consumer Council</u>, 425 U.S. 748 (1976) (statute

declared it unprofessional conduct to advertise prices of prescription drugs); <u>United States v.</u>

<u>O'Brien</u>, 391 U.S. 367 (1967) (burning draft card in protest of war); <u>Zauderer v. Office of</u>

<u>Disciplinary Counsel</u>, 471 U.S. 626 (1985) (prohibitions on lawyer advertising).  Prohibiting

beef-producers from performing a diagnostic test is a restriction on conduct not a restriction on

advertising or other commercial speech.  Accordingly, Wild Oats's First Amendment challenge

to USDA's restrictions on the uses for which BSE test kits may be sold should be rejected out of

hand.

## IX.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT.

Contrary to plaintiff's assertions, defendants have thoroughly demonstrated why they are

entitled to summary judgment in this case.  Defendants have explained that the case is moot and

plaintiff lacks standing to maintain this action, which warrant judgment on all counts in favor of

---

[26]  Indeed, Wild Oats's theory that USDA's regulation of BSE test kits is somehow a restriction on commercial speech would stretch the First Amendment beyond recognition.  Under this theory, any prohibition of conduct related to products or services would prevent the general public from obtaining additional information about those products or services.  Speed limits conceivably would violate the First Amendment because they would prevent car manufacturers from gathering data on how well cars perform going at high rates of speed on public highways, and consumers would be denied such information as well.  First Amendment jurisprudence, however, does not extend that far.

defendants.  Alternatively, at a minimum, in responding to plaintiff's various arguments regarding Counts 1 and 2, defendants have satisfied their burden of establishing that there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law on Counts 1 and 2.  Defendants have demonstrated that the regulations that form the basis for the BSE restrictions are statutorily authorized under VSTA and thus do not violate APA Section 706(2)(C), 5 U.S.C. § 706(2)(C).  Defendants have also established that the particular restrictions on BSE testing themselves are statutorily authorized under VSTA and do not violate APA Section 706(2)(C).  Thus, at a minimum, the Court should grant judgment in favor of defendants on Counts 1 and 2.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment should be denied, and defendants' cross-motion for summary judgment should be granted.

Dated: December 15, 2006               Respectfully submitted,

                                       PETER D. KEISLER
                                       Assistant Attorney General

                                       KEVIN V. RYAN
                                       United States Attorney

                                       /s/ Edward H. White_____
                                       JAMES J. GILLIGAN
                                       EDWARD  H. WHITE (D.C. Bar No. 468531)
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       20 Massachusetts Avenue, N.W.  Room 6110
                                       Washington, D.C. 20530
                                       Tel: (202) 514-5108
                                       Fax: (202) 318-4268
                                       email: ned.white@usdoj.gov

                                       Attorneys for Defendants